IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

ROBERT B. BERGDAHL,

Plaintiff-Appellee-Cross-
Appellant,

v.

UNITED STATES OF AMERICA,

Defendant-Appellant-Cross-
Appellee.

Nos. 24-5150 &
24-5154

**OPPOSITION TO APPELLEE-CROSS-APPELLANT'S MOTION
FOR PARTIAL SUMMARY AFFIRMANCE**

# TABLE OF CONTENTS

**Page**

INTRODUCTION AND SUMMARY ...........................................................1

BACKGROUND ......................................................................................5

ARGUMENT ..........................................................................................11

I.  Summary Affirmance Of The District Court's Judgment
    Vacating A Court-Martial Conviction Is Plainly
    Inappropriate. ..................................................................................13

II. The United States Will Demonstrate On Appeal That The
    District Court Exceeded Its Jurisdiction On Collateral
    Review. ............................................................................................15

II. The United States Will Show On Appeal That The District
    Court Erred Even Within The Framework It Applied. .................25

CONCLUSION .......................................................................................29

CERTIFICATE OF COMPLIANCE

ADDENDUM

# INTRODUCTION AND SUMMARY

Plaintiff Robert "Bowe" Bergdahl, formerly a U.S. Army Sergeant, voluntarily pleaded guilty before a court-martial to desertion and misbehavior before the enemy.  The military judge rejected the prosecution's request for a 14-year prison term and instead imposed a sentence Bergdahl requested—a dishonorable discharge—with no accompanying confinement.  Bergdahl exhausted his direct appeals before the military appellate courts, with two such courts affirming his conviction and sentence, and was subsequently denied *coram nobis* relief.

Unable to overturn his conviction in the military courts Congress entrusted with appellate review of court-martial judgments, Bergdahl sought collateral review of his conviction in district court.  As relevant here, he asserted that the military courts erred under Rule for Courts-Martial (R.C.M.) 902(a), which requires recusal "in any proceeding in which th[e] military judge's impartiality might reasonably be questioned."  The district court agreed with Bergdahl and vacated all rulings of the military courts from the date the purported appearance of conflict arose, including Bergdahl's

judgment of conviction, his final and executed sentence, and the direct appellate proceedings. The United States appealed; Bergdahl cross-appealed seeking broader relief based on a different claim; and Bergdahl moved for summary affirmance in the government's appeal, arguing that only his challenge to the judgment below should be briefed and argued in this Court.

Bergdahl's highly unusual motion is entirely without merit and should be promptly denied. Summary disposition is appropriate only where "the merits of the appeal … are so clear that plenary briefing, oral argument, and the traditional collegiality of the decisional process would not affect [the Court's] decision." *Cascade Broad. Grp. Ltd. v. FCC*, 822 F.2d 1172, 1174 (D.C. Cir. 1987) (per curiam). Bergdahl does not even acknowledge this standard, let alone make any serious attempt to "carr[y] the heavy burden of demonstrating that" this Court can afford this consequential matter "the fullest consideration necessary to a just determination" on the basis of only motions papers. *Id.* (citation omitted).

That consideration alone warrants denial of this motion. But were there any doubt that this Court should order briefing in the

ordinary course, the United States outlines several errors it will establish in its appeal from the district court's extraordinary and unprecedented decision vacating a court-martial judgment. First, that decision far exceeded the district court's jurisdiction. As with challenges to state-court judgments, Congress has not afforded federal district courts jurisdiction to directly review or alter a court-martial judgment. Accordingly, district courts may only grant relief from the *effects* of a military judgment, such as through an order granting release in response to a habeas petition or an award of pay in a back-pay suit. *See Schlesinger v. Councilman*, 420 U.S. 738, 746-47 (1975). The district court's *vacatur* of the court-martial judgment itself went well beyond the district court's jurisdiction. And Bergdahl's reliance on this Court's decision in *In re Al-Nashiri*, 921 F.3d 224 (D.C. Cir. 2019), is misplaced. *Al-Nashiri* did not involve collateral review. Rather, this Court granted a writ of mandamus in aid of its *appellate* jurisdiction to directly review final judgments rendered by Guantanamo military commissions. *See id.* at 233; 10 U.S.C. § 950g(a).

Second, even when considering a properly framed collateral attack on a court-martial judgment, a district court's jurisdiction is limited to considering jurisdictional or fundamental constitutional errors in the proceeding. *See, e.g.*, *Owings v. Secretary of U.S. Air Force*, 447 F.2d 1245, 1261 (D.C. Cir. 1971). The district court here, however, did not find any such error in Bergdahl's court-martial proceeding, identifying only a purported violation of a military recusal rule. Nor could the district court have deemed this purported violation a constitutional error: rules requiring recusal based on an *appearance* of partiality "provide more protection than due process requires." *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 890 (2009). Once again, *Al-Nashiri* offers Bergdahl no aid, as this Court expressly recognized the distinction between the rule-based standard it applied and due process principles. *See* 921 F.3d at 234.

Finally, the district court committed other reversible errors even within the framework it mistakenly applied, including employing the wrong standard of review, disregarding the military courts' determination that Bergdahl defaulted his appearance-of-

partiality claim, and misapprehending the relevance of significant factual differences from *Al-Nashiri*.

These errors plainly warrant a full airing on appeal. This Court should deny the motion and set a plenary briefing schedule permitting the government to explain these and any other errors in the ordinary course.

## BACKGROUND

1. In June 2009, then-Sergeant Bergdahl walked off an observation post in Afghanistan. *United States v. Bergdahl*, 80 M.J. 230, 232 (C.A.A.F. 2020). Hours later, the Taliban captured him, and thousands of U.S. troops searched for him for weeks. *Id.* at 240. Multiple soldiers were injured during that search, some seriously. *Id.* at 240-41. Bergdahl spent five years in Taliban custody before being released in a prisoner exchange. *Id.* at 244.

After Bergdahl's return, he was court-martialed for desertion with intent to shirk hazardous duty and misbehavior before the enemy. 10 U.S.C. §§ 885, 899. Bergdahl twice sought to dismiss the charges against him in light of then-candidate Donald Trump's comments on his case, invoking the military-law doctrine of unlawful command

influence, *id.* § 837(a), which prohibits influence or the appearance of influence over court-martial proceedings by individuals in the chain of command. *See Bergdahl*, 80 M.J. at 236-37. The military judge—Col. Jeffery Nance—denied those motions, noting that as a private citizen, candidate Trump was not part of the chain of command.

On October 16, 2017, Bergdahl pleaded guilty without a plea agreement to misbehavior before the enemy and desertion for a period of one day. Doc. 16-9 at 1631. Judge Nance accepted Bergdahl's pleas, rejecting the government's argument that Bergdahl was liable for desertion for a longer period. *Id.* at 1679-99, 1706.

The same day as Bergdahl's plea hearing, Judge Nance applied to be an immigration judge at the Department of Justice after his military retirement. Addendum (Add.) 16. As his writing sample, Judge Nance used an order denying a motion to dismiss Bergdahl's case based on unlawful command influence. *Id.* The same day, Trump—now President—said in response to a question that although he could not "comment on" Bergdahl, "I think people have heard my comments in the past." *Bergdahl*, 80 M.J. at 238.

Bergdahl filed a third unlawful-command-influence motion, arguing that President Trump had ratified his statements as a candidate. Bergdahl did not seek dismissal, instead urging only that Bergdahl's sentence should "not exceed the sentence of no punishment or at the very least … [should] not include confinement." Doc. 16-9 at 1733-34.

Judge Nance held a hearing on the motion, allowing *voir dire* from the parties. In response to a question about whether the President's statements affected his impartiality, Judge Nance responded "[n]o," stating that he was "a terminal Colonel, which means I'm not going anywhere but the retirement pastures" and that he did not "expect to go anywhere but back home as soon as the Army is done with me in a year." Doc. 16-9 at 1724. Judge Nance denied Bergdahl's motion, explaining he would "consider the President's comments as mitigation evidence" at sentencing. Doc. 16-23 at 2, 4.

Prosecutors requested a 14-year sentence of confinement and a punitive discharge. Doc. 16-12 at 2668-70. Bergdahl offered a statement "accepting responsibility for [his] mistake," Doc. 16-11 at

2155, and his counsel requested a dishonorable discharge, Doc. 16-12 at 2694.

Judge Nance sentenced Bergdahl to be dishonorably discharged, to be reduced in grade, and to forfeit $1,000 pay per month for 10 months.[1] Doc. 16-12 at 2704.

**2.** Bergdahl appealed his conviction and sentence to the Army Court of Criminal Appeals (ACCA) and the Court of Appeals for the Armed Forces (CAAF), both of which affirmed, with the CAAF noting that Judge Nance had shown himself "notably impervious" to "outside forces." *Bergdahl*, 80 M.J. at 244. On the day the CAAF issued its judgment, Bergdahl's counsel submitted a Freedom of Information Act request for Judge Nance's immigration-judge application. Bergdahl sought reconsideration in the CAAF, and after receiving Judge Nance's application, Bergdahl moved to supplement the record with it, asserting for the first time an appearance-of-partiality issue. The CAAF denied

---

[1] No portion of the forfeiture was collected. A court-martial-ordered forfeiture (unlike a fine) is not a debt to the United States and cannot be collected from a discharged individual.

reconsideration without prejudice to Bergdahl seeking a writ of error *coram nobis*.

Bergdahl sought and the ACCA denied the writ, holding that Bergdahl had failed to provide "valid reasons … for not seeking relief earlier." *Bergdahl v. United States*, 2020 WL 7316058, at *2 (A.C.C.A. Dec. 11, 2020). The court noted that while Bergdahl's direct appeal was pending before the ACCA, Judge Nance's immigration-judge appointment "became public knowledge" through a DOJ press release; that this Court had decided *Al-Nashiri*, involving another military judge appointed as an immigration judge in the same press release; and that Bergdahl's counsel had filed an amicus brief in *Al-Nashiri*. *Id.* at *3, *4 n.6. The CAAF denied Bergdahl's writ-appeal petition. 81 M.J. 128 (C.A.A.F. 2021).

**3.** Bergdahl then filed this suit in district court, seeking a declaration "that his conviction and sentence were obtained in violation of the Fifth Amendment, R.C.M. 104(a)(1) and 902, and Rule 2.11 of the Rules of Judicial Conduct for Army Trial and Appellate Judges," and an order that, among other things, "his conviction and sentence be expunged." Doc. 3 at 13-14.

The district court granted Bergdahl summary judgment on the claim that Judge Nance's immigration-judge application created an appearance of partiality requiring recusal under R.C.M. 902(a).

The district court rejected the ACCA's conclusion that Bergdahl failed to timely raise his appearance claim based on its own view of Bergdahl's promptness and the applicable military-court precedents. Add. 51-52, 52 n.14, 54-55. On the merits, the district court acknowledged that R.C.M. 902(a) provides "more specific requirements" than the Constitution, Add. 57, and expressly disclaimed any holding "that there was actual bias in this case," Add. 62. It held only that an "appearance of judicial partiality" existed. Add. 57. The court considered the facts here analogous to *Al-Nashiri*, in which this Court concluded that a military judge presiding over a Guantanamo military commission had an appearance of conflict by virtue of his immigration-judge application. 921 F.3d at 236-37.

The district court held that the appropriate remedy was to "vacate all orders and rulings issued by" Judge Nance from the date he submitted his application, as well as all subsequent appellate orders.

Add. 62, 64.  The district court later clarified that "military proceedings against [Bergdahl] may resume."  Add. 81.

The government appealed.  Bergdahl cross-appealed from an aspect of the judgment denying him relief on his unlawful-command-influence claim, asserting that he is entitled to an order requiring dismissal of the court-martial charges with prejudice.  Mot. 5 & n.3. Bergdahl now moves for summary affirmance of the government's appeal, arguing that briefing is warranted only on his challenge to the judgment below.

## ARGUMENT

Bergdahl's motion for partial summary affirmance should be promptly denied, and this Court should set a briefing schedule permitting both parties to fully air their appeals from the district court's unprecedented judgment in this case.  Bergdahl does not acknowledge, let alone attempt to satisfy, this Court's standard for summary affirmance.  Instead, Bergdahl bases his motion on his own characterization of the United States' as-yet-unbriefed challenge—in which the government seeks to restore a court-martial conviction fully affirmed within the coordinate military-court system—as "the *Al-*

11

*Nashiri* issue," briefly asserting that this case is indistinguishable from *In re Al-Nashiri*, 921 F.3d 224 (D.C. Cir. 2019). Mot. 8-14.

But *Al-Nashiri* does not come close to resolving this case. *Al-Nashiri* did not concern a collateral attack on a court-martial judgment. Rather, it concerned a Guantanamo Bay military commission over which Congress gave this Court direct appellate jurisdiction to review final judgments, including the authority to affirm, reverse, or vacate military-commission judgments based on various types of errors. 10 U.S.C. § 950g(a). This fundamental difference means that *Al-Nashiri* in no way supports the district court's assertion of power to vacate Bergdahl's court-martial judgment or to order any form of relief based on non-constitutional errors. And even beyond these jurisdictional defects, the district court employed a standard of review it acknowledged was more stringent than the Supreme Court has established; disregarded Bergdahl's default before the military courts; and failed to heed material factual differences from *Al-Nashiri*.

## I. Summary Affirmance Of The District Court's Judgment Vacating A Court-Martial Conviction Is Plainly Inappropriate.

Bergdahl's request that this Court summarily affirm the judgment below insofar as the government has challenged it—and thus permit only him to brief a challenge to that judgment—is entirely without merit. As this Court has explained for decades, "[a] party seeking summary disposition bears the heavy burden of establishing that the merits of his case are so clear that expedited action is justified." *Taxpayers Watchdog, Inc. v. Stanley*, 819 F.2d 294, 297-98 (D.C. Cir. 1987) (citation omitted). "To summarily affirm an order of the district court, this [C]ourt must conclude that no benefit will be gained from further briefing and argument of the issues presented," *id.* (citation omitted)—indeed, that full briefing and argument will not "affect [the Court's] decision." *Cascade Broad. Grp. Ltd. v. FCC*, 822 F.2d 1172, 1174 (D.C. Cir. 1987) (per curiam).

Bergdahl neither mentions nor makes any serious attempt to meet this standard. Instead, he devotes much of his motion to matters related to his own cross-appeal, which he contends are "best addressed on plenary briefing." Mot. 2. Bergdahl predicts the United States'

appeal will raise what he calls "the *Al-Nashiri* issue," arguing only briefly that he is "entitle[d] … to relief under *Al-Nashiri*" and asserting summarily that "[n]o purpose would be served by plenary briefing and argument on that issue." Mot. 9-10.

Bergdahl's views do not dictate the arguments the United States will make on appeal, and this Court should not accept his invitation to deprive the government of the opportunity to fully explain the many ways in which *Al-Nashiri* does not control the outcome in this case, which involves fundamental questions regarding district courts' power to disturb convictions fully affirmed through the "military justice system established by Congress," *Schlesinger v. Councilman*, 420 U.S. 738, 753 (1975), as well as what Bergdahl describes as the "highest profile court-martial in decades," Mot. 12. As outlined below, Bergdahl's contention that this case is indistinguishable from *Al-Nashiri* is wrong as a matter of jurisdiction (both the district court's and this Court's) and—even assuming *Al-Nashiri*'s relevance—wrong as a matter of its application to the materially different facts here. The United States should have the opportunity to brief these matters, and any other errors it chooses to raise, in its appeal from the extraordinary

judgment below vacating a coordinate judicial system's criminal conviction.

That Bergdahl believes summarily disposing of the United States' appeal "would facilitate plenary briefing and argument on the [unlawful command influence] issue" *he* wishes to raise, Mot. 9, is hardly a reason to deny the United States a chance to raise and explain the many errors—jurisdictional and otherwise—the district court committed. Indeed, Bergdahl's acknowledgement that the issues presented in the government's appeal and his cross-appeal are "inextricably intertwined," Mot. 11, is a reason enough to deny his motion. And even beyond the entwinement Bergdahl concedes, the United States' jurisdictional objections noted below are equally applicable to the unlawful-command-influence claim Bergdahl indicates he will raise in his cross-appeal. The overlapping issues in the appeal and cross-appeal underscore the impropriety of Bergdahl's request.

## II. The United States Will Demonstrate On Appeal That The District Court Exceeded Its Jurisdiction On Collateral Review.

**A.** District courts lack "jurisdiction directly to review court-martial determinations." *Councilman*, 420 U.S. at 746. Aside from

granting the Supreme Court authority to review decisions of the CAAF by writ of certiorari, 28 U.S.C. § 1259, Congress has never established any process for direct review of court-martial judgments by Article III civilian courts.

Any review of a court-martial judgment by a district court is thus collateral review, as Bergdahl appears to recognize. *See* Mot. i, 1, 5. Collateral review does not act directly on the judgment of a separate court system, such as by vacating it. *See, e.g.*, Restatement of Judgments (First) § 113, cmt. a (1942) ("Apart from statute, a court of equity has no power directly to affect the judgment of another court."). A federal court entertaining a habeas petition from a state prisoner, for example, may order the prisoner's release if his confinement is due to an invalid judgment, but it cannot "revise the state court judgment" itself. *Fay v. Noia*, 372 U.S. 391, 431 (1963), *overruled on other grounds by Wainwright v. Sykes*, 433 U.S. 72, 87-88 (1977).

Collateral review instead may occur within the framework of some other suit in which the judgment is the basis for a claim or defense. As the Supreme Court explained in *Councilman*, collateral review of a court-martial judgment occurs "as a necessary incident to relief

otherwise within the court's power to grant," *i.e.*, the court may decide

that the coordinate court's judgment "must be deemed without res

judicata effect" and "neither justifies nor bars relief from its

consequences." 420 U.S. at 746-47. Thus, a party seeking relief from a

court-martial judgment may bring a suit—such as a habeas petition or

a back-pay action—for which relief would be barred by the preclusive

effect of the court-martial judgment, and can ask a district court to

decide whether that judgment is entitled to preclusive effect. *Id.* at 747-

48 (noting habeas and back-pay remedies). If the military judgment is

invalid—and thus not entitled to preclusive effect—then the district

court is free to grant the collateral relief sought, such as an order of

release (in a habeas petition) or an award of pay (in a back-pay suit).

*Id.*; *see id.* at 752-53 (collateral relief potentially available where

"sought in an action otherwise within the court's subject-matter

jurisdiction, on a ground that recognizes the distinction between direct

and collateral attack, and in a form that the court is able with propriety

to grant").

    **B.** The district court's judgment ignored these limitations.

Bergdahl did not bring any action "otherwise within the district court's

subject-matter jurisdiction," and vacatur is not a remedy "the court is able with propriety to grant." *Councilman*, 420 U.S. at 752. Bergdahl did not (and could not) invoke the habeas statute because he is not in custody, nor did he bring a back-pay action or an injunctive suit against a federal officer. He instead sued the United States, asserting a freestanding challenge directly to his court-martial conviction. No statute provides jurisdiction over such challenges. And for similar reasons, no statute waives the sovereign immunity of the United States—the sole named defendant—in these circumstances.[2] *See, e.g.*, *FDIC v. Meyer*, 510 U.S. 471, 475 (1994).

Bergdahl invoked 28 U.S.C. § 1331, Doc. 3 at 2, but that statute does not provide the necessary waiver of sovereign immunity, nor has it ever been understood to empower a district court to vacate or otherwise alter the judgment of a separate court system. *See Councilman*, 420 U.S. at 746 (observing that district courts lack "jurisdiction directly to

---

[2] The Administrative Procedure Act expressly excludes "courts-martial" from its definition of "agency," 5 U.S.C. § 701(b)(1)(F), and thus its waiver of sovereign immunity for non-monetary suits involving claims that an "agency or an officer or employee thereof acted or failed to act in an official capacity," 5 U.S.C. § 702, does not apply. *See, e.g.*, *McKinney v. White*, 291 F.3d 851, 854-55 (D.C. Cir. 2002).

review court-martial determinations"). Section 1331 grants district courts "original jurisdiction" over civil actions, while the act of reversing or revising the judgment of a state or military court is an exercise of *appellate* jurisdiction. *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284-87, 291-92 (2005); *see Ortiz v. United States*, 585 U.S. 427, 437 (2018) (explaining that the "essential criterion of appellate jurisdiction" is "that it revises and corrects the proceedings in a cause already instituted, and does not create that cause"). And on the exceedingly rare occasions when Article III courts have found military judgments invalid, they have done so in the course of granting other relief under a specific grant of jurisdiction. *See, e.g.*, *Homcy v. Resor*, 455 F.2d 1345, 1347, 1349 (D.C. Cir. 1971) (granting relief on review of an administrative refusal to correct military records and change the character of a discharge); *see also Davies v. Clifford*, 393 F.2d 496, 497 (1st Cir. 1968) (refusing to grant declaratory judgment to "void the [court-martial] conviction" because "[w]e have no jurisdiction to review the Court of Military Appeals").

**C.** The district court also exceeded its jurisdiction by granting relief based on the military courts' purported violation of a military

19

recusal rule. Even where a district court has subject-matter jurisdiction to determine the validity of a court-martial judgment through a proper collateral attack, that jurisdiction confers only limited power to disregard that judgment. "Military law, like state law, is a jurisprudence which exists separate and apart from the law which governs in our federal judicial establishment," and thus "the inquiry, the scope of matters open for review, has always been more narrow than in civil cases." *Burns v. Wilson*, 346 U.S. 137, 139-40 (1953) (plurality op.). And specifically in the context of non-custodial collateral challenges (*i.e.*, matters other than habeas petitions), judgments should not be disregarded absent "lack of jurisdiction or some other equally fundamental defect" that renders the judgment "void." *Councilman*, 420 U.S. at 747, 753.

The Supreme Court and this Court have accordingly understood collateral review of court-martial judgments as limited to jurisdictional or fundamental constitutional errors in military proceedings. The Supreme Court has repeatedly refused to entertain arguments "not of constitutional significance," as such arguments "are beyond [the Court's] scope of review." *Parker v. Levy*, 417 U.S. 733, 761 (1974)

(citation omitted); *accord Augenblick v. United States*, 393 U.S. 348, 351-52 (1969); *Fowler v. Wilkinson*, 353 U.S. 583, 585 (1957); *Burns*, 346 U.S. at 145 n.12. This Court has likewise explained that a collateral attack "requires proof of a constitutional defect in the court-martial proceedings," *Owings v. Secretary of the Air Force*, 447 F.2d 1245, 1261 (D.C. Cir. 1971), and that arguments that a court-martial conviction or sentence violated military law "are not proper subjects for this court's review," *Priest v. Secretary of Navy*, 570 F.2d 1013, 1019 (D.C. Cir. 1977).

Although Bergdahl's motion indicates he may recognize this limitation—urging, as below, that he was deprived of "due process," Mot. 1—the district court did not find any constitutional error in the military proceedings. The court held only that Judge Nance's conduct gave rise to an appearance of partiality under a court-martial rule, R.C.M. 902(a). Add. 57-58. Even assuming that were correct, it would not show constitutional error. "[N]ot '[a]ll questions of judicial qualification … involve constitutional validity.'" *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 820 (1986) (quoting *Tumey v. Ohio*, 273 U.S. 510, 523 (1927)). The Due Process Clause requires recusal only in limited

circumstances "in which experience teaches that the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable." *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 877 (2009). The circumstances required to clear that bar are extreme, such as where a judge has a "direct, personal, substantial, pecuniary interest" in a case, *Tumey*, 273 U.S. at 523, a judge has been personally involved in the case, *e.g.*, *Williams v. Pennsylvania*, 579 U.S. 1, 11 (2016), or in "extreme" and "extraordinary" circumstances where a contributor with a foreseeable case before a judge made massive expenditures to aid that judge's election campaign, *Caperton*, 556 U.S. at 884-85, 887.

Modern recusal requirements—including R.C.M. 902—thus "provide more protection than due process requires." *Caperton*, 556 U.S. at 890. Recusal requirements based on a mere *appearance* of partiality are paradigmatic examples of such prophylactic rules. No such requirement existed in federal law until 1974, when 28 U.S.C. § 455(a) added an "entirely new 'catchall'" requirement now paralleled in R.C.M. 902(a). *Liteky v. United States*, 510 U.S. 540, 548 (1994). Moreover, appearance issues are waivable by the parties, *see* 28 U.S.C.

§ 455(e); R.C.M. 902(e), undermining any suggestion that they create circumstances where "the probability of actual bias … is too high to be constitutionally tolerable." *Caperton*, 556 U.S. at 877.

The district court acknowledged that R.C.M. 902(a) provides "more specific requirements" than those imposed by the Constitution, never suggesting that the asserted violation rose to the level of a constitutional violation. Add. 57. And with good reason, as Judge Nance's conduct did not remotely approach the circumstances in which due process has been held to require recusal.

**D.** *Al-Nashiri* does not address any of the issues above because *Al-Nashiri* arose from a Guantanamo Bay military commission proceeding. Those proceedings are unique: although a military judge presides, Congress gave this Court "[e]xclusive appellate jurisdiction … to determine the validity of a final judgment rendered by a military commission." 10 U.S.C. § 950g(a). As *Al-Nashiri* explained, "jurisdiction to consider mandamus petitions seeking judicial disqualification" within military-commission proceedings existed because of that grant of appellate jurisdiction over the final military-commission judgment. 921 F.3d at 233. Because this Court has direct

appellate jurisdiction to review final judgments of the military commissions, it is empowered to issue extraordinary writs to vacate interlocutory rulings where the mandamus standard is met. And because § 950g(a)'s jurisdictional grant contains no limitations on the types of law that this Court can consider, nothing constrains this Court from considering the proper application of military law or rules in military-commission proceedings. Thus, in *Al-Nashiri*, this Court was able to grant mandamus relief based on a military commissions rule requiring recusal, despite that rule "provid[ing] more protection than due process requires." 921 F.3d at 234.

*Al-Nashiri* thus says nothing about whether the district court here had jurisdiction to vacate military judgments on collateral review. Nor does it afford any support to the district court's assumption it had jurisdiction to afford relief based on the violation of a court-martial rule, rather than limiting its collateral-review inquiry to jurisdictional or fundamental constitutional errors in the court-martial proceedings. *See Owings*, 447 F.2d at 1261. Accordingly, even apart from the district

court's more finely grained errors in applying *Al-Nashiri*, *see infra* pp. 27-29, *Al-Nashiri* cannot serve as a basis for summary affirmance here.

## II. The United States Will Show On Appeal That The District Court Erred Even Within The Framework It Applied.

Even if the district court had jurisdiction to entertain a military-rule-based error on collateral review in this suit, the district court committed multiple additional errors that warrant full briefing.

First, the district court applied what it recognized to be the wrong standard of review. The district court applied a standard articulated by the Supreme Court for habeas review of military convictions in *Burns v. Wilson*, 346 U.S. 137 (1953), under which the court examines whether the military courts have given "full and fair consideration" to the petitioner's claims. Add. 24. The court acknowledged that the standard for *noncustodial* collateral attacks is drawn from *Councilman*, and permits relief only where a military judgment is so fundamentally flawed as to be "void." *Id.* The district court stated it would use "the 'full and fair consideration' test" because it "is the less deferential of the two, and thus, court-martial proceedings that satisfy this standard will also necessarily satisfy the 'void' standard." Add. 25.

Having decided that Bergdahl's court-martial proceedings did *not* meet this "less deferential" *Burns* standard, the district court could not simply ignore the question—which this Court has repeatedly reserved—about how the *Burns* and *Councilman* standards differ. *E.g.*, *Sanford v. United States*, 586 F.3d 28, 31-33 (D.C. Cir. 2009). That error is particularly glaring because *Councilman* makes clear that "grounds of impeachment cognizable in habeas proceedings may not be sufficient to warrant other forms of collateral relief." *Id.* at 753. *Al-Nashiri* says nothing about this question because *Al-Nashiri* did not involve collateral review.

*Al-Nashiri* also has no bearing on the district court's erroneous decision to overlook Bergdahl's default of his appearance-of-partiality claim before the military courts. The ACCA held that Bergdahl had failed to timely raise this issue, which would ordinarily preclude raising it in a collateral attack. In habeas, for example, a petitioner may raise a procedurally defaulted claim only by demonstrating cause for the default and actual prejudice resulting from the purported error. *Francis v. Henderson*, 425 U.S. 536, 542 (1976); *see Lips v. Commandant*, 997 F.2d 808, 812 (10th Cir. 1993) (applying same

26

standard in military habeas).  The district court conducted no such analysis.  And not only was the ACCA's conclusion reasonable, Bergdahl cannot plausibly show actual prejudice: he voluntarily pleaded guilty, accepted responsibility for the offenses to which he pleaded, and received the non-custodial sentence he requested.

The district court's mistaken application of *Al-Nashiri* would not warrant summary affirmance even on its own terms.  A full discussion of the reasons *Al-Nashiri* factually differs must await plenary briefing.  But a central component of *Al-Nashiri*'s conclusion that the military judge there should have disclosed his immigration-judge application was that the Attorney General is both the official with ultimate hiring authority over immigration judges and—unlike in courts-martial—a party to a military-commission proceeding.  921 F.3d at 235-37.  This Court has declined to extend *Al-Nashiri* where both conditions are not satisfied.  *See In re Al-Tamir*, 993 F.3d 906, 916 (D.C. Cir. 2021) (denying mandamus where a military commissions law clerk accepted an AUSA position because it was not "clear and indisputable" that an AUSA "is employed by the Attorney General in the same sense as is an immigration judge").  And here, the relationship between the military

proceeding and the hiring authority is even more attenuated: the district court believed that President Trump had an interest in the proceeding, but he was neither a party to the court-martial nor responsible for selecting immigration judges.[3]

Moreover, *Al-Nashiri* vacated the military-commission judge's rulings based on the factors from *Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847 (1988). *See Al-Nashiri*, 921 F.3d at 239-40. But those factors—developed for addressing appearance issues within federal courts—have never been applied by this Court or any other to vacate the judgments of a separate court system. Those factors would need to be weighed in light of the comity and finality interests such an assertion of authority implicates. *See id.* at 240 (stating that costs of vacatur there were not "intolerabl[e]" given the "pre-trial stage"). And that is particularly true given the absence of any indication that the purported appearance issue resulted in actual

---

[3] Moreover, the district court here acknowledged that Judge Nance's statements about his retirement plans—on which Bergdahl heavily relies, Mot. 10-13—could "just as likely" be understood in context as referring solely to his intent "to retire from the military." Add. 52 n.15.

prejudice to Bergdahl.  *See id.* at 239 (noting "risk of injustice to the parties" as one factor).

## CONCLUSION

For the foregoing reasons, the motion should be denied.

Respectfully submitted,

BRIAN M. BOYNTON
  *Acting Assistant Attorney*
  *General*
MELISSA N. PATTERSON

  *s/ Brad Hinshelwood*
BRAD HINSHELWOOD
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7256*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-7823*
  *bradley.a.hinshelwood@usdoj.gov*

August 2024

**CERTIFICATE OF COMPLIANCE**

This response complies with the type-volume limit of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 5,198 words. This motion also complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 27(d)(1)(E) and 32(a)(5)-(6) because it was prepared using Microsoft Word 2016 in Century Schoolbook 14-point font, a proportionally spaced typeface.

*s/ Brad Hinshelwood*
Brad Hinshelwood

# ADDENDUM

# TABLE OF CONTENTS

Memorandum Opinion on Summary Judgment
(Doc. 25) (July 25, 2023).............................................................. Add. 1

Order (Doc. 26) (July 25, 2023) ...................................................... Add. 64

Memorandum Opinion on Reconsideration
(Doc. 40) (May 23, 2024).......................................................... Add. 66

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| ROBERT B. BERGDAHL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 21-418 (RBW) |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>MEMORANDUM OPINION</u>

The plaintiff, Robert B. Bergdahl, brings this civil action against the defendant, the

United States of America, seeking collateral review of his conviction by a general court-martial,

<u>see</u> Amended Complaint for Declaratory and Injunctive Relief ("Am. Compl.") at 1, ECF No. 3,

pursuant to the Due Process Clause of the Fifth Amendment of the United States Constitution,

<u>see</u> <u>id.</u> ¶ 1; the Rules for Courts-Martial ("R.C.M.") 104(a)(1) and 902, <u>see</u> <u>id.</u>; and "Rule 2.11 of

the binding Rules of Judicial Conduct for Army Trial and Appellate Judges[,]" <u>id.</u>  Currently

pending before the Court are (1) the Defendant's Motion to Dismiss ("Def.'s Mot." or the

"defendant's motion"), ECF No. 16, and (2) the Plaintiff's Cross-Motion for Summary Judgment

("Pl.'s Mot." or the "plaintiff's motion"), ECF No. 18.  Upon careful consideration of the parties'

submissions,[1] the Court concludes for the following reasons that it must grant in part and deny in

---

[1] In addition to the filings already identified, the Court considered the following submissions in rendering its decision: (1) the Defendant's Memorandum of Points and Authorities in Support of Defendant's Motion to Dismiss the Amended Complaint ("Def.'s Mem."), ECF No. 16-1; (2) the Plaintiff's Opposition to Defendant's Motion to Dismiss and Memorandum in Support of Cross-Motion for Summary Judgment ("Pl.'s Mem."), ECF No. 17; (3) the Plaintiff's Statement of Material Facts ("Pl.'s Facts"), ECF No. 18-1; (4) the Defendant's Combined Reply in Support of Its Motion to Dismiss and Opposition to Plaintiff's Summary Judgment Motion ("Def.'s Reply"), ECF No. 21; (5) the Defendant's Response to Plaintiff's Statement of Material Facts ("Def.'s Resp. to Pl.'s Facts"), ECF No. 21-4; and (6) the Plaintiff's Reply to Defendant's Opposition to Cross-Motion for Summary Judgment ("Pl.'s Reply"), ECF No. 23.

part the defendant's motion to dismiss and grant in part and deny in part the plaintiff's motion

for summary judgment.

# I.     BACKGROUND

## A.     Legal Framework

"In the exercise of its authority over the armed forces, Congress has long provided for

specialized military courts to adjudicate charges against service members." Ortiz v. United

States, __ U.S. __, 138 S. Ct. 2165, 2170 (2018).  These courts "form[] part of an integrated

'court-martial system' that closely resembles civilian structures of justice."  Id.  Under the

Uniform Code of Military Justice ("UCMJ"), a general court-martial may be "convened" against

a service member by any of the authorities set forth in 10 U.S.C. § 822, including "the President

of the United States[,]" "the Secretary of Defense[,]" and any of the statutorily designated

"commanding officer[s.]"  10 U.S.C. § 822(a).  Once charges are brought by a convening

authority, "[a] military judge shall be detailed to . . . [preside over the] court-martial[,]" id.

§ 826(a), which consists of "an officer-led tribunal . . . [tasked with] determin[ing the service

member's] guilt or innocence and levy[ing] appropriate punishment, up to lifetime imprisonment

or execution[,]" Ortiz, 138 S. Ct. at 2171 (citing 10 U.S.C. §§ 816, 818).  The service member,

"knowing the identity of the military judge and after consultation with defense counsel, [may]

request[] . . . a court composed of a military judge alone[.]"  10 U.S.C. § 816(b)(3).

An adverse decision issued against a member of the military as part of a court-martial

proceeding is subject to multiple levels of judicial review.  First, a service member may appeal a

"judgment of a court-martial . . . that includes a finding of guilty[,]" id. § 866(b)(1)(A), to a

"Court of Criminal Appeals [('CCA')] which shall be composed of one or more panels, and each

such panel shall be composed of not less than three appellate military judges[,]" id. § 866(a)(1).

The decision of the CCA may then be appealed to the United States Court of Appeals for the

Armed Forces ("CAAF").  See id. § 867(a)(3) ("The [CAAF] shall review the record in . . . all

cases reviewed by a [CCA] in which, upon petition of the accused and on good cause shown, the

[CAAF] has granted a review.").  Following the CAAF's review, the Supreme Court of the

United States "possesses statutory authority to step in afterward . . . by writ of certiorari[,]"

Ortiz, 138 S. Ct. at 2171 (citing 28 U.S.C. § 1259).  Finally, a service member may collaterally

attack his or her court-martial conviction in a federal district court, regardless of whether the

service member is in custody.  See Schlesinger v. Councilman, 420 U.S. 738, 745 (1975) (ruling

that the district court's power to preside over collateral attacks of court-martial convictions was

not limited to proceedings for writs of habeas corpus).

## B.    Factual & Procedural Background

In this case, the plaintiff "is a soldier in the U.S. Army[,]" Am. Compl. ¶ 3, who was

stationed in Afghanistan in 2009, when the events that resulted in his court-martial began, see

Pl.'s Facts ¶ 6; Def.'s Resp. to Pl.'s Facts ¶ 6.

### 1.    The Plaintiff's Capture by the Taliban and Return to the United States

"Around midnight on June 29, 2009, the plaintiff left [his post] without authority . . . to

hike overland to Sharana[,]" Pl.'s Facts ¶ 7; see Def.'s Resp. to Pl.'s Facts ¶ 7, "hop[ing] to

report [what he alleged were] unit leadership issues that he believed to be severe and life-

threatening, to a general officer[,]" Pl.'s Facts ¶ 11; see Def.'s Resp. to Pl.'s Facts ¶ 11.  "Before

he could reach Sharana, the plaintiff was abducted by members of the Haqqani network, a group

of guerrilla fighters loosely affiliated with the Taliban."  Pl.'s Facts ¶ 15; see Def.'s Resp. to Pl.'s

Facts ¶ 15.  The plaintiff was subsequently "held captive by the enemy for five years under

'abominable' and 'brutal' conditions."  Pl.'s Facts ¶ 16; see Def.'s Resp. to Pl.'s Facts ¶ 16.

Throughout the course of his captivity, he "complied with the Code of Conduct for Members of

the Armed Forces of the United States[,]"[2] Pl.'s Facts ¶ 19; see Def.'s Resp. to Pl.'s Facts ¶ 19,

and tried to escape multiple times, see Pl.'s Facts ¶¶ 20–22, 24–26; Def.'s Resp. to Pl.'s Facts

¶¶ 20–22, 24–26.  After enduring prolonged and severe torture for approximately five years in

captivity, "[t]he plaintiff was returned to United States control on May 31, 2014, as part of a

prisoner exchange involving five Taliban leaders who were being detained [by the United States]

at Guantánamo Bay, Cuba."  Pl.'s Facts ¶ 35; see Def.'s Resp. to Pl.'s Facts ¶ 35.  Upon his

return to the United States, "the plaintiff provided significant intelligence to the Army[,]" Pl.'s

Facts ¶ 36; see Def.'s Resp. to Pl.'s Facts ¶ 36, which "was later incorporated into Army training

programs[,]" Pl.'s Facts ¶ 38; see Def.'s Resp. to Pl.'s Facts ¶ 38.

## 2.  The Plaintiff's Court-Martial

On March 25, 2015, the U.S. Army brought charges against the plaintiff.  See Pl.'s Mem.,

Exhibit ("Ex.") 28 (Charge Sheet) at 31–32, ECF No. 17-11.  And, from 2015 to 2017, "the

Army prosecuted the plaintiff before a general court-martial at Fort Bragg, North Carolina, on

charges of desertion and misbehavior before the enemy."  Pl.'s Facts ¶ 46; see Def.'s Resp. to

Pl.'s Facts ¶ 46.  "The court-martial was convened by an Army general in charge of U.S. Army

Forces Command[.]"  Pl.'s Facts ¶ 48; see Def.'s Resp. to Pl.'s Facts ¶ 48.

---

[2] Article III of the Code of Conduct for Members of the Armed Forces of the United States provides that a prisoner of war must "continue to resist by all means available[,] . . . make every effort to escape and aid others to escape[,] . . . [and] accept neither parole nor special favors from the enemy."  Art. III, Code of Conduct for Members of the Armed Forces of the United States, Exec. Order No. 10,631, 20 Fed. Reg. 6,057 (Aug. 17, 1955).  Article IV of the Code provides that a prisoner of war must "keep faith with [his or her] fellow prisoners . . . [and] give no information or take part in any action which might be harmful to [his or her] comrades."  Art. IV, Code of Conduct for Members of the Armed Forces of the United States.  And, Article V of the Code provides that a prisoner of war must, "[w]hen questioned, . . . give name, rank, service number, and date of birth[,] . . . evade answering further questions to the utmost of [his or her] ability[,] . . . [and] make no oral or written statements disloyal to [his or her] country and its allies or harmful to their cause."  Art. V, Code of Conduct for Members of the Armed Forces of the United States, as amended by Exec. Order No. 12,017, 42 Fed. Reg. 57,941 (Nov. 3, 1977).

i.    **The Plaintiff's First and Second Unlawful Command Influence Motions**

During the plaintiff's court-martial proceedings, he filed three motions to dismiss alleging unlawful command influence, which were all denied.  <u>See</u> Def.'s Mot., Ex. 5 (Findings of Fact, Conclusions of Law and Ruling – Defense Motion to Dismiss and, in any Event, to Limit the Sentence That May be Adjudged to No Punishment ("1st UCI Ruling")) at 1, ECF No. 16-17; <u>id.</u>, Ex. 8 (Findings of Fact, Conclusions of Law and Ruling – Defense Motion to Dismiss for Unlawful Command Influence ("2d UCI Ruling")) at 1, ECF No. 16-20; <u>id.</u>, Ex. 11 (Findings of Fact, Conclusions of Law and Ruling – Defense Renewed Motion to Dismiss for Unlawful Command Influence ("3d UCI Ruling")) at 1, ECF No. 16-23.  One of the plaintiff's allegations of unlawful command influence "ar[ose] from words and deeds of [now-deceased ]Senator [John] McCain and two ar[ose] from words and deeds of former President [Donald] Trump."  Am. Compl. ¶ 32.

At the time of the plaintiff's court-martial, Senator McCain was the Chairman of the Senate Armed Services Committee.  <u>See</u> Pl.'s Facts ¶ 75; Def.'s Resp. to Pl.'s Facts ¶ 75.  "Three days after the plaintiff's return from captivity, Senator McCain . . . announced his displeasure with the prisoner exchange negotiated by the Obama administration[,]" Pl.'s Facts ¶ 76; <u>see</u> Def.'s Resp. to Pl.'s Facts ¶ 76, stating, "'this decision to bring [the plaintiff] home[—]and we applaud that he is home[—]is ill-founded . . . [. I]t is a mistake, and it is putting lives of American servicemen and wom[e]n at risk.  And that to me is unacceptable[,]'" Pl.'s Facts ¶ 76 (first and fifth alterations in original); <u>see</u> Def.'s Resp. to Pl.'s Facts ¶ 76.  Furthermore, after an Army general "who had conducted an extensive investigation and interviewed the plaintiff at length testified that confinement 'would be inappropriate[,]'" Pl.'s Facts ¶ 82; <u>see</u> Def.'s Resp. to Pl.'s Facts ¶ 82, and "recommend[ed] [ ] a special court-martial not empowered to impose a jail sentence or punitive discharge[,]" Pl.'s Facts ¶ 83; <u>see</u> Def.'s Resp. to Pl.'s Facts ¶ 83, McCain

stated, "'[i]f it comes out that [the plaintiff] has no punishment, we're going to have to have a hearing in the Senate Armed Services Committee,' adding that the plaintiff . . . 'is clearly a deserter[,]'" Pl.'s Facts ¶ 83; see Def.'s Resp. to Pl.'s Facts ¶ 83.  Thus, the plaintiff

> move[d] th[e] [military c]ourt to dismiss the charges against [him] with prejudice because Senator John McCain and Mr. Steve Barney (General Counsel to the Senate Armed Services Committee (['·]SASC[']·)) made public and other comments indicating that [the plaintiff] was a deserter and that if he wasn't court-martialed and sent to jail the SASC would hold hearings to determine why.

Def.'s Mot., Ex. 5 (1st UCI Ruling) ¶ 1.  However, the military judge presiding over the plaintiff's court-martial denied the motion, concluding that even if Senator McCain were subject to Article 37, under the provision of the UCMJ governing unlawful command influence, no actual unlawful command influence[3] existed because "the executive, not the legislative branch, has civilian command authority over the military" and "no member of congress, not even the Chairman of the SASC, holds command authority over the military."  Id., Ex. 5 (1st UCI Ruling) ¶ 11.  Furthermore, the military judge concluded that no apparent unlawful command influence[4] existed because "[n]o reasonable member of the public knowing that Senator McCain has absolutely no command authority or color of command authority over [the plaintiff's] court-martial . . . could ever reasonably conclude that the proceedings were unfair—no matter what he said or did."  Id., Ex. 5 (1st UCI Ruling) ¶ 12.

---

[3] The military judge noted that "[unlawful command influence] can occur in one of two ways[:] either through [(]1) [a]ctual [unlawful command influence] or [(]2) apparent [unlawful command influence]."  Def.'s Mot., Ex. 5 (1st UCI Ruling) ¶ 4.  Furthermore, the military judge generally defined actual unlawful command influence as "cover[ing] a multitude of situations in which superiors have unlawfully controlled the actions of subordinates in the exercise of their duties under the UCMJ."  Id., Ex. 5 (1st UCI Ruling) ¶ 4 (quoting United States v. Hamilton, 41 M.J. 32, 36 (C.M.A. 1994)).

[4] The military judge noted that "even if there is no actual [unlawful command influence], there may still be apparent [unlawful command influence.]"  Def.'s Mot., Ex. 5 (1st UCI Ruling) ¶ 4.  And, in determining whether there is apparent unlawful command influence, "the focus must be on the 'perception of fairness in the military justice system as viewed through the eyes of a reasonable member of the public[,]'" i.e., "whether an 'objective, disinterested observer fully informed of all the facts and circumstances would harbor a significant doubt about the fairness of the proceeding.'"  Id., Ex. 5 (1st UCI Ruling) ¶ 4 (quoting United States v. Lewis, 63 M.J. 405, 416 (C.A.A.F. 2006)).

As to the plaintiff's second unlawful command influence motion, which concerned comments made by former President Trump, "[b]efore and during the 2016 presidential campaign, candidate [ ] Trump repeatedly vilified the plaintiff, describing him as a traitor at numerous rallies, and suggesting, among other things, that he be executed."  Pl.'s Facts ¶ 90; see Def.'s Resp. to Pl.'s Facts ¶ 90.  Specifically, prior to the plaintiff's filing of his first unlawful command influence motion, former President Trump "asserted[ that the plaintiff] 'went to the other side' and 'negotiated with terrorists[,]'" Pl.'s Facts ¶ 91; see Def.'s Resp. to Pl.'s Facts ¶ 91, and that the plaintiff "was 'the worst,' 'no good,' '[a] bum,' a 'whack job,' '[a] piece of garbage,' a 'son of a bitch,' and 'a very bad person who killed six people[,]'" Pl.'s Facts ¶ 92; see Def.'s Resp. to Pl.'s Facts ¶ 92.  Former President Trump further stated that "deserters used to be shot, implying and at times saying outright that the plaintiff deserved the death penalty[,]" Pl.'s Facts ¶ 94; see Def's Resp. to Pl.'s Facts ¶ 94, and in the context of these types of remarks, "pantomimed executions by rifle and pistol shot, complete with sounds effects[,]" Pl.'s Facts ¶ 95; see Def.'s Resp. to Pl.'s Facts ¶ 95.  Thus, the plaintiff "move[d] th[e] [military c]ourt to dismiss the charges against him because" former President Trump, then

> a candidate for President of the United States, . . . made numerous public comments describing him as a deserter, a traitor, responsible for the death of five or six soldiers and many other similar comments disparaging of the [plaintiff] personally as well as expressing an opinion about his guilt and promising that, if the accused didn't get jail time and [former President] Trump were elected President, he would review the case.

Def.'s Mot., Ex. 8 (2d UCI Ruling) ¶ 1.  However, the military judge presiding over the plaintiff's court-martial denied the motion, concluding that even though "[former President] Trump's comments were disturbing and disappointing[,] [ ] they do not rise to the level of 'some evidence' [of unlawful command influence] required for the [plaintiff] to meet his initial burden [of proof,]" namely because "the statements of a private citizen, even if running for President,

cannot be unlawful command or influence." <u>Id.</u>, Ex. 8 (2d UCI Ruling) ¶ 11.  Furthermore, the military court opined that "[a]ssuming, for the sake of argument, that the [plaintiff] ha[d] met [his] initial burden," the government still met its burden to prove beyond a reasonable doubt that there was no [unlawful command influence] or that any [unlawful command influence] w[ould] not taint [the plaintiff's] proceedings." <u>Id.</u>, Ex. 8 (2d UCI Ruling) ¶ 12.  Specifically, the military court stated that "[i]t is simply not logical, meaning reasonable, to conclude that because [former President Trump] made those statements when he was running for office in a heated and contentious campaign, now that he is President, the [plaintiff] cannot possibly receive a fair trial" because "[t]he reasonable observer would know that his comments were typical campaign rhetoric[.]" <u>Id.</u>, Ex. 8 (2d UCI Ruling) ¶ 13.  But, "recogniz[ing] that this is an unusual case, perhaps unique in all the annals of justice," the military judge "require[d] the parties to submit a member's questionnaire on these issues which w[ould] be provided to the members well in advance of trial and returned for review by the parties well prior to <u>voir dire</u>[,]" and "allow[ed] very liberal <u>voir dire</u> on this topic." <u>Id.</u>, Ex. 8 (2d UCI Ruling) ¶ 15.

**ii.    The Plaintiff's Third Unlawful Command Influence Motion**

"On October 16, 2017, without waiving his [unlawful command influence] claims and without a pretrial agreement, the plaintiff pleaded guilty to misbehavior before the enemy and a one-day desertion[.]"  Pl.'s Facts ¶ 60; <u>see</u> Def.'s Resp. to Pl.'s Facts ¶ 60.  "Shortly thereafter on that same day, former President Trump[,]" who had since taken office as President,

> stated, in the course of a Rose Garden news conference with then[-]Senate Majority Leader Mitch McConnell: "Well, I can't comment on [the plaintiff] because he's—as you know, they're—I guess he's doing something today, as we know.  And he's also—they're setting up sentencing, so I'm not going to comment on him.  But I think people have heard my comments in the past."

Pl.'s Facts ¶ 103; <u>see</u> Def.'s Resp. to Pl.'s Facts ¶ 103.

"On October 17, 2017, the plaintiff filed a renewed [unlawful command influence] motion based on the Rose Garden remarks that ratified former President Trump's disparaging pre-Inauguration comments about him."  Pl.'s Facts ¶ 104; see Def.'s Resp. to Pl.'s Facts ¶ 104. After the plaintiff filed this motion, the military judge presiding over the plaintiff's court-martial allowed the parties the opportunity to ask him individual voir dire questions.  See generally Def.'s Mot., Ex. 1 (Record of Trial ("Trial Tr.")) at 1723:7–1725:1, ECF Nos. 16-4–16-12.  The military judge was asked, "prior to the defense filing, were you aware of any comments made by the [P]resident regarding this case since his election?"  Id., Ex. 1 (Trial Tr.) at 1723:10–11.  The military judge represented that he "never saw any of the comments [former President Trump] made during his election—during his campaign" and that he "didn't see these comments or hear them until the defense filed their motion."  Id., Ex. 1 (Trial Tr.) at 1723:12–14.  He further stated that he "ha[d] purposely avoided any news or—printed or otherwise, of this—any coverage of this case[,]" that he "just d[idn]'t want to expose [him]self to it[,]" and that he "had no idea that the [P]resident had said anything until" the plaintiff's motion was submitted.  Id., Ex. 1 (Trial Tr.) at 1723:15–19.  The government then asked the military judge, "Is there anything about the knowledge that you've now gained, as a result of reading that filing, that makes you believe that you would be unable to sit impartially and fairly as the military judge in this case?"  Id., Ex. 1 (Trial Tr.) at 1723:20–1724:2.  The military judge responded:

> No. I'm what's referred to as a terminal Colonel, which means I'm not going anywhere but the retirement pastures.  And that's in almost a year from now.
>
> I have never aspired to any rank.  I did aspire to be a military judge [thirteen] years ago; but since accepting that posting or assignment, I have recognized that that, in the modern [Judge Advocate General (']JAG[')] Corps, pretty much, meant that I was going to stay at the rank I was, which at the time was Lieutenant Colonel.  So I was actually a little bit surprised to be promoted to Colonel.  And when that happened, I knew obviously that any general officer rank was beyond my reach and, quite frankly, nothing I ever aspired to.

> So that's a long way of saying, "No, no effect on me whatsoever." I don't expect
> to go anywhere but back home as soon as the Army is done with me in a year.

Id., Ex. 1 (Trial Tr.) at 1724:3–16.

The military judge denied the plaintiff's third unlawful command influence motion on

October 30, 2017. See Pl.'s Facts ¶ 109; Def.'s Resp. to Pl.'s Facts ¶ 109. Specifically, the

military court concluded that the plaintiff had "met [his] initial burden of providing some

evidence, beyond mere speculation that [unlawful command influence] exists[,]" Def.'s Mot.,

Ex. 11 (3d UCI Ruling) ¶ 6(a), and that "the government [ ] failed to prove beyond a reasonable

doubt that the comments do not constitute [unlawful command influence,]" id., Ex. 11 (3d UCI

Ruling) ¶ 6(b). However, the court found that the government

> met [its] burden to prove beyond a reasonable doubt that the [unlawful command
> influence] has not and will not place an intolerable strain on the public's
> perception of the military justice system and that an objective, disinterested
> observer, fully informed of all the facts and circumstances, would not harbor a
> significant doubt about the fairness of the proceedings.

Id., Ex. 11 (3d UCI Ruling) ¶ 6(c) (capitalizations omitted) (underline added); see id., Ex. 11 (3d

UCI Ruling) ¶ 6(c) ("I, the military judge in this case, am the sole sentencing authority[ and t]he

evidence establishes beyond a reasonable doubt that I am uninfluenced by the President's

comments and more importantly, that I hold no fear of any repercussions from anyone if they do

not agree with my sentence in this case. As their affidavits make clear, the same is true of

[General] Abrams and [Colonel] Berry with respect to their respective post-trial duties in this

case."). The military judge further stated that he would "consider the President's comments as

mitigation evidence as [he] arrive[d] at an appropriate sentence in this case" and "require anyone

involved in any way in the exercise of discretion in any post-trial aspect of this case to read [an

October 20, 2017] statement [issued by] the White House Press Office before they exercise that discretion[.]"[5]  Id., Ex. 11 (3d UCI Ruling) ¶ 6(d).

"On November 3, 2017, the military judge sentenced the plaintiff to a dishonorable discharge, reduction to the lowest enlisted pay grade, and forfeiture of $10,000 in pay and allowances."  Pl.'s Facts ¶ 62; see Def.'s Resp. to Pl.'s Facts ¶ 62.

### 3. The Plaintiff's Appeal to the U.S. Army Court of Criminal Appeals ("Bergdahl I")

Following the imposition of his sentence, the plaintiff appealed his conviction to the U.S. Army Court of Criminal Appeals ("ACCA") and "[b]y a 2-1 vote, the . . . []ACCA[] thereafter affirmed the findings of guilt and the sentence."  Am. Compl. ¶ 23 (citing United States v. Bergdahl ("Bergdahl I"), 79 M.J. 512 (Army Ct. Crim. App. 2019)).  First, the ACCA "disagree[d] with the military judge as to his conclusions regarding whether Senator McCain was subject to the UCMJ for Article 37 purposes[,]" but because Senator McCain was a military retiree, it "agree[d] with [the military judge's] conclusion that there was no evidence of unlawful command influence."  Bergdahl I, 79 M.J. at 522.  Second, the ACCA agreed with the military judge that, with regard to former President Trump's comments made while a presidential candidate, he was not subject to Article 37 of the UCMJ and his comments did not create apparent unlawful command influence because he was a private citizen at the time.  See id. at 522–23 (noting that "[t]here is no precedent for finding [unlawful command influence] based on

---

[5] The military court noted that this White House press statement, entitled "Statement Regarding Military Justice[,]" "stated essentially that the President 'expects all military personnel who are involved in any way in the military justice process to exercise their independent professional judgment [ ]' as they perform their duties with respect to the military justice system."  Def.'s Mot., Ex. 11 (3d UCI Ruling) ¶ 2(h).  The court further noted that this statement "b[ore] a striking resemblance" to an August 2013 statement by former Secretary of Defense Chuck Hagel, which "was intended to address comments [former] President Obama made about sexual assault cases in the military generally—not about any particular case."  Id., Ex. 11 (3d UCI Ruling) ¶ 2(h).

**Add. 11**

the remarks of private citizens" and "[i]ncendiary remarks by private citizens, even influential

ones, do not constitute evidence of unlawful command influence").

Third, the ACCA held that, although the plaintiff had met his initial burden of showing

"some evidence" of unlawful command influence with respect to former President Trump's

ratification of his comments while serving as President, there was nonetheless "not an intolerable

strain on the public's perception of the military justice system because a fully informed observer

would not harbor a significant doubt as to the fairness of the proceedings." Id. at 524.  In support

of this conclusion, the ACCA noted that "[t]he military judge gave [the plaintiff] an opportunity

to withdraw his plea[ and h]e chose not to[;]" "[t]he actual comments were removed in time from

the sentence proceedings . . . [and therefore] their impact was lessened[;]" and "the military

judge, the [Staff Judge Advocate ('] SJA['] )], and the convening authority credibly explained that

they were not and would not be influenced by the President's statements."  Id.

Finally, the ACCA found no unlawful command influence in the post-trial process.  See

id. at 524–27.  The plaintiff raised for the first time on appeal unlawful command influence

based upon tweets made by former President Trump (1) immediately after the military judge's

sentencing of the plaintiff, but before the convening authority's approval of that sentence, see id.

at 524 ("The same day [that the plaintiff's] sentence was announced, [former] President Trump

. . . post[ed] on Twitter: 'the decision on [the plaintiff's sentence] is a complete and total disgrace

to our [c]ountry and to our [m]ilitary."), and (2) during the pendency of the plaintiff's appeal to

the ACCA, see id. at 527 (quoting former President Trump's tweet as "No money was paid to

North Korea for Otto Warmbier, not two Million Dollars, not anything else.  This is not the

Obama Administration that paid 1.8 Million Dollars for four hostages, or gave five terro[r]ist

hostages plus, who soon went back to battle, for traitor [the plaintiff]!!").  The ACCA concluded

that, as to former President Trump's comment immediately following the plaintiff's sentencing, the plaintiff had met his burden to show some evidence of unlawful command influence, but that "an informed member of the public would [not] harbor any doubt, let alone a significant doubt, that [the plaintiff] received a fair trial[.]" Id. at 526.  Furthermore, although the ACCA "f[ound] some strain" on the military justice system resulting from the statement, "[it was] convinced [that] the military justice system is not so fragile that this comment caused an intolerable strain." Id. at 527.  As to President Trump's tweet made during the pendency of the plaintiff's appeal, the ACCA found that "[w]hile parts of the tweet are inaccurate, there is no nexus between the tweet and the appellate process[,] [the] court would have no knowledge of the President's statement but for the submission by appellant[,]" and it "do[es] not believe that this tweet meets [the plaintiff's] threshold burden of evidence of [unlawful command influence]." Id.

### 4. The Plaintiff's Appeal to the CAAF ("Bergdahl II")

The plaintiff next appealed this decision to the CAAF, which "[b]y a 3-2 vote, . . . affirmed" the prior rulings.  Am. Compl. ¶ 25 (citing United States v. Bergdahl ("Bergdahl II"), 80 M.J. 230 (C.A.A.F. 2020)).  The CAAF concluded that "[a]s a threshold matter, . . . [a]t the time of the comments regarding [the plaintiff's] case, Senator McCain . . . [and] a sitting president of the United States[,]" i.e., former President Trump, were both "capable of committing unlawful command influence." Bergdahl II, 80 M.J. at 234; see id. at 234–36.  The CAAF also "h[e]ld that [the plaintiff] [ ] satisfied his low burden of presenting 'some evidence' of unlawful command influence[,]" id. at 236, as to both Senator McCain, see id., and former President Trump, see id. at 236–38.  However, the CAAF ultimately concluded that "a finding of apparent unlawful command influence is not warranted because there was no intolerable strain on the military justice system." Id. at 239.

The CAAF "predicated [its conclusion] on all of the relevant facts of th[e] case" at various stages of the court-martial proceedings.  Id.  Regarding the "investigation and preferral stages of th[e] case[,]" id., the court noted that "compelling evidence was presented at a hearing held pursuant to Article 32[ of the] UCMJ[,]"[6] id. (noting that the evidence presented indicated that the plaintiff had "deserted his unit with intent to shirk hazardous duty and that he engaged in misbehavior before the enemy"), and, "[i]n light of both the severity of [the plaintiff's alleged] offenses and the strength of the [g]overnment's evidence, an objective disinterested observer clearly would have expected the Army to court-martial [the plaintiff] for his conduct regardless of any public comments by [former] President Trump or Senator McCain[,]" id.

The CAAF next addressed the convening authority's decision to refer the plaintiff's case to a general court-martial rather than a special court-martial, despite the fact that "the Article 32, UCMJ, preliminary hearing officer [had] recommended that [his] case be referred to a special court-martial not empowered to adjudge a bad-conduct discharge—which would have precluded the dishonorable discharge that was actually imposed [in the plaintiff's case.]"  Id.  Although the court "acknowledge[d] that this aspect of the case is a close question and [that] it ha[d] given [the court] great pause[,]" id., it ultimately concluded that "an objective, disinterested observer would [not] harbor a significant doubt about the fairness of the [convening authority's] referral decision[,]" id. at 239–40.  The CAAF noted three major bases for its conclusion.  First, the convening authority stated "in a sworn affidavit that his decisions were 'not impacted by any outside influence'" and "den[ounced] [ ] and disassociat[ed] [himself] from [Senator McCain's]

---

[6] "An Article 32 [i]nvestigation is the military counterpart to the civilian grand jury."  McKinney v. Caldera, 141 F. Supp. 2d 25, 27 n.3 (D.D.C. 2001) (citing Morgan v. Perry, 142 F.3d 670, 678 n.13 (3d Cir. 1998), cert. denied sub nom., Morgan v. Cohen, 525 U.S. 1070 (1999)).  Furthermore, according to the R.C.M., "[t]he primary purpose of [the Article 32 Investigation] is to inquire into the truth of the matters set forth in the charges, the form of the charges, and to secure information on which to determine what disposition should be made of the case[,]" id. (quoting R.C.M. 405(a)), and "[n]o charge may be referred to a general court-martial for trial until an Article 32 investigation has been conducted[,]" id.

comments." Id. at 240.  Second, "there is no requirement that a convening authority adopt the recommendations of an Article 32, UCMJ, preliminary hearing officer." Id. (citing R.C.M. 601). And third, the preliminary hearing officer stated "that the 'strongest factor' in causing him to make a recommendation for a special court-martial was the fact that the [g]overnment failed to submit . . . any evidence 'demonstrating that anyone was killed or wounded' during the military's search and recovery efforts related to [the plaintiff's] disappearance." Id.  However, "it was later shown . . . that several American servicemembers were indeed injured, some severely, while on missions primarily designed to locate [the plaintiff,]" id., and the convening authority "served in military positions where he would [have] be[en] privy to such information" at the time of his referral decision, id. at 241.

Regarding the guilty plea stage of the plaintiff's case, the CAAF stated that "it cannot be emphasized strongly[] enough that [the plaintiff] chose to plead guilty," entered a knowing and voluntary plea, and later declined when the military judge offered him the opportunity to withdraw his guilty plea in light of the plaintiff's unlawful command influence claims.  Id. at 242 (emphasis in original).  Thus, the CAAF concluded that "no claim of unfairness regarding the guilty plea phase of the court-martial proceedings can prevail." Id.

Regarding the sentencing stage of the plaintiff's court-martial proceedings, the CAAF noted that significant mitigation evidence was presented at sentencing.  See id. at 242–43. Furthermore, the court noted that "[the plaintiff] acknowledged both that he was fully aware of the implications of receiving a dishonorable discharge and that he wanted the military judge to impose that specific punishment upon him." Id. at 243–44.  The court

> underscore[d] the fact that despite the sensational nature of this case, despite the public calls for the lengthy imprisonment of [the plaintiff], despite Senator McCain's threat that he would hold a hearing if [the plaintiff] did not receive a sentence to his liking, and despite the Commander in Chief's ratification of his

statements that [the plaintiff] was a traitor who should be severely punished, the military judge imposed <u>no prison time whatsoever</u>.

<u>Id.</u> at 244 (emphasis in original).  Thus, the court reasoned, "an objective, disinterested observer would conclude that rather than being swayed by outside forces, the military judge was notably impervious to them."  <u>Id.</u>

Finally, "in terms of the clemency and appellate stages of this case, [the CAAF] reiterated [several] critical points[,]" including the plaintiff's decision to plead guilty, the compelling evidence presented by the government, and the military judge's sentence, which was consistent with what the plaintiff requested.  <u>Id.</u>  Based upon these facts, the CAAF concluded that "an objective disinterested observer would decide that the convening authority's decision not to exercise his discretionary clemency authority on behalf of [the plaintiff] was a forgone conclusion unaffected by any public comments made about the case[,]" and that "there would be no basis . . . to believe that the decision by the [ACCA] . . . was in any way unfair."  <u>Id.</u>

### 5. The Plaintiff's Petition for Reconsideration and Motion to Supplement the Record

During the course of the plaintiff's appeal to the CAAF, the plaintiff's attorneys obtained a copy of an application submitted to the United States Department of Justice by the military judge who presided over the plaintiff's court-martial.  <u>See</u> Pl.'s Facts ¶ 132; Def.'s Resp. to Pl.'s Facts ¶ 132.  This application indicated that "[o]n October 16, 2017, the military judge applied to the [Department of] Justice [ ] to be an immigration judge[,]" Pl.'s Facts ¶ 119; <u>see</u> Def.'s Resp. to Pl.'s Facts ¶ 119, and that "[t]he sole writing sample the military judge submitted was his February 24, 2017[] ruling denying the plaintiff's January 20, 2017[] [unlawful command influence] motion[,]" Pl.'s Facts ¶ 121; <u>see</u> Def.'s Resp. to Pl.'s Facts ¶ 121.  Furthermore, "[s]ometime between October 16, 2017, and September 28, 2018, the [Department of] Justice [ ]

hired the military judge[,]" Pl.'s Facts ¶ 128; see Def.'s Resp. to Pl.'s Facts ¶ 128, and "[t]he

military judge retired from the Army on November 1, 2018[,]" Pl.'s Facts ¶ 131; see Def.'s Resp.

to Pl.'s Facts ¶ 131.  "The plaintiff's attorneys filed a copy of the military judge's application

[submitted to the Department of Justice] with the [CAAF] on September 18, 2020[,]" Pl.'s Facts

¶ 133; see Def.'s Resp. to Pl.'s Facts ¶ 133, but the CAAF "denied [the] plaintiff's petition for

reconsideration and motion to supplement the record regarding the military judge's [Department

of Justice] job application without prejudice to his right to seek a writ of error coram nobis from

the appropriate court."  Am. Compl. ¶ 27 (citing United States v. Bergdahl ("Bergdahl III"), 80

M.J. 362 (C.A.A.F. 2020)) (underline added) (internal citation omitted).

### 6. The Plaintiff's Petition for <u>Coram Nobis</u>

The plaintiff subsequently filed a writ of error coram nobis petition with the ACCA, see

id. ¶ 28,

> assert[ing] [that] the military judge who presided over his court-martial and made
> rulings adverse to [the plaintiff] concerning unlawful command influence [ ],
> failed to disclose his application for employment as an immigration judge . . . to
> the parties while [the plaintiff's] case was ongoing and, as a result, [the plaintiff]
> did not receive a fair trial.

United States v. Bergdahl ("Bergdahl IV"), ARMY MISC 20200588, 2020 WL 7316058, at *1

(Army Ct. Crim. App. Dec. 11, 2020).  The ACCA denied the plaintiff's petition on December

11, 2020.  See Am. Compl. ¶ 29; Bergdahl IV, 2020 WL 7316058, at *1.  In its opinion denying

the petition, the ACCA noted the six "threshold criteria for a petitioner to obtain coram nobis

review[,]" Bergdahl IV, 2020 WL 7316058, at *2, and concluded that the plaintiff "ha[d] not met

the third threshold requirement[,]" id. at *3, because it "f[ound] no valid reason why [the

plaintiff] did not seek relief earlier[,]" id.  Specifically, the ACCA noted that "[the plaintiff's]

case was pending direct review at [the ACCA] from [ ] June [8, ]2018[,] through [ ] July [16,

]2019[,]" "[t]he military judge's new employment as an immigration judge became public knowledge on [ ] September [28, ]2018[,]" and "[t]hus, [the plaintiff's] case had only been pending at [the ACCA] for less than three months prior to the [Department of Justice]'s press release notice" regarding the military judge's appointment as an immigration judge.  Id. Furthermore, the ACCA noted that "[a]pproximately another ten months passed after the [Department of Justice]'s notice until [the ACCA] issued its decision in [the plaintiff's] case on [ ] July [16, ]2019" and "[a]t no point during those ten months did [the plaintiff] request the military judge's employment application."  Id.  Thus, the court reasoned, "[the plaintiff] has not presented a sound reason why he failed to pursue this claim while his case was [on direct appeal], when such a claim could have been reasonably raised."  Id. at *5.  The ACCA declined to reach the merits of the plaintiff's claim, noting that, "[h]aving concluded [the plaintiff] fails to meet the stringent threshold requirements to establish eligibility for coram nobis review, [it] need not address the merits of his petition."  Id. at *3 n.4.

Finally, "[o]n December 17, 2020, [the] plaintiff filed a writ-appeal petition [ ] [with the] CAAF seeking review of [the] ACCA's denial of his coram nobis petition."  Am. Compl. ¶ 30 (underline added).  The CAAF summarily denied his writ-appeal petition on February 2, 2021. See id. ¶ 31; Bergdahl v. United States ("Bergdahl V"), 81 M.J. 128, 128 (C.A.A.F. 2021).

### 7. This Action

On February 17, 2021, the plaintiff initiated this action, see Complaint for Declaratory and Injunctive Relief ("Compl.") at 1, ECF No. 1, and on February 19, 2021, he filed his Amended Complaint, see Am. Compl. at 1.  On August 2, 2021, the defendant filed its motion to dismiss.  See Def.'s Mot. at 1.  The plaintiff filed his opposition and cross-motion for summary judgment on October 4, 2021, see Pl.'s Mem. at 1; Pl.'s Mot. at 1, the defendant filed its reply in

**Add. 18**

support of its motion and its opposition to the plaintiff's motion on December 17, 2021, <u>see</u>

Def.'s Reply at 1, and the plaintiff filed his reply in support of his motion on January 28, 2022,

<u>see</u> Pl.'s Reply at 1.

## II.      STANDARD OF REVIEW

### A.      Motion to Dismiss Under Rule 12(b)(6)

A Rule 12(b)(6) motion tests whether a complaint "state[s] a claim upon which relief can

be granted[.]"  Fed. R. Civ. P. 12(b)(6).  "To survive a motion to dismiss [under Rule 12(b)(6)], a

complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is

plausible on its face.'"  <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (quoting <u>Bell Atlantic Corp.</u>

<u>v. Twombly</u>, 550 U.S. 544, 570 (2007)).  A claim is facially plausible "when the plaintiff pleads

factual content that allows the court to draw [a] reasonable inference that the defendant is liable

for the misconduct alleged."  <u>Id.</u> (citing <u>Twombly</u>, 550 U.S. at 556).

In evaluating a motion to dismiss under Rule 12(b)(6), "the Court must construe the

complaint in favor of the plaintiff, who must be granted the benefit of all inferences that can be

derived from the facts alleged."  <u>Hettinga v. United States</u>, 677 F.3d 471, 476 (D.C. Cir. 2012)

(internal quotation marks omitted).  While the Court must "assume [the] veracity" of any

"well-pleaded factual allegations" in a complaint, conclusory allegations "are not entitled to the

assumption of truth."  <u>Iqbal</u>, 556 U.S. at 679.  Thus, "[t]hreadbare recitals of the elements of a

cause of action, supported by mere conclusory statements, do not suffice."  <u>Id.</u> at 678 (citing

<u>Twombly</u>, 550 U.S. at 555).  Also, the Court need not "accept legal conclusions cast as factual

allegations" or "inferences drawn by [the] plaintiff if those inferences are not supported by the

facts set out in the complaint[.]"  <u>Hettinga</u>, 677 F.3d at 476.  Finally, the Court "may consider

only the facts alleged in the complaint, any documents either attached to or incorporated in the

complaint[,] and matters of which [the Court] may take judicial notice." Equal Emp.

Opportunity Comm'n v. St. Francis Xavier Parochial Sch., 117 F.3d 621, 624 (D.C. Cir. 1997).

**B.     Motion for Summary Judgment Under Rule 56**

A court may grant a motion for summary judgment pursuant to Federal Rule of Civil

Procedure 56 only if "there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is material if it 'might

affect the outcome of the suit under the governing law[.]'" Steele v. Schafer, 535 F.3d 689, 692

(D.C. Cir. 2008) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). When

ruling on a motion for summary judgment, "[t]he evidence of the non-movant is to be believed,

and all justifiable inferences are to be drawn in his [or her] favor." Anderson, 477 U.S. at 255.

The movant has the burden of demonstrating the absence of a genuine issue of material fact and

that the non-moving party "fail[ed] to make a showing sufficient to establish the existence of an

element essential to that party's case[.]" Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

In responding to a motion for summary judgment, the non-moving party "must do more

than simply show that there is some metaphysical doubt as to the material facts." Matsushita

Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Accordingly, the non-moving

party "must set forth specific facts showing that there [are] [ ] genuine issue[s]" in dispute.

Anderson, 477 U.S. at 250. "The mere existence of a scintilla of evidence in support of the

[non-moving party's] position . . . [is] insufficient" to withstand a motion for summary

judgment[.]" Id. at 252.

**III.     ANALYSIS**

The plaintiff challenges his court-martial conviction on two bases: (1) unlawful command

influence, see Am. Compl. ¶¶ 75–78, and (2) the military judge's failure to disclose a ground for

his disqualification, see id. ¶¶ 79–82.  Specifically, the plaintiff contends that "[b]ecause [the]

CAAF mistakenly found that the government had carried its burden of proof beyond a reasonable

doubt" in regards to its unlawful command influence ruling, "and that an intolerable strain had

not been placed on public confidence in the administration of justice, [the] plaintiff's conviction

and sentence violated due process and are invalid."  Id. ¶ 78.  Furthermore, he argues that,

> [b]y failing to disclose his job application and indicating that he was simply going
> to retire, and then citing that as a basis for denying the renewed [unlawful
> command influence] motion, [the military judge] (a) concealed a material
> financial interest; (b) thwarted [the] plaintiff's opportunity to conduct voir dire,
> challenge him for cause, reconsider his pleas and decision to waive trial by jury;
> and thereby (c) denied him a fair trial before an impartial judge as guaranteed by
> the Fifth Amendment.

Id. ¶ 81.  The defendant argues in response that the plaintiff's claims should be dismissed

because (1) the CAAF conducted a "full and fair consideration of [the p]laintiff's unlawful

command influence claim" as required, Def.'s Mem. at 24, and (2) "[the p]laintiff failed to

timely raise th[e] issue [of the military judge's failure to disclose his job application] during the

direct appeal of his case, and the ACCA fully and fairly considered his argument and effectively

found that the issue had been waived[,]" id. at 34.  Furthermore, the defendant argues that "even

if the Court were to reach the merits of [the p]laintiff's argument, []his claim [that the military

judge improperly failed to disclose his job application] would not support the relief that he

seeks."  Id.  In response, and in support of his motion for summary judgment, the plaintiff argues

that (1) "[his] claims were [not] fully and fairly considered by the military courts[,]" Pl.'s Mem.

at 11; (2) the prosecution did not carry its burden of proof regarding the plaintiff's unlawful

command influence claim, see id. at 26; and (3) "[e]ven if [the] CAAF was right to find that the

prosecution had carried its [unlawful command influence] burden, that determination cannot

stand in light of the military judge's improper concealment of his application for a job with the

[Department of] Justice [ ,]" id.

The Court will first consider the plaintiff's unlawful command influence claim, before turning to his claim that the military judge who presided over his court-martial failed to disclose a ground for his disqualification.

## A.     The Plaintiff's Unlawful Command Influence Claim

The Court first considers whether the CAAF conducted a "full and fair consideration[,]" Sanford v. United States, 586 F.3d 28, 32 (D.C. Cir. 2009), of the plaintiff's unlawful command influence claim.  In affirming the decisions of the two lower military courts, the CAAF ruled that although "a sitting president of the United States can commit both apparent and actual unlawful command influence[ and t]he same [is] true for the late Senator McCain[,]" Bergdahl II, 80 M.J. at 238, "[i]n this particular case, . . . a finding of apparent unlawful command influence is not warranted because there was no intolerable strain on the military justice system[,]" id. at 239. Specifically, the CAAF concluded that "the record reflects that the decision-making at each stage of [the plaintiff's] court-martial proceedings was unaffected by any outside influences" and "therefore, . . . an objective, disinterested observer, fully informed of all the facts and circumstances, would [not] harbor a significant doubt about the fairness of these proceedings.'" Id. at 244 (quoting United States v. Boyce, 76 M.J. 242, 249 (C.A.A.F. 2017)) (alteration in original).

The defendant argues that the plaintiff's unlawful command influence claim should be dismissed because "[a] review of the CAAF's reasoning reveals, manifestly, that the court fully and fairly considered this issue" and "[e]specially given the heightened deference due a decision of the CAAF regarding military law, [the p]laintiff supplies no reason to disturb the CAAF's judgment."  Def.'s Mem. at 28 (internal citation omitted).  Furthermore, the defendant states that

"contrary to [the p]laintiff's contention that there was an 'absence of evidence' supporting the CAAF's decision regarding clemency, the CAAF clearly identified four facts supporting its analysis[,]" id., namely, (1) the plaintiff's decision to "plead[] guilty to deserting his unit with intent to shirk hazardous duty and of engaging in misbehavior before the enemy[,]" id. (quoting Bergdahl II, 80 M.J. at 244); (2) that "American servicemembers were injured searching for [the plaintiff] after he chose to desert his post in a combat zone[,]" id. at 29 (quoting Bergdahl II, 80 M.J. at 244); (3) that "the United States government was required to exchange five members of the Taliban who had been held at the U.S. detention facility in Guantánamo Bay, Cuba, in order to secure [the plaintiff's] release[,]" id. at 31 (quoting Bergdahl II, 80 M.J. at 244); and (4) that "despite [those] three aggravating factors . . . , the military judge 'imposed [ ] a sentence [of] only a dishonorable discharge, a reduction in rank, and partial forfeitures of pay after [the plaintiff] specifically asked to receive a dishonorable discharge,' implying that . . . the sentence was already quite lenient[,]" id. (quoting Bergdahl II, 80 M.J. at 244).  In response and in support of his motion for summary judgment, the plaintiff argues as a preliminary matter that, contrary to the defendant's suggestion, "'greater deference' [to the CAAF] is not warranted [here] simply because [the] plaintiff is not in custody."  Pl.'s Mem. at 12 (citing Def.'s Mem. at 22). Furthermore, the plaintiff argues that "[t]he military courts' consideration [of the plaintiff's case] was neither full nor fair[,]" id. at 14, and specifically, that the CAAF did not afford the plaintiff's claims full and fair consideration because: (1)

> in deciding by a 3-2 vote that "a reasonable member of the public," fully informed of the facts and circumstances, would not harbor a significant doubt as to the fairness of the proceedings, it imputed to that observer numerous facts that would not be known to a member of the public[,]

id.; and (2) "[t]he CAAF majority's [unlawful command influence] analysis . . . was under-inclusive, failing to take into account a host of matters that tended to detract from the government's claim that an intolerable strain had not been placed on public confidence[,]" id.[7]

The standard of review to be applied in cases involving collateral attacks on court-martial convictions "has been described by the D.C. Circuit as 'tangled.'" Luke v. United States, 942 F. Supp. 2d 154, 162 (D.D.C. 2013), aff'd, No. 13-5169, 2014 WL 211305 (D.C. Cir. Jan. 13, 2014) (quoting United States ex rel. New v. Rumsfeld, 448 F.3d 403, 406 (D.C. Cir. 2006)).  "It is clear that, in a habeas petition after a court[-]martial, a civilian court applies the 'full and fair consideration' standard 'to determine whether the military have given fair consideration to each of [the petitioner's] claims.'" Penland v. Mabus, 78 F. Supp. 3d 484, 493 (D.D.C. 2015) (quoting Burns v. Wilson, 346 U.S. 137, 144 (1953)).  However, in cases involving a non-habeas collateral attack on a court-martial judgment—i.e., in cases where the plaintiff is not in custody—"[c]ollateral relief . . . is barred unless it appears that the judgment is void." Priest v. Sec'y of Navy, 570 F.2d 1013, 1016 (D.C. Cir. 1977) (citing Schlesinger, 420 U.S. at 748).  "Whether a judgment may be deemed void turns upon two factors: the nature of the alleged defect in the proceedings and the gravity of the harm from which relief is sought." Id.  And, "[t]hese [factors] in turn must be considered in light of the deference Congress expected the military justice system to receive in the federal courts."  Id.  Furthermore, because "non-habeas review is if anything more deferential than habeas review of military judgments, a

---

[7] The plaintiff also makes arguments regarding (1) the CAAF's "deni[al of] leave to supplement the record with the military judge's job application[,]" Pl.'s Mem. at 15; (2) "the ACCA's coram nobis decision[,]" id. at 17 (underline added); and (3) the "CAAF's denial of the plaintiff's writ-appeal petition[,]" id.  The Court will address these issues in the context of its analysis regarding whether the ACCA properly denied the plaintiff's writ of coram nobis petition, see infra Section III.B.1, and whether the military judge improperly failed to disclose a basis for his disqualification, see infra Section III.B.2.

military court's judgment clearly will not suffer such a defect if it satisfies [the] '[full and ]fair consideration' [standard,]" Rumsfeld, 448 F.3d at 408 (internal citation omitted).

Thus, district courts routinely apply the "full and fair consideration" test to non-custodial collateral attacks on court-martial convictions because this standard is the less deferential of the two, and thus, court-martial proceedings that satisfy this standard will also necessarily satisfy the "void" standard articulated in Priest.  See, e.g., Henry v. Kendall, No. 21-cv-865 (CKK), 2022 WL 3081408, at *4–7 (D.D.C. Aug. 3, 2022) (applying the "full and fair consideration" test to a collateral attack on a court-martial conviction brought by a non-custodial plaintiff); Scott v. United States, 351 F. Supp. 3d 1, 8–10 (D.D.C. 2018), aff'd, No. 19-5033, 2019 WL 3229390 (D.C. Cir. June 25, 2019) (same); Luke, 942 F. Supp. 2d at 165–67 (same); Oppermann v. United States, No. 06-cv-1824 (EGS), 2007 WL 1748920, at *6–9 (D.D.C. June 15, 2007) (same); see also Def.'s Mem. at 24 (arguing for the application of the "full and fair consideration" test to the plaintiff's unlawful command influence claims "[b]ecause any opinion that fully and fairly considers a plaintiff's claim cannot be found to have such a defect" to render the decision "void"); Pl.'s Mem. at 11–12 (arguing that the "full and fair consideration" test is the proper standard to be applied in this case).

> Although in [Rumsfeld] the [D.C. Circuit] did not describe the exact degree of deference accorded to the military courts, its analysis suggests there are two steps in applying the "full and fair consideration" standard: (1) a review of the military court's thoroughness in examining the relevant claims, at least where thoroughness is contested; and (2) a close look at the merits of the claim, albeit with some degree of deference and certainly more than under [a] de novo standard.

Sanford, 586 F.3d at 32.  The Court will apply each of these considerations in turn.

1.  **Whether the Military Courts Thoroughly Considered the Plaintiff's Unlawful Command Influence Claims**

Here, as to the first prong of the "full and fair consideration" test, see id., the Court concludes that the military courts conducted a thorough examination of the plaintiff's unlawful command influence defense. At the court-martial stage of the case, the military judge considered three separate motions to dismiss filed by the plaintiff that were based on unlawful command influence. See Def.'s Mot., Ex. 5 (1st UCI Ruling) at 1; id., Ex. 8 (2d UCI Ruling) at 1; id., Ex. 11 (3d UCI Ruling) at 1. In ruling on these motions, the military judge fully articulated the relevant law of unlawful command influence to be applied, see id., Ex. 5 (1st UCI Ruling) ¶¶ 3–9; id., Ex. 8 (2d UCI Ruling) ¶¶ 3–9; id., Ex. 11 (3d UCI Ruling) ¶¶ 3–5, noting in relevant part that "Article 37[] of the . . . []UCMJ[,]" id., Ex. 5 (1st UCI Ruling) ¶ 3, which concerns unlawful command influence, "was enacted by Congress to prohibit commanders and convening authorities from attempting to coerce, or by unauthorized means, influence the action of a court-martial, or any member thereof, in reaching the findings or sentence in any case[,]" id., Ex. 5 (1st UCI Ruling) ¶ 3. The military judge further specified that "[unlawful command influence] can occur in one of two ways[:] either through [(]1) [a]ctual [unlawful command influence] or [(]2) [a]pparent [unlawful command influence]." Id., Ex. 5 (1st UCI Ruling) ¶ 4; see also id., Ex. 8 (2d UCI Ruling) ¶¶ 3–4 (articulating the same unlawful command influence standards in the context of the plaintiff's second motion); id., Ex. 11 (3d UCI Ruling) ¶ 3 (articulating the same legal standard for apparent unlawful command influence in the context of the plaintiff's third motion).

The military judge's written decisions demonstrate that he thoughtfully considered the application of the law to the facts alleged by the plaintiff regarding then-Senator McCain's and former President Trump's statements and that his conclusions were well-reasoned. Specifically,

as to the plaintiff's first motion, the military judge found that then-Senator McCain was not

"'subject to this chapter' as contemplated by Article 37[,]" id., Ex. 5 (1st UCI Ruling) ¶ 10, and

that, even if he were subject to Article 37, his statements could not constitute either actual

unlawful command influence, see id., Ex. 5 (1st UCI Ruling) ¶ 11 (stating that "[s]ince Senator

McCain holds no[] command authority over anyone involved in this case, he simply does not

have the ability to control this case or to exercise command control of any kind over those who

do"), or apparent unlawful command influence, see id., Ex. 5 (1st UCI Ruling) ¶ 12 ("A

reasonable member of the public knowing all the facts and circumstances would recognize

Senator McCain's ill-advised statements for just what they were[—]political posturing[.]").

As to the plaintiff's second motion, the military judge found that former President Trump

was not subject to Article 37 because "when he made the referenced comments [that were the

basis of the plaintiff's second motion] . . . , he was only Candidate Trump . . . [and t]herefore, [ ]

could not commit actual [unlawful command influence]." Id., Ex. 8 (2d UCI Ruling) ¶ 10.

However, the military judge concluded that, even if former President Trump were subject to

Article 37, "the defense ha[d] failed to establish some facts which, if true, would constitute

[unlawful command influence] or establish that such evidence has a 'logical connection' to th[e]

court-martial in terms of potential to cause unfairness in the proceedings." Id., Ex. 8 (2d UCI

Ruling) ¶ 11 (quoting United States v. Stoneman, 57 M.J. 35, 41 (C.A.A.F. 2002)); see also id.,

Ex. 8 (2d UCI Ruling) ¶ 11 (inviting the plaintiff to "renew [his] motion" if "after voir dire, [ ] it

appears the landscape on this issue has changed").

Finally, as to the plaintiff's third motion, the military judge found that, although the

plaintiff "met [his] initial burden of providing some evidence, beyond mere speculation, that

[unlawful command influence] exists[,]" id., Ex. 11 (3d UCI Ruling) ¶ 6(a),

> the government . . . met [its] burden to prove beyond a reasonable doubt that the [unlawful command influence] has not and will not place an intolerable strain on the public's perception of the military justice system [and] that an objective, disinterested observer, fully informed of all the facts and circumstances, would not harbor a significant doubt about the fairness of the[] proceedings[,]

id., Ex. 11 (3d UCI Ruling) ¶ 6(c). Namely, the military judge reasoned that "[t]he evidence establishes beyond a reasonable doubt that [he was] uninfluenced by the President's comments and more importantly, that [he] h[e]ld no fear of any repercussions from anyone if they d[id] not agree with [his] sentence in th[e] case." Id., Ex. 11 (3d UCI Ruling) ¶ 6(c); see also id., Ex. 11 (3d UCI Ruling) ¶ 6(c) (noting that a White House statement disavowed any "expect[ation of] any certain sentence" in the case); id., Ex. 11 (3d UCI Ruling) ¶ 6(d) (stating that the military judge would "consider the President's comments as mitigation evidence" at sentencing and "require anyone involved in any way in the exercise of discretion in any post-trial aspect of this case to read the statement from the White House Press Office"). Based on this careful reasoning employed by the military judge, the Court concludes that the military judge "heard [the plaintiff] out on[,]" Burns, 346 U.S. at 144, his unlawful command influence claims and that his rulings "thorough[ly] [ ] examin[ed]" them, Sanford, 586 F.3d at 32.

Furthermore, on appeal, the ACCA conducted a thorough review of the military judge's unlawful command influence assessment, "analyz[ing] each allegation of [unlawful command influence] in a discrete fashion[,]" as well as any potential "cumulative effect . . . that [would have] denied [the plaintiff] of a fair trial." Bergdahl I, 79 M.J. at 527. The ACCA detailed the facts of the plaintiff's court-martial and scrutinized the military judge's reasoning, applying relevant case law and legal standards. See, e.g., id. at 522 (distinguishing this case from Trump v. Hawaii, 138 S. Ct. 2392 (2018), in analyzing whether the comments by then-candidate Trump created an appearance of unlawful command influence); id. at 524 (comparing the facts of the

plaintiff's case to <u>United States v. Boyce</u>, 76 M.J. 242 (C.A.A.F. 2017), and <u>United States v.</u>

<u>Barry</u>, 78 M.J. 70 (C.A.A.F. 2018), in determining whether the statements made by

then-President Trump created an appearance of unlawful command influence).  The ACCA

ultimately concluded in its well-reasoned opinion that, although it disagreed with the military

judge's reasoning regarding whether then-Senator John McCain was "subject to" Article 37, <u>see</u>

<u>id.</u> at 521–22, "[t]he military judge correctly found that the defense failed to meet its burden of

establishing some evidence which, if true, would constitute [unlawful command influence,]" <u>id.</u>

at 522 (internal quotation marks omitted).  Furthermore, the ACCA "agree[d] with the military

judge that [the plaintiff] did not meet his burden to establish any evidence of [unlawful command

influence]" as to former President Trump when he was a presidential candidate, concluding that

"[i]ncendiary remarks by private citizens, even influential ones, do not constitute evidence of

[unlawful command influence]."[8]  <u>Id.</u> at 523; <u>see</u> <u>id.</u> at 522 ("There is no precedent for finding

[unlawful command influence] based on the remarks of private citizens, even influential ones.").

And, finally, the ACCA concluded that, "[a]lthough President Trump ratified [his] comments"

made prior to his presidency once he became president, "their impact was lessened by the

remoteness [in time to the plaintiff's court-martial]" and "the military judge [and other decision-

makers involved with the court-martial] credibly explained that they were not and would not be

influenced by the President's statement."  <u>Id.</u> at 524.  The ACCA was also "struck by [the]

differences between cases where individuals reached out to the convening authority and the SJA

---

[8] The plaintiff argued that "th[e] court should look to the rationale in <u>Trump v. Hawaii</u>[, 138 S. Ct. 2392 (2018),]" in
which "the Supreme Court considered candidate Trump's campaign vows to bar Muslims from entering the [United
States] as extrinsic evidence of his motive to issue an Executive Order that placed restrictions on the nationals of
predominantly Muslim countries seeking entry into the [United States]" once he became President.  <u>Bergdahl I</u>, 79
M.J. at 522.  However, the ACCA distinguished this case, opining that "[i]n <u>Trump v. Hawaii</u>, . . . [former President
Trump's] campaign rhetoric was merely a consideration in the Court's analysis of the [Executive Order's]
constitutionality[,]" <u>id.</u>, and "[i]n [the plaintiff's] case, by contrast, at the time of [the plaintiff's] second motion to
dismiss for [unlawful command influence], President Trump had just been inaugurated and had not taken any action
as <u>President</u> or made any comment regarding [the plaintiff,]" <u>id.</u> at 522–23 (emphasis in original).

instead of a case like [the plaintiff's], where the comments were brought to the attention of the court by the defense itself." Id. Thus, based upon the ACCA's reasoning and sufficient thoroughness in addressing each of the plaintiff's unlawful command influence allegations, the Court concludes that the ACCA accorded these claims "full and fair consideration[.]" Sanford, 586 F.3d at 32. See Luke, 942 F. Supp. 2d at 165–66 (concluding that the appellate military court had "carefully assessed all of the evidence presented" where it noted and considered all of the lower court's factual findings and made its own legal conclusions based on these findings and an analysis of the appellant's arguments).

In conducting its review, the CAAF also "treated the plaintiff's arguments[,]" Luke, 942 F. Supp. 2d at 166, with sufficient "thoroughness[,]" id., to constitute "full and fair consideration[,]" Sanford, 586 F.3d at 32, of the plaintiff's unlawful command influence claims. The CAAF concluded, contrary to the military judge's rulings, that both Senator McCain and former President Trump were capable of creating unlawful command influence under Article 37, see Bergdahl II, 80 M.J. at 234–35, but ultimately agreed with the military judge's rulings because it found "no intolerable strain on the military justice system[,]" id. at 239—a finding which it "predicated on all of the relevant facts of th[e] case, regardless of whether the various stages of the court-martial proceedings are viewed individually or cumulatively[,]" id. In reaching this conclusion, the CAAF acknowledged that the plaintiff had met his initial burden of showing "some evidence" of unlawful command influence, see id. at 236–38, and conducted an exhaustive review of the court-martial proceedings, as well as the subsequent appellate proceedings before the ACCA, applying the relevant law to the facts of the plaintiff's case, see id. at 238–44. As part of its conclusion that the plaintiff established no apparent unlawful command influence, the CAAF "underscore[d] the fact that despite the sensational nature of this

case, the public calls for the lengthy imprisonment of [the plaintiff]," and the comments made by

Senator McCain and former President Trump, "the military judge imposed on [the plaintiff] <u>no</u>

<u>prison time whatsoever</u>[ and t]hus, an objective, disinterested observer would conclude that

rather than being swayed by outside forces, the military judge was notably impervious to them."

<u>Id.</u> at 244 (emphasis in original).  Thus, based upon its comprehensive review of each of stage of

the plaintiff's court-martial proceedings and application of the unlawful command influence

doctrine, the Court concludes that the CAAF conducted a thorough review of the plaintiff's

unlawful command influence claims, sufficient to constitute "full and fair consideration[,]" of

them.[9]  <u>Sanford</u>, 586 F.3d at 32.

### 2.  The Merits of the Plaintiff's Unlawful Command Influence Claim

Having determined that the military judge and subsequent appellate military courts

conducted a thorough review of the plaintiff's unlawful command influence claims, the Court

must next independently consider "the merits of the [plaintiff's] claim[s], albeit with some

degree of deference[,]" <u>id.</u>  Article 37 of the UCMJ provides that "[n]o person subject to [the

UCMJ] may attempt to coerce or, by any unauthorized means, attempt to influence the action of

a court-martial . . . or any member thereof[.]"  10 U.S.C. § 837(a)(3).  The R.C.M., which also

explicitly prohibits unlawful command influence, provides that

> [n]o convening authority or commander may censure, reprimand, or admonish a
> court-martial . . . or any member, military judge, or counsel thereof, with respect

---

[9] The plaintiff argues that "[t]he CAAF majority's [unlawful command influence analysis] was not full because it
was under-inclusive[,]" Pl.'s Mem. at 14 (emphasis omitted), citing one example—its "dismissal of the fact that the
plaintiff's prosecution ran counter to American practice since [the] Vietnam [War] to not prosecute returning
[prisoners of war] unless they were guilty of misconduct while in enemy hands[,]" <u>id.</u> at 14–15.  However, the
CAAF did consider this argument, but ultimately concluded based on its review of the source cited by the plaintiff
for this proposition, that "an objective, disinterested observer would give little weight to [ ] this] argument."
<u>Bergdahl II</u>, 80 M.J. at 239 n.10.  Although the CAAF may not have weighed this argument as heavily as the
plaintiff desired, the CAAF's evaluation of this evidence satisfied its obligation to "take account of anything in the
record that 'fairly detracts' from the weight of the evidence supporting" its decision.  <u>Gen. Elec. Co. v. Nat'l Lab.
Rels. Bd.</u>, 117 F.3d 627, 630 (D.C. Cir. 1997).

to the findings or sentence adjudged by the court-martial . . . , or with respect to any other exercise of the functions of the court-martial . . . or such persons in the conduct of the proceedings.

R.C.M. 104(a)(1).  Furthermore,

> [n]o person subject to the [R.C.M.] may attempt to coerce or, by any unauthorized means, influence the action of a court-martial or any other military tribunal or any member thereof, in reaching the findings or sentence in any case or the action of any convening, approving, or reviewing authority with respect to such authority's judicial acts.

R.C.M. 104(a)(2).  The accused in a court-martial proceeding "bears the initial burden of raising unlawful command influence" and "[t]he quantum of evidence required . . .  is 'some evidence.'"

United States v. Salyer, 72 M.J. 415, 423 (C.A.A.F. 2013) (quoting Stoneman, 57 M.J. at 41).

Next,

> [o]nce an issue of unlawful command influence is raised by some evidence, the burden shifts to the government to rebut an allegation of unlawful command influence by persuading the Court beyond a reasonable doubt that (1) the predicate facts do not exist; (2) the facts do not constitute unlawful command influence; or (3) the unlawful command influence did not affect the findings or sentence.

Id.  Furthermore, "[e]ven if there was no actual unlawful command influence, there may be a question whether the influence of command placed an 'intolerable strain on public perception of the military justice system[,]'" i.e., apparent unlawful command influence.  Stoneman, 57 M.J. at 42–43 (quoting United States v. Wiesen, 56 M.J. 172, 175 (C.A.A.F. 2001)).  "An appearance of unlawful command influence arises 'where an objective, disinterested observer, fully informed of all of the facts and circumstances, would harbor a significant doubt about the fairness of the proceeding.'"  Salyer, 72 M.J. at 423 (quoting United States v. Lewis, 63 M.J. 405, 415 (C.A.A.F. 2006)).  On appeal, as to unlawful command influence, the plaintiff only sought review of "whether the charges and specifications should be dismissed with prejudice or other meaningful relief granted because of apparent unlawful command influence."  Pl.'s Opp'n at 9

(capitalization omitted) (emphasis added).  Therefore, the Court will analyze the merits of the plaintiff's claims under the standard applicable to apparent unlawful command influence.  See Salyer, 72 M.J. at 423.

### i. Whether Senator McCain and Former President Trump Were Capable of Committing Unlawful Command Influence

As a preliminary matter, the Court concludes that Senator McCain and former President Trump, during the time that he was President, were capable of committing unlawful command influence under Article 37 and R.C.M. 104(a).  Specifically, Senator McCain, although not an active member of the military at the time of his comments regarding the plaintiff's case, was a "[r]etired member of a regular component of the armed forces[,]" 10 U.S.C. § 802(a)(4), and thus "subject to" the UCMJ, id. § 804(a).  See Bergdahl II, 80 M.J. at 234 (stating that "Senator McCain was a retired member of the United States Navy").  And, former President Trump, while President, served as commander-in-chief of the armed forces and thus constituted a "commander" under the R.C.M.  R.C.M. 104(a)(1).  However, as a candidate, former President Trump was essentially a private, albeit widely publicized, citizen for purposes of the UCMJ and R.C.M., in that he had no association with the military at the time and did not fall under any of the categories of individuals subject to the UCMJ as specifically delineated in the relevant provision of that statute.  See generally 10 U.S.C. § 802.  Accordingly, the Court's analysis regarding former President Trump's comments made in his capacity as a presidential candidate must stop there.

### ii. Whether the Plaintiff Has Presented "Some Evidence" of Unlawful Command Influence

The parties agree that former President Trump ratified his comments made as a candidate once he became President.  Pl.'s Facts ¶ 104; see Def.'s Resp. to Pl.'s Facts ¶ 104.  And,

therefore, the Court must determine whether the plaintiff has presented "some evidence" of unlawful command influence as to both Senator McCain and former President Trump during the time that he served as President.  Stoneman, 57 M.J. at 41.  "Some evidence" is defined as "facts that, if true, constitute unlawful command influence, . . . [with] a logical connection to the court-martial in terms of potential to cause unfairness in the proceedings."  Id.  "This burden [of presenting some evidence] is low, but the evidence presented must consist of more than 'mere allegation or speculation.'"  Boyce, 76 M.J. at 249 (quoting Salyer, 72 M.J. at 423).  Here, because Senator McCain's and former President Trump's comments pertained squarely to the plaintiff and his court-martial proceedings, the Court concludes that the plaintiff has presented some evidence as to both McCain's and Trump's apparent unlawful command influence.  Both vilified the plaintiff, labeling him with terms that "presuppos[ed] [his] guilt[,]" which the ACCA has viewed as evidence of unlawful command influence.  United States v. Alton, ARMY 20190199, 2021 WL 2232100, at *7 (U.S. Army Ct. Crim. App. June 2, 2021); see, e.g., Pl.'s Facts ¶ 83 (Senator McCain stating that the plaintiff "is clearly a deserter"); Def.'s Resp. to Pl.'s Facts ¶ 83; Pl.'s Facts ¶ 90 ("Trump repeatedly vilified the plaintiff, describing him as a traitor at numerous rallies[.]"); Def.'s Resp. to Pl.'s Facts ¶ 90; see Bergdahl II, 80 M.J. at 234 (opining that former President Trump's labeling of the plaintiff as a deserter "is antithetical to the presumption of innocence the Constitution affords to all accused").

Moreover, both Senator McCain and former President Trump expressly stated their desires that the plaintiff be punished harshly, and noted actions they would take if he were not. See Pl.'s Facts ¶ 83 (Senator McCain stating that "'[i]f it comes out that [the plaintiff] has no punishment, we're going to have to have a hearing in the Senate Armed Services Committee'"); Def.'s Resp. to Pl.'s Facts ¶ 83; Def.'s Mot., Ex. 8 (1st UCI Ruling) ¶ 1 (accepting as fact that

former President Trump "express[ed] an opinion about [the plaintiff's] guilt and promis[ed] that, if the [the plaintiff] didn't get jail time and [former President] Trump were elected President, he would review the case"); Bergdahl II, 80 M.J. at 244 (noting that former President Trump ratified his comments once he became President).  The Court concludes that these statements clearly constitute at least some evidence of an "attempt to influence the action of a court-martial . . . or a[] member thereof[.]"  10 U.S.C. § 837(a)(3).  Therefore, because the plaintiff has presented some evidence of apparent unlawful command influence, "the burden shifts to the government to rebut [this] allegation[.]"  Salyer, 72 M.J. at 423.

### iii.    Whether the Command Influence Placed an Intolerable Strain on Public Perception of the Military Justice System

As noted above, in the context of an allegation of apparent unlawful command influence, the government must show that "the influence of command placed [no] 'intolerable strain on public perception of the military justice system[,]'" Stoneman, 57 M.J. at 42–43 (quoting Wiesen, 56 M.J. at 175), by demonstrating that "an objective, disinterested observer, fully informed of all the facts and circumstances, would [not] harbor a significant doubt about the fairness of the proceeding[,]" Lewis, 63 M.J. at 415.[10]  In making this determination, the CAAF "has assessed the aggravating and mitigating facts and circumstances and then decided, in its own estimation, whether the [g]overnment's conduct 'place[d] an intolerable strain upon the

---

[10] The plaintiff argues that in concluding that "'a reasonable member of the public,' fully informed of the facts and circumstances, would not harbor a significant doubt as to the fairness of the proceedings, [the CAAF] imputed to that observer numerous facts that would not be known to a member of the public."  Pl.'s Mem. at 14.  However, in the context of a review of a court-martial conviction, while the CAAF "focus[es] upon the perception of fairness in the military justice system as viewed through the eyes of a reasonable member of the public[,]" that "reasonable member of the public" is considered "an objective, disinterested observer, fully informed of all the facts and circumstances" of the case.  Lewis, 63 M.J. at 415 (emphasis added).  Thus, the test is not governed by the perceptions of just any hypothetical member of the public, but rather one who is fully informed of every factual aspect of the case.  See id.  Given this standard, the Court concludes that the CAAF properly imputed to such an observer knowledge of the facts and circumstances of the plaintiff's case.  See Bergdahl II, 80 M.J. at 238–43 (imputing to the "reasonable observer" knowledge of various aspects of the underlying facts in the plaintiff's case, as well as facts regarding the procedural history of his case).

public's perception of the military justice system.'" United States v. Horne, 82 M.J. 283, 287

(C.A.A.F. 2022) (quoting Boyce, 76 M.J. at 249).  Furthermore, "unlike actual unlawful

command influence where prejudice to the [plaintiff] is required, no such showing is required for

a meritorious claim of an appearance of unlawful command influence."  Boyce, 76 M.J. at 248

(emphasis added).  However, "the lack of personal prejudice [to the plaintiff] is still a

'significant factor in determining whether the unlawful command influence created an

intolerable strain on the public's perception of the military justice system.'"  Horne, 82 M.J. at

289 (quoting United States v. Proctor, 81 M.J. 250, 255 (C.A.A.F. 2021)) (emphasis added).

There are five primary stages of the proceedings at issue in this case, which the plaintiff

contends were tainted by unlawful command influence: (1) the investigation and preferral stage;

(2) the convening authority's decision to refer the plaintiff's case to a general—rather than

special—court-martial; (3) the plaintiff's entry of a guilty plea; (4) the plaintiff's sentencing; and

(5) the appellate proceedings.  See supra Section I.B.4.  The Court will "assess[] the aggravating

and mitigating facts and circumstances[,]" Horne, 82 M.J. at 287, as to each of these stages,

keeping in mind the deference that must be afforded to the military courts, Sanford, 586 F.3d at

32 (noting that, in examining the merits of a plaintiff's collateral attack to a military conviction,

the Court must employ "some degree of deference and certainly more than under [a] de novo

standard").

Regarding the first two stages of the court-martial process—the investigation and

preferral stage, and the convening authority's decision to refer the case to a general court-

martial—the Court concludes that the factors regarding (1) the government's evidence of the

plaintiff's desertion and misbehavior before the enemy, and (2) the significant, compelling

evidence regarding casualties incurred as a result of the plaintiff's alleged desertion, support the

CAAF's conclusion that there was no apparent unlawful command influence as to these aspects of the proceedings.  The CAAF noted that "compelling evidence was presented at a hearing held pursuant to Article 32 . . . that [the plaintiff] deserted his unit with intent to shirk hazardous duty and that he engaged in misbehavior before the enemy[,]" which are serious offenses that "can be punishable by death, or by any punishment other than death" under the UCMJ.  Bergdahl II, 80 M.J. at 239; see Pl.'s Mem., Ex. 28 (Charge Sheet) at 31.  Thus, given that the government presented evidence in support of charges which trigger court-martial jurisdiction and serious potential penalties, see 10 U.S.C. § 885 (desertion); 10 U.S.C. § 899 (misbehavior before the enemy), the Court concludes that "an objective, disinterested observer . . . would [not] harbor a significant doubt about[,]" Lewis, 63 M.J. at 415, the preferral stage of the plaintiff's case or the convening authority's decision to refer the case to a court-martial.  See Pl.'s Mem., Ex. 28 (Charge Sheet) at 31 (stating that the plaintiff "did . . . with intent to shirk important service and avoid hazardous duty, namely: combat operations[,] . . . guard duty[,] . . . and combat patrol duties[,] . . . quit his place of duty"); id., Ex. 28 (Charge Sheet) at 31 (stating that the plaintiff "did, at or near Observation Post Mest, Paktika Province, Afghanistan, . . . before the enemy, endanger the safety of Observation Post Mest and Task Force Yukon, which it was his duty to defend, by intentional misconduct[,] . . . left without authority[,] and wrongfully caused search and recovery operations").  Rather, a member of the public informed of the serious facts which the government alleged in its charges would likely expect the plaintiff to be charged and that the case would be referred for court-martial proceedings.  Compare, e.g., Bergdahl II, 80 M.J. at 239 (noting the gravity of the charges and the strength of the government's evidence), with United States v. Butler, No. ACM 39802, 2021 WL 3732722, at *29–30 (A.F. Ct. Crim. App. Aug. 20, 2021) (finding that "the severity of the offenses and the strength of the [g]overnment's evidence

would [not] negate the logical connection between [command] influence and [the] decision to prefer the charges" where the Article 32 preliminary hearing officer found that "the evidence against the [a]ccused on each charged offense except [one] . . . <u>meets the very low probable cause standard</u>" (seventh alteration in original) (emphasis in original)).[11]

Additionally, regarding the convening authority's decision to refer the plaintiff's case to a general court-martial, the Court finds the evidence regarding the numerous casualties incurred as a result of the plaintiff's alleged desertion persuasive in determining whether an objective observer "would harbor a significant doubt about the fairness of the proceeding[,]" <u>Lewis</u>, 63 M.J. at 415. With respect to the convening authority's decision to refer the case to a general court-martial—contrary to the preliminary hearing officer's recommendation for a special court-martial—the CAAF "acknowledge[d] that this aspect of the case is a close question and [stated that] it ha[d] given [the court] great pause." <u>Bergdahl II</u>, 80 M.J. at 239. The CAAF noted, however, that "the 'strongest factor' in causing [the preliminary hearing officer] to make a recommendation for a special court-martial was the fact that the [g]overnment"—at that stage of

---

[11] The plaintiff argues that his "prosecution ran counter to American practice since [the] Vietnam [War] to not prosecute returning [prisoners of war (']POW[][')] unless they were guilty of misconduct while in enemy hands." <u>Id.</u> at 15; <u>see also id.</u> at 3, 27–28, 32. However, the source he cites in support of this contention states that "[t]he [United States] Military has taken varied approaches to pre-capture and post-capture misconduct by POW[]s [that] range from a general amnesty for misconduct after repatriation to <u>aggressive prosecution of deserters</u>." <u>Id.</u>, Ex. 19 (Information Paper: Historical Approach to Pre-Capture and Post-Capture Misconduct by POW[]s (July 1, 2014) ("Information Paper")) ¶ 2, ECF No. 17-2 (emphasis added). The source further states that "the [Department of Defense] made two policy decisions regarding allegations of misconduct by returning POW[]s at the end of the Vietnam War: (1) there would be no prosecutions for 'propaganda statements,' and (2) no charges would be brought against POW[]s except by other POW[]s." <u>Id.</u>, Ex. 19 (Information Paper) ¶ 2(c). The source noted that "Pentagon officials dropped charges [against multiple Vietnam War POWs] 'owing to the complex legal and policy issues that would have made conviction problematical and the damaging publicity that would have attended a long trial.'" <u>Id.</u>, Ex. 19 (Information Paper) ¶ 2(c)(ii). Thus, the practice the plaintiff alludes to appears to have been put in place in response to the specific legal and policy circumstances during the Vietnam War. Moreover, the plaintiff's contention does not at all account for the fact that the government charged the plaintiff with desertion, an offense which the cited source notes has been "aggressive[ly] prosecut[ed]" by the United States Military. <u>Id.</u>, Ex. 19 (Information Paper) ¶ 2. Accordingly, the Court finds this argument unpersuasive in determining whether "an objective, disinterested observer . . . would harbor a significant doubt about[,]" <u>Lewis</u>, 63 M.J. at 415, the preferral stage of the plaintiff's case.

the case—had "failed to submit before him any evidence 'demonstrating that anyone was killed or wounded' during the military's search and recovery efforts related to [the plaintiff's] disappearance." Id. at 240. However, there were numerous significant casualties that resulted from the plaintiff's disappearance, and the CAAF detailed some of these in its opinion. See id. (stating that, after the plaintiff's disappearance, "thousands of United States soldiers, sailors, airmen, and Marines conducted an intensive search of the region spanning thirty to forty-five days[,]" resulting in "increased presence of American troops precipitat[ing] increased interactions with the enemy, which ultimately increased the risk to those searching for [the plaintiff"); id. at 240–41 & n.10 (noting "numerous American casualties," including "Retired Navy SEAL Senior Chief Petty Officer James Hatch[, who] was shot in the leg, requiring eighteen surgeries over several years[;]" "a military dog[] . . . killed during the mission[;]" "at least two Army specialists [who] came under rocket-propelled grenade fire[;]" "Specialist Jonathan Morita[, who] sustained serious [permanent] injuries to his right hand[;]" and "Master Sergeant [ ] Mark Allen[, who] was shot through the head[,] . . . [placing him] in a 'vegetative state,' . . . [requiring him to] undergo[] fifteen to twenty surgeries which included the removal of both his frontal lobes," and eventually leading to his death). Although the preliminary hearing officer was not provided with this information, the CAAF found that the convening authority, who

> served as the Senior Military Assistant to the Secretary of Defense, during which time he was present for briefings regarding [the plaintiff], was aware of negotiations taking place to effect [the plaintiff's] return from Taliban captivity, and provided daily reports to the Secretary of Defense concerning [the plaintiff's] health and welfare following his eventual return to the United States[,]

would have clearly had access to this casualty information. Id. at 241. And, although it might require an objective observer to make an inference regarding the convening authority's

knowledge of this information, the Court concludes that this is a reasonable inference fairly

encompassed by the knowledge of "an objective, disinterested observer, <u>fully informed of all the

facts and circumstances</u>," of the case, <u>Lewis</u>, 63 M.J. at 415 (emphasis added).  <u>See</u> <u>supra</u> note

10.  Therefore, the Court concludes that an objective observer would reasonably expect a

convening authority, with knowledge of these serious casualties, and with significant discretion

in his referral decision, <u>see</u> R.C.M. 601(d)(1), to refer the case to a general court-martial, where

the plaintiff might face harsher penalties.

Regarding the third stage of the proceedings—the plaintiff's entry of a guilty plea—the

Court concludes that an objective observer would not harbor a significant doubt about the

fairness of the guilty plea.  <u>See</u> <u>Lewis</u>, 63 M.J. at 415.  At multiple points in its opinion, the

CAAF heavily emphasized the fact that the plaintiff <u>chose</u> to plead guilty.  <u>See, e.g.</u>, <u>Bergdahl II</u>,

80 M.J. at 242, 244.  The Court recognizes that there are various reasons why an individual

might choose to plead guilty, some of which are noted by the plaintiff.  <u>See</u> Pl.'s Mem. at 31

(arguing that "in light of the military judge's rulings on pretrial motions, the plaintiff's dilemma

was clear" and that "[h]e pleaded only after the military judge had rejected challenges to the

legal sufficiency of the charges, his claim that the charges were redundant, and three [unlawful

command influence] motions").  However, having concluded that the military judge thoroughly

considered the plaintiff's dispositive motions, <u>see</u> <u>supra</u> Section III.A.1, the Court also concludes

that the plaintiff's subsequent entry of a guilty plea cuts against a finding of apparent unlawful

command influence as to this specific stage of the proceeding.  Specifically, the plaintiff

concedes that there was a factual basis for his guilty plea, <u>see</u> Pl.'s Mem. at 31 ("There was no

dispute that he had left his post seeking to travel overland to a forward operating base and make

a report."), and that his plea was voluntary, <u>see</u> <u>id.</u> at 32 ("We do not contend that the plaintiff's

plea or his request for a punitive discharge were involuntary[.]").  And, while it is possible that

he chose to plead guilty for other strategic reasons—for example, based on the prior adverse

rulings by the military judge—given the thoroughness of the military judge's evaluation of the

plaintiff's dispositive motions, see supra Section III.A.1, "an objective, disinterested observer,

fully informed of all the facts and circumstances, would [not] harbor a significant doubt about

the fairness of" the plaintiff's entry of his guilty plea, Lewis, 63 M.J. at 415.  Compare Bergdahl

II, 80 M.J. at 242 ("In [pleading guilty], [the plaintiff] explicitly agreed in open court that he was

voluntarily pleading guilty because he was in fact guilty and not for any other reason.  In a

lengthy plea colloquy, [he] explained in detail his intent to walk off his post in hostile territory,

his reasoning for doing so, and the exact steps he took to attain this objective."), with United

States v. Gattis, 81 M.J. 748, 757–58 (N.M.C. Ct. Crim. App. Aug. 25, 2021) (finding that "no

impartial observer would conclude it was the actions of the command master chief and other

members of his chain of command that caused him to plead guilty" where "[d]uring a substantial

plea colloquy, [the a]ppellant explained in detail [the factual basis for his plea]").

Regarding the fourth stage of the proceedings—the plaintiff's sentencing—the Court

concludes that consideration of this factor shows that there was no apparent unlawful command

influence for two reasons.  First, the discrepancy between the sentence the plaintiff received, and

the potential penalties, as well as the sentences called for by Senator McCain and former

President Trump, was significant.  And second, the sentence the plaintiff received overall

indicates a lack of prejudice to the plaintiff, which is a "significant factor in determining whether

the unlawful command influence created an intolerable strain on the public's perception of the

military justice system."  Horne, 82 M.J. at 289 (internal quotation marks omitted).  Prior to the

plaintiff's sentencing, Senator McCain stated that, "'[i]f it comes out that [the plaintiff] has no

punishment, we're going to have to have a hearing in the Senate Armed Services Committee,'
adding that the plaintiff . . . 'is clearly a deserter.'"  Pl.'s Facts ¶ 83; see Def.'s Resp. to Pl.'s
Facts ¶ 83; see also Def.'s Mot., Ex. 5 (1st UCI Ruling) ¶ 2(i).  And, former President Trump
stated that "deserters used to be shot, implying and at times saying outright that the plaintiff
deserved the death penalty[,]" Pl.'s Facts ¶ 94; see Def.'s Resp. to Pl.'s Facts ¶ 94, and in the
context of these types of remarks,  in effect "pantomimed executions by rifle and pistol shot,
complete with sounds effects[,]" Pl.'s Facts ¶ 95; see Def.'s Resp. to Pl.'s Facts ¶ 95.  Former
President Trump later "promis[ed] that, if the [plaintiff] didn't get jail time and [former
President] Trump were elected President, he would review the case."  Def.'s Mot., Ex. 8 (2d UCI
Ruling) ¶ 1.  Furthermore, after the military judge imposed the plaintiff's sentence, former
President Trump called it "a complete and total disgrace to our [c]ountry and to our [m]ilitary."
Bergdahl I, 79 M.J. at 524.

Thus, the sentence that the military judge ultimately imposed was in direct contrast to the
harsh punishments requested by Senator McCain and former President Trump.  And, the Court
therefore concludes that a reasonable observer comparing these officials' passionate advocacy
for severe sentences with the far less punitive sentence that the plaintiff actually received,
"would [not] harbor a significant doubt about the fairness of" the sentencing in this case, Lewis,
63 M.J. at 415.  Rather, the Court agrees with the CAAF that, with respect to sentencing, "rather
than being swayed by outside forces, the military judge [appeared] notably impervious to them."
Bergdahl II, 80 M.J. at 244.  Moreover, at sentencing, the plaintiff requested a dishonorable
discharge in lieu of a prison sentence, see Def.'s Mot., Ex. 1 (Trial Tr.) at 2694:15–17 ("[T]he
defense respectfully requests that you sentence [the plaintiff] to a dishonorable discharge."); see
also id., Ex. 1 (Trial Tr.) at 2695:1–2697:1 (affirming the plaintiff's understanding of the

consequences of a dishonorable discharge sentence), which the military judge imposed.  Despite

that penalty, the plaintiff argues that he "did not receive 'the very sentence [he] requested'"

because "he never suggested a five-figure financial sanction" or a "demot[ion] to the lowest

enlisted pay grade."  Pl.'s Mem. at 32 (quoting Def.'s Mem. at 45) (first alteration in original).

While the plaintiff is correct that he did not request these financial sanctions, see generally Def.'s

Mot., Ex. 1 (Trial Tr.) at 2670:12–2694:20, the Court nonetheless concludes that, given the

aggravating factors in this case—the government's strong evidence in support of the plaintiff's

charges, see Bergdahl II, 80 M.J. at 239 (noting the government's strong evidence presented at

the Article 32 hearing); Pl.'s Mem., Ex. 28 (Charge Sheet) at 31 (describing the plaintiff's

charges; the seriousness of the charges, see 10 U.S.C. § 885(c) (noting that potential penalties

for desertion include "death or such other punishment as a court-martial may direct" "if the

offense is committed in time of war"); 10 U.S.C. § 899 (noting that a person convicted of

misbehavior before the enemy "shall be punished by death or such other punishment as a court-

martial may direct"); and the extensive casualties that resulted from the plaintiff's actions, see

Bergdahl II, 80 M.J. at 240–41 (listing casualties)—"an objective, disinterested observer . . .

would [not] harbor a significant doubt about the fairness of" the military judge's imposition of a

hefty fine and demotion in rank, Lewis, 63 M.J. at 415.  Accordingly, the Court concludes that

there was no apparent unlawful command influence as to the sentencing stage of the plaintiff's

court-martial proceedings.

Finally, regarding the appellate stage of the proceedings, the Court concludes that,

because each stage of the court-martial proceedings at the trial level appears untainted by

unlawful command influence, it follows that "an objective, disinterested observer . . . would

[not] harbor a significant doubt about the fairness of" the ACCA's affirmance of the plaintiff's

conviction and sentence, id.  The Court further agrees with the CAAF that, given the aggravating

factors in this case, "an objective, disinterested observer would decide that the convening

authority's decision not to exercise his discretionary clemency authority . . . was a foregone

conclusion[,]"[12] and that "there would be no basis for an impartial observer to believe that the

decision by the [ACCA] to affirm the findings and sentence in this case was in any way unfair."

Bergdahl II, 80 M.J. at 244.

Based on "the totality of the circumstances in this case[,]" Boyce, 76 M.J. at 252, the

Court concludes that "an objective, disinterested observer, fully informed of all the facts and

circumstances, would [not] harbor a significant doubt about the fairness of the proceeding[s,]"

Lewis, 63 M.J. at 415, and therefore, command influence did not "place[] an 'intolerable strain

on public perception of the military justice system[,]'" Stoneman, 57 M.J. at 43 (quoting Wiesen,

56 M.J. at 175).  Thus, according significant deference to the CAAF as required, see Sanford,

586 F.3d at 32, "the Court finds no reason to disturb [the CAAF's] decisions on the merits of [the

plaintiff's unlawful command influence] claim[s,]" Scott, 351 F. Supp. 3d at 8.  Accordingly, the

Court must grant the defendant's motion and deny the plaintiff's motion as to Count I of the

plaintiff's Complaint.  Although it must reach this conclusion, the Court notes that what occurred

in this case illustrates why individuals aspiring for public office and those achieving that

---

[12] The plaintiff disputes the CAAF's characterization that his "post-trial matters submitted to the convening authority were 'absent any formal request for clemency in the form of a sentence reduction.'"  Bergdahl II, 80 M.J. at 244 (quoting Bergdahl I, 79 M.J. at 526); see Pl.'s Mem. at 29–30.  However, even assuming for purposes of the Court's analysis that the plaintiff did effectively seek clemency, the Court concludes that there was no apparent unlawful command influence in the clemency stage of the proceedings.  The fact that the plaintiff received a dishonorable discharge consistent with his request, combined with the multiple aggravating factors which an objective observer would view as justifying the imposition of financial sanctions and the plaintiff's demotion in rank, see supra Section III.A.2.iii, support the convening authority's decision to approve the military judge's findings and sentence.  Furthermore, the Court concludes that because these aggravating factors form such a solid basis for the convening authority's approval of the sentence and denial of clemency, the fact that former President Trump deemed the sentence "a complete and total disgrace to our [c]ountry and to our [m]ilitary[,]" Bergdahl I, 79 M.J. at 524, would not create "a significant doubt about the fairness of" the convening authority's decision, Lewis, 63 M.J. at 415.

objective should not express their desired verdict and punishment of individuals merely accused of committing criminal offenses.  They must be mindful that in the United States, individuals merely accused of committing crimes are presumed to be innocent until the prosecution has satisfied the high bar of proving guilt beyond a reasonable doubt regardless of the severity of the charged offense.  So too must they appreciate the potential impact their comments may have on those who have to adjudicate the accused's culpability and the perception the public may have on the fairness of the process, which the credibility of the judicial system relies on in order for its decisions to be widely accepted.  Otherwise, the system will become subject to widespread condemnation by the public it serves.  And that applies equally to our military justice system.

## B.    The Plaintiff's Claim that the Military Judge Failed to Disclose a Basis for His Disqualification

Having concluded that the military courts fully and fairly considered the plaintiff's unlawful command influence claims, the Court will next address the plaintiff's claim that the military judge who presided over his court-martial proceedings improperly failed to disclose a basis for his disqualification.  After the CAAF denied the plaintiff's appeal and affirmed his conviction on August 27, 2020, see Bergdahl II, 80 M.J. at 244, the plaintiff filed a motion for reconsideration and motion to supplement the record based upon a newly discovered job application submitted to the Department of Justice by the military judge while he was actively presiding over the plaintiff's court-martial proceedings, see Pl.'s Facts ¶¶ 119, 132; Def.'s Resp. to Pl.'s Facts ¶¶ 119, 132.  On October 14, 2020, the CAAF "denied [these motions] without prejudice to [the plaintiff's] right to file a writ of error coram nobis with the appropriate court." Bergdahl III, 80 M.J. at 362 (underline added).  After the plaintiff subsequently filed a writ of error coram nobis with the ACCA, that court denied the plaintiff's writ solely based on its

conclusion that the plaintiff "d[id] not meet the threshold criteria for coram nobis review[,]"
Bergdahl IV, 2020 WL 7316058, at *1, "find[ing] no valid reason why [the plaintiff] did not
seek relief earlier[,]" id. at *3.  Thus, the ACCA denied the plaintiff's writ entirely based on only
one of the criteria for coram nobis review—his delay in raising this particular issue—and did not
reach the merits of his challenge.  See id. at *1–5.  The CAAF summarily affirmed this decision
on February 2, 2021.  See Bergdahl V, 81 M.J. at 128 (C.A.A.F. 2021).

The defendant argues that, "[e]specially given that the [ACCA] closely hewed to
Supreme Court precedent, there is no error, fundamental or otherwise in th[at] court's
decision[,]" "[b]ut [even] if the Court were to consider the merits of this claim, [the p]laintiff
nonetheless would not be entitled to relief."  Def.'s Mem. at 37.  In response, the plaintiff argues
that the "ACCA's insistence that he should have raised the issue sooner is not well-taken because
'sound' or 'valid' reasons exist for not having done so[,]" Pl.'s Mem. at 18,[13] and that,

---

[13] With respect to the ACCA's review of the plaintiff's coram nobis petition, the plaintiff also argues that "[t]he
unfairness [of the ACCA's review] was compounded by the makeup of the ACCA panel[,]" given that "one of the
ACCA judges was married to the head of the Army's Criminal Law Division."  Pl.'s Mem. at 16.  The plaintiff
argues that the judge "should have recused [herself] when the plaintiff objected to her participation" and "[h]er
failure to do so in a case that concerns, of all things, a recusal issue is baffling (as is [the] ACCA's failure to explain
its denial of the recusal motion)."  Id. (emphasis omitted).  The Rules for Courts-Martial provide in relevant part:

> a military judge shall [ ] disqualify himself or herself . . . [w]here . . . the military judge's
> spouse . . . (A) [i]s a party to the proceeding; (B) [i]s known by the military judge to have an
> interest, financial or otherwise, that could be substantially affected by the outcome of the
> proceeding; or (C) [i]s to the military judge's knowledge likely to be a material witness in the
> proceeding.

R.C.M. 902(b)(5)(A)–(C).  Thus, the fact that one the ACCA judge's spouse was employed by the Army's Criminal
Law Division does not render that judge subject to disqualification under this provision, given that there is no
indication that she was a party, had a pecuniary interest in the outcome of the case, or served as a witness.  See Pl.'s
Mem. at 16.  Moreover, the mere fact that a judge's spouse is employed by a party to litigation before that judge
does not necessarily warrant recusal, where the spouse is not otherwise involved in that particular litigation.  See
Philip Morris USA Inc. v. U.S. Food & Drug Admin., 156 F. Supp. 3d 36, 52 (D.D.C. 2016) (concluding that the
presiding judge's wife's employment with a law firm representing one of the litigants in a case before the judge
"d[id] not compel [his] recusal" where "[his] wife was not involved in the firm's representation of [the litigant] in
connection with [the subject matter of the case]" and this was "too remote and too attenuated a connection to merit
[ ] recusal"); see also id. (listing cases from multiple district courts all declining to require recusal where a judge's
spouse worked for a law firm representing a litigant before the judge, but was not involved in that litigation in any
form).  Accordingly, the Court concludes that the mere fact that the ACCA judge's spouse worked for the Army's

(continued . . .)

consequently, the "CAAF's decision cannot survive the later-obtained evidence of the military

judge's concealed job application[,]" id. at 34.

In support of his argument that the military judge improperly failed to disclose grounds

for his disqualification based upon his job application for an immigration judge position with the

Department of Justice, the plaintiff relies heavily upon this Circuit's opinion in In re Al-Nashiri,

921 F.3d 224 (D.C. Cir. 2019).  See Pl.'s Mem. at 38.  In that case, a Guantánamo Bay detainee

"fac[ing] capital charges before a military commission" "s[ought] a writ of mandamus vacating

commission orders by [the military judge that presided over his proceedings]" based upon the

military judge's failure to disclose his application for employment as an immigration judge with

the Department of Justice, which litigated the case on behalf of the government.  Al-Nashiri, 921

F.3d at 226.  This Circuit granted the petition, "conclud[ing] that [the military judge's] job

application to the [Department of] Justice [ ] created a disqualifying appearance of partiality[.]"

Id.  Specifically, the Circuit identified three primary factors which created an appearance of

impartiality requiring disclosure.  See id. at 233–37.

First, the Circuit noted that, because "the Attorney General was a participant in [the] case

from start to finish[,]" id. at 236, "[t]he fact of the [military judge's] employment application [to

a position under the Department of Justice] alone would [ ] be enough to require his

disqualification[,]" id. at 237, as "it is beyond question that judges may not adjudicate cases

involving their prospective employers[,]" id. at 235.  Second, the Circuit opined that the military

judge's "cho[ice] to emphasize his role as the presiding judge over [the petitioner's]

commission" in his job application by "boast[ing]" about his role and "even suppl[ying] an order

---

( . . . continued)
Criminal Law Division, without any additional connection to the plaintiff's case, did not warrant the ACCA judge's
recusal.

from [the petitioner's] case as his writing sample" "affirmatively called the [Department of] Justice['s] attention to his handling of [the] case, making his performance as presiding judge a key point in his argument for employment." <u>Id.</u> at 237.  Third and finally, the Circuit noted that "[a]t no point in the two-plus years after submitting his application did [the military judge] disclose his efforts to secure [this] employment" and "[i]ndeed, perhaps most remarkably, less than twenty-four hours after receiving his [ ] start date [for the immigration judge position], [he] indefinitely abated commission proceedings, musing on the record that 'over the next week or two' he would decide whether 'it might be time . . . to retire.'" <u>Id.</u> (final alteration in original). All of these factors, the Circuit reasoned, combined to "cast an intolerable cloud of partiality over [the military judge's] subsequent judicial conduct." <u>Id.</u>  Consequently, the Circuit "grant[ed] [the petitioner's] petition for writ of mandamus and vacate[d] all orders issued by [the military judge] on or after" the date that he submitted his application for employment as an immigration judge.  <u>Id.</u> at 241.  In this case, the plaintiff argues that

> [t]he[] circumstances [in <u>Al-Nashiri</u>]—the reference to Al-Nashiri's case in [the judge's] job application, the inclusion of a pertinent ruling from that case as the judge's writing sample, the misleading reference to retirement—all bear a striking resemblance to the plaintiff's case and easily meet the [ ] standard for concern over partiality, and therefore plainly require disqualification, as the Court of Appeals ordered in <u>Al-Nashiri</u>.

Pl.'s Mem. at 38.

The Court will proceed by first determining the threshold issue of whether the ACCA, in denying the plaintiff's writ of error <u>coram nobis</u> based upon his delay in raising the issue of the military judge's job application, thoroughly considered the plaintiff's claims.  And, because the Court concludes that it did not, <u>see</u> <u>infra</u> Section III.B.1, the Court will then evaluate the merits of the plaintiff's claim that the military judge improperly failed to disclose a ground for his disqualification, <u>see</u> <u>infra</u> Section III.B.2.  <u>See</u> <u>Sanford</u>, 586 F.3d at 32 (articulating "two steps in

applying the 'full and fair consideration' standard: (1) a review of the military court's

thoroughness in examining the relevant claims, at least where thoroughness is contested; and

(2) a close look at the merits of the claim, albeit with some degree of deference and certainly

more than . . . [a] <u>de novo</u> standard").

1. **Whether the ACCA Properly Denied the Plaintiff's Writ of Error <u>Coram Nobis</u> Based Upon the Plaintiff's Delay in Seeking Such Relief**

The Court must first determine whether the ACCA properly denied the plaintiff's writ of

error <u>coram nobis</u> based upon his delay in raising the issue of the military judge's job

application.  "The writ of <u>coram nobis</u> is an ancient common-law remedy designed 'to correct

errors of fact[,]'" <u>United States v. Denedo</u>, 556 U.S. 904, 910 (2009) (quoting <u>United States v.

Morgan</u>, 346 U.S. 502, 507 (1954)), and "enabl[e a] court[,] where the action was commenced

and where the judgment was rendered[,] to avoid the rigid strictures of judgment finality by

correcting technical errors[,]" <u>id.</u> at 910–11 (internal quotation marks omitted).  However, the

doctrine of <u>coram nobis</u> has been extended to "redress a fundamental error, . . . as opposed to

mere technical errors."  <u>Id.</u> at 911; <u>see id.</u> at 917 (holding that "Article I military courts have

jurisdiction to entertain <u>coram nobis</u> petitions to consider allegations that an earlier judgment of

conviction was flawed in a fundamental respect").  "Continuation of litigation after final

judgment and exhaustion or waiver of any statutory right of review should be allowed through

this extraordinary remedy only under circumstances compelling such action to achieve justice."

<u>Morgan</u>, 346 U.S. at 511.  The Supreme Court has established the following threshold criteria for

<u>coram nobis</u> review:

> (1) the alleged error is of the most fundamental character; (2) no remedy other than <u>coram nobis</u> is available to rectify the consequences of the error; (3) valid reasons exist for not seeking relief earlier; (4) the new information presented in the petition could not have been discovered through the exercise of reasonable diligence prior to the original judgment; (5) the writ does not seek to reevaluate

previously considered evidence or legal issues; and (6) the sentence has been served, but the consequences of the erroneous conviction persist.

Denedo v. United States, 66 M.J. 114, 126 (C.A.A.F. 2008) (citing Morgan, 346 U.S. at 512–13). Because the ACCA denied the plaintiff's coram nobis petition based solely on the finding that he "ha[d] not met the third threshold requirement[,]" Bergdahl IV, 2020 WL 7316058, at *3, the Court will consider whether the ACCA "thorough[ly] [ ] examin[ed] the [plaintiff's] claims[,]" Sanford, 586 F.3d at 32, by analyzing the ACCA's dispositive conclusion regarding that criterion—i.e., whether the ACCA properly found that the plaintiff failed to establish "valid reasons [ ] for not seeking relief earlier[,]" Denedo, 66 M.J. at 126.

Recognizing that "[i]n American jurisprudence the precise contours of coram nobis [review] have not been well defined," Denedo, 556 U.S. at 910 (internal quotation marks omitted), and that "the D.C. Circuit's precedent in this area is thin[,]" United States v. Williams, 630 F. Supp. 2d 28, 32 (D.D.C. 2009), the Court concludes that the plaintiff has established "valid reasons [ ] for not seeking relief earlier[,]" Denedo, 66 M.J. at 126.  The Supreme Court has held that a coram nobis petition should be granted where, in addition to the other criteria, "sound reasons exist[] for failure to seek appropriate earlier relief[.]"  Morgan, 346 U.S. at 512. And, while courts in this Circuit have not articulated a bright-line definition of "sound" or "valid" reasons, see Williams, 630 F. Supp. 2d at 32, "[c]ourts generally deny coram nobis petitions when 'none of the material facts or applicable laws have changed since [the petitioner]'s conviction[,]'" United States v. Pole, No. 09-cr-354 (EGS), 2021 WL 5796518, at *9 (D.D.C. Dec. 7, 2021) (quoting United States v. Lee, 84 F. Supp. 3d 7, 9 (D.D.C. 2015)), or where the information relevant to the petitioner's challenge was in his or her possession, or otherwise known to him or her, at the time of conviction, see id. (finding that the petitioner failed to show valid reasons for not seeking relief earlier where "his claim derive[d] from materials the

defendant himself produced to the government through counsel" and "he and his appellate counsel had everything they needed in order to raise the claim on direct appeal" (internal quotation marks omitted)).

Here, as a preliminary matter, it is undisputed that the plaintiff had no actual knowledge or possession of the military judge's job application during his court-martial proceedings, see Pl.'s Facts ¶ 132 (stating that the plaintiff "obtained a copy of the military judge's application from the [Department of] Justice [ ] on September 15, 2020"); Def.'s Resp. to Pl.'s Facts ¶ 132; see also Pl.'s Mem., Ex. 33 (Writ-Appeal Petition for Review of U.S. Army Court of Criminal Appeals Opinion and Action on Petition for Writ of Error Coram Nobis ("Writ-Appeal Petition")) at 3, ECF No. 17-17 (stating that the military judge's employment application was "obtained under [the Freedom of Information Act ('|FOIA[')]"), and therefore, "material facts . . . have changed since his conviction[,]" Pole, 2021 WL 5796518, at *9. The defendant argues that the plaintiff reasonably should have known about the fact of the military judge's application and the potential legal import of that application either when "[t]he military judge's employment as an immigration judge became public on September 28, 2018[,]" or when the Al-Nashiri opinion—upon which the plaintiff heavily relies—was issued on April 16, 2019. Def.'s Mem. at 21. However, the Court finds it unreasonable to impose a duty upon the plaintiff to not only monitor the employment status of a judge after the conclusion of proceedings before that judge, but also to file a baseless FOIA request to obtain the judge's employment application that would call into question the judge's impartiality, based upon the mere theoretical possibility that he might have applied for such employment while presiding over the plaintiff's case, absent any

reason to surmise that the possibility existed.[14]  This is especially true where, as here, the

ultimate duty in situations of potential judicial disqualification is imposed on the judge, see Al-

Nashiri, 921 F.3d at 234 (noting that various "rules governing judicial conduct[,]" including the

Rules for Courts-Martial, "all speak with one clear voice when it comes to judicial recusal:

judges shall disqualify themselves in any proceeding in which [their] impartiality might

reasonably be questioned" (internal quotation marks omitted) (second alteration in original)), and

the military judge here not only failed to disclose potential grounds for disqualification but also

affirmatively misled the parties, see Pl.'s Mem. at 43 (quoting the military judge as stating, "I'm

what's referred to as a terminal Colonel, which means I'm not going anywhere but the retirement

pastures . . . [a]nd that's in almost a year from now" (quoting Def.'s Mot., Ex. 1 (Trial Tr.) at

1724:3–5)); see also supra Section I.B.2.ii.[15]

---

[14] To the extent that the defendant intends to argue that the appropriate standard to apply in this context requires the plaintiff to have exercised reasonable diligence, or imposes inquiry notice as to the newly-discovered material facts, see Def.'s Mem. at 36–37, the Court notes that while at least one other federal Circuit has affirmed a denial of a coram nobis petition based upon the conclusion that the petitioner "should have known" of the facts underlying his challenge, see Foont v. United States, 93 F.3d 76, 80 (2d Cir. 1996), the Court has been unable to locate any precedent in this Circuit imposing this sort of duty on a petitioner in this context.  However, even if the Court were to impose this duty on the plaintiff, it would still conclude that requiring the plaintiff in this case to have discovered the military judge's employment application prior to the CAAF's judgment would go beyond any "reasonable diligence" expectation under the circumstances.  Cf. Momenian v. Davidson, 878 F.3d 381, 388 (D.C. Cir. 2017) (noting in the context of a legal malpractice case that "[i]nquiry notice extends to that knowledge which a plaintiff would have possessed after due investigation as measured by an objective standard of reasonable diligence under the circumstances" (internal quotation marks and alterations omitted)).  The Court would reach this conclusion, because it finds that it would be unreasonable to demand that a party pursue information he or she has no reason to suspect exists.

[15] The defendant argues that the plaintiff "errs in his characterization of the military judge's comments, which are reasonably understood to be answering a question regarding his plans within the military," Def.'s Reply at 22 (emphasis added), i.e., that he planned to retire from the military, not from all employment.  However, the military judge's references to "not going anywhere but the retirement pastures[,]" Def.'s Mot., Ex. 1 (Trial Tr.) at 1724:4, and not "expect[ing] to go anywhere but back home as soon as the Army is done with [him,]" id., Ex. 1 (Trial Tr.) at 1724:15–16, do not unambiguously support the defendant's interpretation.  While one could infer from the entirety of the military judge's comments that he only intended to retire from the military, see supra Section I.B.2.ii, the Court concludes that a reasonable person would have just as likely construed the military judge's statements on their face as indicating an intention to retire from employment totally, which is misleading given the submission of his job application to become an immigration judge seven days prior to the date when these statements were made, see Pl.'s Facts ¶ 119 ("On October 16, 2017, the military judge applied to the [Department of] Justice [ ] to be an

(continued . . .)

In other words, based upon the military judge's representations during the court-martial proceedings, as well as his failure to disclose his job application, the plaintiff had no reason to know or even suspect that the military judge was applying for a job within the executive branch and that his impartiality could therefore be in question, considering the executive branch's involvement in this case.  Furthermore, the Court agrees with the plaintiff that even though there was "a known appellate issue as to the job application submitted by the judge in Al-Nashiri[,]" Pl.'s Mem. at 21 (internal quotation marks omitted), after the issuance of that opinion, "there was no such issue as to the military judge in this case[,]" id. (emphasis omitted and added), until the plaintiff received, and could review the contents of, the military judge's employment application. That is, even if the Court could expect the plaintiff to be aware of the press release issued on September 28, 2018, announcing the military judge's appointment as an immigration judge, see Pl.'s Facts ¶ 129; Def.'s Resp. to Pl.'s Facts ¶ 129, mere notice of his appointment would not have informed the plaintiff of either (1) the military judge's submission of his application during the pendency of the court-martial proceedings; (2) the misleading nature of the military judge's comments regarding his retirement, in light of the timing of the submission of his application; or (3) the military judge's submission of an order denying the plaintiff's unlawful command influence motion as the writing sample submitted with his employment application, see Pl.'s Mem., Ex. 33 (Writ-Appeal Petition) at 52–67 (consisting of the military judge's application), three facts which are extremely important in applying the rulings in Al-Nashiri to the plaintiff's case, see Pl.'s Mem. at 37–38 (noting these factual similarities between the two cases).[16]

---

(. . . continued)

immigration judge."); Def.'s Resp. to Pl.'s Facts ¶ 119; Def.'s Mot., Ex. 1 (Trial Tr.) at 1717 (indicating that the military judge's statements regarding retirement were made on October 23, 2017).

[16] Furthermore, to the extent the defendant argues that the publication of the Al-Nashiri opinion triggered an obligation on the plaintiff's part to seek out the military judge's employment application, see Def.'s Mem. at 36–37,

(continued . . .)

In its decision denying the plaintiff's <u>coram nobis</u> petition, the ACCA relied heavily upon

<u>United States v. Kates</u>, Misc. Dkt. No. 2014-05, ACM S32018, 2014 CCA LEXIS 360 (A.F. Ct.

Crim. App. June 17, 2014), which involved a petitioner's challenge to an appeal affirming his

court-martial conviction based upon the participation of an appellate military judge who was

later found to have been improperly appointed to his position, <u>see</u> <u>id.</u> at *1–3.  <u>See</u> <u>Bergdahl IV</u>,

2020 WL 7316058, at *3–4 (comparing the plaintiff's case to the facts in <u>Kates</u>).  However, this

case is distinguishable from <u>Kates</u>, and accordingly warrants a different result.

The factual predicate for the petitioner's challenge in <u>Kates</u>—<u>i.e.</u>, the appointment of a

military appellate judge who then participated in deciding the petitioner's appeal—was a known

fact throughout the petitioner's appellate proceedings.  <u>See</u> <u>Kates</u>, 2014 CCA LEXIS 360, at *2

(stating that the military appellate judge "took part in the decision" "that found no basis for relief

in the appellant's assigned errors" and that the petitioner "did not raise the issue of [the military

appellate judge's] participation" in his subsequent appeal).  Moreover, the court in that case

noted that the validity of the specific military appellate judge's appointment had been "very

much at issue in appellate litigation" throughout the petitioner's subsequent appeal.  <u>Id.</u> at *7.

Conversely, the plaintiff in this case had no knowledge of the factual predicate for his

challenge—<u>i.e.</u>, the submission and content of the military judge's job application—until he

---

(. . . continued)

the Court re-emphasizes that the military judge in the plaintiff's case affirmatively misled the plaintiff regarding his
intentions to retire, <u>see</u> <u>supra</u> note 14, and the press release announcing the military judge's appointment as an
immigration judge provided the plaintiff with no knowledge regarding the timing of <u>the submission of his
application</u>, <u>see</u> Pl.'s Facts ¶ 129 ("On September 28, 2018, the [Department of] Justice [ ] issued a press release that
stated in part, 'Attorney General Jeff Sessions appointed [the military judge] to begin hearing cases in October
2018.'" (third alteration in original); Def.'s Resp. to Pl.'s Facts ¶ 129.  Thus, even after the issuance of the Circuit's
opinion in <u>Al-Nashiri</u>, the plaintiff was not on notice that the rulings in that opinion would apply to his case.  And, to
the extent the defendant argues that the plaintiff must have been aware of the military judge's employment
application given that the plaintiff submitted a FOIA request soon after the issuance of the <u>Al-Nashiri</u> opinion, <u>see</u>
Def.'s Reply at 22, the Court declines to speculate regarding the plaintiff's potential subjective suspicions at the time
prior to obtaining the military judge's employment application where, from an <u>objective</u> standpoint, the plaintiff was
not on notice of the submission of the application during his court-martial proceedings.

received the application after the CAAF's final ruling in his case.  <u>See</u> Pl.'s Facts ¶ 132; Def.'s

Resp. to Pl.'s Facts ¶ 132.  Furthermore, there was no other pending litigation or controversy

pertaining specifically to the military judge in his case that would have alerted the plaintiff of

potential grounds for his disqualification.  <u>See generally</u> Pl.'s Facts; Def's Resp. to Pl.'s Facts;

Pl.'s Mem.; Def.'s Mem.  Accordingly, the Court finds the ACCA's invocation of the ruling in

<u>Kates</u> unpersuasive in determining whether the plaintiff has established "sound reasons [ ] for

[his] failure to seek appropriate earlier relief."  <u>Morgan</u>, 346 U.S. at 512.

   Based upon the foregoing reasons, the Court concludes that because the plaintiff did not

"ha[ve] everything [he] needed in order to raise th[is] claim on direct appeal[,]" <u>Pole</u>,

2021 WL 5796518, at *9 (internal quotation marks omitted), he has established "sound reasons

[ ] for [his] failure to seek appropriate earlier relief[,]" <u>Morgan</u>, 346 U.S. at 512.  Therefore,

having concluded that the ACCA improperly denied the plaintiff's <u>coram nobis</u> petition, the

Court must proceed by taking "a close look at the merits" of this claim.  <u>Sanford</u>, 586 F.3d at 32.

## 2. Whether the Military Judge Improperly Failed to Disclose a Basis for His Disqualification

   The Court must next evaluate the merits of the plaintiff's claim that the military judge

improperly failed to disclose a basis for his disqualification.  The plaintiff argues that "[t]he

military judge's job application gave him an impermissible pecuniary interest [that] he had a

duty to disclose[,]" Pl.'s Mem. at 34, and,

> [b]y failing to disclose his job application while claiming that he was impervious
> to [unlawful command influence] because he was retiring, the military judge
> deprived the plaintiff of the opportunity to conduct midstream <u>voir dire</u> . . . , to
> move for recusal, and to decide whether to elect [a] bench trial before whichever
> judge was assigned to the case in his place[,]

id. at 42.  In support of his position, the plaintiff relies heavily on the Circuit's decision in Al-Nashiri and analogizes the facts of that case to his case.  See id. at 37–40.  In response, the defendant argues first that "Al-Nashiri is inapposite here[,]" Def.'s Mem. at 39, and "[the p]laintiff [e]rrs in [a]nalogizing [this case] to Al-Nashiri[,]" id., and second, that "[n]either the military judge's employment application, nor his conduct of the trial, nor the outcome in this case supplies any reason to question his impartiality[,]" id. at 41.

"Unbiased, impartial adjudicators are the cornerstone of any system of justice worthy of the label."  Al-Nashiri, 921 F.3d at 233–34.  "And because '[d]eference to the judgments and rulings of courts depends upon public confidence in the integrity and independence of judges,' jurists must avoid even the appearance of partiality."  Id. at 234 (quoting United States v. Microsoft Corp., 253 F.3d 34, 115 (D.C. Cir. 2001)) (internal quotation marks omitted) (alteration in original).  In other words, "to perform its high function in the best way[,] justice must satisfy the appearance of justice."  Liljeberg v. Health Servs. Acquisition Corp., 486 U.S. 847, 864 (1988) (quoting In re Murchison, 349 U.S. 133, 136 (1955)) (internal quotation marks omitted).  Violation of a statute or rule regarding judicial disqualification is generally established where "a reasonable person, knowing the relevant facts, would expect that a justice, judge, or magistrate knew of circumstances creating an appearance of partiality, notwithstanding a finding that the judge was not actually conscious of those circumstances."  Id. at 850.  And, this standard applies equally to military judges subject to the Rules for Military Commissions.  See Al-Nashiri, 921 F.3d at 234 ("Like the judicial recusal statute they mirror, the Rules for Military Commissions focus not on whether a military judge harbored actual bias, but rather on what 'would appear to a reasonable person . . . knowing all the circumstances.'" (quoting Liljeberg, 486 U.S. at 860–61) (alteration in original)).  Thus, "[s]uch a stringent rule

may sometimes bar trial by judges who have no <u>actual</u> bias and who would do their very best to weigh the scales of justice equally between contending parties." <u>Murchison</u>, 349 U.S. at 136 (emphasis added).

Furthermore, while "[t]he Due Process Clause demarks only the outer boundaries of judicial disqualifications[,]" <u>Aetna Life Ins. Co. v. Lavoie</u>, 475 U.S. 813, 828 (1986), more specific statutes and rules governing judicial conduct "provide more protection than due process requires," <u>Caperton v. A.T. Massey Coal Co.</u>, 556 U.S. 868, 890 (2009).  In this case, the Rules for Courts-Martial provide these more specific requirements governing the conduct of military judges. <u>See</u> Def.'s Mem. at 38; Pl.'s Mem. at 35–36.  Specifically, Rule 902 requires that "a military judge shall disqualify himself or herself in any proceeding in which that military judge's impartiality might reasonably be questioned." R.C.M. 902(a).  Furthermore, "[a] military judge shall also disqualify himself or herself . . . [w]here the military judge . . . [knows he or she] ha[s] an interest, financial or otherwise, that could be substantially affected by the outcome of the proceeding[.]" R.C.M. 902(b)(5)(B).

Here, the Court concludes that, "based on the totality of the circumstances, [the military judge's] conduct falls squarely on the impermissible side of the line[,]" <u>Al-Nashiri</u>, 921 F.3d at 235, with respect to the appearance of judicial partiality.  Specifically, the combination of the three following undisputed facts in this case supports the conclusion that "a reasonable person . . . would expect that . . . [the] judge . . . knew of circumstances creating an appearance of partiality[,]" <u>Liljeberg</u>, 486 U.S. at 850: (1) the judge's application for an immigration judge position with the Department of Justice while the plaintiff's court-martial proceedings were pending before him, <u>see</u> Pl.'s Facts ¶ 119; Def.'s Resp. to Pl.'s Facts ¶ 119, after former President Trump had made comments directly concerning the plaintiff's case, <u>see</u> Pl.'s Facts ¶¶

90–97, 103; Def.'s Resp. to Pl.'s Facts ¶¶ 90–97, 103, and the plaintiff had moved to dismiss the case partially on the former President's comments, see Pl.'s Facts ¶ 104; Def.'s Resp. to Pl.'s Facts ¶ 104; (2) the judge's submission with his application of an order denying the plaintiff's unlawful command influence motion as his writing sample, see Pl.'s Facts ¶ 121; Def.'s Resp. to Pl.'s Facts ¶ 121; and (3) the judge's statements regarding his intent to retire, see Def.'s Mot., Ex. 1 (Trial Tr.) at 1724:3–5, 15–16.

The Court agrees with the plaintiff that these facts "all bear a striking resemblance to" the facts in Al-Nashiri, Pl.'s Mem. at 38, a case in which the Circuit found that a military judge had exhibited an appearance of partiality sufficient to require disclosure of a job application during the course of the petitioner's trial, see Al-Nashiri, 921 F.3d at 237.  See id. (noting that the military judge applied for a job as an immigration judge during Al-Nashiri's trial, "emphasize[d] his role as the presiding judge . . . [by] suppl[ying] an order from Al-Nashiri's case as his writing sample[,]" and "mus[ed] on the record that 'over the next week or two' he would decide whether 'it might be time . . . to retire'").  Nonetheless, despite the similarity of these facts, the defendant argues that this case is inapposite, see Def.'s Mem. at 39, mainly based upon the high degree of emphasis the Circuit placed on the Department of Justice's active involvement in Al-Nashiri's case as one of the parties, see Al-Nashiri, 921 F.3d at 235–37.  However, while that aspect of the case was dispositive in Al-Nashiri, see id. at 237 (stating that, due to the Department of Justice's involvement in the case, "[t]he fact of [the military judge's] employment application alone would [ ] be enough to require his disqualification"), the Court ultimately considered the "totality of the circumstances[,]" id. at 235, in rendering its decision, including the facts which track closely with those in this case.

Moreover, although the Department of Justice was not one of the parties in the plaintiff's court-martial proceedings, this case is unique in that the head of the executive branch during part of the plaintiff's court-martial proceedings—former President Trump—and thus the ultimate authority over the agency that would determine the military judge's appointment as an immigration judge, expressed during his candidacy and subsequently ratified after his election explicit condemnations of the plaintiff, reflecting his "discernible interest in the outcome[,]" United States v. Wilson, No. ACM 39387, 2021 WL 2390367, at *13 (A.F. Ct. Crim. App. June 10, 2021), of the plaintiff's case.[17]  See, e.g., Pl.'s Facts ¶ 90 (stating that Trump "repeatedly vilified the plaintiff, describing him as a traitor at numerous rallies, and suggesting, among other things, that he be executed"); id. ¶ 92 ("The plaintiff, [ ] Trump further asserted, was 'the worst,' 'no good,' 'this bum,' a 'whack job,' 'this piece of garbage,' a 'son of a bitch,' and 'a very bad person who killed six people.'"); id. ¶ 94 ("Trump asserted that deserters used to be shot, implying and at times saying outright that the plaintiff deserved the death penalty."); id. ¶ 104 (stating that, after he was elected president, Trump "ratified [his] disparaging pre-Inauguration comments about [the plaintiff]"); Def.'s Resp. to Pl.'s Facts ¶¶ 90, 92, 94, 104.  See also Def.'s Mot., Ex. 8 (2d UCI Ruling) ¶ 15 (noting that the military judge "recognizes that this is an unusual case, perhaps unique in all the annals of military justice" in part because "a man who

---

[17] The defendant cites to two opinions issued by the Air Force Court of Criminal Appeals to support its proposition that courts have "declined to extend Al-Nashiri's holding to court-martial proceedings in which [the Department of Justice] played no role."  Def.'s Mem. at 40 (citing Wilson, 2021 WL 2390367; United States v. Snyder, No. ACM 39470, 2020 WL 1896341 (A.F. Ct. Crim. App. Apr. 15, 2020)).  However, neither of these cases implicated the head of the executive branch, and his widely publicized explicit interest in the case via the president's remarks, in the way that this case does.  See Wilson, 2021 WL 2390367, at *13; Snyder, 2020 WL 1896341, at *20–21.  Rather, both cases involved challenges to a military judge's application to positions which did not implicate any active litigants that were before the court in those cases, and neither case involved an individual with supervisory authority over a hiring official, who had expressed desires concerning the outcome of those cases.  See Wilson, 2021 WL 2390367, at *13; Snyder, 2020 WL 1896341, at *21.  Therefore, the facts of those cases did not create the same appearance "that [the judge]'s impartiality was in jeopardy[,]" Al-Nashiri, 921 F.3d at 235, which exists in the plaintiff's case by virtue of former President Trump's comments and status as the authority over an ultimate appointing official for immigration judge positions.

**Add. 59**

eventually became President of the United States and Commander[-]in[-]Chief of all the armed

forces ma[de] conclusive and disparaging comments . . . about a soldier facing potential

court-martial" and that "[t]he Court recognizes the problematic potential created by these facts");

Bergdahl II, 80 M.J. at 245 (Stucky, C.J., concurring in part and dissenting in part) ("This case is

unique in modern American military jurisprudence.  Let us hope that we shall not see its like

again.").  Thus, former President Trump—and, arguably, the executive branch by extension—

had explicitly stated an interest in a particular outcome in the plaintiff's case, i.e., that the

plaintiff would be convicted and receive the death penalty.  See Pl.'s Facts ¶ 94; Def.'s Resp. to

Pl.'s Facts ¶ 94.  Furthermore, Trump's statements formed the basis for the plaintiff's second and

third motions to dismiss based upon unlawful command influence.  See Pl.'s Facts ¶¶ 100, 104;

Def.'s Resp. to Pl.'s Facts ¶¶ 100, 104.  Therefore, even though the Department of Justice was

not directly involved in the plaintiff's case as a party, Trump's statements were integral to the

potential success of the plaintiff's defense, see Pl.'s Facts ¶¶ 100, 104 (indicating that former

President Trump's remarks formed the basis for two of the plaintiff's motions to dismiss); Def.'s

Resp. to Pl.'s Facts ¶¶ 100, 104, and specifically referenced the former president's desire that the

plaintiff be convicted and how he should be punished, see, e.g., Pl.'s Facts ¶¶ 90, 94, 103; Def.'s

Resp. to Pl.'s Facts ¶¶ 90, 94, 103.  Thus, the Court concludes that, based upon the military

judge's job application to an executive branch position—a situation in which he might

reasonably be expected to appeal to the president's expressed interest in the plaintiff's conviction

and punishment—"it would appear to a reasonable person[,]" Liljeberg, 486 U.S. at 860,

"knowing all the circumstances," id. at 861 (internal quotation marks omitted), "that [the

judge]'s impartiality was in jeopardy[,]" Al-Nashiri, 921 F.3d at 235.

Having concluded that this case presents a unique situation where the military judge might be inclined to appeal to the president's expressed interest in the plaintiff's conviction and punishment when applying for the immigration judge position, or at least that being the perception a reasonable member of the public would have, the Court concludes that the other circumstances of this case further "undermine [the judge's] apparent neutrality[,]" id. at 237. Namely, the military judge in this case submitted a writing sample along with his application, consisting of an order in which he denied the plaintiff's unlawful-command-influence motion which was based upon former President Trump's statements, and ruled against the plaintiff— both actions that a reasonable person might view as serving the president's interests in the case and thus, "creating the appearance of impropriety[,]" Liljeberg, 486 U.S. at 858.  See Al-Nashiri, 921 F.3d at 237 (concluding that, by "cho[o]s[ing] to emphasize his role as the presiding judge over Al-Nashiri's commission" and "suppl[ying] an order from Al-Nashiri's case as his writing sample[,]" the judge "affirmatively called the [Department of] Justice['s] [ ] attention to his handling of Al-Nashiri's case, making his performance as presiding judge a key point in his argument for employment").  Finally, the military judge's decision not to disclose his application for the immigration judge position, coupled with his misleading affirmative statements regarding his impending retirement, see supra note 14, also could lead "a reasonable observer [ ] [to] wonder whether the judge had done something worth concealing[,]" Al-Nashiri, 921 F.3d at 237.

The Court therefore concludes, based upon the totality of the circumstances, that "a reasonable person, knowing the relevant facts, would expect that [the military judge in this case] knew of circumstances creating an appearance of partiality[,]" Liljeberg, 486 U.S. at 850, and because, "in [this] proceeding[,] . . . [ ] th[e] military judge's impartiality might reasonably be questioned[,]" R.C.M. 902(a), he should have disclosed his job application as a potential ground

for his disqualification.  In reaching this conclusion, the Court does not mean to opine that there was actual bias in this case or that the military judge's "orders were [not] the product of his considered and unbiased judgment, unmotivated by any improper considerations." Al-Nashiri, 921 F.3d at 237.  Rather, the facts of this case present an appearance of partiality and, while "[a]ppearance may be all there is, [ ] that is enough[.]" Microsoft Corp., 253 F.3d at 115.

Accordingly, the Court concludes that it must deny the defendant's motion and grant the plaintiff's motion as to Count II of the plaintiff's Complaint.  Furthermore, the Court will vacate all orders and rulings issued by the military judge who presided over the plaintiff's court-martial as of October 16, 2017, and thereafter—which was the date when that military judge submitted his employment application for an immigration judge position, see Pl.'s Facts ¶ 119; Def.'s Resp. to Pl.'s Facts ¶ 119—and "further vacate all decisions issued by [the appellate military courts] reviewing such orders [and rulings]." Al-Nashiri, 921 F.3d at 241 (vacating all orders issued by the military judge after the submission of his job application which the D.C. Circuit concluded should have been disclosed).  Consequently, the judgment of the military judge regarding the plaintiff's court-martial is rendered void.  See Schlesinger, 420 U.S. at 746–47 ("Collateral attack seeks, as a necessary incident to relief otherwise within the [C]ourt's power to grant, a declaration that the judgment is void.").

## IV.   CONCLUSION

Accordingly, for the foregoing reasons, the Court concludes that it must grant in part and deny in part the defendant's motion to dismiss, and grant in part and deny in part the plaintiff's motion for summary judgment.

**Add. 62**

**SO ORDERED** this 25th day of July, 2023.[18]

REGGIE B. WALTON
United States District Judge

---

[18] The Court will contemporaneously issue an Order consistent with this Memorandum Opinion.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ROBERT B. BERGDAHL, ) | |
| ) | |
| Plaintiff, ) | |
| v. ) | Civil Action No. 21-418 (RBW) |
| ) | |
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Defendant. ) | |
| ) | |

## <u>ORDER</u>

In accordance with the Memorandum Opinion issued on this same date, it is hereby

**ORDERED** that the Defendant's Motion to Dismiss, ECF No. 16, is **GRANTED IN PART AND DENIED IN PART**.  The motion is **GRANTED** to the extent that it seeks dismissal of the Count I of the Complaint in this case.  The motion is **DENIED** in all other respects.  It is further

**ORDERED** that the Plaintiff's Cross-Motion for Summary Judgment, ECF No. 18, is **GRANTED IN PART AND DENIED IN PART**.  The motion is **GRANTED** to the extent that it seeks summary judgment as to Count II of the Complaint in this case.  The motion is **DENIED** in all other respects.  It is further

**ORDERED** that Count I of the Complaint in this case is **DISMISSED**.  It is further

**ORDERED** that summary judgment is **ENTERED** for the plaintiff as to Count II of the Complaint in this case.  It is further

**ORDERED** that all orders and rulings issued as of October 16, 2017, and thereafter by the military judge as part of the plaintiff's court-martial proceedings he conducted, and any appellate decisions reviewing such orders and rulings are **VACATED**.  It is further

**Add. 64**

**ORDERED** that this case is **CLOSED**.

**SO ORDERED** this 25th day of July, 2023.

REGGIE B. WALTON
United States District Judge

**Add. 65**

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

<table>
<tr><td>ROBERT B. BERGDAHL,</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>Plaintiff,</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>v.</td><td>)</td><td>Civil Action No. 21-418 (RBW)</td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>UNITED STATES OF AMERICA,</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>Defendant.</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
</table>

## <u>MEMORANDUM OPINION</u>

The plaintiff, Robert B. Bergdahl, brought this civil action against the defendant, the United States of America, seeking collateral review of his conviction by a general court-martial, <u>see</u> Amended Complaint for Declaratory and Injunctive Relief ("Am. Compl.") at 1, ECF No. 3, pursuant to the Due Process Clause of the Fifth Amendment of the United States Constitution, <u>see</u> <u>id.</u> ¶ 1; the Rules for Courts-Martial ("R.C.M.") 104(a)(1), 902, <u>see</u> <u>id.</u>; and "Rule 2.11 of the binding Rules of Judicial Conduct for Army Trial and Appellate Judges[,]" <u>id.</u>  On July 25, 2023, the Court granted in part and denied in part the defendant's motion to dismiss and granted in part and denied in part the plaintiff's motion for summary judgment.  <u>See</u> <u>Bergdahl v. United States</u>, 683 F. Supp. 3d 24, 35 (D.D.C. 2023) ("July 25, 2023 Memorandum Opinion"); Order at 1 (July 25, 2023), ECF No. 26.  Currently pending before the Court are (1) the Defendant's Motion to Alter or Amend Judgment ("Def.'s Mot." or the "defendant's motion"), ECF No. 27, and (2) The Plaintiff's Cross-Motion to Alter or Amend the Judgment ("Pl.'s Mot." or the "plaintiff's motion"), ECF No. 28.  Upon careful consideration of the parties' submissions,[1] the Court

---

[1] In addition to the filings already identified, the Court considered the following submissions in rendering its decision: (1) the Opposition to the Plaintiff's Cross-Motion to Alter or Amend the Judgment ("Def.'s Opp'n"), ECF
(continued . . .)

concludes for the following reasons that it must grant in part and deny in part the defendant's

motion for reconsideration and deny the plaintiff's cross-motion for reconsideration.

## I.    BACKGROUND

The Court previously discussed the factual background and legal framework pertinent to

this case in its July 25, 2023 Memorandum Opinion, see Bergdahl, 683 F. Supp. 3d at 35–45, and

therefore will not reiterate those facts and authorities again here.  The Court will, however, set

forth the procedural background which is pertinent to the resolution of the pending motions for

reconsideration.

In the Court's July 25, 2023 Memorandum Opinion, the Court granted in part and denied

in part the defendant's motion to dismiss and granted in part and denied in part the plaintiff's

motion for summary judgment.  See id. at 71.  First, the Court addressed the plaintiff's unlawful

command influence claims and found "no reason to disturb [the military courts'] decisions on the

merits of [these] claim[s]."  Id. at 60 (quoting Scott v. United States, 351 F. Supp. 3d 1, 8

(D.D.C. 2018)).  However, in turning to the plaintiff's second claim—viz., "whether the military

judge had a duty to disclose that he had applied for a lucrative job with the Department of

Justice[,]" Am. Compl. at 1—the Court concluded that "based upon the totality of the

circumstances, [ ] 'a reasonable person, knowing the relevant facts, would expect that [the

military judge in this case] knew of circumstances creating an appearance of partiality[,]' and

because 'in [this] proceeding[] . . . [ ] th[e] military judge's impartiality might reasonably be

questioned[,]' he should have disclosed his job application as a potential ground for his

disqualification."  Bergdahl, 683 F. Supp. 3d at 71 (second, third, fourth, sixth, seventh, and

---

(. . . continued)
No. 32; (2) the Plaintiff's Response to Defendant's Motion to Alter or Amend ("Pl.'s Opp'n"), ECF No. 33; (3) the
Defendant's Reply in Support of its Motion to Alter or Amend Judgment ("Def.'s Reply"), ECF No. 35; and (4) the
Plaintiff's Reply to Defendant's Response to Cross-Motion to Alter or Amend ("Pl.'s Reply"), ECF No. 36.

eight alterations in original) (omission in original) (internal citations omitted) (first quoting

Liljeberg v. Health Servs. Acquisition Corp., 486 U.S. 847, 850 (1988); and then quoting R.C.M.

902(a)).  In reaching this conclusion, the Court noted that "the military judge in this case

submitted a writing sample along with his application, consisting of an order in which he denied

the plaintiff's unlawful-command-influence motion which was based upon former President

[Donald J.] Trump's statements [regarding Bergdahl], and [then] ruled against the plaintiff—

both actions that a reasonable person might view as serving the president's interests in this case

and thus, 'creating the appearance of impropriety[.]'"  Id. at 70–71 (quoting Liljeberg, 486 U.S.

at 858).  Moreover, the Court stated that "the military judge's decision not to disclose his

application for the immigration judge position, coupled with his misleading affirmative

statements regarding his impending retirement, also could lead 'a reasonable observer [ ] [to]

wonder whether the judge had done something worth concealing.'"  Id. at 71 (alterations in

original) (quoting In re Al-Nashiri, 921 F.3d 224, 237 (D.C. Cir 2019)).  Accordingly, the Court

vacated "all orders and rulings issued by the military judge who presided over the plaintiff's

court-martial as of October 16, 2017, and thereafter—which was the date when that military

judge submitted his employment application for an immigration judge position—and 'further

vacate[d] all decisions issued by [the appellate military courts] reviewing such orders [and

rulings].'"  Id. (second and third alterations in original) (internal citations omitted) (quoting Al-

Nashiri, 921 F.3d at 241).  Consequently, the Court held that "the judgment of the military judge

regarding the plaintiff's court-martial [was] rendered void."  Id.

On August 22, 2023, the defendant filed its motion for reconsideration of the Court's

July 25, 2023 Memorandum Opinion and Order pursuant to Rule 59(e) of the Federal Rules of

Civil Procedure.  See Def.'s Mot. at 1.  The plaintiff then filed his opposition on September 15,

**Add. 68**

2023, <u>see</u> Pl.'s Opp'n at 1, and the defendant filed its reply in support of its motion on
September 22, 2023, <u>see</u> Def.'s Reply at 1.

On August 22, 2023, the plaintiff also filed his cross-motion for reconsideration pursuant
to Rule 59(e) of the Federal Rules of Civil Procedure.  <u>See</u> Pl.'s Mot. at 1.  In response, the
defendant filed its opposition on September 15, 2023, <u>see</u> Def.'s Opp'n at 1, and the plaintiff
filed his reply in support of his cross-motion on September 22, 2023, <u>see</u> Pl.'s Reply at 1.

## II.   STANDARD OF REVIEW

### A.   Rule 59(e) Motion for Reconsideration

Federal Rule of Civil Procedure 59(e) permits a party to file "[a] motion to alter or amend
a judgment" within "[twenty-eight] days after the entry of the judgment."  Fed. R. Civ. P. 59(e).
However, a Rule 59(e) motion "is not a second opportunity to present [an] argument upon which
the Court has already ruled, nor is it a means to bring before the Court theories or arguments that
could have been advanced earlier[,]" <u>W.C. & A.N. Miller Cos. v. United States</u>, 173 F.R.D. 1, 3
(D.D.C. 1997), and "need not be granted unless the [ ] [C]ourt finds that there is an intervening
change of controlling law, the availability of new evidence, or the need to correct a clear error or
prevent manifest injustice[,]" <u>Anyanwutaku v. Moore</u>, 151 F.3d 1053, 1057–58 (D.C. Cir. 1998)
(internal quotation marks omitted).  Although motions under Rule 59(e) "lie within the discretion
of the Court[,]" <u>AARP v. U.S. Equal Emp. Opportunity Comm'n</u>, 292 F. Supp. 3d 238, 241
(D.D.C. 2017) (citing <u>Ciralsky v. Cent. Intel. Agency</u>, 355 F.3d 661, 671 (D.C. Cir. 2004)), such
motions are "disfavored[,]" and the moving party bears the burden of establishing "extraordinary
circumstances" warranting relief from a final judgment, <u>Niedermeier v. Off. of Max S. Baucus</u>,
153 F. Supp. 2d 23, 28 (D.D.C. 2001) (citing <u>Anyanwutaku</u>, 151 F.3d at 1057-58).

**Add. 69**

### III.   ANALYSIS

As noted earlier, both the plaintiff and the defendant request that the Court reconsider its July 25, 2023 Memorandum Opinion and Order pursuant to Rule 59(e) of the Federal Rules of Civil Procedure.  <u>See</u> Def.'s Mot. at 1; Pl.'s Mot. at 1.  The Court will first address the defendant's motion for reconsideration, before considering the plaintiff's cross-motion for reconsideration.

#### A.   The Defendant's Motion for Reconsideration

The defendant urges the Court to reconsider its July 25, 2023 Memorandum Opinion and Order because it contends that "[t]his case presents 'extraordinary circumstances' warranting relief," Def.'s Mot. at 1–2 (quoting <u>Pfeiffer v. U.S. Dep't of Energy</u>, No. 20-2924 (RBW), 2023 WL 4405158, at *2 (D.D.C. July 7, 2023)), and because the Court committed "clear error," <u>id.</u> at 1.  The defendant argues that "[t]he standard for clear error is satisfied here because the Court imposed the remedy of vacatur upon finding an appearance of partiality without applying the test that should have guided the Court's remedial discretion."  <u>Id.</u> at 3.  More specifically, the defendant claims that "[i]n <u>Liljeberg</u> [<u>v. Health Servs. Acquisition Corp.</u>, 486 U.S. 847 (1988)], the Supreme Court instructed that '[t]here need not be a draconian remedy for every violation' of a statute addressing judicial impartiality and instead 'identified three factors relevant to the question [of] whether vacatur is appropriate.'"  <u>Id.</u> (quoting <u>United States v. Microsoft Corp.</u>, 253 F.3d 34, 116 (D.C. Cir. 2001)).  And here, the defendant argues that "[t]he <u>Liljeberg</u> factors weigh heavily against vacatur[.]"  <u>Id.</u> at 4.[2]  Alternatively, the defendant requests "that, even if

---

[2] The defendant also argues that "[t]his case presents 'extraordinary circumstances' warranting relief because the judgment vacates the final, fully executed orders of an independent court system in a form not sought by the plaintiff, and, therefore, [was] not briefed by the parties, and vacatur is not warranted under the applicable framework."  Def.'s Mot. at 2 (internal citation omitted).  However, because the Court concludes that it did not clearly err for the reasons discussed <u>infra</u>, it sees no occasion to address this argument.  <u>See</u> <u>Anyanwutaku</u>, 151 F.3d

(continued . . .)

5

**Add. 70**

the Court declines to amend its vacatur order, the Court clarify that this case is remanded for further proceedings." Id. at 2.

In response, the plaintiff argues that "[f]ar from constituting clear error, the Court's ruling on the [recusal] issue was plainly correct." Pl.'s Opp'n at 2. More specifically, the plaintiff claims that "[v]acating the military judge's rulings from the time he secretly applied for a Justice Department job is in perfect sync with [the District of Columbia Circuit's decision in] Al-Nashiri." Id. The plaintiff also claims that the defendant's request for clarification is inappropriate because "it is far from clear that further proceedings would be constitutional, as the plaintiff has not been in the Army since his dishonorable discharge was executed." Id. at 5.

Because the defendant does not rely on an "intervening change of controlling law" or "the availability of new evidence," Anyanwutaku, 151 F.3d at 1057 (internal quotation marks omitted), as grounds for reconsideration, see generally Def.'s Mot.; Def.'s Reply, the Court will confine its Rule 59(e) analysis to the question of whether it needs to "correct a clear error or prevent manifest injustice[,]" Anyanwutaku, 151 F.3d at 1058 (internal quotation marks omitted). See id. at 1057–58 (stating that Rule 59(e) motions "need not be granted unless the [ ] [C]ourt finds that there is an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice"). With respect to what amounts to "clear error" under Rule 59(e), courts have imposed a "very exacting standard." Bond v. U.S. Dep't of Justice, 286 F.R.D. 16, 22 (D.D.C. 2012) (quoting Lightfoot v. District of Columbia, 355 F. Supp. 2d 414, 422 (D.D.C. 2005)). To qualify as clear error, the "final judgment must be 'dead wrong[.]'" Lardner v. Fed. Bureau of Investigation, 875 F. Supp. 2d 49,

(. . . continued)
at 1057–58 (stating that "Rule 59(e) motions 'need not be granted unless the district court finds that there is an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice'" (quoting Firestone, 76 F.3d at 1208)).

**Add. 71**

53 (D.D.C. 2012) (quoting <u>Parts & Elec. Motors, Inc. v. Sterling Elec., Inc.</u>, 866 F.2d 228, 233

(7th Cir. 1988)); <u>see also</u> <u>Smith v. Lynch</u>, 115 F. Supp. 3d 5, 12 (D.D.C. 2015) ("[T]o be clearly

erroneous, a decision must strike [a court] as more than just maybe or probably wrong; it must

. . . strike [the court] as wrong with the force of a five-week-old, unrefrigerated dead fish.'"

(quoting <u>Parts & Elec. Motors</u>, 866 F.2d at 233) (second and third alterations in original)).  Thus,

"[m]ere disagreement does not support a Rule 59(e) motion."  <u>Smith</u>, 115 F. Supp. 3d at 12

(internal quotation marks omitted) (alteration in original).

     The Court will first address the defendant's argument that the Court clearly erred in

vacating the military judge's orders under the <u>Liljeberg</u> framework, before addressing the

defendant's request for clarification.

**1.  Whether the Court Clearly Erred in Vacating the Military Judge's Orders**

     When a "petition seeks vacatur of judicial decisions, [the Court's] discretion is guided by

the three <u>Liljeberg</u> factors: '[1] the risk of injustice to the parties in the particular case, [2] the

risk that the denial of relief will produce injustice in other cases, and [3] the risk of undermining

the public's confidence in the judicial process."  <u>Al-Nashiri</u>, 921 F.3d at 239 (quoting <u>Liljeberg</u>,

486 U.S. at 864).  The Court will consider each factor in turn.

**a.  Whether There is a Risk of Injustice to the Parties in This Case**

     The defendant claims that the first <u>Liljeberg</u> factor, "[t]he risk of injustice to the parties[,]

counsels against vacatur[,]" Def.'s Mot. at 4, which was the remedy the Court provided to the

plaintiff.  In support of its position, the defendant first notes that "[n]either the death penalty nor

a sentence of confinement is involved here."  <u>Id.</u>  Indeed, the defendant notes that the "plaintiff

requested [that he receive] his sentence of a dishonorable discharge[]" that was imposed by the

military judge.  <u>Id.</u>  Second, the defendant argues that the costs of vacatur are intolerably high as

"the court that entered the plaintiff's conviction and sentence does not currently exist." Id. at 4–5 (citing United States v. Denedo, 556 U.S. 904, 925 (2009) (Roberts, C.J., concurring in part) ("[A] court-martial is not a standing court . . . . When the object of its creation has been accomplished[,] it is dissolved.")). Accordingly, the defendant claims that a resumption of proceedings would "require[] expending significant military resources." Id. at 5 (internal quotation marks omitted).

In response, the plaintiff argues that "while the plaintiff was not charged capitally, and indeed, was not sentenced to confinement, the desertion charge was potentially capital[.]" Pl.'s Opp'n at 3. Furthermore, the plaintiff notes that he "was sentenced to a dishonorable discharge [and s]uch a discharge imposes a lifetime stigma." Id. Finally, the plaintiff claims that "[j]ust as the [District of Columbia] Court of Appeals did not deem the costs of granting mandamus 'intolerably high' in Al-Nashiri, it is hard to see at this point how the costs of this Court's decision are 'intolerable.'" Id. at 4.

With respect to the defendant's first argument, the Court notes that the District of Columbia Circuit has already "pointed out that [while] 'the deprivation of liberty under an invalid conviction is a grievous injury, [ ] a military discharge under other than honorable conditions imposes a lifelong disability of greater consequence for persons unlawfully convicted by courts martial.'" Homcy v. Resor, 455 F.2d 1345, 1349 (D.C. Cir. 1971) (quoting Kauffman v. Sec'y of the Air Force, 415 F.2d 991, 995 (D.C. Cir. 1969)). Indeed, "[i]n terms of its effects on reputation, the stigma experienced by the recipient of a discharge under other than honorable

conditions is very akin to the concept of infamy."  Kauffman, 415 F.2d at 995.  Accordingly, it follows then that the plaintiff's sentence imposes significant consequences.[3]

"On the other side of the ledger, the [defendant] warns that granting [the plaintiff's] petition would require relitigation of [these] proceedings, thus costing additional time and resources.  But while the public unquestionably possesses . . . an interest in avoiding unwarranted delays in the administration of justice, surely the public's interest in efficient justice is no greater than its interest in impartial justice."  Al-Nashiri, 921 F.3d at 240 (internal citation omitted) (internal quotation marks omitted).  "Any institution that wields the government's power to deny life and liberty must do so fairly, as the public's ultimate objective is not in securing a conviction but in achieving a just outcome."  Id.  Thus, while the defendant is correct that vacating the military judge's orders and resetting the military proceedings to the pre-adjudication stage will "require[] expending significant military resources," Def.'s Mot. at 5 (internal quotation marks omitted), if the military decides to further prosecute this case, it offers no alternative means to achieving a just outcome in this matter.  Indeed, under the defendant's approach, the plaintiff would be left with no recourse or relief to address the "appearance of partiality" in this matter.  Bergdahl, 683 F. Supp. 3d at 71.

---

[3] The defendant emphasizes the fact that the plaintiff voluntarily chose to plead guilty.  See Def.'s Mot. at 4. However, as the Court stated in its July 25, 2023 Memorandum Opinion, "there are various reasons why an individual might choose to plead guilty[.]"  Bergdahl, 683 F. Supp. 3d at 58.  "Here, as a preliminary matter, it is undisputed that the plaintiff had no actual knowledge or possession of the military judge's job application during his court-martial proceedings."  Id. at 64.  "In other words, based upon the military judge's representations during the court-martial proceedings, as well as his failure to disclose his job application, the plaintiff had no reason to know or even suspect that the military judge was applying for a job within the executive branch and that his impartiality could therefore be in question, considering the executive branch's involvement in this case."  Id. at 66.  Had the plaintiff known of the military judge's apparent conflict of interest, it is reasonable to expect that he may have chosen not to plead guilty.  Moreover, the plaintiff faced a potential sentence of lifetime imprisonment on the desertion charge and "[t]he military judge [had] denied [all three of] the plaintiff's [ ] unlawful command influence [motions,]" id. at 40, which likely further incentivized the plaintiff's decision to plead guilty.  Given these circumstances, the Court is unwilling to ascribe significant weight to the plaintiff's decision to plead guilty.

**Add. 74**

Instead, this Court—consistent with circuit precedent—adopted the approach taken in Al-Nashiri—viz., "vacatur of all orders entered by [the military judge] after" the date of his immigration judge application, Al-Nashiri, 921 F.3d at 240.  See Bergdahl, 683 F. Supp. 3d at 71.  "Additionally, because 'ordinary appellate review' on the merits cannot 'detect all of the ways that bias can influence a proceeding,'" Al-Nashiri, 921 F.3d at 240, the Court also vacated all decisions issued by the appellate military courts reviewing the military judge's orders and rulings.  See Bergdahl, 683 F. Supp. 3d at 71.  And, the defendant has failed to show how the Court's approach constituted clear error under the applicable circuit precedent.  See Lardner, 875 F. Supp. 2d at 53 (noting that "a final judgment must be 'dead wrong' to constitute clear error" (quoting Parts & Elec. Motors, 866 F.2d at 233)).  Accordingly, the first Liljeberg factor weighs in favor of vacatur.

### b.   Whether There is a Risk that the Denial of Relief Will Produce Injustice in Other Cases

Next, the defendant argues that "[t]he second Liljeberg factor, the 'risk that the denial of relief will produce injustice in other cases,' also weighs against vacatur."  Def.'s Mot. at 6 (quoting Al-Nashiri, 921 F.3d at 239).  While the defendant acknowledges that "restrictions against an appearance of partiality may generally prevent injustice in other cases," it claims that "this case's unique posture makes the possibility of injustice elsewhere remote."  Id.  More specifically, the defendant states that "the appearance of partiality arose only from the 'unique' circumstance that the then-President, 'the ultimate authority over the agency that would determine the military judge's appointment as an immigration judge, expressed during his candidacy and subsequently ratified after his election explicit condemnations of the plaintiff, reflecting his discernible interest in the outcome of the plaintiff's case.'"  Id. at 6–7 (quoting Bergdahl, 683 F. Supp. 3d at 69).  Accordingly, the defendant asserts that "[t]he unique

circumstances here undermine any suggestion that systematic considerations warrant vacatur." Id. at 7.

However, the defendant's argument appears to be premised upon an overly narrow reading of the Court's decision.  As the Court explained in its July 25, 2023 Memorandum Opinion, "the ultimate duty in situations of potential judicial disqualification is imposed upon the judge . . . and the military judge here not only failed to disclose potential grounds for disqualification but also affirmatively misled the parties." Bergdahl, 683 F. Supp. 3d at 65.  In other words, the Court took issue with the military judge's failure to disclose his employment prospects and his misrepresentations to the parties regarding those prospects.  Neither of these rationales is premised upon the "case's unique posture," Def.'s Mot. at 6; instead, they enforce commonly understood notions of a judge's recusal obligations.  See, e.g., R.C.M. 902(b)(5)(B) ("A military judge shall also disqualify himself or herself . . . [w]here the military judge . . . [knows he or she] ha[s] an interest, financial or otherwise, that could be substantially affected by the outcome of the proceeding[.]").  Moreover, the Court's concerns were further exacerbated by the fact that "the military judge in this case submitted a writing sample along with his application, consisting of an order in which he denied the plaintiff's unlawful-command-influence motion which was based upon former President Trump's statements, and ruled against the plaintiff—both actions that a reasonable person might view as serving the president's interests in the case and thus, 'creating the appearance of impropriety[.]'" Bergdahl, 683 F. Supp. 3d at 70–71 (quoting Liljeberg, 486 U.S. at 858).

"[A]s the Supreme Court explained in Liljeberg, [the judiciary's] 'willingness to enforce' disqualification 'may prevent a substantive injustice in some future case by encouraging a judge or litigant to more carefully examine possible grounds for disqualification and to promptly

**Add. 76**

disclose them when discovered.'"  Al-Nashiri, 921 F.3d at 239 (quoting Liljeberg, 486 U.S. at 868).  "And [the Court] cannot dismiss [the military judge's] lapse as a one-time aberration, as [the plaintiff's petition] is not the first meritorious request for recusal that [courts in this Circuit] ha[ve] considered with respect to military [ ] proceedings."  Id. at 240; see generally id. (issuing a writ of mandamus vacating a military judge's orders due to the military judge's failure to disclose a disqualifying conflict arising from his application for an immigration judge position); In re Mohammad, 866 F.3d 473 (D.C. Cir. 2017) (issuing a writ of mandamus recusing a military judge for expressing an opinion about the accused's guilt).  "It would seem, therefore, that some additional 'encourag[ement] . . . to more carefully examine possible grounds for disqualification,' would be especially 'appropriate under the circumstances.'"  Al-Nashiri, 921 F.3d at 240 (internal citation omitted) (internal quotation marks omitted).  Accordingly, the second Liljeberg factor also weighs in favor of vacatur.

> **c.      Whether There is a Risk of Undermining the Public's Confidence in the Judicial Process**

Finally, the defendant argues "as to the third Liljeberg factor, in contrast to Al-Nashiri, there is no 'risk of undermining the public's confidence in the judicial process,' absent vacatur." Def.'s Mot. at 7 (quoting Al-Nashiri, 921 F.3d at 239).  More specifically, the defendant claims that "even assuming the military judge's application created a situation in which his 'impartiality might reasonably be questioned,' the indicia of fairness at each step of the proceeding would supply ready and conclusive answers to any such questions."  Id. at 8 (quoting Bergdahl, 683 F. Supp. 3d at 71).

In response, the plaintiff argues that the defendant's "claim falls flat[,]" as the military judge "not only engaged in conduct that gave rise to the appearance of a conflict of interest by applying for a Justice Department position, but affirmatively misled the plaintiff by claiming

falsely that his plan was simply to retire."  Pl.'s Opp'n at 5.  Accordingly, the plaintiff asserts

that "[v]acating the military judge's rulings from the time he secretly applied for a Justice

Department job is in perfect sync with Al-Nashiri."  Id. at 2.

As a starting point, "[t]he Court agrees with the plaintiff that the[] facts [in this case] 'all

bear a striking resemblance to' the facts in Al-Nashiri[.]"  Bergdahl, 683 F. Supp. 3d at 69.  And,

the Al-Nashiri court found that such judicial conduct could risk undermining the public's

confidence in the judicial process.  921 F.3d at 240 ("[W]e cannot permit an appearance of

partiality to infect a system of justice that requires the most scrupulous conduct from its

adjudicators, 'for the appearance of bias demeans the reputation and integrity not just of one

jurist, but of the larger institution of which he or she is a part.'" (quoting Williams v.

Pennsylvania, 579 U.S. 1, 15 (2016))).

However, the defendant asserts that Al-Nashiri is distinguishable because "there is no

risk that the court-martial proceedings [in this case] would remain 'under a cloud of illegitimacy'

in the absence of vacatur."  Def.'s Mot. at 6 (quoting Al-Nashiri, 921 F.3d at 240).  More

specifically, the defendant asserts that considering "the Court's finding [on the plaintiff's

unlawful command influence ('UCI') claims,] an impartial observer would not harbor significant

doubts about the fairness of the proceedings[,]" which counsels against vacatur.  Id.

The defendant misunderstands the import of the Court's UCI decision.  As a threshold

matter, the Court notes that it was evaluating the plaintiff's UCI claims under a highly deferential

standard.  See, e.g., Bergdahl, 683 F. Supp. 3d at 60 ("Thus, according significant deference to

the [military courts] as required, 'the Court finds no reason to disturb the [military courts']

decisions on the merits of [the plaintiff's unlawful command influence] claim[s]." (third and

fourth alterations in original) (internal citation omitted)); id. at 55 ("The Court will 'assess[] the

aggravating and mitigating facts and circumstances[,]' as to each of these stages, keeping in mind the deference that must be afforded to the military courts." (alterations in original) (internal citation omitted) (quoting <u>United States v. Horne,</u> 82 M.J. 283, 287 (C.A.A.F. 2022))).  Stated otherwise, the Court did <u>not</u> hold that the military judge's rulings on the UCI issue were correct—<u>viz.</u>, the Court did not hold that there was no unlawful command influence in this matter, but only that vacatur on this ground was not warranted considering the constraint imposed on the Court by the highly deferential standard of review.[4]

Furthermore, even assuming <u>arguendo</u> that the military judge's rulings on the plaintiff's UCI claims were correct, that would not allay the Court's concerns regarding the military judge's apparent conflict.  Indeed, as the Court noted in its July 25, 2023 Memorandum Opinion, "[i]n reaching [its] conclusion, the Court [did] not mean to opine that there was actual bias in this case or that the military judge's 'orders were [not] the product of his considered and unbiased judgment, unmotivated by any improper considerations.'" <u>Id.</u> at 71 (fourth alteration in original) (quoting <u>Al-Nashiri</u>, 921 F.3d at 237)).  "Rather, the facts of this case present[ed] an appearance of partiality, and while '[a]ppearance may be all there is, [ ] that is enough[.]" <u>Id.</u> (second, third, and fourth alterations in original) (quoting <u>Microsoft</u>, 253 F.3d at 115).  Accordingly, the Court's rulings on the plaintiff's UCI claims did not bear on the Court's decision to order vacatur <u>on the basis of the plaintiff's recusal claims.</u>

---

[4] Indeed, in reaching this conclusion, the Court explicitly noted its concerns regarding former President Trump's and Senator McCain's comments about the plaintiff's court-martial proceedings.  <u>See, e.g.</u>, <u>Bergdahl</u>, 683 F. Supp. 3d at 60–61 ("Although it must reach this conclusion, the Court notes that what occurred in this case illustrates why individuals aspiring for public office and those achieving that objective should not express their desired verdict and punishment of individuals merely accused of committing criminal offenses.  They must be mindful that in the United States, individuals merely accused of committing crimes are presumed to be innocent until the prosecution has satisfied the high bar of proving guilty beyond a reasonable doubt regardless of the severity of the charged offense.  <u>So too must they appreciate the potential impact their comments may have on those who have to adjudicate the accused's culpability and the perception the public may have on the fairness of the process, which the credibility of the judicial system relies on in order for its decisions to be widely accepted.</u>" (emphasis added)).

**Add. 79**

Significant to the Court's analysis is the fact that the defendant does not contest the "appearance of bias" in its motion for reconsideration.  See generally Def.'s Mot.  Accordingly, consistent with Al-Nashiri, the Court cannot "permit [the] appearance of partiality [created in this case] to infect a system of justice that requires the most scrupulous conduct from its adjudicators, 'for the appearance of bias demeans the reputation and integrity not just of one jurist, but of the larger institution of which he or she is a part.'"  Al-Nashiri, 921 F.3d at 240 (quoting Williams, 579 U.S. at 15).  Thus, the third Liljeberg factor also weighs in favor of vacatur.

Based on all of the foregoing reasons, the Court concludes that its order of vacatur was required pursuant to the Liljeberg factors.  Accordingly, the Court must deny the defendant's motion for reconsideration to the extent that it argues that the Court clearly erred in vacating the military judge's orders under the Liljeberg framework.

## 2.  Whether the Court Should Clarify its July 25, 2023 Order

Alternatively, the defendant requests "that, if the Court retains its Order of vacatur, the Court amend that Order to clarify its intention to remand the case for further proceedings." Def.'s Mot. at 9.  More specifically, the defendant states that "[a]s the Court adopted the remedy ordered in Al-Nashiri—a case at the pretrial stage, which could and did resume thereafter—the defendant understands this Court's Order to permit a like result here."  Id. (internal citation omitted).  However, the defendant notes that "as the court-martial that entered the plaintiff's conviction and sentence was dissolved once the plaintiff's conviction became final, further proceedings consistent with the Court's opinion would have to be instigated by an appropriate authority."  Id.

**Add. 80**

In response, the plaintiff notes that "the Army has [not] made [ ] a decision" on whether to resume proceedings against him.  Pl.'s Opp'n at 5.  Accordingly, the plaintiff argues that "[i]t is inappropriate for the defendant to seek—or for the Court to grant—a ruling on a hypothetical situation in advance, especially because it is far from clear that further proceedings would be constitutional, as the plaintiff has not been in the Army since his dishonorable discharge was executed."  Id.

As an initial matter, the Court notes that it may—of course—clarify its Order to indicate that military proceedings against the plaintiff may resume.  See, e.g., Al-Nashiri, 921 F.3d at 240; see also Microsoft, 253 F.3d at 119 ("Remand[ing] the case . . . for reassignment to a different trial judge for further proceedings consistent with [the court's] opinion[,]" after finding the Liljeberg factors supported vacatur).  And here, the Court sees no reason to bar further proceedings against the plaintiff given "the government's strong evidence in support of the plaintiff's charges, . . .; the seriousness of the charges . . .; [and] the extensive casualties that resulted from the plaintiff's actions[.]"  Bergdahl, 683 F. Supp. 3d at 59–60.  If the plaintiff wishes to dispute the constitutionality of any further military proceedings, that would be an issue for the military courts to address in the first instance.  See Zivotofsky ex rel. Zivotofsky v. Clinton, 566 U.S. 189, 201 (2012) (holding that courts ordinarily do not "decide in the first instance issues not decided below" (quoting Nat'l Collegiate Athletic Ass'n v. Smith, 525 U.S. 459, 470 (1999))).  That, however, is a separate issue from the intended effect of the Court's Order.  Accordingly, the Court will grant the defendant's request to clarify its July 25, 2023 Order to indicate that military proceedings against the plaintiff may resume.  Therefore, nothing in the Court's July 25, 2023 Memorandum Opinion or Order should be construed as prohibiting future proceedings within the military justice system against the plaintiff.

The Court will next address the plaintiff's cross-motion for reconsideration.

## B.    The Plaintiff's Cross-Motion for Reconsideration

In his cross-motion for reconsideration, the plaintiff agrees that "[t]he Court correctly granted relief under [Al-Nashiri]." Pl.'s Mot. at 2. However, the plaintiff asserts that "the Court did not also consider the military judge's conduct as bearing on whether the government had, as required by settled unlawful command influence (UCI) jurisprudence, proved beyond a reasonable doubt that a member of the general public, aware of all the facts and circumstances, would not harbor a significant doubt about the fairness of the proceedings." Id. Accordingly, the plaintiff argues that the Court erred in "deal[ing] with the UCI and [the recusal] issues as if they were entirely separate." Pl.'s Reply at 1. Therefore, the plaintiff claims that "[g]iven the onerous burden of proof that [the] [United States Court of Appeals for the Armed Forces ("CAAF")] jurisprudence imposes on the prosecution, such a material change dictates a restriking of the balance and compels a ruling for the plaintiff on the UCI issue, and correspondingly broader relief." Pl.'s Mot. at 3. More specifically, he notes that the "CAAF's jurisprudence permits dismissal with prejudice for UCI, even in guilty-plea cases such as this[,]" id., the sanction which he asks the Court to impose.

In response, the defendant claims that "[t]he plaintiff's cross-motion asks [the] Court to revisit its July 25, 2023 Order . . . based on argument that [the] plaintiff lifts, in large part, directly from his summary judgment briefing." Def.'s Opp'n at 1. However, "[b]ecause a party may not use a motion under Federal Rule of Civil Procedure 59(e) to relitigate arguments previously made," the defendant asserts that "the Court should deny the plaintiff's cross motion for that reason alone." Id. Alternatively, the defendant states that the plaintiff does not "identify sufficient grounds for invoking the drastic remedy of dismissal with prejudice[.]" Id. at 2. The

Court will first address whether the plaintiff's cross-motion for reconsideration is permitted under Rule 59(e), before addressing the merits of the plaintiff's motion.

### 1.   Whether the Plaintiff's Cross-Motion is Permitted Under Rule 59(e)

"Rule 59(e) permits a court to alter or amend a judgment, but it may not be used to relitigate old matters[.]"  Leidos, Inc. v. Hellenic Republic, 881 F.3d 213, 217 (D.C. Cir. 2018) (quoting Exxon Shipping v. Baker, 554 U.S. 471, 486 n.5 (2008)).  Thus, a court should not consider arguments that simply "rehash[]" matters that were "squarely before the court" earlier in the proceedings.  Pfeiffer, 2023 WL 4405158, at *5.

 Here, the plaintiff's cross-motion for reconsideration attempts to relitigate an argument that the plaintiff already raised in his prior summary judgment briefing.  See Pl.'s Mot. at 2 (quoting Pl.'s Opp'n to Def.'s Mot. to Dismiss and Mem. in Supp. of Cross-Mot. for Summ. J., ECF No. 18).  Indeed, the crux of the plaintiff's cross-motion was presented as a heading in the plaintiff's summary judgment motion: "The military judge's concealed job application materially alters the evidence and precludes a finding that an informed member of the public would not harbor a significant doubt about the fairness of the proceedings."  Pl.'s Opp'n to Def.'s Mot. to Dismiss and Mem. in Supp. of Cross-Mot. for Summ. J. at 43.  The argument then concludes: "Whether [the] CAAF's UCI determination was right or . . . wrong when made, it cannot survive when the military judge's concealed job application is taken into account."  Id. at 44.  This is the same argument that the plaintiff now attempts to relitigate under Rule 59(e).  See Pl.'s Mot. at 2 ("[T]he Court did not [ ] consider the military judge's conduct as bearing on whether the government had, as required by settled unlawful command influence (UCI) jurisprudence, proved beyond a reasonable doubt that a member of the general public, aware of all facts and circumstances, would not harbor a significant doubt about the fairness of the proceedings.").

This he cannot do.  See Leidos, 881 F.3d at 217; Pfeiffer, 2023 WL 4405158, at *5.

Accordingly, the Court concludes that the plaintiff's cross-motion for reconsideration is not

permitted under Rule 59(e).

### 2.   Whether the Court Should Grant the Plaintiff's Requested Relief

However, even if the plaintiff were not improperly attempting to relitigate arguments that

he previously pursued, he would not be entitled to his requested relief—viz., dismissal with

prejudice.  More specifically, even if the plaintiff were correct that the Court erred in "deal[ing]

with the UCI and [the recusal] issues as if they were entirely separate[,]" Pl.'s Reply at 1, he fails

to demonstrate why dismissal of this action with prejudice is appropriate.

The plaintiff claims that the "CAAF's jurisprudence permits dismissal with prejudice for

UCI[.]"  Pl.'s Mot. at 3.  However, the CAAF has "long held that dismissal [with prejudice] is a

drastic remedy and courts must look to see whether alternative remedies are available."  Lewis,

63 M.J. at 416.  And here, the Court's July 25, 2023 Memorandum Opinion and Order already

cure the plaintiff's grievances by vacating "all orders and rulings issued by the military judge

who presided over the plaintiff's court-martial as of October 16, 2017, and thereafter—which

was the date when that military judge submitted his employment application for an immigration

judge position—and '[ ] vacat[ing] all decisions issued by [the appellate military courts]

reviewing such orders [and rulings].'"  Bergdahl, 683 F. Supp. 3d at 71.  Moreover, as discussed

supra Section III.A.2, the Court sees no reason to bar further proceedings against the plaintiff

given "the government's strong evidence in support of the plaintiff's charges, . . .; the

seriousness of the charges . . .; [and] the extensive casualties that resulted from the plaintiff's

actions[.]"  Id. at 59–60.  Accordingly, because (1) the plaintiff's cross-motion for

reconsideration is not permitted under Rule 59(e) and (2) the plaintiff's cross-motion for reconsideration lacks merit, the Court must deny the plaintiff's cross-motion for reconsideration.

## IV.    CONCLUSION

For the foregoing reasons, the Court concludes that it must grant in part and deny in part the defendant's motion for reconsideration and deny the plaintiff's cross-motion for reconsideration.

**SO ORDERED** this 23rd day of May, 2024.[5]

REGGIE B. WALTON
United States District Judge

---

[5] The Court will contemporaneously issue an Order consistent with this Memorandum Opinion.