**[ORAL ARGUMENT NOT SCHEDULED]**

**Nos. 24-5150, 24-5154**

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————

ROBERT B. BERGDAHL,

Plaintiff-Appellee-Cross-Appellant,

v.

UNITED STATES OF AMERICA,

Defendant-Appellant-Cross-Appellee.

———————————

On Appeal from the United States District Court
for the District of Columbia

———————————

**OPENING BRIEF FOR APPELLANT-CROSS-APPELLEE**

———————————

YAAKOV M. ROTH
  *Acting Assistant Attorney
  General*

MELISSA N. PATTERSON
BRAD HINSHELWOOD
  *Attorneys, Appellate Staff
  Civil Division, Room 7256
  U.S. Department of Justice
  950 Pennsylvania Avenue NW
  Washington, DC 20530
  (202) 514-7823*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), the undersigned counsel certifies as follows:

### A.    Parties and Amici

Robert B. Bergdahl was the plaintiff in district court and is appellee-cross-appellant here.  The United States of America was the defendant in district court and is appellant-cross-appellee here.  No amici appeared in district court, and none has appeared in this Court.

### B.    Rulings Under Review

The rulings under review are orders of the district court (Walton, J.) granting partial summary judgment to Bergdahl, Doc.26, and denying the government's Rule 59(e) motion, Doc.41.  The district court issued memorandum opinions in connection with each order.  Doc.25; Doc.40.  The summary judgment opinion is published at 683 F. Supp. 3d 24.  The opinion denying the Rule 59(e) motion is unpublished, but is available on Westlaw at 2024 WL 2383025.

### C.    Related Cases

We are not aware of any related cases under Rule 28(a)(1)(C).

*/s/ Brad Hinshelwood*
Brad Hinshelwood

# TABLE OF CONTENTS

**Page**

GLOSSARY

INTRODUCTION ................................................................. 1

STATEMENT OF JURISDICTION ....................................... 2

STATEMENT OF THE ISSUES .......................................... 3

PERTINENT STATUTES ................................................... 3

STATEMENT OF THE CASE ............................................. 3

    A.    Statutory Background .............................................. 3

    B.    Factual Background and Military-Court Proceedings .......... 6

    C.    District Court Proceedings ...................................... 18

SUMMARY OF ARGUMENT ............................................ 20

STANDARD OF REVIEW ................................................ 23

ARGUMENT ................................................................. 23

I.    The District Court Lacked Jurisdiction to Vacate the
    Judgments of the Coordinate Court-Martial System
    Established by Congress ............................................ 23

    A.    District Courts Lack Jurisdiction to Directly Review
        Court-Martial Judgments ....................................... 24

    B.    Collateral Review Does Not Permit Action Directly on
        the Judgment and Requires an Independent
        Jurisdictional Grant .............................................. 30

    C.    This Court's Cases Do Not Support the District Court's
        Vacatur ............................................................. 37

II.    The District Court Exceeded Even the Limits on Properly
       Framed Collateral Suits.................................................... 42

       A.    Review of Court-Martial Judgments Encompasses, At
             Most, Jurisdictional and Fundamental Constitutional
             Errors.................................................................... 43

       B.    The District Court Erred in Granting Relief on a
             Purported Error Not of Constitutional Dimension.............. 46

III.   The District Court's Judgment Was Erroneous on Its Own
       Terms ........................................................................... 51

       A.    The Conduct of Bergdahl's Proceeding Demonstrates
             No Fundamental Error ............................................... 52

       B.    Bergdahl's Claim Was Not Timely Raised Before the
             Military Courts and in Any Event Would Not Warrant
             Vacatur .................................................................. 62

CONCLUSION ........................................................................ 68

CERTIFICATE OF COMPLIANCE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:** **Page(s)**

*Aetna Life Ins. Co. v. Lavoie*,
    475 U.S. 813 (1986) ........................................................ 46, 48

*Allen v. U.S. Air Force*,
    603 F.3d 423 (8th Cir. 2010) .............................................. 46

*Al-Nashiri, In re*,
    921 F.3d 224 (D.C. Cir. 2019) .............................. 14, 19, 23, 37, 38, 48,
                                   55-56, 56, 60, 61

*Armann v. McKean*,
    549 F.3d 279 (3d Cir. 2008) .............................................. 46

*Ashe v. McNamara*,
    355 F.2d 277 (1st Cir. 1965) ........................................... 34, 35

*Baker v. Schlesinger*,
    523 F.2d 1031 (6th Cir. 1975) ........................................... 34

*Bergdahl v. United States*:
    2020 WL 7316058 (A. Ct. Crim. App. Dec. 11, 2020) ............ 16, 17, 60,
                                      61, 62
    81 M.J. 128 (C.A.A.F. 2021) ............................................. 17

*Bolton v. Department of the Navy Bd. for Corr. of Naval Records*,
    914 F.3d 401 (6th Cir. 2019) .............................................. 34

*Bowling v. United States*,
    713 F.2d 1558 (Fed. Cir. 1983) ......................................... 46

*Brown v. Vanihel*,
    7 F.4th 666 (7th Cir. 2021) ............................................. 35-36

*Burns v. Wilson*,
    346 U.S. 137 (1953) ................................................. 43, 45, 62

iv

*Caperton v. A.T. Massey Coal Co.*,
    556 U.S. 868 (2009) ...................................................................... 47, 48

*Clark v. Library of Cong.*,
    750 F.2d 89 (D.C. Cir. 1984) ............................................................ 30

*Coleman v. Thompson*,
    501 U.S. 722 (1991) ..................................................................... 35, 63

*Davies v. Clifford*,
    393 F.2d 496 (1st Cir. 1968) ........................................................ 27, 35

*De Csepel v. Republic of Hungary*,
    859 F.3d 1094 (D.C. Cir. 2017) ......................................................... 41

*Del Vecchio v. Illinois Dep't of Corr.*,
    31 F.3d 1363 (7th Cir. 1994) ............................................................ 49

*Denedo v. United States*,
    66 M.J. 114 (C.A.A.F. 200) .............................................................. 62

*Department of the Army v. FLRA*,
    56 F.3d 273 (D.C. Cir. 1995) ............................................................ 38

*Durfee v. Duke*,
    375 U.S. 106 (1963) ....................................................................... 36

*Dynes v. Hoover*,
    61 U.S. (20 How.) 65 (1857) ............................................................. 25

*Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*,
    544 U.S. 280 (2005) ............................................................. 28, 29, 36

*Fay v. Noia*,
    372 U.S. 391 (1963), *overruled on other grounds by*
    *Wainwright v. Sykes*, 433 U.S. 72 (1977) ........................................... 35

*F.D.I.C. v. Meyer*,
    510 U.S. 471 (1994) ....................................................................... 30

v

*Fletcher v. Outlaw*,
  578 F.3d 274 (5th Cir. 2009) ............................................................. 46

*Fowler v. Wilkinson*,
  353 U.S. 583 (1957) ........................................................................... 45

*Francis v. Henderson*,
  425 U.S. 536 (1976) ........................................................................... 63

*Gouveia v. Espinda*,
  926 F.3d 1102 (9th Cir. 2019) ........................................................... 36

*Homcy v. Resor*,
  455 F.2d 1345 (D.C. Cir. 1971) ............................................... 6, 34, 35

*Jeffries v. Barr*,
  965 F.3d 843 (D.C. Cir. 2020) ........................................................... 23

*Kendall v. Army Bd. for Corr. of Military Records*,
  996 F.2d 362 (D.C. Cir. 1993) ........................................................... 63

*Larrabee v. Del Toro*,
  45 F.4th 81 (D.C. Cir. 2022) ....................................................... 39, 40

*Liljeberg v. Health Servs. Acquisition Corp.*,
  486 U.S. 847 (1988) ........................................................ 20, 48, 64, 67

*Liteky v. United States*,
  510 U.S. 540 (1994) ........................................................................... 47

*Marbury v. Madison*,
  5 U.S. (1 Cranch) 137 (1803) ............................................................ 27

*Martinez v. Ryan*,
  566 U.S. 1 (2012) ....................................................................... 23, 63

*Martinez v. Ryan*,
  926 F.3d 1215 (9th Cir. 2019) ........................................................... 63

*McKinney v. White,*
    291 F.3d 851 (D.C. Cir. 2002) ....................................................27-28, 30

*Ortiz v. United States,*
    585 U.S. 427 (2018) ................................................................ 4, 25, 27

*Owings v. Secretary of the U.S. Air Force (SAFOS),*
    447 F.2d 1245 (D.C. Cir. 1971) ...........................................................45

*Parker v. Levy,*
    417 U.S. 733 (1974) ....................................................................22, 44

*Priest v. Secretary of the Navy,*
    570 F.2d 1013 (D.C. Cir. 1977) ..........................................................46

*Railey v. Webb,*
    540 F.3d 393 (6th Cir. 2008) .............................................................49

*Romero v. International Terminal Operating Co.,*
    358 U.S. 354 (1959) ...................................................................32-33

*Sanford v. United States,*
    586 F.3d 28 (D.C. Cir. 2009) .........................................................39, 51

*Schlesinger v. Councilman,*
    420 U.S. 738 (1975) ...................................4, 5, 6, 18, 21-22, 22, 25, 26,
                                                      31, 32, 33, 35, 37, 38, 39, 40,
                                                      41, 43, 44, 45, 46, 51, 67

*Shaw v. United States,*
    209 F.2d 811 (D.C. Cir. 1954) .............................................................28

*Singletary v. District of Columbia,*
    766 F.3d 66 (D.C. Cir. 2014) ..............................................................28

*Smith v. Phillips,*
    455 U.S. 209 (1982) ..........................................................................45

*Thomas v. U.S. Disciplinary Barracks,*
    625 F.3d 667 (10th Cir. 2010) ............................................................46

*Tumey v. Ohio*,
  273 U.S. 510 (1927) .............................................................46-47, 47

*Underwriters Nat'l Assurance Co. v. North Carolina Life &*
  *Accident & Health Ins. Guar. Ass'n*,
  455 U.S. 691 (1982) .............................................................. 36

*United States v. Augenblick*,
  393 U.S. 348 (1969) .............................................................. 45

*United States v. Barry*,
  78 M.J. 70 (C.A.A.F. 2018) ...................................................... 8

*United States v. Bergdahl*:
  79 M.J. 512 (A. Ct. Crim. App. 2019) .................................... 15
  80 M.J. 230 (C.A.A.F. 2020) ...................... 6, 7, 8, 9, 10, 12, 13, 15, 16,
                                                23, 52-53, 53, 54, 55, 58, 65

*United States v. Cotton*,
  535 U.S. 625 (2002) .............................................................. 38

*United States v. Denedo*,
  556 U.S. 904 (2009) ........................................................ 16, 66

*United States v. Hamilton*,
  41 M.J. 32 (C.M.A. 1994) ...................................................... 8

*United States v. Martinez*,
  70 M.J. 154 (C.A.A.F. 2011) .................................................. 64

*United States ex rel. New v. Rumsfeld*,
  448 F.3d 403 (D.C. Cir. 2006) ........................................ 39, 40, 45

*United Student Aid Funds, Inc. v. Espinosa*,
  559 U.S. 260 (2010) .............................................................. 44

*Verizon Md., Inc. v. Public Serv. Comm'n of Md.*,
  535 U.S. 635 (2002) ........................................................ 21, 26

*Williams v. Pennsylvania*,
  579 U.S. 1 (2016) ................................................................ 47

*Wilson v. Corcoran,*
    562 U.S. 1 (2010) ..................................................................50

*Withrow v. Larkin,*
    421 U.S. 35 (1975) ................................................................59

**U.S. Constitution:**

Art. I, § 8, cl. 14 ..........................................................................3, 24-25

**Statutes:**

Administrative Procedure Act:
    5 U.S.C. § 701(b)(1)(F) .......................................................30
    5 U.S.C. § 702 .....................................................................30

Military Justice Act of 1983,
    Pub. L. No. 98-209, § 10, 97 Stat. 1393, 1405-06 ............5, 26

8 U.S.C. § 1101(b)(4) ...................................................................56

10 U.S.C. § 818 ..............................................................................8

10 U.S.C. § 830 ..............................................................................7

10 U.S.C. § 834(e) ..........................................................................8

10 U.S.C. § 837(a) ....................................................................8, 58

10 U.S.C. § 858a ...........................................................................13

10 U.S.C. § 866 .......................................................................4, 25

10 U.S.C. § 867 .......................................................................4, 25

10 U.S.C. § 876 .......................................................................5, 26

10 U.S.C. § 885.............................................................................7

10 U.S.C. § 899.............................................................................7

10 U.S.C. §§ 941-942....................................................................4

10 U.S.C. § 948j(a)......................................................................38

10 U.S.C. § 950g(a).....................................................................38

10 U.S.C. § 1552(a)...............................................................6, 33-34

10 U.S.C. § 1552(f)..................................................................6, 34

10 U.S.C. § 1553(a).........................................................6, 33-34, 34

28 U.S.C. § 455(a).......................................................................47

28 U.S.C. § 455(e).......................................................................48

28 U.S.C. § 1257.........................................................................29

28 U.S.C. § 1259......................................................................2, 26

28 U.S.C. § 1331...............................................................2, 21, 26, 40

28 U.S.C. § 1346(a)(2)..................................................................33

28 U.S.C. § 1361.........................................................................34

28 U.S.C. § 1491.........................................................................33

28 U.S.C. § 2241......................................................................5, 33

**Rules:**

Fed. R. App. P. 4(a)(1)(B) ............................................................3

Fed. R. Civ. P. 59(e) ................................................................ 2

Fed. R. Civ. P. 60(b)(4) ......................................................... 44

Rules for Courts-Martial:
   104(a) ............................................................................... 8
   104(a)(1) ......................................................................... 18
   307 ..................................................................................... 7
   601(a) ............................................................................... 8
   902 ............................................................................ 18, 47
   902(a) .............................................. 16, 19, 37, 48, 49, 64
   902(e) ............................................................................. 48

## Other Authorities:

Restatement (First) of Judgments § 113
   cmt. a (Am. Law Inst. 1942) ..................................... 31

U.S. Dep't of the Army, Reg. 27-10,
   *Military Justice* (Jan. 8, 2025) ............................... 13

## GLOSSARY

| | |
|---|---|
| ACCA | Army Court of Criminal Appeals |
| APA | Administrative Procedure Act |
| CAAF | Court of Appeals for the Armed Forces |
| R.C.M. | Rule for Courts-Martial |
| UCMJ | Uniform Code of Military Justice |

**INTRODUCTION**

In 2009, Robert "Bowe" Bergdahl, a soldier in the U.S. Army, walked off his post in Afghanistan.  His disappearance led to a massive and exhausting search-and-rescue effort, imperiling his fellow soldiers and leading several to suffer permanent injuries.  On his return to the United States, Bergdahl voluntarily pleaded guilty to desertion and misbehavior before the enemy at a court-martial and recognized his responsibility for his misconduct.  Despite the severity of Bergdahl's conduct and its effects, the military judge rejected the prosecution's calls for a 14-year prison sentence.  The military judge gave Bergdahl no prison time at all, instead imposing a dishonorable discharge, which Bergdahl himself had proposed as an appropriate sentence.  Bergdahl's convictions and sentence were affirmed through the military appellate system established by Congress.

The district court here purported to vacate Bergdahl's convictions, sentence, and the judgments of the military appellate courts that reviewed the court-martial, based on its view that the court-martial judge had violated a military procedural rule requiring recusal.  That dramatic and virtually unprecedented step was inappropriate on every

level.  The district court lacked jurisdiction to sit in appellate review of the judgment of another court system, much less to vacate or alter such a judgment; the court erred in granting relief despite failing to find the type of jurisdictional or fundamental constitutional error that could support relief even in a proper collateral suit; and the court's assessment of the purported violation of the Rules for Courts-Martial was based on a misapprehension of the relevant authorities and the court's role in assessing military courts' application of their own timeliness rules.  This Court should reverse.

## STATEMENT OF JURISDICTION

Jurisdiction is contested, but Bergdahl invoked 28 U.S.C. § 1331. Doc.3.at.2.  The district court entered final judgment on July 25, 2023. Doc.26.at.1-2.  The parties filed timely cross-motions under Federal Rule of Civil Procedure 59(e) on August 22, 2023.  *See* Dkt. Nos. 27, 28. On March 31, 2024, the district court entered an order purporting to resolve those motions but stated that its order was "*not* a 'final decision.'"  Doc.39.at.1 & n.1.  The district court subsequently issued an order and opinion on those motions on May 23, 2024.  Doc.41.at.1.  The government filed its notice of appeal on May 29, 2024—within 60 days

2

of both the March 31 and May 23 orders.  Doc.42.at.1; Fed. R. App. P.

4(a)(1)(B).

## STATEMENT OF THE ISSUES

1.      Whether the district court had jurisdiction to hear a suit

seeking to vacate a court-martial judgment.

2.      Whether the district court exceeded its authority by issuing

relief based on a purported error in the court-martial proceedings that

is neither jurisdictional nor constitutional in nature.

3.      Whether the district court erred in vacating the judgment of

conviction, sentence, and all appellate proceedings and judgments in

the military courts from the date of the alleged error.

## PERTINENT STATUTES

Pertinent statutes are reproduced in the addendum.

## STATEMENT OF THE CASE

### A.    Statutory Background

Through its power "To make Rules for the Government and

Regulation of the land and naval Forces," U.S. Const. art. I, § 8, cl. 14,

Congress has provided for courts-martial to adjudicate prosecutions of

active-duty servicemembers and others, as well as a comprehensive

scheme of appellate review of court-martial judgments that "replicates

the judicial apparatus found in most States." *Ortiz v. United States*, 585 U.S. 427, 438 (2018). Under the Uniform Code of Military Justice (UCMJ), court-martial judgments are reviewed by intermediate courts of appeals for each military service, the judges of which may be servicemembers or civilians. *See* 10 U.S.C. § 866. The judgments of the courts of appeals are subject to review by the Court of Appeals for the Armed Forces (CAAF), which is staffed by five civilian judges appointed by the President and confirmed by the Senate. *See id.* §§ 867, 941-942.

"The court-martial is older than the Constitution, was recognized and sanctioned by the Framers, and has been authorized here since the first Congress." *Ortiz*, 585 U.S. at 428. For much of that history, however, direct review of court-martial judgments concluded with the highest court in the military justice system; no provision allowed for direct review of court-martial judgments by the Supreme Court or any other Article III court. *See Schlesinger v. Councilman*, 420 U.S. 738, 746 (1975). In 1983, however, Congress for the first time granted the Supreme Court certiorari jurisdiction over certain judgments of the

4

military courts.[1]  Military Justice Act of 1983, Pub. L. No. 98-209, § 10, 97 Stat. 1393, 1405-06.

The final judgments of the military courts "are final and conclusive" and are "binding upon all departments, courts, agencies, and officers of the United States," subject to limited exceptions not relevant here.  10 U.S.C. § 876.  Thus, "[t]he valid, final judgments of military courts, like those of any court of competent jurisdiction not subject to direct review for errors of fact or law, have res judicata effect and preclude further litigation of the merits."  *Councilman*, 420 U.S. at 746.

After a court-martial judgment has become final on direct review, defendants may seek only "collateral relief from the consequences of court-martial judgments."  *Councilman*, 420 U.S. at 748.  "[B]y far the most common" form of collateral relief is release from custody sought through a habeas petition under 28 U.S.C. § 2241.  *Id.* at 747.  Habeas is not available to individuals not in custody, but such individuals may seek relief from the consequences of court-martial judgments through

---

[1] Congress has since broadened the Supreme Court's certiorari jurisdiction over military-court judgments.  *See* 28 U.S.C. § 1259.

5

other proceedings.  Courts have historically entertained backpay suits seeking pay lost because of a court-martial judgment.  *See id.* at 748.  In addition, Congress has established administrative boards within each military department empowered to correct military records.  10 U.S.C. §§ 1552(a), 1553(a).  Those bodies cannot vacate or alter a court-martial judgment, but may take "action on the sentence of a court-martial for purposes of clemency," such as by changing the character of a court-martial-ordered discharge.  *Id.* §§ 1552(f), 1553(a).  Decisions of those boards are reviewable by Article III courts.  *See, e.g.*, *Homcy v. Resor*, 455 F.2d 1345, 1347-49, 1352 n.7 (D.C. Cir. 1971).

## B.    Factual Background and Military-Court Proceedings

**1.**  In June 2009, Bergdahl walked off an observation post in Afghanistan alone, apparently to head overland roughly 20 miles to a headquarters post to report what he believed to be mistreatment of his platoon.  *United States v. Bergdahl*, 80 M.J. 230, 232 (C.A.A.F. 2020).  Within hours, Bergdahl was captured by the Taliban, and over the ensuing weeks "thousands of United States soldiers, sailors, airmen, and Marines conducted an intensive search of the region … in an attempt to locate" him.  *Id.* at 240.  These efforts placed fellow soldiers

6

in significant danger, and multiple soldiers were injured: a Navy SEAL shot in the leg who required 18 surgeries; another soldier struck by a rocket-propelled grenade who lost use of his hand; and another who was effectively paralyzed after being shot in the head, lived the remainder of his life in constant pain with no ability to speak, and died in 2019. *Id.* at 240-41, 241 n.13. Despite the search efforts, Bergdahl spent five years in Taliban custody, where he was tortured. *Id.* at 243. In 2014, Bergdahl was released in exchange for five individuals in U.S. custody at Guantanamo Bay. *Id.* at 244.

After Bergdahl's return, charges were preferred[2] for desertion with intent to shirk hazardous duty (spanning the period from his departure from his post until his return to American custody) and misbehavior before the enemy. 10 U.S.C. §§ 885, 899. Both offenses carry significant penalties, including life in prison or (in some circumstances) the death penalty. *Id.* The convening authority

---

[2] "Preferral of charges" is the initiation of charges within the court-martial system, akin to an indictment in civilian court. 10 U.S.C. § 830; Rule for Courts-Martial (R.C.M.) 307.

referred[3] the charges to a general court-martial, which has the power to impose all punishments authorized by the UCMJ. *Bergdahl*, 80 M.J. at 239; *see* 10 U.S.C. § 818.

During the proceedings, Bergdahl thrice sought relief by invoking military law's prohibition against "unlawful command influence." *See* 10 U.S.C. § 837(a); R.C.M. 104(a). That doctrine generally forbids efforts by members of the military—especially superiors with command authority—to interfere with the court-martial process. *See generally United States v. Barry*, 78 M.J. 70, 76-77 (C.A.A.F. 2018); *United States v. Hamilton*, 41 M.J. 32, 36 (C.M.A. 1994). The doctrine encompasses both actual and apparent unlawful command influence, and here, Bergdahl contended that there had been an appearance of unlawful command influence based on comments made by then-Senator John McCain and President Donald Trump. *Bergdahl*, 80 M.J. at 233.

Bergdahl's first motion sought dismissal of the charges based on a statement by then-Senator John McCain that there would be a Senate committee hearing "[i]f it comes out that [Bergdahl] has no

---

[3] "Referral" is "the order of a convening authority" that "charges and specifications against an accused will be tried by a specified court-martial." R.C.M. 601(a); *see* 10 U.S.C. § 834(e).

punishment." *Bergdahl*, 80 M.J. at 236.  Colonel Jeffery Nance, the presiding judge, denied that motion for reasons not relevant to this appeal.  Doc.16-17.at.9-10.

Bergdahl's second motion sought dismissal based on statements made before and during President Trump's first candidacy for President, referring to Bergdahl as a "traitor," asserting that he was a deserter and that multiple servicemembers were killed while searching for Bergdahl, and calling for Bergdahl to be executed.  *Bergdahl*, 80 M.J. at 236-38.  Judge Nance denied the motion, holding that although the comments were "troubling," "disturbing and disappointing," as a private citizen then-candidate Trump could not commit unlawful command influence.  Doc.16-20.at.7.  Judge Nance also emphasized that he would "take special care to ensure that the comments" did not "invade this trial," including by permitting a questionnaire and "very liberal *voir dire*" of potential members (the military equivalent of jurors) on the issue of the President's campaign comments, and that Bergdahl could again seek relief after voir dire.  Doc.16-20.at.8, 9.

Roughly eight months later, on October 16, 2017, Bergdahl pleaded guilty without a plea agreement to misbehavior before the

9

enemy and desertion for a period of one day, spanning the time from his
departure from his post to his capture by the Taliban.  Doc.16-9.at.132.
At the plea hearing, Judge Nance rejected the government's argument
that Bergdahl was liable for desertion for the entire period of his
captivity, holding that Bergdahl was guilty only of desertion for one
day, and accepted Bergdahl's pleas.  Doc.16-9.at.180-200, 207.

Two other significant events occurred the same day.  First,
President Trump stated at a public event that while he could not
"comment on" Bergdahl, "I think people have heard my comments in the
past." *Bergdahl*, 80 M.J. at 238.  Second, Judge Nance—who was
nearing mandatory retirement from the military—applied to the
Department of Justice for a position as an immigration judge.
Doc.25.at.16.  As his writing sample, Judge Nance submitted his order
denying Bergdahl's unlawful command influence motion based on then-
candidate Trump's comments.  *Id.*

After President Trump's day-of-plea comments, Bergdahl filed a
third unlawful command influence motion, arguing that the President
had ratified his campaign statements.  Bergdahl did not seek dismissal.
Instead, because the ratification occurred after Bergdahl's pleas,

10

Bergdahl sought a ruling that his sentence would "not exceed the sentence of no punishment or at the very least … will not include confinement." Doc.16-9.at.234-35.

At a hearing on October 23, Judge Nance offered Bergdahl the opportunity to withdraw his pleas, and Bergdahl declined. Doc.16-9.at.222. Judge Nance also allowed the parties to question him regarding unlawful command influence. The prosecution asked Judge Nance whether the President's statements made him "believe that [he] would be unable to sit impartially and fairly." Doc.16-9.at.224-25. Judge Nance responded:

> No. I'm what's referred to as a terminal Colonel, which means I'm not going anywhere but the retirement pastures. And that's in almost a year from now.
>
> I have never aspired to any rank. I did aspire to be a military judge 13 years ago; but since accepting that posting or assignment, I have recognized that that, in the modern JAG Corps, pretty much, meant that I was going to stay at the rank I was, which at the time was Lieutenant Colonel. So I was actually a little bit surprised to be promoted to Colonel. And when that happened, I knew obviously that any general officer rank was beyond my reach and, quite frankly, nothing I ever aspired to.
>
> So that's a long way of saying "No, no effect on me whatsoever." I don't expect to go anywhere but back home as soon as the Army is done with me in a year.

11

Doc.16-9.at.225.  Aside from confirming Judge Nance's active-duty status, Doc.16-9.at.225-26, Bergdahl's counsel did not ask any questions.

Judge Nance denied Bergdahl's motion, reiterating that he had "no hope of or ambition for promotion beyond [his] current rank" and his approaching mandatory retirement.  Doc.16-23.at.3-4.  Judge Nance held that the government had met its burden to show that there was no "intolerable strain" on the military justice system and that a "fully informed" observer "would not harbor a significant doubt about the fairness of these proceedings," in part because "[t]he evidence establishes beyond a reasonable doubt that I am uninfluenced by the President's comments and more importantly, that I hold no fear of any repercussions from anyone if they do not agree with my sentence in this case."  Doc.16-23.at.5; *see Bergdahl*, 80 M.J. at 234 (explaining the framework for apparent unlawful command influence claims).  Judge Nance also stated that he would "consider the President's comments as mitigation evidence" in setting "an appropriate sentence," and would direct anyone involved in post-trial aspects of the case to read a corrective statement the White House press office had issued explaining

12

that persons involved in military justice should "exercise their independent professional judgment." Doc.16-23.at.3, 5.

At sentencing, the prosecution presented evidence substantiating the injuries to multiple servicemembers sustained during the search for Bergdahl described above. *Bergdahl*, 80 M.J. at 240-41. The prosecution requested a 14-year sentence of confinement, along with a punitive discharge. Doc.16-12.at.269-71. Bergdahl offered mitigating evidence and a statement "accepting responsibility for [his] mistake," Doc.16-11.at.56, and his counsel "request[ed] that [Judge Nance] give Sergeant Bergdahl a dishonorable discharge," Doc.16-12.at.295.

Judge Nance sentenced Bergdahl to be dishonorably discharged, to be reduced to the grade of E-1, and to forfeit $1,000 pay per month for 10 months. Doc.16-12.at.305.[4]

**2.** Bergdahl appealed, arguing that Judge Nance erred in resolving his unlawful command influence motions. In September

---

[4] No portion of the forfeiture was collected. A court-martial-ordered forfeiture (unlike a fine) is not a debt to the United States and cannot be collected from a discharged individual. In addition, by operation of law, a punitive discharge automatically results in a reduction to E-1. *See* 10 U.S.C. § 858a; U.S. Dep't of the Army, Reg. 27-10, *Military Justice* ¶ 5-38 (Jan. 8, 2025). Bergdahl's request for a dishonorable discharge thus necessarily carried this consequence.

2018—while Bergdahl's appeal was pending before the Army Court of Criminal Appeals (ACCA)—the Department of Justice publicly announced that Judge Nance (among others) had been appointed as an immigration judge, and Judge Nance retired from the military in November of that year.  Doc.25.at.16-17.

In addition, while Bergdahl's appeal was pending before the ACCA, Bergdahl's counsel submitted an amicus brief on behalf of a different client in *In re Al-Nashiri*, 921 F.3d 224 (D.C. Cir. 2019), a mandamus petition to this Court.  *Al-Nashiri* addressed whether a military judge presiding over a Guantanamo military commission trial (over which this Court has direct appellate jurisdiction) was required to recuse because his application for and acceptance of a position as an immigration judge created an appearance of partiality.  The *Al-Nashiri* judge's appointment was announced in the same press release as Judge Nance's appointment.  This Court also issued its opinion in *Al-Nashiri* in April 2019, holding that the military commission judge's application created an appearance of partiality and granting mandamus to vacate orders in the military commission proceeding.  Though Bergdahl's case was still pending at the ACCA, he did not raise any recusal issue on his

14

direct appeal and did not request Judge Nance's immigration judge application.

The ACCA affirmed Bergdahl's conviction. *United States v. Bergdahl*, 79 M.J. 512 (A. Ct. Crim. App. 2019). Bergdahl then successfully petitioned the CAAF for discretionary review, still without raising any recusal issue. The CAAF likewise affirmed, holding that "an objective, disinterested observer, fully informed of all the facts and circumstances, would not harbor a significant doubt about the fairness of these proceedings." *Bergdahl*, 80 M.J. at 244 (alteration and quotation omitted). As especially relevant here, the CAAF noted that Bergdahl "chose to plead guilty," in doing so "explicitly agreed in open court that … he was in fact guilty," and declined to withdraw that plea after President Trump's post-plea comments. *Id.* at 242 (emphases omitted). Bergdahl also "specifically recognized that he was deserving of punishment and asked to have a dishonorable discharge imposed upon him." *Id.* at 243 (emphasis omitted). And the CAAF observed that Judge Nance "imposed on [Bergdahl] no prison time whatsoever," which underscored that an objective observer would conclude that the

15

military judge was "notably impervious" to "outside forces." *Id.* at 244 (emphasis omitted).

**3.** The CAAF issued its opinion and judgment on August 27, 2020. That same day, Bergdahl's counsel filed a Freedom of Information Act request seeking Judge Nance's application to be an immigration judge. *Bergdahl v. United States*, 2020 WL 7316058, at *2 (A. Ct. Crim. App. Dec. 11, 2020). On September 7, Bergdahl moved for reconsideration of the CAAF's decision, and after receiving Judge Nance's application, Bergdahl on September 18 moved to supplement the record with Judge Nance's application for the immigration judge position and other related materials. *Id.*; Doc.22-2.at.2, 16-47.

The CAAF denied reconsideration without prejudice to Bergdahl seeking a writ of error coram nobis. *Bergdahl*, 2020 WL 7316058, at *2; *see generally United States v. Denedo*, 556 U.S. 904, 910-15 (2009). Bergdahl sought the writ from the ACCA, arguing both that Judge Nance's application undermined the CAAF's holding that there was no appearance of unlawful command influence and that Judge Nance had a duty to recuse under R.C.M. 902(a). Doc.16-26. That rule, like the federal recusal statute, requires that military judges recuse themselves

16

"in any proceeding in which that military judge's impartiality might reasonably be questioned."

The ACCA denied the petition, explaining that a petitioner seeking coram nobis relief must show (*inter alia*) that "valid reasons exist for not seeking relief earlier." *Bergdahl*, 2020 WL 7316058, at *2. The court noted that Judge Nance's appointment as an immigration judge "became public knowledge on 28 September 2018," and that Bergdahl had not raised the issue or sought Judge Nance's employment application until the CAAF "denied [Bergdahl] relief on his direct appeal" nearly two years later. *Id.* at *3. The court further noted that Bergdahl's counsel had submitted an amicus brief in *Al-Nashiri*, and that Bergdahl had taken no steps to develop the issue even in the 16 months after this Court's decision in that case. *Id.* at *4 & n.6. The court thus held that Bergdahl had "not presented a sound reason why he failed to pursue this claim while his case was pending" on direct review. *Id.* at *5. The CAAF denied review. *Bergdahl v. United States*, 81 M.J. 128 (C.A.A.F. 2021).

17

### C.   District Court Proceedings

Bergdahl filed suit in district court, seeking a declaration "that his conviction and sentence were obtained in violation of the Fifth Amendment, R.C.M. 104(a)(1) and 902, and Rule 2.11 of the Rules of Judicial Conduct for Army Trial and Appellate Judges," and an order that "his conviction and sentence be expunged."  Doc.3.at.13-14.

The district court first stated that although Bergdahl was not in custody, it would apply the "full and fair consideration" standard drawn from habeas review of military judgments rather than the more deferential standard for noncustodial challenges drawn from *Councilman*, 420 U.S. 738, under which a military judgment may be collaterally attacked only if "void."  Doc.25.at.25.  The district court believed this course was appropriate because "the 'full and fair consideration' test … is the less deferential of the two, and thus, court-martial proceedings that satisfy this standard will also necessarily satisfy the 'void' standard."  Doc.25.at.25.

The court dismissed Bergdahl's apparent unlawful command influence claim, holding that the military courts had given it full and fair consideration, Doc.25.at.26-31, and endorsing the CAAF's

18

conclusions that a reasonable observer would not question the fairness of the proceedings and that Judge Nance had proven "notably impervious" to outside influence, Doc.25.at.31 (quotation omitted); *see* Doc.25.at.31-44.

However, the district court granted summary judgment to Bergdahl on the claim that Judge Nance's immigration-judge application created an appearance of partiality requiring recusal under R.C.M. 902(a). The court rejected the ACCA's conclusion that Bergdahl failed to timely raise his appearance claim based on its own view of Bergdahl's promptness and the applicable military-court precedents. Doc.25.at.51-52, 52 n.14, 54-55. On the merits, the court disclaimed any holding "that there was actual bias in this case," Doc.25.at.62, concluding only that an "appearance of judicial partiality" existed, Doc.25.at.57. The court held that Judge Nance "might reasonably be expected to appeal to the president's expressed interest in [Bergdahl's] conviction and punishment," Doc.25.at.60, particularly given Judge Nance's use of a writing sample from the case and his comments about retirement. The court viewed these facts as bearing a "striking resemblance" to *Al-Nashiri*. Doc.25.at.58 (quotation omitted).

19

The district court summarily held that the appropriate remedy was to "vacate all orders and rulings issued by" Judge Nance from the date he submitted his application, as well as all subsequent appellate orders.  Doc.25.at.62, 64.  The court adhered to that view on reconsideration, holding that the factors outlined in *Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847 (1988), supported vacatur.  Doc.40.at.8-15.  The court did clarify that under its judgment "military proceedings against [Bergdahl] may resume," though it noted that Bergdahl was free "to dispute the constitutionality of any further military proceedings" before the military courts.  Doc.40.at.16.

The government appealed, and Bergdahl cross-appealed.  The district court granted a consent motion by the government to stay the judgment pending appeal.  *See* Minute Order (June 17, 2024) (JA__).  Bergdahl sought summary affirmance of the government's appeal, which this Court denied.  *See* Order (Dec. 4, 2024).

## SUMMARY OF ARGUMENT

The district court purported to "vacate" the judgment of the court-martial that convicted and sentenced Bergdahl, as well as the judgments of the military appellate courts established by Congress.  It

based that remedy on its holding that the military judge had failed to follow a non-constitutional rule of court-martial procedure.

That order exceeded the district court's authority in multiple respects. District courts lack jurisdiction to vacate or alter court-martial judgments. That is the province of courts exercising direct appellate review, which Congress has conferred on the military appellate courts and the Supreme Court by writ of certiorari. The statute Bergdahl invokes, 28 U.S.C. § 1331, confers only original jurisdiction on district courts, not the appellate jurisdiction to revise and correct prior proceedings that the court exercised here. *See Verizon Md., Inc. v. Public Serv. Comm'n of Md.*, 535 U.S. 635, 644 n.3 (2002). Instead, district courts may address suits over which they have original jurisdiction seeking to ameliorate specific collateral consequences of a court-martial conviction—such as suits seeking release from custody, an award of backpay, or an administrative alteration to records through procedures authorized by Congress. In such suits, a court decides whether a court-martial judgment is entitled to res judicata effect in considering the request for relief before it, but does not purport to vacate or eliminate the court-martial judgment itself. *Schlesinger v.*

21

*Councilman*, 420 U.S. 738, 746-53 (1975). Bergdahl did not bring a suit seeking such collateral relief, and the district court manifestly did not grant collateral relief.

Moreover, even where a district court has subject-matter jurisdiction to determine the validity of a court-martial judgment in a suit seeking collateral relief, that jurisdiction confers only limited power to disregard the judgment. Collateral relief could be available only based on jurisdictional or fundamental constitutional errors in military proceedings, not the non-constitutional error of military procedure the district court purported to identify here. *See, e.g.*, *Councilman*, 420 U.S. at 753; *Parker v. Levy*, 417 U.S. 733, 761 (1974).

Finally, the district court's decision is erroneous even on its own terms. Bergdahl voluntarily pleaded guilty to the charges against him and received the lenient sentence he requested, not the much more severe sentence proposed by the prosecution or the even more extreme punishments referenced by President Trump while a presidential candidate. Bergdahl has never called into question the voluntariness of his pleas. The military courts also held that Bergdahl had failed to timely raise his claim in the nearly two years his case was pending on

22

direct review after Judge Nance was announced as an immigration

judge or the roughly 16 months it remained pending after this Court's

decision in *In re Al-Nashiri*, 921 F.3d 224 (D.C. Cir. 2019). Bergdahl

could not properly raise this belated claim to seek collateral relief in

federal court. *See, e.g.*, *Martinez v. Ryan*, 566 U.S. 1, 9-10 (2012). And

even if he could raise the claim, Bergdahl's voluntary guilty pleas and

Judge Nance's imposition of the sentence Bergdahl himself requested

underscore not only that Judge Nance was "notably impervious" to

"outside forces," *United States v. Bergdahl*, 80 M.J. 230, 244 (C.A.A.F.

2020), but also that any error would not support vacatur given the

complete lack of prejudice to Bergdahl from allowing his convictions and

sentence to stand.

## STANDARD OF REVIEW

This Court reviews a grant of summary judgment de novo.

*Jeffries v. Barr*, 965 F.3d 843, 859 (D.C. Cir. 2020).

## ARGUMENT

## I. The District Court Lacked Jurisdiction to Vacate the Judgments of the Coordinate Court-Martial System Established by Congress

District courts generally lack jurisdiction over suits seeking to

vacate or otherwise alter the judgments of separate and independent

23

court systems, including the military courts. The reversal, vacatur, or revision of court-martial judgments is the province of courts empowered to exercise direct appellate review, including the military appellate courts and the Supreme Court by writ of certiorari. Once direct review is exhausted and a court-martial judgment becomes final, it is subject only to collateral review. And collateral review in federal court of a judgment rendered by a separate and independent court system is not a substitute for, or continuation of, appellate review, and cannot seek to act directly on the court-martial judgment.

Here, Bergdahl's suit sought to eliminate his court-martial conviction, and the district court purported to vacate not only the court-martial judgment, but also the judgments of two military appellate courts established by Congress. Congress has never granted district courts that extraordinary authority, and the judgment should be reversed for lack of jurisdiction.

## A. District Courts Lack Jurisdiction to Directly Review Court-Martial Judgments

Courts-martial and the military appellate courts that review them derive authority from Congress's power "To make Rules for the Government and Regulation of the land and naval Forces." U.S. Const.

24

art. I, § 8, cl. 14.  That provision "gives Congress the power—'entirely independent' of Article III—'to provide for the trial and punishment of military and naval offences in the manner then and now practiced by civilized nations.'"  *Ortiz v. United States*, 585 U.S. 427, 443 (2018) (quoting *Dynes v. Hoover*, 61 U.S. (20 How.) 65, 79 (1857)).  Thus, military courts, like state courts, are part of a judicial system separate and independent from Article III courts.

Historically, Congress did not "confer[] on any Art. III court jurisdiction directly to review court-martial determinations." *Schlesinger v. Councilman*, 420 U.S. 738, 746 (1975).  Instead, direct review of a court-martial judgment occurs through the "'integrated system of military courts and review procedures'" established by the UCMJ, which "replicates the judicial apparatus found in most States." *Ortiz*, 585 U.S. at 438 (quoting *Councilman*, 420 U.S. at 758).  Although the process differs based on the type of court-martial, the judgments of general courts-martial are first reviewed by a court of appeals for the appropriate military service, with the possibility of further review by the CAAF.  *See* 10 U.S.C. §§ 866, 867.  And in 1983, Congress for the first time incorporated the Supreme Court into this process of direct

review by granting certiorari jurisdiction.  Military Justice Act of 1983, § 10, 97 Stat. at 1405-06; *see* 28 U.S.C. § 1259.

At the conclusion of direct review, Article 76 of the UMCJ provides that court-martial judgments "are final and conclusive" and "binding upon all departments, courts, agencies, and officers of the United States."  10 U.S.C. § 876.  "The valid, final judgments of military courts, like those of any court of competent jurisdiction not subject to direct review for errors of fact or law, have res judicata effect and preclude further litigation of the merits."  *Councilman*, 420 U.S. at 746.

Congress has never given federal district courts or courts of appeals a role in this process of direct appellate review.  Nor does 28 U.S.C. § 1331—which Bergdahl invoked here—provide jurisdiction for district courts to inject themselves into that process.  Section 1331 gives district courts "original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."  That provision "is a grant of original jurisdiction, and it does not authorize district courts to exercise appellate jurisdiction" over the judgments of coordinate court systems.  *Verizon Md., Inc. v. Public Serv. Comm'n of Md.*, 535 U.S. 635, 644 n.3 (2002).  The "essential criterion" of appellate

jurisdiction is that it "revises and corrects the proceedings in a cause already instituted." *Ortiz*, 585 U.S. at 436 (quoting *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 175 (1803)).

Courts exercising original jurisdiction conferred by § 1331 thus may not "revise[] and correct[]" the judgment of a court from the entirely separate court-martial and military appellate system. The First Circuit's decision in *Davies v. Clifford* illustrates the point. There, a discharged servicemember sought a declaratory judgment that his court-martial conviction was void. 393 F.2d 496, 496-97 (1st Cir. 1968). The First Circuit affirmed the dismissal of the suit, emphasizing that it had "no jurisdiction to review the Court of Military Appeals"—the predecessor to the CAAF—and that the district court had no "direct jurisdiction over the conviction itself." *Id.* at 497.

This Court has applied the same principle. In *McKinney v. White*, this Court held that a district court could not review the decisions of actors within the court-martial review system under the Administrative Procedure Act (APA), explaining that "Congress has not granted jurisdiction to this court to review direct appeals from the highest military official of a general court martial," and that there was thus "no

jurisdiction" to review the military's rejection of a request "to set aside the court martial finding and sentence." 291 F.3d 851, 854, 856 (D.C. Cir. 2002); *see Shaw v. United States*, 209 F.2d 811, 812-13 (D.C. Cir. 1954) (dismissing petitions for review of court-martial judgments because "[n]othing in the [UCMJ] confers upon this court or any other court the power to review the decisions of the Court of Military Appeals").

Analogous principles apply in the context of state judgments. The Supreme Court and this Court have repeatedly recognized that district courts have no jurisdiction under § 1331 to entertain actions that seek "review and rejection" of a state-court judgment. *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 291-92 (2005) (explaining that district courts lack jurisdiction over suits brought to "overturn an injurious state-court judgment"); *accord Singletary v. District of Columbia*, 766 F.3d 66, 71-72 (D.C. Cir. 2014). Such suits also improperly impinge on the Supreme Court's exclusive "appellate jurisdiction over state-court judgments," as Congress has tasked only

28

the Supreme Court with such review.  *Exxon*, 544 U.S. at 291; 28 U.S.C. § 1257.

Those principles control here.  The district court purported to vacate the judgment and sentence of the court-martial, as well as the judgments of the military appellate courts.  That is a quintessential exercise of appellate jurisdiction Congress has entrusted to the military appellate courts and the Supreme Court, not an exercise of the original jurisdiction conferred by § 1331.

The incongruity of the district court's exercise of jurisdiction here is underscored by the district court's view of further proceedings.  The district court vacated only orders of the military courts from the date on which Judge Nance's purported appearance of partiality arose and stated that "military proceedings against [Bergdahl] may resume." Doc.40.at.16.  But Bergdahl's sentence has been fully executed, he was discharged from the military, and Bergdahl has already contended (as the district court acknowledged) that it would be unconstitutional to subject him to further military proceedings.  Doc.40.at.16; *see* Dkt. No. 33 at 8.  Such arguments are only available because the district court

29

improperly treated itself as an extension of the military justice system empowered to vacate court-martial judgments.

Finally, the absence of any statutory basis for jurisdiction here is further underscored by the lack of any waiver of sovereign immunity applicable to this suit.  The sole defendant named in Bergdahl's complaint is the United States, which is immune from suit unless Congress enacts an express waiver of that immunity.  *F.D.I.C. v. Meyer*, 510 U.S. 471, 475 (1994).  While Congress has waived sovereign immunity for many non-monetary suits through the APA, Congress has excluded "courts-martial" from the APA's waiver and corresponding cause of action.  5 U.S.C. §§ 701(b)(1)(F), 702; *McKinney*, 291 F.3d at 854-55; *Clark v. Library of Cong.*, 750 F.2d 89, 102 (D.C. Cir. 1984).  No other statute provides a waiver of sovereign immunity applicable to this suit.

## B.    Collateral Review Does Not Permit Action Directly on the Judgment and Requires an Independent Jurisdictional Grant

The absence of any authority for district courts to engage in direct review of court-martial judgments precludes them from vacating, expunging, or otherwise acting directly on those judgments.  District

courts may nevertheless sometimes engage in "collateral" review of court-martial judgments, and the district court here purported to engage in such "collateral" review.  *See, e.g.*, Doc.25.at.1.  But collateral review is not direct review, and does not permit a court to act directly on the judgment of a separate court system, such as by vacating it.  *See, e.g.*, Restatement (First) of Judgments § 113 cmt. a (Am. Law Inst. 1942) ("Apart from statute, a court of equity has no power directly to affect a judgment of another court.").  Instead, in collateral review, a court considers whether to grant res judicata effect to a judgment of another court—whether a court-martial, a state court, or some other court—that would otherwise control the outcome of some claim or issue before the court.

The Supreme Court outlined these principles in *Councilman*.  The Court observed that the final judgments of military courts "have res judicata effect and preclude further litigation of the merits," and that at the time Congress had not "conferred on any Art. III court jurisdiction directly to review court-martial determinations."  420 U.S. at 746.  Collateral review of such judgments thus "seeks, as a necessary incident to relief *otherwise within the court's power to grant*, a declaration that a

31

judgment is void." *Id.* at 746-47 (emphasis added). Such a ruling does not "necessarily mean that the judgment is invalid for all purposes," but rather "only that for purposes of the matter at hand the judgment must be deemed without res judicata effect: because of lack of jurisdiction or some other equally fundamental defect, the judgment neither justifies nor bars relief from its consequences." *Id.* at 747.

The specific issue in *Councilman* was whether the finality language of Article 76 of the UCMJ barred courts from conducting even this limited, collateral review by stripping "subject-matter jurisdiction in suits for collateral relief other than by way of habeas." 420 U.S. at 749. *Councilman* held that Article 76 did not have this effect, noting that "remedies alternative to habeas, particularly suits for backpay, historically have been available," and that the text of Article 76 "does not expressly effect any change in the subject-matter jurisdiction of Art. III courts." *Id.* at 749, 751. For the same reason, *Councilman* held that § 1331 conferred jurisdiction over the suit before it, which "sought injunctive relief from an impending court-martial" on the ground that "any judgment entered by the court-martial would be void and hence subject to collateral impeachment." *Id.* at 748-49; *see Romero v.*

*International Terminal Operating Co.*, 358 U.S. 354, 359 & n.5 (1959) (explaining that § 1331 confers equity jurisdiction on district courts).

*Councilman* thus affirmed the continuing availability of collateral challenges that do not act directly on the court-martial judgment. Instead, the petitioner or plaintiff seeks a remedy—release from custody or an award of backpay—that may be granted after declining to give res judicata effect to the court-martial judgment, and in doing so invokes an express statutory grant of jurisdiction. *See* 28 U.S.C. § 2241 (providing jurisdiction over habeas petitions); *id.* §§ 1346(a)(2), 1491 (providing jurisdiction over backpay suits through the Tucker Act and Little Tucker Act). In such cases, collateral relief is properly "sought in an action otherwise within the court's subject-matter jurisdiction, on a ground that recognizes the distinction between direct and collateral attack, and in a form that the court is able with propriety to grant." *Councilman*, 420 U.S. at 752-53.

*Councilman* also recognized this distinction in the context of administrative remedies. Congress has established administrative boards within each military department empowered to correct military records, including by changing the character of a discharge. 10 U.S.C.

33

§§ 1552(a), 1553(a).  Those boards' power over "records of courts-martial and related administrative records pertaining to court-martial cases" conducted under the UCMJ "may extend only to" alterations reflecting subsequent steps taken by the military courts or "action on the sentence of a court-martial for purposes of clemency."  *Id.* § 1552(f); *accord id.* § 1553(a).  Those boards thus have no power to vacate court-martial judgments or to expunge records of a court-martial conviction.  *See, e.g.*, *Bolton v. Department of the Navy Bd. for Corr. of Naval Records*, 914 F.3d 401, 407-09 (6th Cir. 2019).  A decision of one of those boards denying a change in the character of a discharge is reviewable by an Article III court; before and after *Councilman*, this Court and others entertained such suits under the federal-officer mandamus statute, 28 U.S.C. § 1361.  *See Ashe v. McNamara*, 355 F.2d 277, 279-82 (1st Cir. 1965); *Homcy v. Resor*, 455 F.2d 1345, 1347-49, 1352 n.7 (D.C. Cir. 1971); *Baker v. Schlesinger*, 523 F.2d 1031, 1033, 1034-35 (6th Cir. 1975).

On the rare occasions relief has been granted in a suit challenging a refusal to upgrade a discharge resulting from an allegedly void court-martial judgment, that relief was limited to an order compelling

34

administrative action to upgrade the discharge, with no suggestion that the court could vacate the court-martial judgment itself. *See Ashe*, 355 F.2d at 282; *Homcy*, 455 F.2d at 1347, 1352 n.7. And *Councilman* specifically contrasted the successful collateral challenge the First Circuit affirmed in *Ashe* with the improper suit seeking a declaration that a court-martial judgment was void that the First Circuit rejected in *Davies*. *Councilman*, 420 U.S. at 747 n.13; *see Davies*, 393 F.2d at 497 (distinguishing *Ashe* because that petitioner sought "collateral administrative relief").

That understanding also mirrors the bedrock principles governing treatment of other judgments. For example, in considering a habeas petition from a state prisoner, a federal court may order the prisoner's release if his confinement is due to an invalid state judgment, but it cannot "revise the state court judgment." *Fay v. Noia*, 372 U.S. 391, 431 (1963), *overruled on other grounds by Wainwright v. Sykes*, 433 U.S. 72, 87-88 (1977); *accord, e.g.*, *Coleman v. Thompson*, 501 U.S. 722, 730 (1991) (explaining that when reviewing "a state prisoner's habeas corpus petition … [t]he court does not review a judgment, but the lawfulness of the petitioner's custody *simpliciter*"); *Brown v. Vanihel*, 7

F.4th 666, 669-70 (7th Cir. 2021); *Gouveia v. Espinda*, 926 F.3d 1102, 1109-10 (9th Cir. 2019). More generally, a state court judgment is entitled to preclusive effect in a subsequent action in federal court (and the courts of other states) unless some defect renders the judgment void. *See, e.g.*, *Durfee v. Duke*, 375 U.S. 106, 109-11 (1963); *Underwriters Nat'l Assurance Co. v. North Carolina Life & Accident & Health Ins. Guar. Ass'n*, 455 U.S. 691, 704-05 (1982). But a conclusion that a state-court judgment is void and without preclusive effect in a subsequent action does not reverse, vacate, or otherwise act directly upon that judgment. *See Exxon*, 544 U.S. at 293.

Thus, to obtain collateral relief from his court-martial conviction, Bergdahl would need to bring a suit otherwise within the district court's jurisdiction—such as a habeas petition, backpay suit, or challenge to an administrative denial of a change in the character of a discharge—and seek the remedy appropriate to that type of suit—release, backpay, or a change in the character of a discharge. Bergdahl pursued none of these options. This suit thus does not seek, and the district court did not grant, "collateral" relief from the effects of a court-martial judgment

36

through a suit "otherwise within the court's subject-matter jurisdiction." *Councilman*, 420 U.S. at 752-53.

### C. This Court's Cases Do Not Support the District Court's Vacatur

**1.** The district court relied heavily on *In re Al-Nashiri*, 921 F.3d 224 (D.C. Cir. 2019). But *Al-Nashiri* did not involve collateral relief from a court-martial judgment. There, this Court addressed a mandamus petition from a Guantanamo detainee subject to pretrial proceedings before a military commission—not a court-martial. *Id.* at 226. This Court held that the judge's application to become an immigration judge created an impermissible appearance of partiality under Rule for Military Commissions 902(a). *Id.* at 236-37. And this Court held that the appropriate remedy was to vacate all of the military judge's rulings from the date he submitted his application. *Id.* at 240.

*Al-Nashiri* is a poor analogy on its facts, as we explain below. *Infra* pp. 55-59. But even more fundamentally, *Al-Nashiri* says nothing about the district court's power in a collateral challenge to a court-martial judgment. The military commission system from which *Al-Nashiri* arose is a unique system that is separate from the court-martial system. Military commissions are presided over by military judges, *see*

37

10 U.S.C. § 948j(a), but unlike with courts-martial, Congress has granted this Court "[e]xclusive appellate jurisdiction … to determine the validity of a final judgment rendered by a military commission," *id.* § 950g(a).  Because this Court has appellate jurisdiction over final judgments of the military commissions, it likewise has "jurisdiction to consider mandamus petitions seeking judicial disqualification" within military-commission proceedings. *Al-Nashiri*, 921 F.3d at 233. *Al-Nashiri* thus says nothing about whether a district court exercising *original* jurisdiction may vacate a court-martial judgment (as well as subsequent military appellate-court judgments) in a collateral suit.

**2.**  The government did not raise below its objection to the court's jurisdiction or the absence of a waiver of sovereign immunity, and the district court did not address either issue.  But these errors may be raised at any time and are not subject to waiver or forfeiture. *E.g.*, *United States v. Cotton*, 535 U.S. 625, 630 (2002); *Department of the Army v. FLRA*, 56 F.3d 273, 275 (D.C. Cir. 1995).

Nor do this Court's decisions establish the district court's jurisdiction to vacate a court-martial judgment.  This Court has previously observed that *Councilman* holds that Article 76 of the UCMJ

38

does not strip district courts of jurisdiction over suits for collateral relief that require determining the validity of a court-martial judgment. *See United States ex rel. New v. Rumsfeld*, 448 F.3d 403, 406 (D.C. Cir. 2006) (describing *Councilman* as holding "that Congress didn't intend to confine collateral attacks on court-martial proceedings to § 2241"); *Sanford v. United States*, 586 F.3d 28, 32 (D.C. Cir. 2009) (stating that *Councilman* "held that federal courts have jurisdiction to review the validity of court-martial proceedings brought by non-custodial plaintiffs who cannot bring habeas suits" (emphasis omitted)); *Larrabee v. Del Toro*, 45 F.4th 81, 86 (D.C. Cir. 2022) (citing *Sanford* and a military habeas case for the proposition that authority for collateral review is "long established" and "persists" for plaintiffs no longer in custody).

These statements are correct: as discussed, in appropriate cases "otherwise within the court's subject-matter jurisdiction," federal courts can consider the validity of court-martial judgments in determining whether to give those judgments res judicata effect. *Councilman*, 420 U.S. at 752-53. However, to the extent this Court's cases suggest that § 1331 confers jurisdiction over a *freestanding* "collateral attack" on a

39

court-martial judgment, untethered to a cognizable suit seeking collateral relief, those statements do not bind this panel.

In *New*, this Court addressed a case in which the parties and the district court "all assumed" that the habeas statute provided jurisdiction. 448 F.3d at 406. Without briefing from the parties or analysis beyond the observation that collateral review is not "confine[d]" to habeas, the Court stated that the district court "had subject-matter jurisdiction to hear New's collateral attack under § 1331." *Id.* Similarly, in *Larrabee*, jurisdiction was apparently uncontested, and in a parenthetical this Court described *Councilman* as "reading the UCMJ and 28 U.S.C. § 1331 to permit non-habeas collateral attacks against court-martial judgments that are allegedly 'void.'" 45 F.4th at 86.

Neither *New* nor *Larrabee* analyzed why jurisdiction would be available under § 1331, and neither opinion discussed *Councilman*'s analysis in any detail or explained how *Councilman*'s affirmation of the continuing vitality of traditional avenues for collateral relief could be read to recognize jurisdiction over a wholly new category of freestanding suits to vacate or alter a court-martial judgment. The absence of

40

discussion is unsurprising given that in both cases jurisdiction was uncontested and relief was ultimately denied.  Those unexamined and unbriefed statements would, at most, constitute drive-by jurisdictional rulings lacking precedential effect.  *De Csepel v. Republic of Hungary*, 859 F.3d 1094, 1105-06 (D.C. Cir. 2017).

Moreover, reinforcing limits on district-court jurisdiction in this context is imperative.  Freestanding collateral challenges to court-martial judgments have historically been hen's-teeth rare, and indeed, *Councilman* approvingly cited the First Circuit's prior repudiation of such suits.  420 U.S. at 747 n.13.  Yet the district court has recently seen a steady stream of suits by plaintiffs not in custody seeking to vacate, expunge, or otherwise alter court-martial judgments—at least 12 between the filing of Bergdahl's suit in February 2021 and the filing of this brief, including at least seven in the past six months alone.[5]

---

[5] *Tate v. Averill*, No. 1:25-cv-00414 (D.D.C. filed Feb. 12, 2025); *Burnside v. United States*, No. 1:25-cv-0417 (D.D.C. filed Feb. 12, 2025); *Hansen v. United States*, No. 1:25-cv-00049 (D.D.C. filed Jan. 8, 2025); *Zier v. Kendall*, No. 1:24-cv-03429 (D.D.C. filed Dec. 10, 2024); *Sablan v. Kendall*, No. 1:24-cv-03344 (D.D.C. filed Nov. 26, 2024); *King v. Kendall*, No. 1:24-cv-03282 (D.D.C. filed Nov. 19, 2024); *Tinsley v. United States*, No. 1:24-cv-02988 (D.D.C. filed Oct. 21, 2024); *Prescott v. United States*, No. 1:24-cv-01886 (D.D.C. filed June 28, 2024); *Riojas v.*

*Continued on next page.*

41

Such suits are likely to continue to proliferate until this Court makes clear that the district court is not an additional layer of appellate review after final judgment in the military justice system.

## II. The District Court Exceeded Even the Limits on Properly Framed Collateral Suits

The lack of jurisdiction over this suit is alone basis to vacate and remand with instructions to dismiss: Bergdahl's suit seeks impermissible direct review of the court-martial judgment, rather than any cognizable collateral relief.  But even if Bergdahl had brought a suit within the district court's jurisdiction seeking some form of collateral relief, the error the district court purported to identify could not support granting relief.

---

*United States*, No. 1:24-cv-01577 (D.D.C. filed May 28, 2024); *Henry v. Kendall*, No. 1:21-cv-00865 (D.D.C. filed Mar. 31, 2021), *appeal dismissed*, No. 22-5259 (D.C. Cir. Oct. 17, 2024); *Campbell v. Kendall*, No. 1:21-cv-02654 (D.D.C. filed Oct. 11, 2021), *aff'd*, 2024 WL 1262827 (D.C. Cir. Mar. 26, 2024); *see Sampson v. Department of the Army*, No. 1:24-cv-00729 (D.D.C. dismissed Nov. 13, 2024) (dismissed for non-prosecution after failure to properly serve defendants); *Sampson v. Department of the Army*, No. 1:23-cv-01373 (D.D.C. filed May 10, 2023) (dismissed without prejudice).

A.    **Review of Court-Martial Judgments Encompasses, At Most, Jurisdictional and Fundamental Constitutional Errors**

Even where a district court has subject-matter jurisdiction to determine the validity of a court-martial judgment through a properly framed suit seeking collateral relief, a court has only limited power to disregard that judgment.  In habeas, the Supreme Court has explained that "[m]ilitary law, like state law, is a jurisprudence which exists separate and apart from the law which governs in our federal judicial establishment," and thus "the inquiry, the scope of matters open for review, has always been more narrow than in civil cases."  *Burns v. Wilson*, 346 U.S. 137, 139-40 (1953) (plurality opinion).

That "more narrow" inquiry is even more constrained in non-habeas collateral review, such as a backpay suit.  In such non-custodial collateral challenges, the Supreme Court has stated that judgments should not be disregarded absent "lack of jurisdiction or some other equally fundamental defect" that renders the judgment "void." *Councilman*, 420 U.S. at 747, 753.  Indeed, "grounds of impeachment cognizable in habeas proceedings may not be sufficient to warrant other forms of collateral relief."  *Id.* at 753.  Thus, "whether a court-martial

43

judgment properly may be deemed void—*i.e.*, without res judicata effect for purposes of the matter at hand—may turn on the nature of the alleged defect, and the gravity of the harm from which relief is sought." *Id.* "[B]oth factors must be assessed in light of the deference that should be accorded the judgments of the carefully designed military justice system established by Congress." *Id.*

The Supreme Court has not since *Councilman* further defined what errors render a court-martial judgment "void" for purposes of awarding collateral relief. *Cf. United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260, 271 (2010) (stating a judgment is "void" under Federal Rule of Civil Procedure 60(b)(4) only when "premised either on a certain type of jurisdictional error or on a violation of due process that deprives a party of notice or the opportunity to be heard"). But it is clear that that category can include, at most, jurisdictional or fundamental constitutional errors in the proceedings.

In military habeas, as in state habeas, the Supreme Court has repeatedly refused to entertain claims of error "not of constitutional significance," as such arguments "are beyond [the Court's] scope of review." *Parker v. Levy*, 417 U.S. 733, 761 (1974) (quotation omitted);

44

*Fowler v. Wilkinson*, 353 U.S. 583, 585 (1957); *Burns*, 346 U.S. at 145 n.12; *see Smith v. Phillips*, 455 U.S. 209, 221 (1982) (explaining that "[f]ederal courts hold no supervisory authority over state judicial proceedings and may intervene [in habeas] only to correct wrongs of constitutional dimension").  And as the justifications for disregarding court-martial judgments in non-custodial collateral review can be no broader than in habeas, *Councilman*, 420 U.S. at 753; *New*, 448 F.3d at 408, such non-constitutional errors likewise could not be a basis for relief in a non-custodial posture.  The Supreme Court has recognized this point too: before *Councilman*, the Supreme Court sidestepped the effect of Article 76's finality language in a backpay suit by assuming "that a collateral attack on a court-martial judgment may be made … alleging a 'constitutional' defect in the military decision," and holding that the plaintiffs' contentions there did "not rise to that level."  *United States v. Augenblick*, 393 U.S. 348, 351-52 (1969).

This Court has likewise explained that collateral relief "requires proof of a constitutional defect in the court martial proceedings," *Owings v. Secretary of the U.S. Air Force (SAFOS)*, 447 F.2d 1245, 1261 (D.C. Cir. 1971), and that arguments that a court-martial conviction or

45

sentence violated military law "are not proper subjects for this court's review," *Priest v. Secretary of the Navy*, 570 F.2d 1013, 1019 (D.C. Cir. 1977). Other courts of appeals have reached the same conclusion in addressing both habeas petitions, *Thomas v. U.S. Disciplinary Barracks*, 625 F.3d 667, 670 (10th Cir. 2010); *Fletcher v. Outlaw*, 578 F.3d 274, 278 (5th Cir. 2009); *Armann v. McKean*, 549 F.3d 279, 289-92 (3d Cir. 2008), and noncustodial suits, *Allen v. U.S. Air Force*, 603 F.3d 423, 433 n.4 (8th Cir. 2010); *Bowling v. United States*, 713 F.2d 1558, 1561, 1562-63 (Fed. Cir. 1983).

## B.    The District Court Erred in Granting Relief on a Purported Error Not of Constitutional Dimension

The district court purported to identify only a violation of a court-martial rule governing recusal that is substantially more protective than due process requires. That non-constitutional error is not a basis for holding a court-martial judgment "void" in a collateral suit. *Councilman*, 420 U.S. at 753.

"[N]ot '[a]ll questions of judicial qualification … involve constitutional validity.'" *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 820 (1986) (second and third alterations in original) (quoting *Tumey v. Ohio*,

46

273 U.S. 510, 523 (1927)).  The Due Process Clause requires recusal only in limited circumstances "in which experience teaches that the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable." *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 877 (2009) (quotation omitted).  The circumstances required to clear that bar are extreme, such as where a judge has a "direct, personal, substantial, pecuniary interest" in a case, *Tumey*, 273 U.S. at 523, a judge was personally involved in the case before joining the bench, *e.g.*, *Williams v. Pennsylvania*, 579 U.S. 1, 11 (2016), or in "extreme" and "extraordinary" circumstances where an individual with a foreseeable case before a judge made massive expenditures to aid that judge's election campaign, *Caperton*, 556 U.S. at 884-85, 887.

Modern recusal requirements—including R.C.M. 902—thus "provide more protection than due process requires." *Caperton*, 556 U.S. at 890.  Recusal requirements based on a mere *appearance* of partiality are paradigmatic examples of such prophylactic rules.  No such requirement existed in federal law until 1974, when 28 U.S.C. § 455(a) added an "entirely new 'catchall'" requirement.  *Liteky v. United States*, 510 U.S. 540, 548 (1994).  Moreover, appearance issues

are waivable by the parties, *see* 28 U.S.C. § 455(e); R.C.M. 902(e), undermining any suggestion that they create circumstances where "the probability of actual bias … is too high to be constitutionally tolerable." *Caperton*, 556 U.S. at 877 (quotation omitted). And unlike a due process claim about a biased adjudicator, appearance issues are subject to a form of harmless error review even when timely raised. *Liljeberg v. Health Serv. Acquisition Corp.*, 486 U.S. 847, 862 (1988); *see infra* pp. 64-67.

This Court's decision in *Al-Nashiri* underscores the point, explaining that "the 'Due Process Clause demarks only the outer boundaries of judicial disqualifications,'" and that "various statutes and codes of conduct, in service of their essential function 'to maintain the integrity of the judiciary and the rule of law,' 'provide more protection than due process requires.'" 921 F.3d at 234 (first quoting *Lavoie*, 475 U.S. at 828; and then quoting *Caperton*, 556 U.S. at 889-90). As an example of these more-protective rules, this Court noted R.C.M. 902(a). *Id.* And this Court limited its analysis to the parallel Rule for Military Commissions 902(a) rather than applying constitutional due process standards.

48

None of that is consistent with treating an appearance issue as a constitutional error, much less one so fundamental as to void a military conviction on collateral review. Indeed, in the related context of habeas petitions seeking release from state custody, courts have consistently recognized that appearance claims cannot serve as a basis for a due process violation. *See Railey v. Webb*, 540 F.3d 393, 407-15 (6th Cir. 2008) (collecting cases); *Del Vecchio v. Illinois Dep't of Corr.*, 31 F.3d 1363, 1371-72 (7th Cir. 1994) (en banc).

The district court did not hold or suggest that Judge Nance's conduct created a due process violation. The district court expressly disclaimed any holding "that there was actual bias in this case," Doc.25.at.62, and acknowledged that R.C.M. 902(a) provides "more specific requirements" than those imposed by the Constitution, Doc.25.at.57. Nor could the district court have identified constitutional error, as the circumstances here are not comparable to the sort of extreme structural tensions that have led the Supreme Court to declare that a judge's participation in a case creates a due process violation. The court thus limited its holding to the conclusion that Judge Nance's conduct gave rise to an "appearance of judicial partiality" and that

49

Judge Nance was required under the Rules for Courts-Martial to recuse when he applied to become an immigration judge. Doc.25.at.57-58. Even assuming that was correct, *but see infra* pp. 52-59, 64-65, it would not be sufficient to justify disregarding a court-martial judgment as "void"; just as district courts in habeas do not sit to determine whether state courts have properly interpreted or applied state law, *see Wilson v. Corcoran*, 562 U.S. 1, 16 (2010) (per curiam), district courts do not sit to review the application of military rules in military proceedings in the absence of constitutional error.

The district court's failure to appreciate these fundamental limitations led it to compound its errors by expressly declining to apply *Councilman*'s "void" standard. The district court instead applied the "full and fair consideration" test from military habeas on the theory that if the military courts' judgments could be sustained under that "less deferential" test, they would necessarily survive under *Councilman*. Doc.25.at.25. Having concluded that the court-martial judgment did not survive the "less deferential" habeas standard, the district court should have revisited the question of whether the purported error it identified actually rendered the judgment "void"

50

under the more deferential standard applicable to non-custodial

challenges. *Councilman*, 420 U.S. at 753; *see, e.g.*, *Sanford*, 586 F.3d at

31-33 (reserving question about differences between "full and fair

consideration" and "void" standards).  It did not undertake that inquiry.

But acknowledging the well-settled limitations on collateral review

illustrates that the difference between those standards is irrelevant

here: an appearance issue would not be sufficient to warrant relief even

in habeas, and so by definition cannot suffice for relief in a non-

custodial suit.

## III.  The District Court's Judgment Was Erroneous on Its Own Terms

Even if the district court had jurisdiction to entertain a

freestanding suit seeking to vacate a court-martial judgment based on a

violation of a court-martial procedural rule, the judgment reflects

multiple additional errors.  The military courts held that Bergdahl had

failed to timely raise his claim, and the district court provided no sound

basis for rejecting that determination.  And in any event, there is no

basis to vacate Bergdahl's voluntary guilty pleas, his receipt of the

sentence he requested, or the subsequent judgments of the military

appellate courts.  The district court's conclusions ignore or downplay

51

central facts, rest on error, and improperly disregard the judgments of the military courts.

## A.    The Conduct of Bergdahl's Proceeding Demonstrates No Fundamental Error

**1.**  The district court believed that an appearance of partiality arose when Judge Nance applied to be an immigration judge. Doc.25.at.58.  Judge Nance's conduct from that date belies any such assertion.  The same day, Bergdahl pleaded guilty with no plea agreement.  At his plea hearing, Bergdahl walked through an extended colloquy with Judge Nance in which he addressed each element of the offenses to which he pleaded guilty and acknowledged his guilt.  Doc.16-9.at.132-177.  And in accepting Bergdahl's pleas, Judge Nance agreed with Bergdahl that he was guilty of desertion for only one day, rejecting prosecutors' argument that he was guilty of desertion for the entire duration of his captivity.  *See* Doc.16-9.at.180-200, 207.

Judge Nance's conduct regarding Bergdahl's sentence similarly belies any appearance of partiality.  As the CAAF explained, desertion and misbehavior before the enemy are "very serious" offenses that are "anathema to the military and its mission" for which the UCMJ authorizes life in prison or the death penalty.  *United States v.*

*Bergdahl*, 80 M.J. 230, 233 (C.A.A.F. 2020).  Prosecutors provided significant evidence of the harms Bergdahl caused by leaving his post, including a massive search-and-rescue operation that involved thousands of soldiers operating in "miserable" conditions in an around-the-clock effort to recover Bergdahl.  Doc.16-10.at.3-12, 48-55, 94-105, 119-134, 153-62.  That effort exposed soldiers to significant risk, and multiple soldiers were injured: a Navy SEAL who required 18 surgeries after being shot in the leg; a soldier who lost use of his hand; and another who was effectively paralyzed after being shot in the head, lived the remainder of his life in constant pain with no ability to speak, and died in 2019.  *Bergdahl*, 80 M.J. at 240-41, 241 n.13; Doc.16-9.at.278-90; Doc.16-10.at.182-88, 209-224, 236-53, 297-301; Doc.16-11.at.2-18, 26-48.  Bergdahl offered a statement "accepting responsibility for [his] mistake," Doc.16-11.at.56, and his counsel urged that "an appropriate sentence" would include "no confinement" and "request[ed] that [Judge Nance] give Sergeant Bergdahl a dishonorable discharge," Doc.16-12.at.294-95.  That was consistent with Bergdahl's final unlawful command influence motion, which urged that Bergdahl's

sentence should "not exceed the sentence of no punishment or at the very least … will not include confinement." Doc.16-9.at.235.

Given the gravity of Bergdahl's offense, however, the prosecution requested a sentence of 14 years in prison, a reduction in grade, and a punitive discharge, Doc.16-12.at.269-71, and the President's comments while a candidate supported an even more severe penalty. *Bergdahl*, 80 M.J. at 236-37. But Judge Nance accepted Bergdahl's proposal, not the prosecution's request or the President's earlier suggestion. Indeed, Judge Nance made clear he considered the President's comments as "mitigation evidence," Doc.16-23.at.5; *accord* Doc.16-12.at.186, in choosing the sentence Bergdahl requested: no confinement, a dishonorable discharge, and a symbolic forfeiture of pay, Doc.16-12.at.305; *see supra* p. _ n.4. Indeed, the lack of any apparent partiality is underscored by the President's comments describing the sentence Judge Nance imposed as "a complete and total disgrace to our Country and to our Military." *Bergdahl*, 80 M.J. at 238; Doc.3.at.9.

In sum, Judge Nance proved himself "notably impervious" to "outside forces," imposing the sentence Bergdahl sought "despite the sensational nature of this case" and "public calls" for "lengthy

54

imprisonment." *Bergdahl*, 80 M.J. at 244.  Bergdahl received the
noncustodial sentence he requested after voluntarily pleading guilty to
some of the most serious offenses under the UCMJ.  *See* Dkt. No. 18-2
at 32 (Bergdahl's express statement that he "do[es] not contend that
[his] plea or his request for a punitive discharge were involuntary").  As
the CAAF explained, "it is wholly unrealistic to believe there was any
scenario where" Bergdahl "would not have been held accountable at a
general court-martial for his offenses" and "would not have received the
dishonorable discharge he himself subsequently requested." *Bergdahl*,
80 M.J. at 233.

**2.**  The district court largely ignored these aspects of Judge
Nance's conduct.  It instead focused on what it viewed as the "striking
resemblance" between Judge Nance's conduct and the actions of the
military-commission judge in *Al-Nashiri*.  Doc.25.at.58 (quotation
omitted); *see* Doc.25.at.57-60.  But here, too, the district court painted
an inaccurate picture.

In *Al-Nashiri*, this Court emphasized that an appearance issue
arises when judges adjudicate "cases involving their prospective
employers," and concluded that the Attorney General was both an

55

immigration judge's "employer" and a "party" to Al-Nashiri's military commission proceeding based on the Attorney General's unique role with regard to military commissions. 921 F.3d at 235-36. By contrast, as the district court acknowledged, the Attorney General—who hires immigration judges—is in no sense a party to a court-martial. Doc.25.at.59; *see* 8 U.S.C. § 1101(b)(4).

The district court brushed off this central aspect of *Al-Nashiri* by stating that the Executive Branch as a whole "arguably" had "an interest in a particular outcome" in Bergdahl's case, "*i.e.*, that [Bergdahl] would be convicted and receive the death penalty," and that the President's statements "were integral to the potential success of [Bergdahl's] defense." Doc.25.at.60. But if that is true, Bergdahl in fact succeeded in his defense. His third unlawful command influence motion—the only one Judge Nance addressed after the purported appearance of conflict arose—sought a ruling that his sentence would be limited to "no punishment or at the very least" no "confinement," Doc.16-9.at.234-35, and a no-confinement sentence is exactly what Judge Nance imposed. The district court's contrary conclusion was apparently driven by an obvious factual mistake: the court thought that

56

Bergdahl's third motion sought "to dismiss" the charges against him. Doc.25.at.60; *see* Doc.25.at.26, 58 (also erroneously stating that the third motion sought dismissal).[6]  And Judge Nance's prior denial of Bergdahl's other unlawful command influence motions—which *did* seek dismissal—long predated any possible appearance of conflict and are not vacated by the district court's judgment here.

More generally, Judge Nance was repeatedly critical of the President's comments about Bergdahl.  Judge Nance's opinion on Bergdahl's second unlawful command influence motion—which he submitted as his writing sample with his application—called then-candidate Trump's comments "troubling" and "disturbing and disappointing," Doc.16-20.at.7; *see* Doc.16-7.at.172, 199-200 (similar statements at hearing); allowed submission of a questionnaire and "very liberal *voir dire*" on the potential influence of the statements; and denied the motion based on the legal conclusion—not questioned by the

---

[6] The district court also misunderstood the timing of Bergdahl's third unlawful command influence motion.  The court stated that Bergdahl may have pleaded guilty because Judge Nance had "denied all three" of Bergdahl's unlawful command influence motions.  Doc.40.at.9 n.3 (alteration and quotation omitted).  The third motion was filed *after* Bergdahl's pleas, and Bergdahl declined to withdraw his pleas before Judge Nance ruled on the motion.

57

district court—that a private citizen could not commit unlawful command influence, Doc.16-20.at.6, 8, 9; *Bergdahl*, 80 M.J. at 238. Indeed, by the time of the hearing on Bergdahl's third unlawful command influence motion, Bergdahl's counsel observed that "[t]he White House" would have been "long aware of the dim view the Court took of President Trump's pre-inauguration statements about Sergeant Bergdahl." Doc.16-9.at.233. And after that hearing, Judge Nance not only treated the comments as mitigation evidence, but required anyone involved in post-trial proceedings to read a statement from the White House emphasizing the need to exercise their independent judgment. Doc.16-23.at.5.

The district court's treatment of Judge Nance's comments about retirement was likewise distorted. The district court acknowledged that Judge Nance's statements about retirement could be "reasonably understood to be answering a question regarding [Judge Nance's] plans within the *military*." Doc.25.at.52 n.15 (quotation omitted). Judge Nance was, after all, being asked a question about potential unlawful command influence, which addresses actions by individuals subject to the UCMJ to improperly influence a court-martial, 10 U.S.C. § 837(a),

58

and the context is underscored by Judge Nance's repeated reference to his lack of aspiration for higher military rank and his upcoming mandatory retirement from the military in explaining why the President's statements would have "no effect on [him] whatsoever" as he headed for the "retirement pastures," Doc.16-9.at.224-25; *see* Doc.16-23.at.3-4, 5 (making similar points in written order denying motion).

The district court nevertheless believed that these statements could "just as likely" be understood as reflecting "an intention to retire from employment totally," and thus that Judge Nance "affirmatively misled the parties" about his plans.  Doc.25.at.52 & n.15.  Even assuming those interpretations were actually equally reasonable in context, two evenly-matched possibilities are not a basis on which to impute misconduct to Judge Nance, particularly given the "presumption of honesty and integrity in those serving as adjudicators," *Withrow v. Larkin*, 421 U.S. 35, 47 (1975), and Judge Nance's subsequent conduct at sentencing.

**3.**  Finally, Bergdahl's own strategic conduct in pursuing this claim counsels strongly against granting relief.  Bergdahl did not raise any challenge to Judge Nance's conduct while his case was pending on

direct review.  Bergdahl instead waited until the day the CAAF ruled against him in his direct appeal to request information about Judge Nance's application, and then raised the issue for the first time through a post-judgment motion in the CAAF.  Doc.22-2.at.2-13.  The CAAF denied that motion without prejudice to Bergdahl seeking a writ of coram nobis before the ACCA.

As the ACCA's opinion on the ensuing coram nobis petition explains, Bergdahl's direct appeal with the ACCA was docketed on June 8, 2018, and Judge Nance's appointment as an immigration judge was publicly announced just a few months later, on September 28.  *Bergdahl v. United States*, 2020 WL 7316058, at *1 (A. Ct. Crim. App. Dec. 11, 2020).  The case then remained pending on direct review before the ACCA and the CAAF for almost two years, until the CAAF's judgment on August 27, 2020.

During that period, *Al-Nashiri* was also pending before this Court.  Judge Nance's appointment was announced in the same press release as the judge at issue in *Al-Nashiri*, and one of Bergdahl's counsel filed an amicus brief in *Al-Nashiri*.  *Bergdahl*, 2020 WL 7316058, at *4 n.6.  *Al-Nashiri* was decided on April 16, 2019—two months before the

60

ACCA's decision on Bergdahl's direct appeal and over a year before the CAAF's decision. *Id.* at *4. Bergdahl apparently took no steps during the nearly two years his case was on direct review after the announcement of Judge Nance's appointment—or the roughly 16 months after this Court's decision in *Al-Nashiri*—to obtain Judge Nance's application or to develop the factual basis for his claim.

Bergdahl has carefully avoided explaining when he became aware of Judge Nance's employment as an immigration judge. But it is plain that he was aware on the day the CAAF ruled against him on direct appeal, because he submitted a Freedom of Information Act request for Judge Nance's application that day. *Bergdahl*, 2020 WL 7316058, at *2. That timing alone strongly suggests a strategic decision to hold an appearance-of-partiality claim in reserve while awaiting the result of his direct appeal.

Under these circumstances there was "no valid reason why [Bergdahl] did not seek relief earlier," and Bergdahl's claim "could have been reasonably raised" while the case was pending on direct review. *Bergdahl*, 2020 WL 7316058, at *3, *5.

61

**B.    Bergdahl's Claim Was Not Timely Raised Before the Military Courts and in Any Event Would Not Warrant Vacatur**

These facts highlight additional errors in the district court's analysis, any of which would require reversal.

**1.**  Bergdahl's claim was not timely raised before the military courts and thus could not be asserted in district court.  The military courts have explained that the extraordinary remedy of coram nobis requires meeting six independent requirements, including that "valid reasons exist for not seeking relief earlier." *Denedo v. United States*, 66 M.J. 114, 126 (C.A.A.F. 2008).  In his briefing before the ACCA, Bergdahl was well aware of the need to show valid reasons for his delay. *See* Doc.16-26.at.11; Doc.16-28.at.4-13.  The ACCA considered and rejected those arguments, applying military precedent addressing the "valid reasons" requirement.  *Bergdahl*, 2020 WL 7316058, at *2-5.

The military courts thus rejected Bergdahl's petition based on application of military law governing when those claims should be raised.  That suffices for full and fair consideration of Bergdahl's petition, *see Burns*, 346 U.S. at 142, and was by no measure a void conclusion in its own right.  The holding that Bergdahl's claim was

62

raised too late is precisely the sort of application of a military procedural rule that would ordinarily preclude collateral relief in federal court.  *See, e.g.*, *Martinez v. Ryan*, 566 U.S. 1, 9-10 (2012); *Coleman*, 501 U.S. at 730; *Kendall v. Army Bd. for Corr. of Military Records*, 996 F.2d 362, 366 (D.C. Cir. 1993).  Just as district courts may not "review state court applications of state procedural rules" in a collateral attack on a state court decision, the district court here was not free to revisit the ACCA's conclusions or question the CAAF and the ACCA's application of military procedural requirements to the facts before them.  *Martinez v. Ryan*, 926 F.3d 1215, 1224 (9th Cir. 2019) (quotation omitted) (declining to consider late-raised judicial bias claim).

Instead, a claim not timely raised before the military courts could be considered only if Bergdahl established both cause for the default and actual prejudice resulting from the purported error.  *Francis v. Henderson*, 425 U.S. 536, 542 (1976).  Bergdahl has not attempted to establish either, and in light of Bergdahl's conduct, voluntary guilty plea, and receipt of the sentence he requested, he plainly could not meet this standard.

**2.** In any event, vacatur was not an appropriate remedy. An appearance of bias under R.C.M. 902(a) is determined objectively from the perspective of "a reasonable man knowing all the circumstances," asking "whether, taken as a whole in the context of this trial, a court-martial's legality, fairness, and impartiality were put into doubt by the military judge's actions." *United States v. Martinez*, 70 M.J. 154, 157 (C.A.A.F. 2011) (quotations omitted). If an appearance problem exists, the military courts have adopted the Supreme Court's *Liljeberg* factors to guide the inquiry into the appropriate remedy. *Id.* at 158. Under those factors, vacatur is not automatic, and the remedial inquiry considers "the risk of injustice to the parties in the particular case, the risk that the denial of relief will produce injustice in other cases, and the risk of undermining the public's confidence in the judicial process." *Liljeberg*, 486 U.S. at 864.

The facts described above make clear that Bergdahl would suffer no injustice from leaving the judgment in place—and, indeed, that a reasonable observer fully informed of *all* the facts and circumstances would not harbor a reasonable doubt about Judge Nance's impartiality. No reasonable person would conclude that Judge Nance was trying to

64

appeal to the President to gain appointment as an immigration judge by repeatedly criticizing the President's statements, including in his writing sample; repeatedly stating that he would consider the President's comments as mitigation evidence at sentencing; accepting Bergdahl's pleas while rejecting the prosecution's arguments about the scope of his liability; and imposing the sentence Bergdahl requested, rather than the much more severe sentences proposed by the prosecution and favored by the President.

More generally, a fully informed observer would also recognize the severity of the offenses to which Bergdahl pleaded guilty, as well as the enormous effects Bergdahl's actions had on his fellow soldiers, who faced extreme risk for weeks—and in some cases, suffered serious and permanent injury—while desperately searching for him. It would be "wholly unrealistic to believe" that Bergdahl would not have received at least "the dishonorable discharge he himself subsequently requested." *Bergdahl*, 80 M.J. at 233.

While Bergdahl faces no prejudice, vacatur imposes a significant burden on the military justice system, unwinding years of proceedings before the military courts. The costs of upsetting final judgments are

65

always considerable, and all the more so here, as courts-martial are not continuing bodies, and calling them into existence "requires expending significant military resources," diverting servicemembers from "performance of [the military's] primary function." *United States v. Denedo*, 556 U.S. 904, 925 (2009) (Roberts, C.J., concurring in part and dissenting in part) (quotation omitted).  Moreover, to the extent Bergdahl continues to believe that it would be impermissible to resume proceedings against him, *see supra* pp. 29-30, the risk of injustice would be even higher, presenting the prospect that Bergdahl could escape any penalty for offenses to which he voluntarily pleaded guilty while purporting to accept responsibility for his actions and the harms his conduct caused fellow servicemembers.

The remaining factors likewise weigh heavily against vacatur. The district court repeatedly characterized the facts here as "unique," Doc.25.at.59, 61, reflecting the minimal likelihood that this issue would arise in future cases.  And here, too, the facts of Bergdahl's voluntary guilty pleas, requested sentence, and the effects of his conduct on his fellow soldiers undermine any suggestion that public confidence in the court-martial system would be undermined.  Indeed, the greater threat

66

to public confidence is the district court's indulgence of Bergdahl's apparent strategy to hold this challenge in reserve until he lost in the CAAF.

As these points illustrate, the district court also failed to appreciate the need to weigh all the *Liljeberg* factors in light of the relationship between Article III courts and the independent court-martial system established by Congress. Those factors were crafted by the Supreme Court for addressing recusal issues in the lower federal courts, and have never to our knowledge been applied by federal courts to the judgments of coordinate court systems on collateral review. That underscores district courts' lack of jurisdiction to vacate or alter such judgments, *see supra* pp. 24-30, but if such authority did exist, special account should be taken of the need for comity and finality between coordinate court systems and "the deference that should be accorded the judgments of the carefully designed military justice system established by Congress." *Councilman*, 420 U.S. at 753.

67

## CONCLUSION

For the foregoing reasons, the judgment of the district court

should be vacated, or in the alternative reversed in relevant part.

Respectfully submitted,

YAAKOV M. ROTH
  *Acting Assistant Attorney General*

MELISSA N. PATTERSON

 */s/ Brad Hinshelwood*
BRAD HINSHELWOOD
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7256*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-7823*
  *bradley.a.hinshelwood@usdoj.gov*

April 2025

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of

Appellate Procedure 32(a)(7)(B) because it contains 12,772 words.  This

brief also complies with the typeface and type-style requirements of

Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was

prepared using Word for Microsoft 365 in Century Schoolbook 14-point

font, a proportionally spaced typeface.


                                            */s/ Brad Hinshelwood*
                                            Brad Hinshelwood

**ADDENDUM**

# TABLE OF CONTENTS

10 U.S.C. § 876.................................................................................. A1

10 U.S.C. § 1552............................................................................... A2

10 U.S.C. § 1553............................................................................... A8

28 U.S.C. § 1331............................................................................... A12

**10 U.S.C. § 876**

**Art. 76. Finality of proceedings, findings, and sentences**

The appellate review of records of trial provided by this chapter, the proceedings, findings, and sentences of courts-martial as approved, reviewed, or affirmed as required by this chapter, and all dismissals and discharges carried into execution under sentences by courts-martial following approval, review, or affirmation as required by this chapter, are final and conclusive.  Orders publishing the proceedings of courts-martial and all action taken pursuant to those proceedings are binding upon all departments, courts, agencies, and officers of the United States, subject only to action upon a petition for a new trial as provided in section 873 of this title (article 73) and to action by the Secretary concerned as provided in section 874 of this title (article 74) and the authority of the President.

**10 U.S.C. § 1552**

**§ 1552. Correction of military records: claims incident thereto**

(a)

(1) The Secretary of a military department may correct any military record of the Secretary's department when the Secretary considers it necessary to correct an error or remove an injustice. Except as provided in paragraph (2), such corrections shall be made by the Secretary acting through boards of civilians of the executive part of that military department. The Secretary of Homeland Security may in the same manner correct any military record of the Coast Guard.

(2) The Secretary concerned is not required to act through a board in the case of the correction of a military record announcing a decision that a person is not eligible to enlist (or reenlist) or is not accepted for enlistment (or reenlistment) or announcing the promotion and appointment of an enlisted member to an initial or higher grade or the decision not to promote an enlisted member to a higher grade. Such a correction may be made only if the correction is favorable to the person concerned.

(3)

(A) Corrections under this section shall be made under procedures established by the Secretary concerned. In the case of the Secretary of a military department, those procedures must be approved by the Secretary of Defense.

(B) If a board makes a preliminary determination that a claim under this section lacks sufficient information or documents to support the claim, the board shall notify the claimant, in writing, indicating the specific information or documents necessary to make the claim complete and reviewable by the board.

(C) If a claimant is unable to provide military personnel or medical records applicable to a claim under this section, the board shall make reasonable efforts to obtain the records. A claimant shall provide the board with documentary evidence of the efforts of the claimant to obtain such records. The board shall inform the claimant of the results of the board's efforts, and shall

provide the claimant copies of any records so obtained upon request of the claimant.

(D) Any request for reconsideration of a determination of a board under this section, no matter when filed, shall be reconsidered by a board under this section if supported by materials not previously presented to or considered by the board in making such determination.

(4)

(A) Subject to subparagraph (B), a correction under this section is final and conclusive on all officers of the United States except when procured by fraud.

(B) If a board established under this section does not grant a request for an upgrade to the characterization of a discharge or dismissal, that declination may be considered under section 1553a of this title.

(5) Each final decision of a board under this subsection shall be made available to the public in electronic form on a centralized Internet website. In any decision so made available to the public there shall be redacted all personally identifiable information.

(b) No correction may be made under subsection (a)(1) unless the claimant (or the claimant's heir or legal representative) or the Secretary concerned files a request for the correction within three years after discovering the error or injustice. The Secretary concerned may file a request for correction of a military record only if the request is made on behalf of a group of members or former members of the armed forces who were similarly harmed by the same error or injustice. A board established under subsection (a)(1) may excuse a failure to file within three years after discovery if it finds it to be in the interest of justice.

(c)

(1) The Secretary concerned may pay, from applicable current appropriations, a claim for the loss of pay, allowances, compensation, emoluments, or other pecuniary benefits, or for the repayment of a fine or forfeiture, if, as a result of correcting a record under this section, the amount is found to be due the

A3

claimant on account of his or another's service in the Army, Navy, Air Force, Marine Corps, Space Force, or Coast Guard, as the case may be, or on account of his or another's service as a civilian employee.

(2) If the claimant is dead, the money shall be paid, upon demand, to his legal representative. However, if no demand for payment is made by a legal representative, the money shall be paid—

  (A) to the surviving spouse, heir, or beneficiaries, in the order prescribed by the law applicable to that kind of payment;

  (B) if there is no such law covering order of payment, in the order set forth in section 2771 of this title; or

  (C) as otherwise prescribed by the law applicable to that kind of payment.

(3) A claimant's acceptance of a settlement under this section fully satisfies the claim concerned. This section does not authorize the payment of any claim compensated by private law before October 25, 1951.

(4) If the correction of military records under this section involves setting aside a conviction by court-martial, the payment of a claim under this subsection in connection with the correction of the records shall include interest at a rate to be determined by the Secretary concerned, unless the Secretary determines that the payment of interest is inappropriate under the circumstances. If the payment of the claim is to include interest, the interest shall be calculated on an annual basis, and compounded, using the amount of the lost pay, allowances, compensation, emoluments, or other pecuniary benefits involved, and the amount of any fine or forfeiture paid, beginning from the date of the conviction through the date on which the payment is made.

(d) Applicable current appropriations are available to continue the pay, allowances, compensation, emoluments, and other pecuniary benefits of any person who was paid under subsection (c), and who, because of the correction of his military record, is entitled to those benefits, but for not longer than one year after the date when his record is corrected under this section if he is not reenlisted in, or

A4

appointed or reappointed to, the grade to which those payments relate. Without regard to qualifications for reenlistment, or appointment or reappointment, the Secretary concerned may reenlist a person in, or appoint or reappoint him to, the grade to which payments under this section relate.

(e) No payment may be made under this section for a benefit to which the claimant might later become entitled under the laws and regulations administered by the Secretary of Veterans Affairs.

(f) With respect to records of courts-martial and related administrative records pertaining to court-martial cases tried or reviewed under chapter 47 of this title (or under the Uniform Code of Military Justice (Public Law 506 of the 81st Congress)), action under subsection (a) may extend only to—

  (1) correction of a record to reflect actions taken by reviewing authorities under chapter 47 of this title (or under the Uniform Code of Military Justice (Public Law 506 of the 81st Congress)); or

  (2) action on the sentence of a court-martial for purposes of clemency.

(g)

  (1) Any medical advisory opinion issued to a board established under subsection (a)(1) with respect to a member or former member of the armed forces who was diagnosed while serving in the armed forces as experiencing a mental health disorder shall include the opinion of a clinical psychologist or psychiatrist if the request for correction of records concerned relates to a mental health disorder.

  (2) If a board established under subsection (a)(1) is reviewing a claim described in subsection (h), the board shall seek advice and counsel in the review from a psychiatrist, psychologist, or social worker with training on mental health issues associated with post-traumatic stress disorder or traumatic brain injury or other trauma as specified in the current edition of the Diagnostic and Statistical Manual of Mental Disorders published by the American Psychiatric Association.

A5

(3) If a board established under subsection (a)(1) is reviewing a claim in which sexual trauma, intimate partner violence, or spousal abuse is claimed, the board shall seek advice and counsel in the review from an expert in trauma specific to sexual assault, intimate partner violence, or spousal abuse, as applicable.

(h)

(1) This subsection applies to a former member of the armed forces whose claim under this section for review of a discharge or dismissal is based in whole or in part on matters relating to post-traumatic stress disorder or traumatic brain injury as supporting rationale, or as justification for priority consideration, and whose post-traumatic stress disorder or traumatic brain injury is related to combat or military sexual trauma, as determined by the Secretary concerned.

(2) In the case of a claimant described in paragraph (1), a board established under subsection (a)(1) shall—

(A) review medical evidence of the Secretary of Veterans Affairs or a civilian health care provider that is presented by the claimant; and

(B) review the claim with liberal consideration to the claimant that post-traumatic stress disorder or traumatic brain injury potentially contributed to the circumstances resulting in the discharge or dismissal or to the original characterization of the claimant's discharge or dismissal.

(i) Each board established under this section shall make available to the public each calendar quarter, on an Internet website of the military department concerned or the Department of Homeland Security, as applicable, that is available to the public the following:

(1) The number of claims considered by such board during the calendar quarter preceding the calendar quarter in which such information is made available, including cases in which a mental health condition of the former member, including post-traumatic stress disorder or traumatic brain injury, is alleged to have contributed, whether in whole or part, to the original characterization of the discharge or release of the former member.

A6

(2) The number of claims submitted during the calendar quarter preceding the calendar quarter in which such information is made available that relate to service by a former member during a war or contingency operation, catalogued by each war or contingency operation.

(3) The number of military records corrected pursuant to the consideration described in paragraph (1) to upgrade the characterization of discharge or release of former members.

(4) The number and disposition of claims decided during the calendar quarter preceding the calendar quarter in which such information is made available in which sexual assault is alleged to have contributed, whether in whole or in part, to the original characterization of the discharge or release of the former member.

(j) For a recommendation to award or upgrade a military decoration or award submitted pursuant to section 1130 of this title, a board determination in favor of the claimant shall allow such a recommendation to proceed, and an award or upgrade to be made by the applicable award authority, without regard to the statutory time limitation contained in section 7274, section 8298, or section 9274 of this title, as the case may be.

(k) In this section, the term "military record" means a document or other record that pertains to (1) an individual member or former member of the armed forces, or (2) at the discretion of the Secretary of the military department concerned, any other military matter affecting a member or former member of the armed forces, an employee or former employee of that military department, or a dependent or current or former spouse of any such person. Such term does not include records pertaining to civilian employment matters (such as matters covered by title 5 and chapters 81, 83, 87, 108, 747, 855, 857, 871, and 947 of this title).

A7

**10 U.S.C. § 1553**

**§ 1553. Review of discharge or dismissal**

(a) The Secretary concerned shall, after consulting the Secretary of Veterans Affairs, establish a board of review, consisting of not fewer than three members, to review the discharge or dismissal (other than a discharge or dismissal by sentence of a general court-martial) of any former member of an armed force under the jurisdiction of his department upon its own motion or upon the request of the former member or, if he is dead, his surviving spouse, next of kin, or legal representative.  A motion or request for review must be made within 15 years after the date of the discharge or dismissal.  With respect to a discharge or dismissal adjudged by a court-martial case tried or reviewed under chapter 47 of this title (or under the Uniform Code of Military Justice (Public Law 506 of the 81st Congress)), action under this subsection may extend only to a change in the discharge or dismissal or issuance of a new discharge for purposes of clemency.

(b)

(1) A board established under this section may, subject to review by the Secretary concerned, change a discharge or dismissal, or issue a new discharge, to reflect its findings.

(2) If a board established under this section does not grant a request for an upgrade to the characterization of a discharge or dismissal, that declination may be considered under section 1552 or section 1553a of this title, as applicable.

(c) A review by a board established under this section shall be based on the records of the armed forces concerned and such other evidence as may be presented to the board. A witness may present evidence to the board in person or by affidavit. A person who requests a review under this section may appear before the board in person or by counsel or an accredited representative of an organization recognized by the Secretary of Veterans Affairs under chapter 59 of title 38.

(d)

(1)

(A) In the case of a former member of the armed forces who, while serving on active duty as a member of the armed forces, was deployed in support of a contingency operation and who, at any time after such deployment, was diagnosed by a physician, clinical psychologist, or psychiatrist as experiencing post-traumatic stress disorder or traumatic brain injury as a consequence of that deployment, a board established under this section to review the former member's discharge or dismissal shall include a member who is a clinical psychologist or psychiatrist, or a physician with training on mental health issues connected with post traumatic stress disorder or traumatic brain injury (as applicable).

(B) In the case of a former member described in paragraph (3)(B) who claims that the former member's post-traumatic stress disorder or traumatic brain injury as described in that paragraph is based in whole or in part on sexual trauma, intimate partner violence, or spousal abuse, a board established under this section to review the former member's discharge or dismissal shall seek advice and counsel in the review from a psychiatrist, psychologist, or social worker with training on mental health issues associated with post-traumatic stress disorder or traumatic brain injury or other trauma as specified in the current edition of the Diagnostic and Statistical Manual of Mental Disorders published by the American Psychiatric Association.

(2) In the case of a former member described in paragraph (1) or a former member whose application for relief is based in whole or in part on matters relating to post-traumatic stress disorder or traumatic brain injury as supporting rationale or as justification for priority consideration, the Secretary concerned shall expedite a final decision and shall accord such cases sufficient priority to achieve an expedited resolution. In determining the priority of cases, the Secretary concerned shall weigh the medical and humanitarian circumstances of all cases and accord higher priority to cases not involving post-traumatic stress disorder or

A9

traumatic brain injury only when the individual cases are considered more compelling.

(3)

(A) In addition to the requirements of paragraphs (1) and (2), in the case of a former member described in subparagraph (B), the Board shall—

(i) review medical evidence of the Secretary of Veterans Affairs or a civilian health care provider that is presented by the former member; and

(ii) review the case with liberal consideration to the former member that post-traumatic stress disorder or traumatic brain injury potentially contributed to the circumstances resulting in the discharge or dismissal or to the original characterization of the member's discharge or dismissal.

(B) A former member described in this subparagraph is a former member described in paragraph (1) or a former member whose application for relief is based in whole or in part on matters relating to post-traumatic stress disorder or traumatic brain injury as supporting rationale, or as justification for priority consideration, whose post-traumatic stress disorder or traumatic brain injury is related to combat or military sexual trauma, as determined by the Secretary concerned.

(e) In the case of a former member of the armed forces (other than a former member covered by subsection (d)) who was diagnosed while serving in the armed forces as experiencing a mental health disorder, a board established under this section to review the former member's discharge or dismissal shall include a member who is a clinical psychologist or psychiatrist, or a physician with special training on mental health disorders.

(f) Each board established under this section shall make available to the public each calendar quarter, on an Internet website of the military department concerned or the Department of Homeland Security, as applicable, that is available to the public the following:

(1) The number of motions or requests for review considered by such board during the calendar quarter preceding the calendar

A10

quarter in which such information is made available, including cases in which a mental health condition of the former member, including post-traumatic stress disorder or traumatic brain injury, is alleged to have contributed, whether in whole or part, to the original characterization of the discharge or dismissal of the former member.

(2) The number of claims submitted during the calendar quarter preceding the calendar quarter in which such information is made available that relate to service by a former member during a war or contingency operation, catalogued by each war or contingency operation.

(3) The number of discharges or dismissals corrected pursuant to the consideration described in paragraph (1) to upgrade the characterization of discharge or dismissal of former members.

(4) The number and disposition of claims decided during the calendar quarter preceding the calendar quarter in which such information is made available in which sexual assault is alleged to have contributed, whether in whole or in part, to the original characterization of the discharge or release of the former member.

A11

**28 U.S.C. § 1331**

**§ 1331. Federal question**

The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.