[ORAL ARGUMENT NOT SCHEDULED]

Nos. 24-5150 & 24-5154

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

\_\_\_\_

ROBERT B. BERGDAHL, *Appellee/Cross-Appellant*,

v.

UNITED STATES, *Appellant/Cross-Appellee.*

\_\_\_\_

Appeal from the United States District Court
for the District of Columbia

\_\_\_\_

APPELLEE/CROSS-APPELLANT'S BRIEF

EUGENE R. FIDELL
D.C. Bar No. 112003
Feldesman Leifer LLP
1129 20th St., N.W., Ste. 400
Washington, DC 20036
(202) 256-8675 (mobile)
efidell@feldesman.com

FRANKLIN D. ROSENBLATT
D.C. Bar No. 1600851
151 E. James H. Meredith Dr.
Jackson, MS 39201
frosenblatt@mc.edu

STEPHEN I. VLADECK
D.C. Bar No. 988509
600 New Jersey Ave., N.W.
Washington, DC 20001
stephen.vladeck@law.georgetown.edu

STEPHEN A. SALTZBURG
D.C. Bar No. 370949
2000 H St., N.W.
Washington, DC 20052
ssaltz@law.gwu.edu

*Attorneys for Appellee/Cross-Appellant*

May 7, 2025

## CERTIFICATE AS TO PARTIES, RULINGS
## UNDER REVIEW, AND RELATED CASES

*Parties and Amici.* Appellee Robert B. Bergdahl is the cross-appellant and was the plaintiff in the district court. The United States is the appellant/cross-appellee and was the defendant below. There were no *amici* below and there are none in this court. The Navy-Marine Corps Appellate Defense Division filed an *amicus* brief in support of Sgt. Bergdahl in the U.S. Court of Appeals for the Armed Forces, as did Professors Joshua E. Kastenberg and Rachel E. VanLandingham.

*Rulings Under Review.* The rulings under review are the district court's judgment entered on July 25, 2023 and denial of reconsideration on March 31 and May 23, 2024, on non-habeas collateral review of a general court-martial and related rulings thereon by the U.S. Army Court of Criminal Appeals and the U.S. Court of Appeals for the Armed Forces.

*Related Cases.* There are no related cases in this court, the district court, or the military courts.

/s/ *Eugene R. Fidell*
Eugene R. Fidell
Feldesman Leifer LLP
1129 20th St., N.W., Suite 400
Washington, DC 20036
(202) 256-8675 (mobile)
efidell@feldesman.com

# Index

Certificate as to Parties, Rulings Under Review, and Related Cases ........................ i

Table of Authorities ................................................................................................. v

Glossary .................................................................................................................... xi

Introduction ............................................................................................................... 1

Statement of Jurisdiction .......................................................................................... 2

Statutes, Rules, and Regulations .............................................................................. 2

Issues Presented for Review ..................................................................................... 2

> DID THE DISTRICT COURT HAVE JURISDICTION?
>
> IS THE CASE BARRED BY SOVEREIGN IMMUNITY?
>
> DID THE MILITARY COURTS AFFORD SGT. BERGDAHL'S CLAIMS FULL AND FAIR CONSIDERATION?
>
> DID THE DISTRICT COURT CORRECTLY GRANT RELIEF UNDER *AL-NASHIRI*?
>
> DID THE DISTRICT COURT ERR IN SUSTAINING CAAF'S RULING ON UNLAWFUL COMMAND INFLUENCE?
>
> SHOULD THE CHARGES AND SPECIFICATIONS BE DISMISS-ED WITH PREJUDICE?

Statement of the Case ................................................................................................ 3

Statement of the Facts ............................................................................................... 5

Summary of Argument ............................................................................................... 6

Argument .................................................................................................................... 6

I.  STANDARD OF REVIEW ...........................................................6

II.  THE DISTRICT COURT HAD JURISDICTION .........................7

III.  THE CASE IS NOT BARRED BY SOVEREIGN IMMUNITY ................9

IV.  THE MILITARY COURTS' CONSIDERATION WAS NOT FULL
     AND FAIR.....................................................................10

     A.  The military courts never addressed the fact that the military judge
         did not disclose a conflict of interest and materially
         misrepresented his future plans ............................................10

     B.  ACCA's denial of Sgt. Bergdahl's coram nobis petition was
         infected by a conflict of interest and flagrantly mistaken ....................11

     C.  CAAF's consideration was not full and fair in other critical respects ..17

V.  SGT. BERGDAHL WAS DENIED DUE PROCESS OF LAW ..............21

     A.  The basic principles of UCI..................................................23

     B.  CAAF's UCI decision is indefensible................................26

     C.  Once Col. Nance's conflict and misrepresentation are taken into
         account, Sgt. Bergdahl is even more clearly entitled to prevail ..........44

VI.  THE CHARGES AND SPECIFICATIONS SHOULD BE
     DISMISSED WITH PREJUDICE ...........................................53

     A.  The district court's rationale concerning UCI was flawed .................53

     B.  Dismissal with prejudice is warranted ................................54

     C.  Only dismissal with prejudice will deter political meddling in
         specific courts-martial..................................................56

Conclusion.....................................................................60

Addendum ......................................................................1

Certificate of Compliance .........................................................................xii

Certificate of Service..............................................................................xii

Cases:

\* *In re Al-Nashiri*, 921 F.3d 224 (D.C. Cir. 2019)..............1, 2, 4, 6, 10, 14, 15, 16, 22, 25, 48, 49, 50, 51, 52, 53, 54, 60

*Bergdahl v. Nance,* CCA 20170114 (A. Ct. Crim. App. Mar. 13, 2017), *writ-appeal pet. denied*, 76 M.J. 342 (C.A.A.F. 2017) (order) ........................29

*Bergdahl v. United States*, ARMY MISC 20200588, 2020 WL 7316058, 2020 CCA LEXIS 443 (A. Ct. Crim. App. Dec. 11, 2020) ....................4, 11, 13

\* *Bergdahl v. United States*, 2024 WL 2383025 (D.D.C. May 23, 2024) .........2, 12, 39, 49

\* *Bergdahl v. United States*, 683 F. Supp. 3d 24 (D.D.C. 2023) .................2, 12, 35

*Bergdahl v. United States*, 81 M.J. 128 (C.A.A.F. 2021) (order) ............................4

*Blanton v. United States*, 94 F.3d 227 (6th Cir. 1996)................................17

*Bond v. Kendall*, Civil No. 22-1509, 2023 WL 5404069 (D. Md. Aug. 22, 2023)...9

\* *Burns v. Wilson*, 346 U.S. 137 (1953)....................................6, 9, 10, 18

*Campbell v. Kendall*, No. 22-5228, 2024 WL 1262827 (D.C. Cir. Mar. 26, 2024) (per curiam) .......................................................................................7

*Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868 (2009) ................................22

*Chappell v. Wallace*, 462 U.S. 296 (1983)................................................58

*Delaware v. Van Arsdall*, 475 U.S. 673 (1986) ...........................................45

*Denedo v. United States*, 66 M.J. 114 (C.A.A.F. 2008)..................................21

*Department of the Army v. FLRA*, 56 F.3d 273 (D.C. Cir. 1995) ...........................9

*Doe v. McMillan*, 412 U.S. 306 (1973)...................................................58

*Duncan v. Bonta*, 133 F.4th 852 (9th Cir. 2025) (en banc)................................33

*Gov't of Virgin Islands v. Gereau*, 523 F.2d 140 (3d Cir. 1975) ...........................33

*Hanratty v. F.A.A.*, 780 F.3d 33 (Fed. Cir. 1985) ..................................19

*Hasan v. U.S. Army Court of Criminal Appeals*, 79 M.J. 292 (C.A.A.F. 2019) (mem.) ................................................................................12

*Khadr v. United States*, 67 F.4th 413 (D.C. Cir. 2023)...................................18, 40

*Kluge v. U.S. Government*, Civil No. 19-2618, 2021 WL 11747723 (D.D.C. Aug. 24, 2021)................................................................................10

*Larrabee v. Del Toro*, 45 F.4th 81 (D.C. Cir. 2022), *cert. denied*, 144 S. Ct. 277 (2023) ........................................................................7, 29

*Listecki v. Official Comm. of Unsecured Creditors*, 780 F.3d 731 (7th Cir. 2015)..............................................................................14

*Mallory v. Norfolk S. Ry. Co*., 600 U.S. 122 (2023) ...............................8

---

[*] Authorities upon which we chiefly rely are marked with asterisks.

*Matias v. United States*, 923 F.2d 821 (Fed. Cir. 1990).........................................7

*Merck & Co. v. Reynolds*, 559 U.S. 633 (2010)......................................................15

*In re Mohammad*, No. 24-001, 2024 WL 5396185 (Ct. Mil. Comm'n. Rev. Dec. 30, 2024) (per curiam) ...............................................................................59

*National Security Archive v. C.I.A.*, 104 F.4th 267 (D.C. Cir. 2024)....................7

*Nixon v. Fitzgerald*, 457 U.S. 731 (1982).................................................................58

*Noyd v. Bond*, 395 U.S. 683 (1969).........................................................................26

*Palsgraf v. Long Island R.R. Co.*, 248 N.Y. 339, 162 N.E. 99 (1928)..................16

*Penland v. Mabus*, 78 F. Supp. 3d 484 (D.D.C. 2015) ...........................................9

*Priest v. Sec'y of the Navy*, 570 F.2d 1013 (D.C. Cir. 1977) ...................................7

*Ragbir v. United States*, 950 F.3d 54 (3d Cir. 2020).............................................13

*Roberts v. United States*, 77 M.J. 615 (A. Ct. Crim. App. 2018)..........................55

* *Sanford v. United States*, 586 F.3d 28 (D.C. Cir. 2009)..............................6, 7, 21

* *Schlesinger v. Councilman*, 420 U.S. 738 (1975) ........................................7, 8, 25

*In re Sealed Case*, 901 F.3d 397 (D.C. Cir. 2018) .................................................40

*Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197 (2020)...................22

*Sinclair v. Kleindienst*, 711 F.2d 291 (D.C. Cir. 1983).............................................9

*Spirit Airlines, Inc. v. U.S. Dep't of Transp. & F.A.A.*, 997 F.3d 1247 (D.C. Cir. 2021) ...............................................................................................44

*Tinsley v. United States*, Civil No. 24-2988, 2025 WL 1167958 (D.D.C. Apr. 22, 2025) .........................................................................................9

*Tocci v. United States*, 178 F. Supp. 2d 176 (N.D.N.Y. 2001) ..............................16

*Trump v. United States*, 603 U.S. 593 (2024) ..................................................58, 59

* *Tumey v. Ohio*, 273 U.S. 510 (1927)...............................................................46, 47

*In re United States*, No. 25-1009 (D.C. Cir. (pending) .........................................59

*United States v. Anderson*, 82 M.J. 82 (C.A.A.F. 2022) ........................................32

*United States v. Anderson*, 881 F.2d 1128 (D.C. Cir. 1989)..................................45

*United States v. Bagstad*, 68 M.J. 460 (C.A.A.F. 2010) ........................................25

*United States v. Barry*, 78 M.J. 70 (C.A.A.F. 2018) ...................................21, 53, 54

*United States v. Bergdahl*, 79 M.J. 512 (A. Ct. Crim. App. 2019) .....................3, 30

*United States v. Bergdahl*, 79 M.J. 307 (C.A.A.F. 2019) (order) ............................4

* *United States v. Bergdahl*, 80 M.J. 230 (C.A.A.F. 2020) ............4, 17, 18, 19, 20, 22, 23, 31, 32, 33, 34, 36, 37, 39, 41, 57, 60

*United States v. Bergdahl*, 80 M.J. 362 (C.A.A.F. 2020) (order) ............................4

*United States v. Bergdahl*, 80 M.J. 366 (C.A.A.F. 2020) (issuance of mandate) ...11

*United States v. Biagase*, 50 M.J. 143 (C.A.A.F. 1999) ........................................24

*United States v. Blackburn*, 80 M.J. 205 (C.A.A.F. 2020)......................................31

*United States v. Boyce*, 76 M.J. 242 (C.A.A.F. 2017)...............22, 23, 24, 30, 31, 46

*United States v. Commisso*, 76 M.J. 315 (C.A.A.F. 2017)......................................52

*United States v. Cordova*, 706 F.3d 1085 (D.C. Cir. 2015) ...................................35

*United States v. Day*, 83 M.J. 53 (C.AA.F. 2022)....................................................18

*United States v. Denedo*, 556 U.S. 904 (2009)..............................................7, 21, 55

*United States v. Dingle*, 114 F.3d 307 (D.C. Cir. 1997) ..........................................45

*United States v. Draher*, No. 202300163, 2024 WL 5233006
    (N-M. Ct. Crim. App. Dec. 27, 2024) (per curiam) .........................................53

*United States v. Dyer*, 136 F.3d 417 (5th Cir. 1998)................................................17

*United States v. Gilmet*, 83 M.J. 398 (C.A.A.F. 2023) ...........................................53

*United States v. Gore*, 60 M.J. 178 (C.A.A.F. 2004) ........................................53, 54

*United States v. Guillen*, 561 F.3d 527 (D.C. Cir. 2009) .........................................40

*United States v. Heldt*, 668 F.2d 1238 (D.C. Cir. 1981) ..........................................48

*United States v. Horne*, 82 M.J. 283 (C.A.A.F. 2022) .............................................24

*United States v. Jackson*, 371 F. Supp. 3d 257 (E.D. Va. 2019)..............................17

* *United States v. Lewis*, 63 M.J. 405 (C.A.A.F. 2006)............18, 24, 39, 40, 41, 53

*United States v. Marchena-Silvestre*, 802 F.3d 196 (1st Cir. 2015)........................39

*United States v. Morgan*, 346 U.S. 502 (1954) .......................................................21

*United States v. Negron*, No. 202300164, 2024 WL 5233005
    (N-M. Ct. Crim. App. Dec. 27, 2024) .............................................................53

*United States v. Paul*, 73 M.J. 274 (C.A.A.F. 2014)................................................32

*United States v. Proctor*, 81 M.J. 250 (C.A.A.F. 2021)...........................................24

*United States v. Quintanilla*, 56 M.J. 37 (C.A.A.F. 2001) ......................................50

*United States v. Rhone*, 884 F.2d 832 (D.C. Cir. 1989) ..........................................45

*United States v. Riesbeck*, 77 M.J. 154 (C.A.A.F. 2018) .........................................53

*United States v. Rome*, 47 M.J. 467 (C.A.A.F. 1998) ..............................................25

*United States v. Rushatz*, 31 M.J. 450 (C.M.A. 1990) .............................................32

*United States v. Salyer*, 72 M.J. 415 (C.A.A.F. 2013) .........................14, 23, 24, 53

*United States v. Shelton*, 64 M.J. 32 (C.A.A.F. 2006) .............................................31

*United States v. Thomas*, 22 M.J. 388 (C.M.A. 1986) .......................................21, 23

*United States v. Wales*, 31 M.J. 301 (C.M.A. 1990) ................................................33

*United States v. Wiesen*, 56 M.J. 172 (C.A.A.F. 2001).............................................25

*United States v. Woods*, 74 M.J. 238 (C.A.A.F. 2015) ............................................35

*United States ex rel. New v. Rumsfeld*, 486 F.3d 403 (D.C. Cir. 2006) ................6, 7

*United States ex rel. Toth v. Quarles*, 350 U.S. 11 (1955).......................................55

*Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474 (1951)......................................44

*Ward v. City of Monroeville*, 409 U.S. 57 (1972) ....................................................47

*Weiss v. United States*, 510 U.S. 163 (1994)............................................................57

*Williams v. Pennsylvania*, 579 U.S. 1 (2016)..........................................................12

*Wilson v. Sellers*, 584 U.S. 122 (2018) ...................................................................11

*Yongo v. United States*, Civil No. 10-220, 2013 WL 2285341 (E.D.N.C.
    May 23, 2013) ..................................................................................................9

*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952)..............................55

Constitution and Statutes:

U.S. Constitution:
    Art. I, § 6, cl. 1 ................................................................................58
    Art. I, § 8, cl. 14 ..............................................................................57
    Art. III ..........................................................................................9, 25
    * Amend. V .......................................................................................1
Freedom of Information Act, 5 U.S.C. § 552 ....................................15, 16
Uniform Code of Military Justice, 10 U.S.C. §§ 801 *et seq.*
    Art. 30(a)(1), UCMJ, 10 U.S.C. § 830(a)(1) ..................................59
    Art. 32, UCMJ, 10 U.S.C. § 832 ................................................34, 35
    * Art. 37, UCMJ, 10 U.S.C. § 837 ............................................29, 31
    Art. 60(c), UCMJ, 10 U.S.C. § 860(c) (former version) ..................37
    Art. 63(a), 10 U.S.C. § 863 (former version) ................................55
    Art. 73, UCMJ, 10 U.S.C. § 873 ..................................................50
    Art. 85(a)(2), UCMJ, 10 U.S.C. § 885(a)(2) ..................................3
    Art. 88, UCMJ, 10 U.S.C. § 888 ..................................................21
    Art. 99(3), UCMJ, 10 U.S.C. § 899(3) ...........................................3
    Art. 131f(2), UCMJ, 10 U.S.C. § 931f(2) ......................................59
    Art. 137(a)(3), UCMJ, 10 U.S.C. § 937(a)(3) ...............................35
    Art. 142(b)(1), UCMJ, 10 U.S.C. § 941(b)(1) ...............................22
    Art. 142(b)(3), UCMJ, 10 U.S.C. § 941(b)(3) ...............................22
    Art. 142(b)(4), UCMJ, 10 U.S.C. § 941(b)(4) ...............................22
    Art. 142(c), UCMJ, 10 U.S.C. § 942(c) .........................................22
28 U.S.C. § 1291 ...................................................................................2
28 U.S.C. § 1331 ................................................................................2, 8
Tucker Act, 28 U.S.C. § 1491 ................................................................7
28 U.S.C. § 1631 ...................................................................................9
28 U.S.C. § 2401(a) ...............................................................................9
Military Pay Act, 37 U.S.C. § 204(a)(1) ...................................................9
National Defense Authorization Act for Fiscal Year 2017, Pub. L. No. 114-328,
    § 541(c), 130 Stat. 2125 (2016) .................................................22
Pub. L. No. 94-574, § 3, 90 Stat. 2721-22 (1976) .....................................8
Pub. L. No. 96-486, § 2, 94 Stat. 2369 (1980) ........................................8
64 Stat. 129 (1950) ..............................................................................22

Executive Orders, Rules, and Regulations:

C.A.A.F. Rules of Practice and Procedure:
R. 30A(a)............................................................................................32
R. 30A(b)............................................................................................32
R. 30A(c)............................................................................................32
R. 30A(d)............................................................................................32
R. 30A(e)............................................................................................32
R. 43A(a)............................................................................................10
Code of Conduct for Members of the Armed Forces of the United States,
Exec. Order No. 10,631, 3 C.F.R. 266 (1954-1958)............................5
Exec. Order No. 12,633, 3 C.F.R. 561 (1988)....................................5
1 C.F.R. § 5.4(b)..................................................................................14
Code of Judicial Conduct for Army Trial and Appellate Judges
(May 16, 2008)..............................................................12, 13, 14, 47
* R. 2.11 & Comment ...........................................................12, 14, 47
*Manual for Courts-Martial, United States*
¶ 14.c. ................................................................................................21
¶ 87.c.(2)............................................................................................59
Appendix 2.1 ......................................................................................35
§ 1.4................................................................................................35
§ 2.7.e ............................................................................................35
Rules for Courts-Martial:
R.C.M. 306(b) (Discussion) (former version).....................................35
R.C.M. 307(a) ....................................................................................60
R.C.M. 810(d)(1) (former version) ....................................................55
* R.C.M. 902 .............................................................................14, 47
R.C.M. 902(a) ....................................................................................47
R.C.M. 902(b)(5)(B) ..........................................................................48
R.C.M. 902(e) ....................................................................................48
R.C.M. 1107(c) (Discussion) (2012 ed.).............................................37
R.C.M. 1210 (Discussion)...................................................................50
R.C.M. 1210(a) (2012 ed.).................................................................50
Rule for Military Commissions 902(e) ...................................................49
Standing Rules of the Senate, S. Doc. No. 113-18, Rule XXV (2013)...................30

Miscellaneous:

Michael Ames, *A Decade Later, How the Bergdahl Affair Predicted Today's Politics*, RealClearPolitics.com, June 2, 2024 ...................................27

Michael Ames, *How Trump's New Intelligence Chief Spread Misinformation About Bowe Bergdahl*, Politico, Mar. 11, 2020 ...............................................26

1975 Ann. Rep. of the U.S. Court of Military Appeals and the Judge Advocates General of the Armed Forces and the General Counsel of the Dep't of Transportation ........................................................................................8

Stephen G. Breyer, *Judicial Independence in the United States*, 40 ST. LOUIS U. L. REV. 989 (1996) ...............................................................23

Matthew M. Burke, *US Soldier in Germany Who Was AWOL for Months Granted Discharge Without Trial*, STARS & STRIPES, Nov. 6, 2024.................36

Cotton, McConnell Statement on Revocation of Plea Deal for 9/11 Terrorists, Aug. 3, 2024 .........................................................................59

VERNON E. DAVIS, THE LONG ROAD HOME: U.S. PRISONER OF WAR PLANNING AND POLICY IN SOUTHEAST ASIA (2000) .........................................20

MATT FARWELL & MICHAEL AMES, AMERICAN CIPHER: BOWE BERGDAHL AND THE U.S. TRAGEDY IN AFGHANISTAN (2019) .............................27

Fox & Friends, *Pete Hegseth on What He Expects from Bowe Bergdahl*, Fox News, Oct. 16, 2017..................................................................55

Max Jesse Goldberg, *Congressional Influence on Military Justice*, 130 YALE L.J. 2110 (2021) .......................................................................59

Emmett Lindner, *U.S. Soldier Pleads Guilty to Desertion After Fleeing Into North Korea*, N.Y. TIMES, Sept. 21, 2024 ...................................36

Justin Oshana, *I Led the Prosecution Against Bowe Bergdahl. Trump Made My Job Much Harder*, WASH. POST, Aug. 31, 2020 ........................23, 26

Michel Paradis, *Judicial Disclosure and the Judicial Mystique*, 49 HOFSTRA L. REV. 125 (2020) ....................................................................47

Prosecutorial Ethics in Real Life: Justin Oshana, Interview, Sept. 15, 2021, James E. Rogers College of Law, Univ. of Ariz. ................................26

Austin Ramzy, *Charles Jenkins, 77, U.S. Soldier Who Regretted Fleeing to North Korea, Dies*, N.Y. TIMES, Dec. 12, 2017.............................36

Misti E. Rawles, *Congressional Oversight: The New Mortal Enemy of Military Justice?* (LL.M. thesis 2020) .............................................................59

S. 4946, 118th Cong. (2024) .....................................................................59

Tuan Samahon, *Blackmun (and Scalia) at the Bat: The Court's Separation-of-Powers Strike Out in* Freytag, 12 NEV. L.J. 691 (2012) ..............22

Rachel E. VanLandingham, *Military Due Process: Less Military and More Process*, 94 TUL. L. REV. 1 (2019) .............................................59

# Glossary

ACCA ....................................................... U.S. Army Court of Criminal Appeals
CAAF .................................................. U.S. Court of Appeals for the Armed Forces
CCA .......................................................................... Court of Criminal Appeals
HASC ....................................................... House Committee on Armed Services
MCM ................................................... Manual for Courts-Martial, United States
POW ........................................................................................ Prisoner of War
R.C.M. ............................................................................. Rules for Courts-Martial
SASC ....................................................... Senate Committee on Armed Services
SJA .................................................................................... Staff Judge Advocate
UCI ............................................................................ unlawful command influence
UCMJ ................................................................ Uniform Code of Military Justice

**Introduction**

This appeal arises on non-habeas collateral review of a court-martial. The military courts did not afford Sgt.[1] Bergdahl's case full and fair consideration and denied him Fifth Amendment due process.

First, the military judge failed to disclose a conflict of interest and misrepresented personal plans that were relevant to that conflict. The military courts never considered either the conflict or the misrepresentation.

Second, the prosecution did not prove beyond a reasonable doubt (as it had to under the doctrine of apparent unlawful command influence (UCI)) that meddling by Sen. McCain and other Legislative Branch actors, coupled with President Trump's public disparagement of Sgt. Bergdahl and criticism of his sentence, would not lead an informed observer to harbor a significant doubt about the fairness of the proceedings. That failure becomes all the more glaring once the military judge's conflict and falsehood – fatal under *In re Al-Nashiri*, 921 F.3d 224 (D.C. Cir. 2019) – are taken into account. Neither the military courts nor the district court ever evaluated the sum total of evidence bearing on the UCI issue.

The decision below should be affirmed as to the *al-Nashiri* issue and reversed as to UCI. The charges and specifications should be dismissed with prejudice.

---

[1] Having been discharged, Mr. Bergdahl has been a civilian for over four years. He was a sergeant at the time of trial.

## Statement of Jurisdiction

The district court's jurisdiction rests on 28 U.S.C. § 1331. This court's jurisdiction rests on 28 U.S.C. § 1291. Judgment was entered on July 25, 2023. *Bergdahl v. United States*, 683 F. Supp. 3d 24 (D.D.C. 2023). The district court denied motions to alter or amend on March 31, 2024, ECF No. 39, and May 23, 2024. ECF No. 41, *Bergdahl v. United States*, 2024 WL 2383025 (D.D.C. May 23, 2024). Notices of appeal and cross-appeal were timely filed on May 29 and June 10, 2024, respectively.

## Statutes, Rules, and Regulations

Governing provisions are reproduced in the Addendum.

## Issues Presented for Review

DID THE DISTRICT COURT HAVE JURISDICTION?

IS THE CASE BARRED BY SOVEREIGN IMMUNITY?

DID THE MILITARY COURTS AFFORD SGT. BERGDAHL'S CLAIMS FULL AND FAIR CONSIDERATION?

DID THE DISTRICT COURT CORRECTLY GRANT RELIEF UNDER *AL-NASHIRI*?

DID THE DISTRICT COURT ERR IN SUSTAINING CAAF'S RULING ON UNLAWFUL COMMAND INFLUENCE?

SHOULD THE CHARGES AND SPECIFICATIONS BE DISMISSED WITH PREJUDICE?

## Statement of the Case

Sgt. Bergdahl was convicted at a general court-martial of a one-day desertion with intent to avoid hazardous duty or shirk important service (Art. 85(a)(2), UCMJ) and misbehavior before the enemy (Art. 99(3), UCMJ). Both charges arose from the same absence. He pleaded guilty without a pretrial agreement. A military judge, Col. Jeffery R. Nance, sentenced him to a dishonorable discharge, reduction to private, and forfeiture of $10,000. The convening authority approved the findings and sentence, and the U.S. Army Court of Criminal Appeals (ACCA) affirmed. *United States v. Bergdahl*, 79 M.J. 512 (A. Ct. Crim. App. 2019). One judge dissented in part on the ground that it was impossible to say with the requisite certainty that the prosecution had proved beyond a reasonable doubt that an objective, disinterested observer would not "harbor a significant doubt about the fairness" of the proceedings. 79 M.J. at 533 (Ewing, J., dissenting in part). He would have set aside the dishonorable discharge because the convening authority's action was not free from apparent UCI. 79 M.J. at 534.

The U.S. Court of Appeals for the Armed Forces (CAAF) granted review on a single issue:

> WHETHER THE CHARGES AND SPECIFICATIONS SHOULD BE DISMISSED WITH PREJUDICE OR OTHER MEANINGFUL RELIEF GRANTED BECAUSE OF APPARENT UNLAWFUL COMMAND INFLUENCE.

79 M.J. 307. CAAF affirmed. 80 M.J. 230. Chief Judge Stucky and Judge Sparks concurred in part and dissented in part. They would have dismissed the charges and specifications with prejudice on the basis of UCI. 80 M.J. at 244, 245.

Sgt. Bergdahl filed a timely petition for reconsideration. ECF No. 17-15. While it was pending, he moved to supplement the record upon receiving a copy of an application Col. Nance had submitted during trial for appointment as an immigration judge. ECF No. 17-17 at 113-40. CAAF denied reconsideration and leave to supplement without explanation and without prejudice to Sgt. Bergdahl's "right to file a writ of error coram nobis with the appropriate court." 80 M.J. 362. When he did so, ACCA punted, ruling that he had not explained why he had not raised the matter while the case was before it on direct review. *Bergdahl v. United States*, ARMY MISC 20200588, at *4, 2020 WL 7316058, 2020 CCA LEXIS 443 (A. Ct. Crim. App. Dec. 11, 2020). It expressly disclaimed ruling on his *Al-Nashiri* claim. *Id*. at *3 n.4. CAAF denied a writ-appeal, again without explanation. 81 M.J. 128.

The district court ruled for Sgt. Bergdahl on the *Al-Nashiri* issue but for the government on UCI. On reconsideration, it clarified that the decision did not bar resumption of military justice proceedings.

## Statement of the Facts

In 2009, Sgt. Bergdahl left his post in Afghanistan to hike to a higher headquarters to complain about conditions and leadership deficiencies in his unit. The Taliban-allied "Haqqani network" promptly captured him. Held hostage for five years under brutal conditions and torture, he comported himself in accordance with the Code of Conduct for Members of the Armed Forces of the United States, Exec. Order No. 10,631, 3 C.F.R. 266 (1954-1958), *amended*, Exec. Order No. 12,633, 3 C.F.R. 561 (1988), including daring escape attempts. In 2014, he was exchanged for five Taliban members detained at Guantánamo and immediately made the object of intense hostile attention as political opponents worked to score points against then-President Obama for executing the exchange without the statutorily-required prior notice to Congress. A general court-martial followed.

After taking office in 2017, President Trump publicly ratified the numerous disparaging remarks he had made about Sgt. Bergdahl during the 2016 campaign.[2] He later denounced the sentence as a "complete and total disgrace to our Country and to our Military." ECF No. 17-12 at 306.

---

[2] A DVD collecting those remarks was admitted in evidence and can be accessed at https://www.youtube.com/watch?v=S2MJeMm950M.

**Summary of Argument**

The court-martial should be set aside and the charges and specifications dismissed because the record does not show, as it had to, beyond a reasonable doubt that a fully informed member of the public would not harbor a significant doubt about the fairness of the proceedings. When Col. Nance's failure to disclose his job application and false account of his post-retirement plans are taken into account, it is even clearer that the court-martial cannot be sustained. Given the shadow UCI cast over the proceedings, Sgt. Bergdahl's long captivity and torture, the fact that any new sentence could not exceed the one adjudged in 2017, and the public interest in deterring political meddling, dismissal of the charges and specifications should be with prejudice.

**Argument**

I

STANDARD OF REVIEW

This court reviews the district court's decision *de novo*. *Sanford v. United States*, 586 F.3d 28, 31 (D.C. Cir. 2009). The military courts having "manifestly refused to consider" Sgt. Bergdahl's *Al-Nashiri* claim, that claim is subject to *de novo* review. *Burns v. Wilson*, 346 U.S. 137, 142 (1953) (plurality opinion). His UCI claim is subject to review if those courts did not afford it "full and fair" consideration. *Id*. The precise standard may be "tangled," *United States ex rel. New*

*v. Rumsfeld*, 488 F.3d 403. 406 (D.C. Cir. 2006), but, as in *Sanford* and *Campbell v. Kendall*, No. 22-5228, 2024 WL 1262827 *1 (D.C. Cir. Mar. 26, 2024) (per curiam), it need not be untangled here because the military proceedings "fail under any standard." *Sanford*, 586 F.3d at 33.

## II

## THE DISTRICT COURT HAD JURISDICTION

Thirty-five years ago, when the government tried to kill off collateral review of courts-martial under the Tucker Act, 28 U.S.C. § 1491, the Federal Circuit rejected that effort. *Matias v. United States*, 923 F.2d 821, 822-25 (Fed. Cir. 1990). Fifteen years ago, when the government tried to bar the military courts from providing post-conviction review by writ of error coram nobis, the Supreme Court rejected that effort. *United States v. Denedo*, 556 U.S. 904, 914-17 (2009). Now the government is trying to do much the same thing to federal question review in the district courts. Its effort to gut a long-settled form of collateral review must be rejected because it is precluded by both Supreme Court and Circuit precedent. *Schlesinger v. Councilman*, 420 U.S. 738, 749-53 (1975); *Larrabee v. Del Toro*, 45 F.4th 81, 86 (D.C. Cir. 2022), *cert. denied*, 144 S. Ct. 277 (2023); *Sanford*; *New*; *Priest v. Sec'y of the Navy*, 570 F.2d 1013, 1016 (D.C. Cir. 1977). "This court is charged with following case law that directly controls a particular issue, 'saving to [the Supreme Court] the prerogative of overruling its own decisions.'" *National*

*Security Archive v. C.I.A.*, 104 F.4th 267, 272 n.1 (D.C. Cir. 2024) (quoting *Mallory v. Norfolk S. Ry. Co.*, 600 U.S. 122, 136 (2023)).

Captain Councilman, suing in the Western District of Oklahoma, invoked federal question jurisdiction. *See* Brief for Respondent on the Jurisdictional Issues, *Schlesinger v. Councilman*, U.S. No. 73-662, 1974 WL 185761 at *4. The Supreme Court was sufficiently interested in the jurisdictional issue that it requested pre-argument supplemental briefs on it, among others. 420 U.S. at 743-44. The parties having briefed it, the Court was plainly satisfied: its decision made nothing of the point, moving past it to address, among other things, the UCMJ's finality provision. Had the Court seen a lack of jurisdiction, its opinion would surely have stopped there.

The government is of course free to try to overturn *Councilman*, of which Congress has been aware ever since it was decided,[3] but that is not this Court's affair. It points to a recent uptick in actions for non-habeas collateral review of courts-martial. Gov't Br. at 41 n.5. A dozen cases over four years hardly suggests a

---

[3] *See* Report of the Judge Advocate General of the Army, January 1, 1975 to December 31, 1975, at 13-14, in 1975 Ann. Rep. of the U.S. Court of Military Appeals and the Judge Advocates General of the Armed Forces and the General Counsel of the Dep't of Transportation, https://www.armfor.uscourts.gov/newcaaf/annual/1975AnnualReport.pdf. Congress has taken no steps to overturn it, even though it has amended section 1331 twice. Pub. L. No. 96-486, § 2, 94 Stat. 2369 (1980); Pub. L. No. 94-574, § 3, 90 Stat. 2721-22 (1976).

floodgates problem. Some of those cases, unlike Sgt. Bergdahl's, may well not satisfy the *Burns v. Wilson* test or may lack substance on the merits.

Article III courts have jurisdiction over cases like this if the error is fundamental. The errors discussed here meet that test with room to spare. Dismissing them as trivial violations of some obscure regulation of no particular importance to the administration of justice, as the government does, cannot hide that fact.

## II

## THE CASE IS NOT BARRED BY SOVEREIGN IMMUNITY

The government also claims for the first time that Sgt. Bergdahl's case is barred by sovereign immunity. Gov't Br. at 30, 38. This point too is not well taken. *E.g., Tinsley v. United States*, Civil No. 24-2988, 2025 WL 1167958 (D.D.C. Apr. 22, 2025); *Penland v. Mabus*, 78 F. Supp. 3d 484, 492 (D.D.C. 2015); *Yongo v. United States*, Civil No. 10-220, 2013 WL 2285341 at *6 (E.D.N.C. May 23, 2013); *Bond v. Kendall*, Civil No. 22-1509, 2023 WL 5404069 at *6, *9 (D. Md. Aug. 22, 2023). *Department of the Army v. FLRA*, 56 F.3d 273 (D.C. Cir. 1995), on which the government relies, is plainly distinguishable: it involved an award of money damages as "a substitute for a consequential loss," 56 F.3d at 312, whereas this case seeks declaratory and injunctive relief.[4]

---

[4] If the district court lacked jurisdiction or the case were barred by sovereign immunity, transfer to the Court of Federal Claims for adjudication of Sgt. Bergdahl's entitlement to pay under 37 U.S.C. § 204(a)(1) would be warranted. 28 U.S.C. §

## III

## THE MILITARY COURTS' CONSIDERATION
## WAS NOT FULL AND FAIR

Under *Burns v. Wilson*, the threshold issue is whether the military courts afforded Sgt. Bergdahl's claims full and fair consideration. They did not.

### A

*The military courts never addressed the fact that*
*the military judge did not disclose a conflict of interest*
*and materially misrepresented his future plans*

ACCA and CAAF never addressed either Sgt. Bergdahl's *Al-Nashiri* claim or Col. Nance's misrepresentation of his future plans, even though both cast doubt on the fairness of the proceedings. The linchpin of the government's defense below to that failure was its claim that CAAF had entered judgment before Sgt. Bergdahl moved to supplement the record. ECF No. 22 at 15. In this court, it refers to that as a "post-judgment motion," Gov't Br. at 60, but the flaw in its earlier argument remains: while CAAF had already rendered its decision when Sgt. Bergdahl attempted to bring Col. Nance's job application to its attention, his petition for reconsideration was still pending. Under CAAF Rule 43A(a), "[t]he timely filing of

---

1631. Requiring him to file a new case there would not be in the interest of justice because it would be time-barred. 28 U.S.C. § 2401(a); *Sinclair v. Kleindienst*, 711 F.2d 291, 294 (D.C. Cir. 1983); *Kluge v. U.S. Government*, Civil No. 19-2618, 2021 WL 11747723 at *2-3 (D.D.C. Aug. 24, 2021).

a petition for reconsideration shall stay the mandate until disposition of the petition unless otherwise ordered by the Court." Because CAAF did not "otherwise order[]," its decision was without effect until October 21, 2020, when the mandate issued. 80 M.J. 366. The government's suggestion that Sgt. Bergdahl requested leave to supplement the record *after* CAAF's decision was final overlooked that rule.

As for CAAF's denial of Sgt. Bergdahl's coram nobis writ-appeal, ACCA had disavowed ruling on the merits of his coram nobis petition, *Bergdahl v. United States*, 2020 WL 7316058 (A. Ct. Crim. App. Dec. 11, 2020) and CAAF's denial was unexplained. ECF No. 17-19 at 2. There being no "convincing grounds to believe the silent court [CAAF] had a different basis for its decision than the analysis followed by the previous court," it must be assumed that, like ACCA, CAAF did not reach the merits. *Wilson v. Sellers*, 584 U.S. 122 (2018) (applying "look through" presumption that imputes to silent higher court the ground set forth in next lower court reasoned opinion).

B

*ACCA's denial of Sgt. Bergdahl's coram nobis petition
was infected by a conflict of interest and flagrantly mistaken*

Lt. Col. Elizabeth Walker was a member of the ACCA panel that considered Sgt. Bergdahl's coram nobis petition. Because she was married to the chief of the Army's Criminal Law Division, Sgt. Bergdahl moved that she recuse. ECF No. 17-17 at 68-70. ACCA denied his motion without explanation. *Id.* at 70. Under *Williams*

*v. Pennsylvania*, 579 U.S. 1, 14-16 (2016), that was "an error that affected [ACCA's] whole adjudicatory framework." The district court suggested that more needed to be shown to disqualify her, 683 F. Supp. 3d at 62, n. 13, but that was impossible: the Army has no mechanism for appellate discovery into such matters and indeed, *voir dire* examination of ACCA judges is expressly forbidden. U.S. Army, Code of Judicial Conduct R. 2.11 (cmt.), ECF No. 17-17 at 169-70, reproduced in Addendum *infra*.

Many of the Criminal Law Division's functions align it with the prosecution. *See* ECF No. 18-2 at 16 n.60. "High profile" cases are among them. Having been disqualified in ACCA's review of the Ft. Hood mass shooting case because her husband had been the local Chief of Military Justice, *Hasan v. U.S. Army Court of Criminal Appeals*, 79 M.J. 292 (C.A.A.F. 2019) (mem.), it is baffling that Lt. Col. Walker participated in ACCA's consideration of Sgt. Bergdahl's coram nobis petition.[5]

ACCA denied coram nobis on the theory that Sgt. Bergdahl had not explained why he did not complain earlier about Col. Nance's concealment of his job application. But counsel only obtained the application *after* ACCA had affirmed.

---

[5] We respectfully disagree with the district court's contrary conclusion. ECF No. 25 at 46 n.13. Lt. Col. Walker's husband did not simply "work for" the Criminal Law Division, as the district court wrote; *he was its Chief*. ECF No. 17-17 at 68.

Sgt. Bergdahl immediately submitted it to CAAF in support of his still-pending petition for reconsideration. When CAAF denied reconsideration and leave to supplement without prejudice to his seeking coram nobis, Sgt. Bergdahl did so within nine days.

There were good reasons for not having raised the issue earlier. Above all, Sgt. Bergdahl was unaware that Col. Nance had even applied to be a Trump Administration immigration judge until long after trial. Not until after ACCA's and CAAF's decisions on direct review did he learn that Col. Nance had applied *during* the trial, that the application had cited this very court-martial as an achievement, and that the writing sample was an opinion denying the UCI motion Sgt. Bergdahl filed on Inauguration Day of 2017. As his coram nobis petition explained, he

> exercised reasonable diligence in relying on [Col. Nance's] assertions that he was impervious to UCI because he was going to retire. The defense had a right to assume he would comply with the [Army Code of Judicial Conduct] and that his assurances would be accurate. He had no way of knowing that when [Col. Nance] made those representations he had already submitted an application to the Department of Justice.

ECF No. 16-26 at 11-12. It remained reasonable to take Col. Nance at his word that, as a terminal Colonel heading for retirement pastures, he was impervious to command influence from President Trump. *See* p. 45 *infra*. And until Sgt. Bergdahl received the job application, he lacked an evidentiary basis for raising an issue about Col. Nance's nondisclosure and lack of candor about his future plans. Because a claim that lacks such a basis is not one that "can be reasonably raised," ACCA's

reliance on *Ragbir v. United States*, 950 F.3d 54, 65 (3d Cir. 2020), *see* 2020 WL 7316058 at *3, was misplaced.

"[A] party does not have an obligation to discover any potentially disqualifying information that is in the public record. The onus is on the judge to ensure any potentially disqualifying information is brought to the attention of the litigants." *Listecki v. Official Comm. of Unsecured Creditors*, 780 F.3d 731, 750 (7th Cir. 2015). Col. Nance's application was not "in the public record" and he never revealed that he had applied, as he had a duty to do under R.C.M. 902 and Rule 2.11 of the Army's Code of Judicial Conduct. Sgt. Bergdahl, on the other hand, had no duty to turn over every rock in order to see if Col. Nance had misrepresented his plans. Consistent with *United States v. Salyer*, 72 M.J. 415 (C.A.A.F. 2013), which disfavors the investigation of judges' personal affairs, the government admitted before CAAF that it "is unaware of an unending duty to independently investigate every facet of a military judge's life." ECF No. 16-27 at 8 n.5.

ACCA insisted that "the issue of the military judge's employment as an immigration judge was a *known appellate issue* at either the date of the [Executive Office for Immigration Review]'s press release [September 28, 2018], or at least when Al-Nashiri submitted his pleadings challenging the judge in his case" (emphasis added). But the press release, ECF No. 17-17 at 127-40, did not reveal *when* Col. Nance had applied. As a result, even if Sgt. Bergdahl had known about it

in real time,[6] it would have been reasonable to assume (given Col. Nance's misrepresentations about his post-retirement plans) that he had not applied until *after* the trial. Equally clearly, the *Al-Nashiri* mandamus petition did not put Sgt. Bergdahl on inquiry notice, *see generally Merck & Co. v. Reynolds*, 559 U.S. 633, 650-53 (2010), as neither it nor the parties' briefs here referred either to this case or to Col. Nance.

ACCA insinuated that lead counsel for Sgt. Bergdahl knew about the job application because he had filed an *amicus* brief for a student clinic in *Al-Nashiri*. *See* Brief of the Ethics Bureau at Yale [EBaY] as Amicus Curiae in Support of Petitioner's Petition for a Writ of Mandamus and Prohibition, *In re Al-Nashiri*, 2018 WL 5994080 (D.C. Cir. 2019); *see also* Gov't Br. at 14, 60-61. Neither that brief nor this court's decision referred to Col. Nance, and counsel was unaware until a year later that he had applied for appointment as an immigration judge during the court-martial.[7]

---

[6] He didn't. Press releases do not afford constructive notice; they are not included in the *Federal Register*. 1 C.F.R. § 5.4(b).

[7] The government goes further than ACCA down the road of innuendo by suggesting that Sgt. Bergdahl's counsel made "a strategic decision to hold an appearance-of-partiality claim in reserve while awaiting the result of [the] direct appeal." Gov't Br. at 61; *see also id*. at 59, 67. It fails, however, to explain why doing so would have made the slightest practical sense – any more than it would for us to respond that the government held its "strategic decision" theory (with its implication of chicanery) "in reserve." After all, having known since at least September 24, 2020 when Sgt. Bergdahl's FOIA request was submitted, *see* ECF No. 17-17 at 143, nothing

There was a "known appellate issue" involving the judge (Col. Vance Spath) who presided over the Al-Nashiri military commission, but there was no such "known appellate issue" as to Col. Nance. That a recusal issue has arisen as to one judge does not warrant an inference that such an issue exists as to others. Just as there is no such thing as "negligence in the air," *Palsgraf v. Long Island R.R. Co.*, 248 N.Y. 339, 341, 349, 162 N.E. 99, 102 (1928), there is no such thing as "judicial disqualification in the air."

"The sufficiency of the reasons [for delay in seeking coram nobis] bears an inverse relationship to the length of the delay – the longer the delay, the more compelling must be the reason." *Tocci v. United States*, 178 F. Supp. 2d 176, 181-82 (N.D.N.Y. 2001) (finding "sound reasons" for a 2½-year delay). Depending on which start date is employed, the delay here was *at the absolute most* less than two years. Thus, even if reasonable diligence required Sgt. Bergdahl to submit a FOIA request the day the Justice Department issued its press release, only 10 months elapsed between then and ACCA's decision on direct review and only 16 from *Al-Nashiri* to CAAF's decision on direct review. Delays of this duration are not a sufficient ground for denying coram nobis. *See* ECF No. 17-17 at 16-18 (collecting

_____

prevented it from raising its "in reserve" claim, illogical though it be, in response to his motion to supplement the record at CAAF or in the subsequent coram nobis proceedings at ACCA and CAAF. It never did, even in the district court, and should not be heard to now.

cases); *e.g., Blanton v. United States*, 94 F.3d 227, 231-32 (6th Cir. 1996) (three-year delay not unduly long). Importantly, the government has never suggested that its ability to respond was compromised. *See United States v. Dyer*, 136 F.3d 417, 427-29 (5th Cir. 1998); *United States v. Jackson*, 371 F. Supp. 3d 257, 265 (E.D. Va. 2019).

ACCA's denial of coram nobis was infected by Lt. Col. Walker's participation and flagrantly mistaken. Its sole basis for refusing to address the merits of Sgt. Bergdahl's petition lacking merit, its consideration was not full and fair.

## C

*CAAF's consideration was not full
and fair in other critical respects*

CAAF's decision rested on matter not in the record or otherwise proper. It relied on what it claimed a member of the public would have known about what the convening authority, in turn, would have known. 80 M.J. at 241-42. Nothing in the record supports it. CAAF's hypothesis that there would have been devastating effects on morale if the convening authority had not referred the charges to a general court-martial was just that – a hypothesis. It involves three levels of imputation: what troops would have felt, what the convening authority would have made of that supposed reaction, and what a member of the general public would have concluded. This layer-cake of imputed knowledge is not a substitute for evidence. The government never asked CAAF to take judicial notice of these or any other imputed

facts and CAAF did not purport to do so. It perforce never afforded Sgt. Bergdahl an opportunity to object that they did not qualify for judicial notice.

In support of its conclusion that no reasonable observer would discern UCI in the denial of clemency, CAAF cited the injuries soldiers sustained while searching for Sgt. Bergdahl and the release of Taliban members in the prisoner exchange. 80 M.J. at 244. But neither of those matters was mentioned in the advice the convening authority received from the Staff Judge Advocate (SJA), *see* ECF No. 17-12, at 320-21, as they would have been had they been germane to clemency. Perhaps alert to this difficulty, CAAF tacked on an observation that Sgt. Bergdahl had not *expressly* sought clemency from the CA. 80 M.J. at 244. This is blatantly wrong. As we show in Point V it literally could not have been clearer that he was seeking clemency.

CAAF emphasized Sgt. Bergdahl's guilty plea. 80 M.J. at 242, 244. This was both *legally incorrect* and *unfair*. Absent some contrary provision in a pretrial agreement (there was none here), an unconditional guilty plea does not waive a claim sounding in due process, *United States v. Day*, 83 M.J. 53, 56 (C.AA.F. 2022), as is the case with UCI, any more than it waives a challenge to the constitutionality of a statute of conviction. *See Khadr v. United States*, 67 F.4th 413, 420-21 (D.C. Cir. 2023). CAAF had granted UCI relief years before in a guilty-plea case, *United States v. Lewis*, 63 M.J. 405 (C.A.A.F. 2006). By heavily relying on Sgt. Bergdahl's plea as a basis for rejecting his UCI claim, it materially changed its doctrine after the fact.

Such switches are "inherently unfair." *Hanratty v. F.A.A.*, 780 F.3d 33, 35 (Fed. Cir. 1985).

If the word "fair" in *Burns* means anything, it is evenhandedness. CAAF's decision, however, was one-sided, unjustifiably imputing knowledge to the notional member of the public when it tended to support the majority's conclusion while slighting evidence that cut the other way. Thus, CAAF failed to take into account matters that tended to rebut the government's claim that an intolerable strain had not been placed on public confidence. It was less than impressed by the fact that Sgt. Bergdahl's prosecution ran counter to American policy not to prosecute repatriated POWs unless they were guilty of misconduct during captivity. 80 M.J. at 239 n.10. The government did not dispute his description of that policy, but claimed that his "desertion and misbehavior makes [*sic*] this case different from a typical POW case." Brief on Behalf of Appellee, *United States v. Bergdahl*, CAAF Dkt. No. 19-406, 2020 WL 278778 at *33. It never explained what, in its view, constitutes a "typical POW case." If a "typical POW case" is one that involves misconduct against a fellow POW, that would mean Sgt. Bergdahl was *more* deserving of leniency under the policy, rather than *less*.

CAAF did not reject Sgt. Bergdahl's account, but afforded it "little weight" because, among other things, he had not proven that some deserting soldiers were not prosecuted even if others were wounded in rescue attempts. 80 M.J. at 239 n.10.

In effect, CAAF demanded precedent that was on all fours with the facts of Sgt. Bergdahl's case, requiring him to prove a negative on a matter as to which the government had both the burden of proof and an effective monopoly over the pertinent information. The prosecution never submitted any evidence on the policy, while Sgt. Bergdahl cited the Defense Department's definitive study, VERNON E. DAVIS, THE LONG ROAD HOME: U.S. PRISONER OF WAR PLANNING AND POLICY IN SOUTHEAST ASIA (2000), and an Army summary of the services' actual practice. ECF No. 17-2, at 2-3. Because the prosecution had to prove its UCI defensive case beyond a reasonable doubt, even the "little weight" CAAF afforded the repatriated-POWs policy is significant when added to the other facts and circumstances that tend to raise a question about the fairness of the proceedings.

CAAF's treatment of Sgt. Bergdahl's UCI claim was also neither full nor fair because it denied leave to supplement the record with irrefutable evidence of Col. Nance's failure to disclose his job application and false account of his future plans, even though they obviously bore on what a member of the public would think about the fairness of the proceedings.

To make matters worse, it was highly unfair for CAAF to send Sgt. Bergdahl off in search of coram nobis because doing so stood the UCI burden of proof on its head: rather than requiring the prosecution to carry *its* evidentiary burden, *he* would have to show that the case was "extraordinary" and presented circumstances that

compel issuance of the writ. *See United States v. Morgan*, 346 U.S. 502, 511 (1954); *Denedo v. United States*, 66 M.J. 114, 126 (C.A.A.F. 2008) (petitioner must show "clear and indisputable right" to relief), *aff'd & remanded*, 556 U.S. 904, 911 (2009). That test is far more onerous than the *de novo* review CAAF applies to UCI issues on direct review. *See, e.g.,* 80 M.J. at 234 (citing *United States v. Barry*, 78 M.J. 70, 77 (C.A.A.F. 2018)).

The military courts having failed to afford Sgt. Bergdahl's claims full and fair consideration, a "close look" at the merits is required. *Sanford*, 586 F.3d at 32.

V

SGT. BERGDAHL WAS DENIED DUE PROCESS OF LAW

Where, as here, UCI malefactors include a sitting President and the Ranking Member and later Chair of SASC (which approves all officer promotions), a close look is especially warranted. As President, Mr. Trump was the ultimate superior of every commissioned officer involved in the military justice process. Article 88, UCMJ, protected him from contemptuous words by Col. Nance, the SJA, the convening authority, and the ACCA judges, even if the words were true. *Manual for Courts-Martial, United States* (2024 ed.) ¶ 14.c. It requires no imagination to see how that criminal prohibition could chill their willingness to fault the Commander in Chief with the asperity his comments merited.

CAAF is supposed to be a "bulwark" against UCI, *United States v. Thomas*,

22 M.J. 388, 393 (C.M.A. 1986); *United States v. Boyce*, 76 M.J. 242, 246 (C.A.A.F. 2017), but the President can remove its judges, Art. 142(c), 10 U.S.C. § 942(c), a power that is obviously problematic when *he* is the source of the UCI. Whether or not Congress can constrain the removal power in the case of collegial bodies for which there is neither an expertise nor a political balance requirement,[8] "neglect of duty" and "misconduct" provide little real-world protection.[9]

Col. Nance had a disqualifying personal interest that he had a duty to disclose. That a judge be free of personal interests, forthrightly disclose them if they exist, is essential to due process[10] and public confidence in the administration of justice. On this, this Court's decision in *Al-Nashiri* is dispositive. But the due process problem

---

[8] *See Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 216 (2020). The UCMJ requires only that CAAF judges be members of the bar, Art. 142(b)(3), "appointed from civilian life," Art. 142(b)(1), and, if they retired as regular commissioned officers within the preceding seven years, that Congress has waived Article 142(b)(4)'s cooling-off period. There once was a political balance requirement, 64 Stat. 129 (1950), but Congress repealed it. National Defense Authorization Act for Fiscal Year 2017, Pub. L. No. 114-328, § 541(c), 130 Stat. 2000, 2125 (2016).

[9] *See* Tuan Samahon, *Blackmun (and Scalia) at the Bat: The Court's Separation-of-Powers Strike Out in* Freytag, 12 Nev. L.J. 691, 698-99 (2012) (discussing Pres. Reagan's removal of Fletcher, C.J. for disability following state sex offense). "Although the Office of Legal Counsel determined the White House likely lacked any 'for cause' grounds to terminate Fletcher, the in terrorem effect was nonetheless potent and precipitated his resignation." *Id.* at 699 & n.62.

[10] *Caperton v. A. T. Massey Coal Co.*, 556 U.S. 868 (2009) (due process violation for a judge not to recuse when he received campaign contributions from a litigant).

runs deeper: "[t]he vilification of Sergeant Bergdahl before, during, and after his court-martial was unprecedented, hostile, and pernicious in the extreme." 80 M.J. at 238 (Sparks, J., concurring in part and dissenting in part). As the lead prosecutor has acknowledged,

> Bergdahl, like every American, deserved to have his actions judged, not on the campaign trail, not on cable news, but in a court of law. He did not deserve to be condemned by the president before he got his day in court. While the presidency might be the most powerful position on Earth, the responsibility to fair and impartial justice does not wane to score political points.

Justin Oshana, *I Led the Prosecution Against Bowe Bergdahl. Trump Made My Job Much Harde*r, WASH. POST, Aug. 31, 2020.[11]

## A

### *The basic principles of UCI*

UCI, the "mortal enemy of military justice." *Thomas*, 22 M.J. at 393, can take two forms: "actual," in which the accused must show prejudice, and "apparent," in which the overriding concern is public confidence in the military justice system.

---

[11] *See also* Stephen G. Breyer, *Judicial Independence in the United States*, 40 ST. LOUIS U. L. REV. 989, 996 (1996) ("The good that proper adjudication can do for the justice and stability of a country is only available . . . if judges actually decide according to law, and *are perceived by everyone around them* to be deciding according to law, rather than according to their own whim or *in compliance with the will of powerful political actors*.") (emphasis added).

*Boyce*, 76 M.J. at 247; *United States v. Proctor*, 81 M.J. 250, 255 (C.A.A.F. 2021).

Once the accused has presented "some evidence" of UCI,

> the burden shifts to the government to prove beyond a reasonable doubt that either: (a) the "predicate facts proffered by the appellant do not exist," or (b) "the facts as presented do not constitute unlawful command influence." *Id.* (citing *Salyer*, 72 M.J. at 423; *United States v. Biagase*, 50 M.J. 143, 151 (C.A.A.F. 1999)). If the government cannot succeed at this step, it must prove beyond a reasonable doubt that the unlawful command influence "did not place an intolerable strain upon the public's perception of the military justice system and that an objective, disinterested observer, fully informed of all the facts and circumstances, would [not] harbor a significant doubt about the fairness of the proceeding." *Id.* at 249 (alteration in original) (internal quotation marks omitted) (citation omitted).

80 M.J. at 234. Apparent UCI is found if the observer (who is deemed to be "a reasonable member of the public," *Lewis*, 63 M.J. at 415; *Salyer,* 72 M.J. at 423; *see also Boyce*, 76 M.J. at 252), "might well be left with the impression" that the process had been unfair. *Salyer*, 72 M.J. at 427.

Whether the facts establish UCI is a question of law. *United States v. Horne*, 82 M.J. 283, 286 (C.A.A.F. 2022). In deciding whether apparent UCI has occurred, CAAF "simply has assessed the aggravating and mitigating facts and circumstances and then decided, *in its own estimation*, whether the Government's conduct 'place[d] an intolerable strain upon the public's perception of the military justice system.'" *Id.* at 287 (emphasis added). It declined in *Horne* to engage with an *amicus*'s criticism of its practice's "objectivity and propriety" on the ground that the parties had not challenged it, disagreeing only about its application. *Id.* That was not unreasonable

given the convention against *amici* raising new issues, but it is also true that CAAF cannot *Councilman*-proof its UCI decisions by applying an amorphous, solipsistic test.[12]

*Councilman* deference is not one-size-fits-all; it depends on the nature of the issue. Thus, the Court referred to the "nature of the alleged defect" and "the gravity of the harm". 420 U.S. at 753. Whatever deference might be warranted as a default, CAAF is entitled to none when it entirely fails to address an issue, as it did with respect to the *Al-Nashiri* issue. But what if it has addressed an issue? The government conceded below that the military courts "may not have special expertise in 'generic due process issues.'" Instead, it claimed that CAAF "relied primarily on its assessment of matters specific to military life." ECF No. 22 at 6. That concession was correct; the claim was not.

*Councilman* refers to "matters as to which the expertise of military courts is singularly relevant, and their judgments indispensable to inform any eventual review in Art. III courts." 420 U.S. at 760 & n.34. Far from being "specific to military life,"

---

[12] CAAF's judges have divided sharply over what knowledge may be imputed to the reasonable observer in the context of implied bias claims. *Compare United States v. Wiesen*, 56 M.J. 172, 175-76 (C.A.A.F. 2001) (3-2 decision) (military jury member was the supervisor of six other members), *with id*. at 180-81 (Crawford, C.J. dissenting), *and id*. at 184-85 (Sullivan, J., dissenting); *compare United States v. Bagstad*, 68 M.J. 460, 462-63 (C.A.A.F. 2010) (3-2 decision), *with id*. at 464 (Baker, J., dissenting). *See also United States v. Rome*, 47 M.J. 467, 472 (C.A.A.F. 1998) (Crawford, J., dissenting) (faulting "subjective 'I know it when I see it' approach").

the standards for coram nobis and judicial recusal are familiar territory for civilian courts. Their application does not turn on "extremely technical provisions of the [UCMJ] which have no analogs in civilian jurisprudence." *See Noyd v. Bond*, 395 U.S. 683, 696 (1969). UCI, on the other hand, lacks a direct analog in civilian jurisprudence, but it too does not call for special expertise, turning as it does on what a member of the general public—*a civilian*—is deemed to know. As to *that*, CAAF can, again, claim no special insight. From either perspective, therefore, its decision is entitled to little if any deference.

B

*CAAF's UCI decision is indefensible*

Partisan politics has no more place in the administration of military justice than it does in civilian justice. Yet, as the lead prosecutor has confirmed, "the case became politicized very quickly."[13] The day after the prisoner exchange, Richard A. Grenell, who was running "a scrappy media shop" "taped a Fox News interview in which he suggested Bergdahl had intentionally defected to the Taliban."[14] On

---

[13] *See* Prosecutorial Ethics in Real Life: Justin Oshana, Interview, Sept. 15, 2021, James E. Rogers College of Law, Univ. of Ariz., https://www.youtube.com/watch?v=OTNJ1E6m7_U, at 23:4714:51; *see also* Oshana, *I Led the Prosecution, supra*.

[14] Michael Ames, *How Trump's New Intelligence Chief Spread Misinformation About Bowe Bergdahl*, Politico, Mar. 11, 2020, https://www.politico.com/news/magazine/2020/03/11/richard-grenell-smear-

television the next day, Mr. Trump called Sgt. Bergdahl a traitor. "In the chaotic weeks of news coverage that followed, Grenell helped weaponize the prisoner swap into a prolonged political attack on the Obama administration." *Id.*

SASC and HASC closely monitored the Army's decision-making regarding Sgt. Bergdahl, including the status of investigations, the progress of the military justice process, and even his entitlement to back pay and decorations. *See* ECF No. 17-11 at 154-58, 309-11. When the preliminary hearing officer recommended against both jail time and a punitive discharge, Sen. McCain threatened to hold a hearing if Sgt. Bergdahl were not punished. ECF No. 17-11 at 3, 60, 152. HASC warned that it would "remain abreast of the disciplinary process which is underway." ECF No. 17-5 at 5. *See generally* ECF No. 17-13 at 55-62.

The general officer who investigated Sgt. Bergdahl's disappearance (and also recommended against jail time) traveled across the country to brief the highest officials of the Army, as well as the Secretary of Defense, the Chairman and Vice Chairman of the Joint Chiefs of Staff, and HASC and SASC staff. ECF No. 17-21

---

against-bowe-bergdahl-125157; MATT FARWELL & MICHAEL AMES, AMERICAN CIPHER: BOWE BERGDAHL AND THE U.S. TRAGEDY IN AFGHANISTAN 265-66 (2019). The Taliban were the original source for the false allegation that Sgt. Bergdahl had defected and converted to Islam. Michael Ames, *A Decade Later, How the Bergdahl Affair Predicted Today's Politics*, RealClearPolitics.com, June 2, 2024, https://www.realclearpolitics.com/2024/06/02/a_decade_later_how_bergdahl_affair_predicted_todays_politics_624810.html.

at 2-3; *see also* ECF No. 17-11 at 149. The Army picked an even more senior general (whose command at Ft. Bragg had never before convened a court-martial) to deal with disciplinary action against Sgt. Bergdahl, who was stationed 1,200 miles away and had never had any connection with that command. The Army assigned more than 50 lawyers to the team prosecuting him.

On these facts, a reasonable member of the public would harbor a significant doubt as to whether the referral of Sgt. Bergdahl's case to a general court-martial was business as usual, unaffected by congressional pressure. The military courts struggled with this simple issue.

Col. Nance denied Sgt. Bergdahl's first UCI motion. ECF No. 17-11 at 64. He ruled that Sen. McCain could not commit UCI because he was not subject to the UCMJ for UCI purposes, and as "an elected public official who has one vote in one chamber of congress among 535 votes that may be cast on any issue effecting [*sic*] the funding or regulation of the military . . . [h]e simply has no authority over the military services or its members." *Id.* at 70. While he found the possibility of apparent UCI "[p]otentially more troubling," Col. Nance concluded that because Sen. McCain "had no command authority or present ability to influence the decision whether or not to refer the case to trial, he could not possibly be reasonably as exercising unlawful influence." *Id.* "A reasonable member of the public knowing all the facts and circumstances would recognize Senator McCain's ill-advised

statements for just what they were – political posturing designed to embarrass a political opponent (President Obama) and gain some political advantage." *Id.* (footnotes omitted). Sgt. Bergdahl, he wrote, had failed to provide "some evidence which, if true, would constitute UCI which would have a logical connection to this court-martial in terms of potential unfairness in the proceedings." *Id.* As a result, Col. Nance never reached the question whether the prosecution had proven beyond a reasonable doubt that an informed member of the public would not harbor a significant doubt as to the fairness of the proceedings.

Sgt. Bergdahl sought mandamus from ACCA, but that court denied his petition without prejudice, *Bergdahl v. Nance*, CCA 20170114 (A. Ct. Crim. App. Mar. 13, 2017), and CAAF denied his writ-appeal. *Bergdahl v. Nance*, 76 M.J. 342 (C.A.A.F. 2017) (order). When the case reached ACCA again after trial, that court disagreed with Col. Nance's determination that Sen. McCain, despite being a Regular Navy retiree, was not subject to Article 37,[15] but otherwise agreed with him. It found "the link between the role of SASC and issues that Senator McCain may have had with other Army officials and policies speculative at best. Assuming *arguendo* that the comment constituted some evidence of UCI, [it found] the

---

[15] This court later held that certain military retirees are subject to the UCMJ. *Larrabee*, *supra*.

government successfully met its burden and removed any taint with [the convening authority's] testimony" that he had had no communication with Sen. McCain or his office, "nor did any person in senior Army leadership (either military or civilian) attempt[ed] to interfere with [the convening authority] as he made his referral decision. ACCA added that "the record contains no evidence that Senator McCain attempted to take any action for or against the [CA] or any member of the court-martial." 79 M.J. at 521-22 & n.13.

CAAF, in contrast, held that Sen. McCain was legally capable of committing UCI:

> In October 2015 while Appellant's case was pending a referral decision, Senator McCain told a reporter: "If it comes out that [Appellant] has no punishment, we're going to have to have a hearing in the Senate Armed Services Committee." Senator McCain was not just a member of the Senate who was subject to the UCMJ, he was the chairman of the Senate Armed Services Committee. This leadership position gave him unique sway over the military. For example, he could delay or block assignments or promotions of senior military personnel. *See* Standing Rules of the Senate, S. Doc. No. 113-18, Rule XXV, at 20 (2013). Further, Senator McCain did not make this public comment in the context of conducting congressional oversight of the armed forces regarding military justice issues generally, or the disposition of certain categories of cases, or even the disposition of a particular case that was already final. Rather, Senator McCain made his public threat to hold a hearing in a specific case *that was currently pending* if the sentence imposed in that specific case was not to his liking. This situation is altogether different from standard congressional oversight, and the quid pro quo nature of Senator McCain's threat entitles Appellant to cite to it as "some evidence" that could cause an "objective, disinterested observer ... [to] harbor a significant doubt about the fairness" of Appellant's court-martial. *Boyce*, 76 M.J. at 248–49 (internal quotation marks omitted) (citations omitted).

Senator McCain's comment was especially problematic because of the timing of his remarks. He made them after learning that the preliminary hearing officer in Appellant's case recommended that the charges be referred to a special court-martial not empowered to adjudge a bad-conduct discharge, and before the general court-martial convening authority (GCMCA) made a referral decision. Thus, Senator McCain's public threat to hold a hearing provides "some evidence" of an appearance of unlawful command influence because it had the potential to appear to "coerce or ... influence" the outcome of Appellant's court-martial under Article 37, UCMJ. *Boyce*, 76 M.J. at 249, 253 (internal quotation marks omitted).

80 M.J. at 236 (footnote omitted).

CAAF therefore had to decide the question Col. Nance never reached: whether the prosecution had carried its burden. In doing so, it offered a hodge-podge of assertions that do not withstand scrutiny. Indeed, several had never been made by the prosecution. CAAF also did not play by the rules in fundamental ways.

a. *Departure from settled practice.* CAAF's settled practice is that "when reviewing a lower court's decision on a military judge's ruling, we 'typically have pierced through that intermediate level and examined the military judge's ruling, then decided whether the Court of Criminal Appeals was right or wrong in its examination of the military judge's ruling.'" *United States v. Blackburn*, 80 M.J. 205, 211 (C.A.A.F. 2020) (quoting *United States v. Shelton*, 64 M.J. 32, 37 (C.A.A.F. 2006)). It did not do so here. Moreover, in a departure from universally accepted standards of appellate review (standards that are reflected in its rules, *see* C.A.A.F.R. 30A(a)), it relied on matter *dehors* the record. *See* p. 17 *supra*.

b. *Improper imputation of knowledge to the notional observer*. A court may not pull facts out of its hat when deciding a case. There is no such thing as judicial notice *sub silentio*. CAAF did not purport to take judicial notice of any of the non-record matters on which it relied. C.A.A.F.R. 30A(b). It had no right to deny Sgt. Bergdahl the protections associated with judicial notice[16] by pretending that it was not doing so. Nor did CAAF invoke its own factfinding process, C.A.A.F.R. 30A(e), or remand for further factual development under C.A.A.F.R. 30A(c).[17] The parties entered into (and CAAF approved) no appellate stipulation. C.A.A.F.R. 30A(d).

CAAF relied on what it believed the convening authority would have known from an earlier tour of duty at the Pentagon. 80 M.J. at 241. Aside from the multiple-imputation problem cited in Point IV(C), this was improper because it in no way qualified for judicial notice, as witness *United States v. Anderson*, 82 M.J. 82, 88 n.4 (C.A.A.F. 2022). There CAAF correctly declined to take judicial notice of "the operational tempo of the command to justify the military judge's delay," observing that "the Government has provided no information that makes indisputable the

---

[16] CAAF knew better. Over a decade ago, it disapproved when an intermediate appellate court denied an accused notice and an opportunity to be heard when taking judicial notice. *United States v. Paul*, 73 M.J. 274, 278 (C.A.A.F. 2014).

[17] CAAF itself "does not sit to find facts." *United States v. Rushatz*, 31 M.J. 450, 457 & n.1 (C.M.A. 1990).

operational tempo of Fort Bliss."[18] Similarly, in *United States v. Wales*, 31 M.J. 301, 309 (C.M.A. 1990), CAAF insisted on conventional proof of a custom of the service on which the government had hoped to rely through judicial notice. Its *de facto* judicial notice in Sgt. Bergdahl's case stands in stark contrast to these precedents.

Moreover, information related to sensitive military operations would unquestionably have been classified in whole or in part. And members of the public are not presumed either to hold clearances or to be privy to classified information. Knowledge of such matters therefore cannot properly be imputed to the notional observer when deciding whether the prosecution carried its UCI burden.

Out of the blue, CAAF imputed to the observer knowledge of other facts that would be utterly unknown to a member of the public, such as the contents of a congressional report from decades earlier that neither side had cited or referred to at oral argument. *See* 80 M.J. at 241-42. This was contrary to the government's acknowledgement that the only matters that may be imputed to the notional observer – other than the facts of the case – are "things in the [*sic*] general knowledge." CAAF Hearing Audio, June 2, 2020, at 39:00-40:05, *United States v. Bergdahl*,

_____

[18] If the judges were drawing on personal knowledge, that was improper. *Gov't of Virgin Islands v. Gereau*, 523 F.2d 140, 147-48 (3d Cir. 1975). A judge is not a witness, lay or expert. *See generally Duncan v. Bonta*, 133 F.4th 852, 886-88 (9th Cir. 2025) (en banc) (Berzon, J., concurring).

https://www.armfor.uscourts.gov/newcaaf/CourtAudio8/20200602.mps. The government has never repudiated that concession. CAAF ignored it.

c. *Reliance on matters not fairly imputable to the reasonable observer*. To impute to the observer, as CAAF did, "recogni[tion] that [General] Abrams had ready access to this casualty information at the time he decided to send [Sgt. Bergdahl]'s case to a general court-martial rather than to the more limited special court-martial recommended by the Article 32, UCMJ, preliminary hearing officer," 80 M.J. at 241 & n.15; *see also* ECF No. 17-14 at 12-13, is to stretch the category of knowledge imputed to the notional observer even further past the breaking point. We have already addressed the problem of imputing knowledge to the observer of knowledge further imputed to the convening authority about presumed effects on morale. *See* p. 17 *supra*.

CAAF also claimed that "any observer of the military justice system would realize that it is not uncommon for a [general court-martial convening authority] to refer a case to a court-martial in a manner contrary to the recommendation of the Article 32, UCMJ, preliminary hearing officer, even in those instances where there is not a scintilla of unlawful command influence." 80 M.J. at 240. It cited no authority for this assertion, which is military justice "inside baseball" utterly

unknown to the overwhelming majority of Americans, including veterans, and indeed, even to non-lawyer active duty personnel.[19]

This particular element of CAAF's UCI analysis is further called into question by changes Congress made in Article 32 in 2013 and 2016. An informed observer may be deemed to have "examined" the law, *United States v. Cordova*, 706 F.3d 1085, 1092 (D.C. Cir. 2015), but – *let's get real* – almost no Americans actually know about the "old" Article 32, and even fewer know about the new one. As a result, it was indefensible for CAAF to permit the shifting ins and outs of Article 32 to play *any* role, especially *sua sponte* and on a point as to which the prosecution had the burden of proof beyond a reasonable doubt. It is one thing to impute a rough familiarity with the "unique structure of the military justice system," *United States*

_____

[19] Article 32 is not among the provisions that must "be carefully explained" to GIs. *See* Art. 137(a)(3), UCMJ. What is more, even if inside baseball were fair game when imputing knowledge to members of the public, CAAF had to be evenhanded. If knowledge of some convening authorities' practice under Article 32 could be imputed, so too, knowledge had to be imputed that at the time the charges against Sgt. Bergdahl were referred for trial, nothing in the *Manual for Courts-Martial* forbade acquiescence to political pressure. *See Manual for Courts-Martial, United States* (2012 & 2016 eds.), R.C.M. 306(b) (Discussion) (former versions). The absence of such a prohibition is certainly more relevant to whether an informed observer would harbor a significant doubt about the fairness of the proceedings than the frequency with which convening authorities reject the advice of preliminary hearing officers. (Under current "non-binding guidance," it is now "inappropriate" to take into account "[p]olitical pressure to take or not to take specific actions in the case," *Manual for Courts-Martial, United States* (2024 ed.), App. 2.1, § 2.7.e, at A2.1-3, but even that is "non-litigable" and confers no enforceable rights. *See id.* § 1.4, at A2.1-2.)

*v. Woods*, 74 M.J. 238, 244 (C.A.A.F. 2015), when testing for implied bias, but quite another to impute knowledge of military justice arcana out of the clear blue for the prosecution's benefit while purporting to guard against UCI.

But let us assume that imputation is not confined to the broad architecture of the system. Given the government's "general knowledge" concession, *see* p. 33 *supra*, an informed observer would know, contrary to CAAF's account, 80 M.J. at 233, 239, that even though the UCMJ *permits* severe penalties for the offenses to which Sgt. Bergdahl pleaded guilty, its *actual practice* tells a markedly different tale. Another Army sergeant – one who wished to avoid transfer to hazardous duty in Vietnam – defected to and collaborated with North Korea in a highly-publicized case but received a sentence of only 30 days' confinement and a dishonorable discharge. Austin Ramzy, *Charles Jenkins, 77, U.S. Soldier Who Regretted Fleeing to North Korea, Dies*, N.Y. TIMES, Dec. 12, 2017.[20] The observer thus would know

---

[20] More recently, a private who deserted to North Korea to avoid prosecution for other offenses (including assaulting an officer) was sentenced to a dishonorable discharge and a year's confinement. Emmett Lindner, *U.S. Soldier Pleads Guilty to Desertion After Fleeing Into North Korea*, N.Y. TIMES, Sept. 21, 2024. With credit for pretrial confinement and time off for good behavior, he was released immediately. The Army described the outcome as "a fair and just result that reflects the seriousness of the offenses." *Id.* A staff sergeant facing 31 years' confinement for desertion, attempted voluntary manslaughter and child endangerment was allowed to avoid trial entirely, receiving only an other-than-honorable administrative discharge. Matthew M. Burke, *US Soldier in Germany Who Was AWOL for Months Granted Discharge Without Trial*, STARS & STRIPES, Nov. 6, 2024, https://www.stripes.com/branches/army/2024-11-06/awol-soldier-avoids-court-martial-15758054.html. The Army's actual behavior in desertion cases speaks for

that the theoretical maximum punishment is a highly imperfect guide to the actual gravity of such offenses, especially where the accused's actions were misguided rather than malevolent, as CAAF acknowledged. *See* 80 M.J. at 232, 243.

The CAAF majority admitted that the apparent UCI issue concerning the referral phase of Sgt. Bergdahl's case presented a "close question" that had "given us great pause" and required "long consideration." 80 M.J. at 240. In the end, their resolution of it does not withstand scrutiny.

d. *Disregard of the record.* Clemency review is a significant element of the court-martial process. The convening authority had unfettered discretion to set aside the findings of guilt or disapprove the sentence in whole or in part *literally* for any reason or no reason. Art. 60(c), UCMJ (former version); R.C.M. 1107(c) (Discussion) (2012 ed.). But before he had a chance to exercise that power, the Commander in Chief denounced the sentence as a national disgrace. Not surprisingly, the convening refused to grant clemency – and did so without the slightest explanation. A member of the public would be justified in harboring a significant doubt that his refusal was uninfluenced by President Trump's "disgrace" tweet.

CAAF sought to sidestep this by claiming that Sgt. Bergdahl never formally

itself and undermines CAAF's account.

sought clemency. This flies in the face of the record. He had objected to the post-trial involvement of the convening authority and SJA because they would have to rule on the lawfulness of their own role in the secret destruction of numerous letters the convening authority had received concerning the case which he never provided to the defense. ECF No. 17-12 at 309-11. For an official exercising a quasi-judicial function to engage in spoliation in connection with a pending criminal case, without notice to counsel, is shocking. Still, the convening authority and SJA refused to recuse. ECF No. 17-12 at 312.

Preserving his objection, Sgt. Bergdahl made it clear that he wished to seek clemency, setting forth the numerous circumstances that made him a viable candidate for it. ECF No. 17-12 at 307. He carefully explained that clemency is the accused's "best hope" for relief, noted that he "has a right to a clemency determination by officials who are not disqualified," and identified thirteen "grounds for clemency," adding that "[o]ther grounds for clemency come from the government's legal errors in the processing of this case." ECF No. 17-12 at 307-08. The SJA was aware that he wanted clemency; after all, she advised the convening authority that "in my opinion, *clemency is not warranted*." Signing off on her recommendation, he affirmed that he had "personally considered the matters listed in the preceding paragraphs before taking action in this case." ECF No. 17-12 at 321.

Given this unrebutted evidence, the CAAF majority's suggestion that Sgt.

Bergdahl had not sought clemency "is like the thirteenth chime of a clock: you not only know it's wrong, but it causes you to wonder about everything you heard before." *United States v. Marchena-Silvestre*, 802 F.3d 196, 203 (1st Cir. 2015).

e. *Unfair reliance on guilty plea*. CAAF expressly relied above all on Sgt. Bergdahl's guilty plea as a factor that militated against his UCI claim: "*it cannot be emphasized strongly enough* that [he] chose to plead guilty." 80 M.J. at 242 & n.16 (emphasis added, other emphasis omitted). This was mistaken. As the district court explained:

> The defendant emphasizes the fact that the plaintiff voluntarily chose to plead guilty. *See* Def.'s Mot. at 4. However, as the Court stated in its July 25, 2023 Memorandum Opinion, "there are various reasons why an individual might choose to plead guilty[.]" *Bergdahl*, 683 F. Supp. 3d at 58. "Here, as a preliminary matter, it is undisputed that the plaintiff had no actual knowledge or possession of the military judge's job application during his court-martial proceedings." *Id*. at 64. "In other words, based upon the military judge's representations during the court-martial proceedings, as well as his failure to disclose his job application, the plaintiff had no reason to know or even suspect that the military judge was applying for a job within the executive branch and that his impartiality could therefore be in question, considering the executive branch's involvement in this case." *Id*. at 66. Had the plaintiff known of the military judge's apparent conflict of interest, it is reasonable to expect that he may have chosen not to plead guilty. Moreover, the plaintiff faced a potential sentence of lifetime imprisonment on the desertion charge and "[t]he military judge [had] denied [all three of] the plaintiff's [] unlawful command influence [motions,]" *id*. at 40, which likely further incentivized the plaintiff's decision to plead guilty. Given these circumstances, the Court is unwilling to ascribe significant weight to the plaintiff's decision to plead guilty.

2024 WL 2383025 at *4 n.3.

Beyond this, CAAF's decision in *Lewis* shows that UCI can be found even when there has been a guilty plea. Such a plea is thus not the deal-breaker CAAF treated it as in Sgt. Bergdahl's case. Col. Nance did not view it as such: his decision denying Sgt. Bergdahl's motion to dismiss did not rely on it. *See* ECF No. 16-23 at 2-6.

CAAF's emphasis on Sgt. Bergdahl's "naked" guilty plea was also tantamount to treating it as a waiver of his UCI claims. A waiver must be not only intelligent and voluntary but *knowing. E.g., Khadr v. United States*, 67 F.4th at 424. When pleading, however, Sgt. Bergdahl was unaware that Col. Nance had concealed a conflict of interest and misled him about his future plans. Although Col. Nance later offered him an opportunity to change his plea, ECF No. 229 at 220-21, he still did not disclose the fact that he had submitted the job application, much less intimate that Sgt. Bergdahl would (despite *Lewis*) be dooming his UCI claim if he continued to plead guilty.[21] Those omissions—knowledge of which is imputed to the observer

---

[21] *A fortiori*, Sgt. Bergdahl's plea cannot be treated as a waiver of a UCI claim based on President Trump's *later* Rose Garden ratification of his campaign-trail vilification and condemnation of the sentence as a disgrace. It is one thing to find anticipatory waiver (or, as here, its practical equivalent) when the issue concerns something that is inherently knowable, such as the potential sentence. *See United States v. Guillen*, 561 F.3d 527, 529-30 (D.C. Cir. 2009); *cf. In re Sealed Case*, 901 F.3d 397, 400-01 (D.C. Cir. 2018) (claim not foreclosed where waiver is arguable or ambiguous). It is quite another to impute to a defendant clairvoyance as to future

because they are apparent from the record of trial—made it especially unfair for CAAF, years later and notwithstanding *Lewis*, to rely on, much less afford pride of place to, Sgt. Bergdahl's plea as a basis for rejecting his UCI claim.

g. *Sentencing and Col. Nance's alleged independence*. Sgt. Bergdahl's request for a dishonorable discharge is easy to understand given the terrifying prospect of prolonged incarceration fresh on the heels of five years' brutal captivity. Expert testimony made it clear that prison would exacerbate his diagnosed psychiatric condition. *See* ECF No. 16-12 at 120-21. In addition, seeking a punitive discharge is a recognized way of reducing the chances or duration of a sentence to confinement. And the providence inquiry made it equally clear that his desire was "to be discharged from the service with either a bad conduct discharge or a dishonorable discharge if, as your counsel indicated, it will preclude you from going to confinement." *See id.* at 297-98. An observer would know all of this from the record of trial, not from guesswork or military arcana. The context for Sgt. Bergdahl's plea and request for a punitive discharge is among the "facts and circumstances of the case" that must be taken into account in deciding whether that observer would harbor

_____

acts of an elected official who can use his bully pulpit for political ends regardless of legal constraints. Sgt. Bergdahl's guilty plea did not give President Trump a free pass to engage in future UCI.

a significant doubt about the fairness of the proceedings. Here again, CAAF's decision was flawed.

Was Col. Nance's failure to sentence Sgt. Bergdahl to prison evidence of independence, as CAAF suggested? 80 M.J. at 244. It just as readily indicates a careful effort to thread a political needle, hoping not to provoke a mercurial Commander in Chief at the very time the judge was seeking a job that related to that official's signature policy initiative. An observer would be justified in hearing echoes of both the charged political environment and Col. Nance's undisclosed effort to secure a lucrative post-retirement job. That he did not send Sgt. Bergdahl to Leavenworth is also hardly the point when longstanding policy is not even to charge, much less imprison, repatriated POWs for offenses committed prior to capture.

Col. Nance sentenced Sgt. Bergdahl to forfeit $10,000. Sgt. Bergdahl never suggested such a sanction. Nor did he ask to be demoted to the lowest pay grade. CAAF's point that he got what he asked for is therefore not well-taken.

Having rejected Sgt. Bergdahl's UCI claim following President Trump's Rose Garden ratification, Col. Nance said he would take Mr. Trump's vilification of Sgt. Bergdahl into account when deciding on a sentence. The defense asked that he state the discount with particularity in order to permit meaningful appellate review. ECF

No. 16-9 at 235. He ignored that request, ECF No. 16-12 at 305, making it impossible to know whether he in fact applied a discount, and if so, what it was.

Although Col. Nance made a few rulings that were favorable to the defense, those on Sgt. Bergdahl's key motions were overwhelmingly adverse, as an observer would know from the record. The kid-glove treatment of the four-star convening authority, allowing him alone, over objection, to enter the courtroom by a side door in order to avoid a scrum of reporters and television cameras, ECF No. 16-5 at 525, revealed Col. Nance as obsequious rather than independent. He refused to permit the defense to examine the lead prosecutor about his collaboration with the White House, ECF No. 16-9 at 44-45, or to examine the SJA concerning the spoliation of the case-related letters the convening authority had destroyed based on her advice. *See* Trial App. Ex. 21 at 8-9.

Nor would an observer make anything of the fact that Col. Nance acquitted Sgt. Bergdahl of all but the first day of the five-year desertion the prosecution had charged. An observer would know from the record that the prosecutors' attempt to prove the longer period without calling a single witness was perfunctory. ECF No. 16-9 at 177-79. Col. Nance earns no points for independence based on the partial acquittal; he had no alternative.

Similarly, an observer would know from the record that Col. Nance's offer to

direct that the convening authority and ACCA judges read the White House's anemic "Statement on Military Justice" was no evidence of independence. ECF No. 17-12 at 169. That document made no reference to either Sgt. Bergdahl or President Trump's ratification of his own prior disparaging remarks. It was also already in the record of trial, where it would be read by the convening authority and the ACCA judges (whom Col. Nance could no more order around than this court can give marching orders to the Supreme Court). *See* ECF No. 16-12 at 306; ECF No. 17-12 at 30 n.14. A member of the public would know as a matter of "the general knowledge" (the test the government correctly employed at CAAF, *see* p. 33 *supra*) and high school civics that a lower court cannot boss around a higher court. Giving the observer credit for a modicum of common sense, they would likely see Col. Nance's offer as window-dressing since the immediately preceding paragraph of his decision found that the prosecution had carried its end-stage UCI burden of proof. ECF No. 16-23 at 5.

C

*Once Col. Nance's conflict and misrepresentation are taken into account, Sgt. Bergdahl is even more clearly entitled to prevail*

"[T]he substantiality of evidence must take into account whatever in the record fairly detracts from its weight."[22] The same principle applies when judging

---

[22] *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951), *quoted in Spirit Airlines, Inc. v. U.S. Dep't of Transp. & F.A.A.*, 997 F.3d 1247, 1256-57 (D.C. Cir.

whether the prosecution proved what it had to in Sgt. Bergdahl's case: the record as a whole is taken into account, including evidence that runs counter to the prosecution's.[23] Even if the matters on which CAAF relied were sufficient to overcome reasonable doubt, its decision cannot survive once the later-acquired evidence of Col. Nance's job application and his account of his future plans are factored in. He was not merely being frugal with information: he affirmatively misled the parties in service of his claim to be impervious to UCI.

Col. Nance buttressed his denial of Sgt. Bergdahl's renewed UCI motion with a claim that he was immune to improper influence: "I'm what's referred to as a terminal Colonel, which means I'm not going anywhere but the retirement pastures," he stated, "[a]nd that's in almost a year from now." Regarding his susceptibility to outside influence, he said: "So that's a long way of saying, 'No, no effect on me whatsoever.' I don't expect to go anywhere but back home as soon as the Army is done with me in a year." ECF No. 16-9 at 225. When he made those statements, the ink was barely dry on his job application. A reasonable member of the public, armed

---

2021).

[23] *Delaware v. Van Arsdall*, 475 U.S. 673, 681, 684 (1986); *United States v. Rhone*, 884 F.2d 832, 836 (D.C. Cir. 1989); *United States v. Anderson*, 881 F.2d 1128, 1140 (D.C. Cir. 1989); *see also United States v. Dingle*, 114 F.3d 307, 310 (D.C. Cir. 1997).

with these facts, would have good reason to doubt the fairness of proceedings over which he presided.

To refute this, the best the government can do is point to the district court's observation that Col. Nance's statements "could 'just as likely' be understood as reflecting 'an intention to retire from employment totally.'" Gov't Br. at 59 (quoting ECF No. 25 at 52 & n.15). "Even assuming those interpretations were actually equally reasonable in context, two evenly-matched possibilities are not a basis to impute misconduct" to Col. Nance. *Id*. The trouble with this is that it ignores the burden of proof. If the evidence were in equipoise, the prosecution loses because, under CAAF's settled UCI jurisprudence, it not only had the burden of proof, but had to carry that burden beyond a reasonable doubt.

Military judges have an "essential role as the 'sentinel' of the military justice system in identifying and addressing instances of unlawful command influence." *Boyce*, 76 M.J. at 253 n.9. Col. Nance could not be counted on to fulfill that role because he had a financial interest in employment at the Justice Department. By continuing to preside after submitting his job application and by failing to disclose it, he deprived Sgt. Bergdahl of the due process right to be tried by an impartial judge. As Chief Justice Taft wrote in *Tumey v. Ohio*:

> Every procedure which would offer a possible temptation to the average
> man as a judge to forget the burden of proof required to convict the

defendant, or which might lead him not to hold the balance nice, clear, and true between the State and the accused denies the latter due process of law.

273 U.S. 510, 532 (1927); *see also Ward v. City of Monroeville*, 409 U.S. 57, 59-60 (1972). The handsome salary of an immigration judge refutes the district court's view that Col. Nance's conduct gave rise to only the appearance of a conflict of interest, rather than the genuine article. ECF No. 17-17 at 266 (listing the immigration judge starting salary range when Col. Nance secretly applied from $144,042 to $172,100). Such a salary dwarfs the paltry sums (even by 1920s standards) that drove *Tumey*.

Rule 2.11 of the Army Code of Judicial Conduct provides: "Army judges shall disqualify themselves from a proceeding when required by R.C.M. 902 or other provision of law." Disclosure "plays an unusually important role in ensuring that military judges act with dispassion and independence." Michel Paradis, *Judicial Disclosure and the Judicial Mystique*, 49 HOFSTRA L. REV. 125, 145 (2020). The Comment to Rule 2.11 provides:

> A judge should disclose on the record information that the judge believes the parties or their lawyers might consider relevant to the question of disqualification, even if the judge believes there is no real basis for disqualification.

R.C.M. 902(a) in turn sets forth the general rule that, unless the issue has been waived, "a military judge shall disqualify himself or herself in any proceeding in

which that military judge's impartiality might reasonably be questioned." Since Sgt. Bergdahl was unaware of Col. Nance's job application until long after trial, the waiver exception is inapplicable. In any event, waiver applies only if "it is preceded by a *full disclosure on the record* of the basis for disqualification." R.C.M. 902(e) (emphasis added); *see also Al-Nashiri*, 921 F.3d at 237. Here there was no disclosure. R.C.M. 902(b)(5)(B) specifies additional grounds for mandatory disqualification, including situations "[w]here the military judge . . . is known by the military judge to have an interest, financial or otherwise, that could be substantially affected by the outcome of the proceeding."

"[A]ll that must be demonstrated to compel recusal" is "a showing of an appearance of bias . . . sufficient to permit the average citizen reasonably to question a judge's impartiality." *United States v. Heldt*, 668 F.2d 1238, 1271 (D.C. Cir. 1981) (quoted in *Al-Nashiri*, 921 F.3d at 234). It takes little imagination to recognize that a job application from someone who had publicly put the Attorney General's immediate superior (the President) in the embarrassing position of having caused the dismissal of the highest-profile court-martial in decades would not be looked on with favor. The record is silent as to Col. Nance's subjective state of mind, as the prosecution never proffered a statement from him. Whether he saw the matter this way is immaterial: the question is "what a reasonable observer might

think." Such an observer "might reasonably" further infer that he never disclosed his job application because he feared that doing so would cause a ruckus in the closely-watched trial and harm his chances of being hired.

This court wrote in *Al-Nashiri*:

First, in his job application, Spath chose to emphasize his role as the presiding judge over Al-Nashiri's commission. He boasted that he had been "handpicked by the top lawyer of the Air Force to be the trial judge" on "the military commissions proceedings for the alleged 'Cole bombing' mastermind," Reply Attachments B-2, and he even supplied an order from Al-Nashiri's case as his writing sample, *see id*. at B-11. Spath thus affirmatively called the Justice Department's attention to his handling of Al-Nashiri's case, making his performance as presiding judge a key point in his argument for employment.

Second, while Spath made sure to tell the Justice Department about his assignment to Al-Nashiri's commission, he was not so forthcoming with Al-Nashiri. At no point in the two-plus years after submitting his application did Spath disclose his efforts to secure employment with the Executive Office for Immigration Review. Indeed, perhaps most remarkably, less than twenty-four hours after receiving his July 2018 start date, Spath indefinitely abated commission proceedings, musing on the record that "over the next week or two" he would decide whether "it might be time . . . to retire." Commission Tr. 12374 (Feb. 16, 2018); *see also supra* at 230–31. Given this lack of candor, a reasonable observer might wonder whether the judge had done something worth concealing. *Cf.* Rule for Military Commissions 902(e) (permitting, in some circumstances, "the parties to [a] proceeding" to waive judicial disqualification but only if the waiver "is preceded by a full disclosure on the record of the basis for disqualification").

921 F.3d at 237. As the district court observed, 2024 WL 2383025 at *6, the facts in *Al-Nashiri* "bear a striking resemblance" to this case.[24] They handily meet the "average citizen" standard for concern over partiality.

Sgt. Bergdahl was prejudiced by Col. Nance's failure to disclose a possible ground for disqualification. Concealment "deprived the parties of an adequate foundation for their decisions on whether or not to request recusal" and made it harder to evaluate "those facts crucial to determining whether there was a conflict or appearance of conflict requiring disqualification." *United States v. Quintanilla*, 56 M.J. 37, 79–80 (C.A.A.F. 2001). It also prevented him from seeking a new trial. "[W]illful concealment of a material ground for challenge of the military judge" may constitute a fraud on the court for purposes of the right to seek a new trial when "the basis for challenge or disqualification was not known to the defense at the time of trial." R.C.M. 1210 (Discussion). By the time he learned that Col. Nance had applied *during the trial*, the deadline for seeking a new trial had passed. Art. 73, UCMJ (former version); R.C.M. 1210(a) (2012 ed.).

---

[24] The government suggests that *Al-Nashiri* is distinguishable because of the role the Attorney General plays in military commissions. Gov't Br. at 55-56. Justice Department lawyers played active supporting roles in the prosecution of Sgt. Bergdahl. ECF No. 18-2 at 38-40. There is no material difference between the detail of a single attorney to the prosecution team in the *Al-Nashiri* commission case and the behind-the-scenes support provided by Justice Department attorneys to the prosecution of Sgt. Bergdahl.

The UCI inquiry focuses on "*all* the facts and circumstances." 80 M.J. 230, 233 (C.A.A.F. 2020) (emphasis added). While the district court subjected the nondisclosure issue to the requisite "close look," ECF No. 25 at 55, and reached the right conclusion on the *Al-Nashiri* issue, it did not integrate its findings and conclusions on that issue with the other evidence bearing on the UCI issue, *id*. at 55-62, even though the two are closely connected. ECF No. 18-2 at 15, 34, 43-44. At the very time Col. Nance was claiming to be impervious to UCI, he was secretly citing his role in this UCI-infused court-martial as a significant professional achievement and submitting as his writing sample a ruling that rejected a Trump-related UCI motion to dismiss. ECF No. 17-17, at 52-67. The *factual* nexus between the UCI issue and the concealment at the root of the *Al-Nashiri* issue is therefore clear and sufficient to require an integrated analysis of the evidence bearing on each. The *legal* nexus is equally clear: the district court's evaluation of Col. Nance's concealment correctly employed the same factors as govern UCI analysis.[25]

Despite this, the government insisted below that Col. Nance's job application "would do nothing to alter the robust set of facts that informed the Court's ultimate

---

[25] *See* ECF No. 25 at 60-61 ("it would appear to a reasonable person," "knowing all the circumstances," "the perception a reasonable member of the public would have," "could lead 'a reasonable observer [] [to] wonder whether the judge had done something worth concealing,'" "actions a reasonable person might view as serving the president's interests," "impartiality might reasonably be questioned").

conclusion" that he appeared "notably impervious" to President Trump's statements. ECF No. 32 at 6. But the district court determined that Col. Nance's conduct created an appearance of partiality. ECF No. 25 at 58, 60-62. To say that judicial conduct that "falls squarely on the impermissible side of the line," *id*. at 57, would "do nothing to alter" the view of a disinterested observer is not merely counterintuitive; it is startling coming from the government because "[u]nbiased, impartial adjudicators are the cornerstone of any system of justice worthy of the label." *Id*. at 56 (quoting *Al-Nashiri*).

CAAF strained to find that the prosecution had carried its heavy evidentiary burden. To do so it had to rely on matters that the prosecution never suggested, were unsupported by or flatly contrary to the record, or were ineligible for judicial notice. Unsustainable when made, CAAF's decision becomes entirely indefensible once the evidence regarding Col. Nance's conduct is taken into account. Given the evidentiary standard the prosecution had to satisfy, even a modest change in the facts and circumstances easily alters the UCI bottom line. The change here was substantial. CAAF's refusal even to consider Col. Nance's undisclosed job application and false account of his plans was a clear abuse of discretion, even by its own standards. *See e.g., United States v. Commisso*, 76 M.J. 315, 321 (C.A.A.F. 2017).

# VI

## THE CHARGES AND SPECIFICATIONS
## SHOULD BE DISMISSED WITH PREJUDICE

Neither the "sentinel" (the military judge) nor the "bulwark" (CAAF) that are supposed to prevent and remedy UCI functioned as they should have. It therefore falls to this court to go beyond the *Al-Nashiri* relief the district court granted and direct that the charges and specifications be dismissed with prejudice, a remedy that has repeatedly been ordered in UCI cases. *See Barry*, 78 M.J. at 79-80; *United States v. Riesbeck*, 77 M.J. 154, 167 (C.A.A.F. 2018); *Salyer*, 72 M.J. at 417, 428; *United States v. Gore*, 60 M.J. 178, 189 (C.A.A.F. 2004); *Lewis*; *United States v. Gilmet*, 83 M.J. 398, 408 (C.A.A.F. 2023); and the *Gilmet*-related cases of *United States v. Negron*, No. 202300164, 2024 WL 5233005 (N-M. Ct. Crim. App. Dec. 27, 2024), and *United States v. Draher*, No. 202300163, 2024 WL 5233006 (N-M. Ct. Crim. App. Dec. 27, 2024) (per curiam).

### A

### *The district court's rationale concerning UCI was flawed*

The district court considered dismissal with prejudice inappropriate because alternative remedies are available, *viz*., the relief it granted under *Al-Nashiri*. 2024 WL 2383025 at *9. That was incorrect because *Al-Nashiri* relief is not equivalent to dismissal, much less to dismissal with prejudice. All it does is turn back the hands of the clock to where they were when the recusal issue arose and require

reassignment to a different judge. It does nothing to remedy either the *original* sin – the pressure exerted by Sen. McCain and the Committees on Armed Services before the charges were referred for trial – or the cumulative apparent UCI, including that attributable to the Nation's highest official. *Al-Nashiri* relief is not the "cure" the district court deemed it to be.

## B

*Dismissal with prejudice is warranted*

Given the gravity of the McCain and Trump UCI, the Army's failure to take remedial measures, the cumulative effect on public confidence, the sheer time that has elapsed since the charged offenses, the fact that Sgt. Bergdahl has for years suffered the stigma of a dishonorable discharge, and, importantly, the fact that no "useful purpose would be served by continuing the proceedings," *Barry*, 78 M.J. at 79; *Gore*, 60 M.J. at 187, dismissal with prejudice is warranted.

Sgt. Bergdahl paid an awful price for his actions. He was held by the enemy longer and under worse conditions than any member of the armed forces since the Vietnam War. His life has been on hold. Despite his innocent motivation and blameless behavior in captivity, he has been branded a traitor by the Nation's highest official, relegated in the court of public opinion to the same odious category as Tokyo Rose and Axis Sally. The stigma flowing from President Trump's attacks is clear and intentional. "No other personality in public life can begin to compete with

[an incumbent President] in access to the public mind through modern methods of communications." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 654 (1952) (Jackson, J. concurring).

Given President Trump's re-election, his known view of Sgt. Bergdahl ("people have heard," ECF No. 17-12 at 152) and appointment of an individual with similar views as Secretary of Defense,[26] the Army can be expected to try to resume the already unduly protracted proceedings against Sgt. Bergdahl if afforded an opportunity to do so. Further proceedings would serve no practical purpose. Even if there were a way around the lack of jurisdiction[27] and he were convicted, the sentence could not exceed the one previously adjudged. Art. 63 (former version), UCMJ; R.C.M. 810(d)(1) (former version).

In contrast, dismissal with prejudice would vindicate the public interest in deterring UCI. As the Navy-Marine Corps Appellate Defense Division's *amicus* brief to CAAF noted, this relief is necessary "[b]ecause the highest levels of military

---

[26] *See* Fox & Friends, *Pete Hegseth on What He Expects from Bowe Bergdahl*, Fox News, Oct. 16, 2017, https://www.foxnews.com/video/5612529645001 ("you never want a Bowe Bergdahl ever walking free . . . the least he can do is serve behind bars for the rest of his life . . . a dirtbag").

[27] Having been discharged, Sgt. Bergdahl is not subject to the UCMJ. *United States ex rel. Toth v. Quarles*, 350 U.S. 11 (1955); *United States v. Denedo*, 556 U.S. at 923 n.2 (Roberts, C.J., concurring in part & dissenting in part). The first and only thing a court-martial could do now is "announce th[at] fact and dismiss[] the cause." *Roberts v. United States*, 77 M.J. 615, 616 (A. Ct. Crim. App. 2018).

and civilian leadership have unequivocally not gotten the message, causing the public's perception of the military justice system to continue to erode."[28] The government contends that, despite his ordeal at the hands of the enemy and intrepid conduct in captivity, affording Sgt. Bergdahl relief would undermine public confidence in the military justice system. Gov't Br. at 66. We suggest that tolerating meddling by elected officials poses a far greater threat to public confidence.

C

*Only dismissal with prejudice will stand a chance of*
*deterring political meddling in specific courts-martial*

The UCI that permeates Sgt. Bergdahl's case should not have happened. When it did, it should have been corrected – but wasn't. Even before that, it should have been deterred. But nothing deterred government officials from doing things that repeatedly set off UCI alarm bells.

The Army understood this and tried in vain to persuade Sen. McCain that his meddling and threat raised a UCI issue. ECF No. 17-12 at 273-305. His staff and others on Capitol Hill repeatedly sought reports on the status of the case. *Id*. Whether the Army cooperated against its better judgment, or caved to irresistible political pressure, is immaterial.

---

[28] The brief is available at https://www.armfor.uscourts.gov/newcaaf/briefs/2019Term/Bergdahl190406AmicusCuriaeBriefNAMCAppDef.pdf.

President Trump was equally undeterred. After Sgt. Bergdahl moved to dismiss on the basis of the vilification to which he was subjected during the 2016 campaign, the chief prosecutor worked with the White House to discourage further comments. ECF No. 16-9 at 24-26. It was no use. President Trump ratified his campaign-trail vilification when speaking in the Rose Garden. ECF No. 17-12 at 152. A White House statement purporting to urge everyone to let military justice run its course (but somehow never getting around to mentioning Sgt. Bergdahl), ECF No. 17-12 at 169, proved to be a sham: no sooner was it issued than President Trump tweeted that Sgt. Bergdahl's sentence was "a complete and total disgrace to our Country and to our Military." Not content with this, he continued to disparage Sgt. Bergdahl and the sentence. ECF No. 17-12 at 306, 323-24, 663-64. Col. Nance's tepid descriptions – "troubling," "disturbing," "disappointing," "inaccurate," "inappropriate," and "ill-advised," 80 M.J. 244 & nn.17-22 – simply rolled off the President's back.

Congress has broad legislative power over military justice under Article I, § 8, cl. 14 of the Constitution. Its exercise of that power is accorded great deference. *E.g., Weiss v. United States*, 510 U.S. 163, 177-78 (1994). What it does *not* have is the power to control *individual* cases. Nonetheless, President Trump had company on Capitol Hill.

Before the convening authority even acted on the record of trial, 100 Members

of Congress sent a letter to the acting Secretary of the Army expressing their "firm belief that Private Bergdahl should not be awarded back pay." *See* https://hws-media-libraries.s3.us-east-2.amazonaws.com/crawford.house.indigov.us/uploads/legacy/uploadedfiles/crawfordletter.pdf. Members of Congress also introduced bills seeking to deny him any back pay to which he might be entitled. ECF No. 17-8 at 2-4, ECF No. 17-9 at 2-4. Those bills died, but the fact that they were introduced itself speaks volumes. Only three days after the decision below, five members of the House wrote to the Attorney General and the Secretary of Defense to urge further proceedings against Sgt. Bergdahl. ECF No. 38 at 3-4. The district court's criticism had no deterrent effect.

There are no other deterrents. Military personnel may not sue their superiors. *Chappell v. Wallace*, 462 U.S. 296 (1983). Presidents enjoy immunity for acts done in their official capacity. *Trump v. United States*, 603 U.S. 593 (2024); *Nixon v. Fitzgerald*, 457 U.S. 731 (1982). Senators and Members of Congress have broad protection under the Speech or Debate Clause, *see* U.S. Const. Art. I, § 6, cl. 1; *e.g., Doe v. McMillan*, 412 U.S. 306 (1973), and neither Chamber has taken steps to discourage, much less punish, meddling in pending courts-martial (or, for that matter, other criminal cases). The meddling continues. *See* Max Jesse Goldberg,

*Congressional Influence on Military Justice*, 130 YALE L.J. 2110, 2129-31, 2135, 2139-40 (2021) (collecting instances).[29]

Finally, while UCI has long been an offense under the UCMJ, *see* Art. 131f(2), UCMJ; *Manual for Courts-Martial, United States* (2024 ed.) ¶ 87.c.(2), and the *Military Justice Reporter* and *Court-Martial Reports* have no dearth of UCI cases, no one has ever been prosecuted for it. Rachel E. VanLandingham, *Military Due Process: Less Military and More Process*, 94 TUL. L. REV. 1, 30-31 & n.130 (2019). Presidents and federal legislators are not, as such, subject to the UCMJ. Even if some future President happened to be a retired regular and therefore subject to the UCMJ, they would be immune from prosecution under *Trump v. United States*. And since only active-duty personnel may prefer charges, Art. 30(a)(1), UCMJ; R.C.M. 307(a), anyone who had the temerity to do so would have to be a military

---

[29] Other instances are collected in Misti E. Rawles, *Congressional Oversight: The New Mortal Enemy of Military Justice?* (LL.M. thesis 2020), https://apps.dtic.mil/sti/pdfs/ADA439865.pdf. *See also* S. 4946, 118th Cong. (2024) (purporting to override plea agreements by three 9/11 military commission defendants). Taking a victory lap after Secretary of Defense Austin rescinded the plea agreements, Senator Cotton and Minority Leader McConnell expressed satisfaction that he had "heeded our warning." Cotton, McConnell Statement on Revocation of Plea Deal for 9/11 Terrorists, Aug. 3, 2024, https://www.cotton.senate.gov/news/press-releases/cotton-mcconnell-statement-on-revocation-of-plea-deal-for-9/11-terrorists. The rescission was later set aside. *In re Mohammad*, No. 24-001, 2024 WL 5396185 (Ct. Mil. Comm'n. Rev. Dec. 30, 2024) (per curiam), *petition for writ of mandamus & prohibition pending sub nom. In re United States*, No. 25-1009 (D.C. Cir.).

subordinate, that is hardly a likely scenario. Even more fantastical is the notion that a President would face electoral defeat or impeachment and removal or that a Senator or Member of Congress would face censure or expulsion for UCI. UCI did not figure in last year's presidential election, even though the winner was a principal malefactor in this, the highest profile UCI case in decades.

Chief Judge Stucky hoped that "we shall not see [this case's] like again." 80 M.J. at 245. Unfortunately, experience teaches that unless remedial action is sufficiently firm that political branch officials recognize that they run a substantial risk of public embarrassment, UCI by such officials will persist. Mere tut-tutting, whether by CAAF or on collateral review, will not suffice.

## Conclusion

The decision below should be affirmed as to the *Al-Nashiri* issue and reversed as to UCI. The case should be remanded with instructions to set aside the court-martial and all related proceedings and dismiss the charges and specifications with prejudice.

Respectfully submitted,

/s/ *Eugene R. Fidell*
EUGENE R. FIDELL
D.C. Bar No. 112003
Feldesman Leifer LLP
1129 20th St., N.W., Ste. 400
Washington, DC 20036
(202) 256-8675 (mobile)
efidell@feldesman.com

/s/ *Franklin D. Rosenblatt*
FRANKLIN D. ROSENBLATT
D.C. Bar No. 1600851
151 E. James H. Meredith Dr.
Jackson, MS 39201
(202) 793-0005
frosenblatt@mc.edu

/s/ *Stephen A. Saltzburg*
STEPHEN A. SALTZBURG
D.C. Bar No. 370949
2000 H St., N.W.
Washington, DC 20052
(202) 994-7089
ssaltz@law.gwu.edu

/s/ *Stephen I. Vladeck*
STEPHEN I. VLADECK
D.C. Bar No. 988509
600 New Jersey Ave., N.W.
Washington, DC 20001
(202) 662-9313
stephen.vladeck@law.georgetown.edu

*Attorneys for Appellee/Cross-Appellant*

May 7, 2025

# Addendum

Governing Provisions

Fifth Amendment

No person shall . . . be deprived of life, liberty, or property, without due process of law . . . .

Article 37, UCMJ (applicable version)

§837. Art. 37. Unlawfully influencing action of court

(a) No authority convening a general, special, or summary court-martial, nor any other commanding officer, may censure, reprimand, or admonish the court or any member, military judge, or counsel thereof, with respect to the findings or sentence adjudged by the court, or with respect to any other exercise of its or his functions in the conduct of the proceeding. No person subject to this chapter may attempt to coerce or, by any unauthorized means, influence the action of a court-martial or any other military tribunal or any member thereof, in reaching the findings or sentence in any case, or the action of any convening, approving, or reviewing authority with respect to his judicial acts. The foregoing provisions of the subsection shall not apply with respect to (1) general instructional or informational courses in military justice if such courses are designed solely for the purpose of instructing members of a command in the substantive and procedural aspects of courts-martial, or (2) to statements and instructions given in open court by the military judge, president of a special court-martial, or counsel.

(b) In the preparation of an effectiveness, fitness, or efficiency report, or any other report or document used in whole or in part for the purpose of determining whether a member of the armed forces is qualified to be advanced, in grade, or in determining the assignment or transfer of a member of the armed forces or in determining whether a member of the armed forces should be retained on active duty, no person subject to this chapter may, in preparing any such report (1) consider or evaluate the performance of duty of any such member as a member of a court-martial, or (2) give a less favorable rating or evaluation of any member of the armed forces because of the zeal with which such member, as counsel, represented any accused before a court-martial.

## Rule 104. **Unlawful command influence**

(a) General prohibitions.

(1) *Convening authorities and commanders*. No convening authority or commander may censure, reprimand, or admonish a court-martial or other military tribunal or any member, military judge, or counsel thereof, with respect to the findings or sentence adjudged by the court-martial or tribunal, or with respect to any other exercise of the functions of the court-martial or tribunal or such persons in the conduct of the proceedings.

(2) *All persons subject to the UCMJ*. No person subject to the UCMJ may attempt to coerce or, by any unauthorized means, influence the action of a court-martial or any other military tribunal or any member thereof, in reaching the findings or sentence in any case or the action of any convening, approving, or reviewing authority with respect to such authority's judicial acts.

## Rule 902. **Disqualification of military judge**

(a) *In general*. Except as provided in subsection (e) of this rule, a military judge shall disqualify himself or herself in any proceeding in which that military judge's impartiality might reasonably be questioned.

(b) *Specific grounds*. A military judge shall also disqualify himself or herself in the following circumstances:

(1) Where the military judge has a personal bias or prejudice concerning a party or personal knowledge of disputed evidentiary facts concerning the proceeding.

(2) Where the military judge has acted as counsel, preliminary hearing officer, investigating officer, legal officer, staff judge advocate, or convening authority as to any offense charged or in the same case generally.

(3) Where the military judge has been or will be a witness in the same case, is the accuser, has forwarded charges in the case with a personal recommendation as to disposition, or, except in the performance of duties as military judge in a previous trial of the same or a related case, has expressed an opinion concerning the guilt or innocence of the accused.

(4) Where the military judge is not eligible to act because the military judge is not qualified under R.C.M. 502(c) or not detailed under R.C.M. 503(b).

(5) Where the military judge, the military judge's spouse, or a person within the third degree of relationship to either of them or a spouse of such person:

(A) Is a party to the proceeding;

(B) Is known by the military judge to have an interest, financial or otherwise, that could be substantially affected by the outcome of the proceeding; or

(C) Is to the military judge's knowledge likely to be a material witness in the proceeding.

### Discussion

A military judge should inform himself or herself about his or her financial interests, and make a reasonable effort to inform himself or herself about the financial interests of his or her spouse and minor children living in his or her household.

_____

(c) *Definitions*. For the purposes of this rule the following words or phrases shall have the meaning indicated—

(1) "Proceeding" includes pretrial (to include prereferral), trial, post-trial, appellate review, or other stages of litigation.

(2) The "degree of relationship" is calculated according to the civil law system.

### Discussion

Relatives within the third degree of relationship are children, grandchildren, great grandchildren, parents, grandparents, great grandparents, brothers, sisters, uncles, aunts, nephews, and nieces.

_____

(d) *Procedure*.

(1) The military judge shall, upon motion of any party or *sua sponte*, decide whether the military judge is disqualified.

### Discussion

There is no peremptory challenge against a military judge. A military judge should carefully consider whether any of the grounds for disqualification in this rule exist in each case. The military judge should broadly construe grounds for challenge but should not step down from a case unnecessarily.

Possible grounds for disqualification should be raised at the

earliest reasonable opportunity. They may be raised at any time, and an earlier adverse ruling does not bar later consideration of the same issue, as, for example, when additional evidence is discovered.

_____

(2) Each party shall be permitted to question the military judge and to present evidence regarding a possible ground for disqualification before the military judge decides the matter.

## Discussion

Nothing in this rule prohibits the military judge from reasonably limiting the presentation of evidence, the scope of questioning, and argument on the subject so as to ensure that only matters material to the central issue of the military judge's possible disqualification are considered, thereby, preventing the proceedings from becoming a forum for unfounded opinion, speculation or innuendo.

_____

(3) Except as provided under subsection (e) of this rule, if the military judge rules that the military judge is disqualified, the military judge shall recuse himself or herself.

(e) *Waiver.* No military judge shall accept from the parties to the proceeding a waiver of any ground for disqualification enumerated in subsection (b) of this rule. Where the ground for disqualification arises only under subsection (a) of this rule, waiver may be accepted provided it is preceded by a full disclosure on the record of the basis for disqualification.

Rule 1210. **New trial**

## Discussion

*Examples of fraud on a court-martial which may warrant granting a new trial are*: confessed or proved perjury in testimony or forgery of documentary evidence which clearly had a substantial contributing effect on a finding of guilty and without which there probably would not have been a finding of guilty of the offense; willful concealment by the prosecution from the defense of evidence favorable to the defense which, if presented to the court-martial, would probably have resulted

in a finding of not guilty; and *willful concealment of a material ground for challenge of the military judge* or any member or of the disqualification of counsel or the convening authority*, when the basis for challenge or disqualification was not known to the defense at the time of trial* (*see* R.C.M. 912).

[Emphases added.]

## Code of Judicial Conduct for Army Trial and Appellate Judges
## (May 16, 2008)

Rule 2.11 *Disqualification*

Army judges shall disqualify themselves from a proceeding when required by R.C.M. 902 or other provision of law. Army appellate judges shall disqualify themselves from hearing a case for the same reasons that Army trial judges must disqualify themselves under R.C.M. 902.

COMMENT

*See* R.C.M. 902 for the rules and procedures regarding disqualification of Army judges. A judge should disclose on the record information that the judge believes the parties or their lawyers might consider relevant to the question of disqualification, even if the judge believes there is no real basis for disqualification. In addition, the Court of Appeals for the Armed Forces has held that 28 U.S.C. §455, which governs disqualification of federal judges, applies to judges of the Courts of Criminal Appeals. *See United States v. Lynn*, 54 M.J. 202, 205 (2000). Appellate judges, however, are not subject to voir dire by counsel regarding potential grounds for challenge.

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(g) of the Federal Rules of Appellate Procedure and based on the word count function in Microsoft Word for Mac 2025, I certify that the foregoing brief complies with the type-volume limitations of Rule 27(d)(2)(a) because it contains 15,124 words, excluding the parts exempted by Rule 32(f), and that it complies with the typeface and type style requirements of Rules 32(a)(5) and (a)(6).

/s/ *Eugene R. Fidell*
EUGENE R. FIDELL
Feldesman Leifer LLP
1129 20th St., N.W., Ste. 400
Washington, DC 20036
(202) 256-8675 (mobile)
efidell@feldesman.com

## CERTIFICATE OF SERVICE

I certify that, I have, this 7th day of May, 2025, electronically filed the foregoing brief with the Clerk of the United States Court of Appeals for the District of Columbia Circuit through the CM/ECF system. Opposing counsel are registered CM/ECF users and will be served by that system.

/s/ *Eugene R. Fidell*
EUGENE R. FIDELL
Feldesman Leifer LLP
1129 20th St., N.W., Ste. 400
Washington, DC 20036
(202) 256-8675 (mobile)
efidell@feldesman.com