**[ORAL ARGUMENT NOT SCHEDULED]**

**Nos. 24-5150, 24-5154**

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————

ROBERT B. BERGDAHL,

Plaintiff-Appellee-Cross-Appellant,

v.

UNITED STATES OF AMERICA,

Defendant-Appellant-Cross-Appellee.

———————————

On Appeal from the United States District Court
for the District of Columbia

———————————

**FINAL RESPONSE AND REPLY BRIEF FOR APPELLANT-
CROSS-APPELLEE**

———————————

BRETT A. SHUMATE
  *Assistant Attorney General*

MELISSA N. PATTERSON
BRAD HINSHELWOOD
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7256*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-7823*

# TABLE OF CONTENTS

**Page**

GLOSSARY

INTRODUCTION AND SUMMARY OF ARGUMENT ............................. 1

STATEMENT OF CROSS-APPEAL ISSUE .............................................. 4

ARGUMENT ....................................................................................................... 5

I.    The District Court Lacked Authority to Entertain Bergdahl's
Claims ..................................................................................................... 5

    A.    District Courts Lack Jurisdiction to Entertain Suits
Seeking to Vacate or Alter Court-Martial Judgments .......... 6

    B.    Bergdahl Identifies No Jurisdictional or Fundamental
Constitutional Error That Could Authorize a Grant of
Relief ...................................................................................... 15

        1.    Judge Nance's Application Does Not Create
Constitutional Error ..................................................... 15

        2.    Apparent Unlawful Command Influence, Like an
Appearance of Partiality, Is Not a Constitutional
Issue ............................................................................... 20

II.    Bergdahl's Claims Fail on The Merits Even if Entertained ......... 24

    A.    The Military Courts Exhaustively Considered
Bergdahl's Apparent Unlawful Command Influence
Claim ...................................................................................... 25

    B.    Bergdahl's Late-Raised Allegations of an Appearance of
Partiality Do Not Justify Relief ........................................... 37

    C.    Bergdahl Fails to Defend the District Court's Vacatur
Remedy, Much Less Justify Broader Relief .......................... 43

CONCLUSION .......................................................................................48

CERTIFICATE OF COMPLIANCE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:**                                              **Page(s)**

*Aetna Life Ins. Co. v. Lavoie*,
  475 U.S. 813 (1986) ................................................................ 18, 20

*Al-Nashiri, In re*,
  921 F.3d 224 (D.C. Cir. 2019) ........................................ 19, 44, 45, 46

*Bergdahl v. United States*,
  2020 WL 7316058 (A. Ct. Crim. App. Dec. 11, 2020) ...................... 39

*Brown v. Royall*,
  81 F. Supp. 767 (D.D.C. 1949) .......................................................... 13

*Burns v. Wilson*,
  346 U.S. 137 (1953) ............................................................... 3, 26, 30

*Clemens v. U.S. Dist. Ct. for the Cent. Dist. of Calif.*,
  428 F.3d 1175 (9th Cir. 2005) ........................................................... 34

*Coleman v. Thompson*,
  501 U.S. 722 (1991) ............................................................................ 8

*Connally v. Georgia*,
  429 U.S. 245 (1977) .......................................................................... 17

*Davies v. Clifford*,
  393 F.2d 496 (1st Cir. 1968) ............................................................. 13

*Del Vecchio v. Illinois Dep't of Corr.*,
  31 F.3d 1363 (7th Cir. 1994) ............................................................. 23

*Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*,
  544 U.S. 280 (2005) ...................................................................... 7, 10

*FAA v. Cooper*,
  566 U.S. 284 (2012) .......................................................................... 14

*Gibson v. Berryhill*,
  411 U.S. 564 (1973) .......................................................................... 18

*Goland v. CIA,*
    607 F.2d 339 (D.C. Cir. 1978) ............................................................ 40

*Goldstein v. Johnson,*
    184 F.2d 342 (D.C. Cir. 1950) ............................................................ 13

*Kendall v. Army Bd. for Corr. of Mil. Recs.,*
    996 F.2d 362 (D.C. Cir. 1993) ............................................................ 37

*Leopold v. Manger,*
    102 F.4th 491 (D.C. Cir. 2024) ............................................................ 9

*Liljeberg v. Health Servs. Acquisition Corp.,*
    486 U.S. 847 (1988) ............................................................ 4, 43, 44, 45

*Marbury v. Madison,*
    5 U.S. (1 Cranch) 137 (1803) ............................................................6-7

*Marshall v. Jerrico, Inc.,*
    446 U.S. 238 (1980) ............................................................ 17

*Martinez v. Ryan,*
    566 U.S. 1 (2012) ............................................................ 38

*Martinez v. Ryan,*
    926 F.3d 1215 (9th Cir. 2019) ............................................................ 3, 37-38

*McKinney v. White,*
    291 F.3d 851 (D.C. Cir. 2002) ............................................................ 14

*Murray v. Carrier,*
    477 U.S. 478 (1986) ............................................................ 39

*Olson v. Olson,*
    671 N.W.2d 64 (Mich. Ct. App. 2003) ............................................................ 19

*Ortiz v. United States,*
    585 U.S. 427 (2018) ............................................................ 6, 13

*Parker v. Connors Steel Co.,*
    855 F.2d 1510 (11th Cir. 1988) ............................................................ 34

*Priest v. Secretary of the Navy,*
    570 F.2d 1013 (D.C. Cir. 1977) ............................................................ 14

*Ragbir v. United States,*
    950 F.3d 54 (3d Cir. 2020) .................................................... 39

*Romero v. International Terminal Operating Co.,*
    358 U.S. 354 & n.5 (1959) ...................................................... 9

*Sanford v. United States,*
    586 F.3d 28 (D.C. Cir. 2009) .............................................. 26

*Schlesinger v. Councilman,*
    420 U.S. 738 (1975) ................................... 1, 2, 7, 9, 10, 11, 13, 26, 45

*Sensley v. Albritton,*
    385 F.3d 591 (5th Cir. 2004) .............................................. 34

*Swan v. Clinton,*
    100 F.3d 973 (D.C. Cir. 1996) ........................................... 15

*Tumey v. Ohio,*
    273 U.S. 510 (1927) ..................................................... 17, 20

*United States v. Bergdahl*:
    79 M.J. 512 (A. Ct. Crim. App. 2019) ................................. 27
    80 M.J. 230 (C.A.A.F. 2020) ............... 23, 27, 29, 32, 34, 35, 36, 41, 42

*United States v. Boyce,*
    76 M.J. 242 (C.A.A.F. 2017) ........................... 21-22, 22, 23, 24, 31, 33

*United States v. Davis,*
    2024 WL 3179658 (A. Ct. Crim. App. June 24, 2024) ...................... 24

*United States v. Denedo,*
    556 U.S. 904 (2009) ........................................................ 7

*United States v. Eubanks,*
    2024 WL 5058698 (C.G. Ct. Crim. App. Dec. 11, 2024) ..................... 24

*United States v. Gattis,*
    81 M.J. 748 (N-M. Ct. Crim. App. 2021) ............................. 24

*United States v. Gilmet,*
    83 M.J. 398 (C.A.A.F. 2023) .............................................. 24

*United States v. Horne,*
  82 M.J. 283 (C.A.A.F. 2022) ............................................................ 31

*United States v. Lewis,*
  63 M.J. 405 (C.A.A.F. 2006) ...............................................23, 31, 33, 46

*United States v. Pearson,*
  203 F.3d 1243 (10th Cir. 2000) ........................................................ 34

*United States v. Timmreck,*
  441 U.S. 780 (1979) ......................................................................... 45

*United States v. Turner,*
  75 M.J. 954 (A.F. Ct. Crim. App. 2016) ............................................ 41

*United States v. Whitmore,*
  384 F.3d 836 (D.C. Cir. 2004) ...................................................... 39-40

*United States ex rel. New v. Rumsfeld,*
  448 F.3d 403 (D.C. Cir. 2006) ..................................................... 26, 30

*Van Harken v. City of Chicago,*
  103 F.3d 1346 (7th Cir. 1997) ..................................................... 18-19

*Vargas, In re,*
  84 M.J. 734 (A.F. Ct. Crim. App. 2024) ........................................... 24

*Verizon Md., Inc. v. Public Serv. Comm'n of Md.,*
  535 U.S. 635 (2002) ......................................................................... 10

*Wales v. Whitney,*
  114 U.S. 564 (1885) ......................................................................... 12

*Ward v. Village of Monroeville,*
  409 U.S. 57 (1972) ........................................................................... 17

*Young, Ex parte,*
  209 U.S. 123 (1908) ......................................................................... 10

**Statutes:**

Act of Mar. 3, 1875, ch. 137, § 1,
  18 Stat. 470, 470 ............................................................................... 9

10 U.S.C. § 837 (2012) ........................................................... 41

10 U.S.C. § 837(a) (2012) ....................................................... 21

10 U.S.C. § 837(c) ................................................................... 24

10 U.S.C. § 866 ......................................................................... 6

10 U.S.C. § 867 ......................................................................... 6

10 U.S.C. § 876 ................................................................... 7, 11

10 U.S.C. § 1552(f)(2) ............................................................ 14

10 U.S.C. § 1553(a) ............................................................... 14

28 U.S.C. § 1259 ....................................................................... 6

28 U.S.C. § 1331 ....................................................................... 9

28 U.S.C. § 1491(a) ............................................................... 11

**Rules:**

C.A.A.F. R. 30A(a) (2016) ..................................................... 40

R.C.M. 104(a)(1) ....................................................................... 5

R.C.M. 902(a) .............................................................. 3, 5, 41

R.C.M. 902(b)(5) ..................................................................... 42

R.C.M. 1106 ............................................................................ 35

R.C.M. 1110(c) ....................................................................... 35

**Other Authorities:**

Eugene R. Fidell et al., *Guide to the Rules of Practice and
Procedure for the U.S. Court of Appeals for the Armed
Forces* (23rd ed. 2024) ......................................................... 40

Richard E. Flamm, *Judicial Disqualification: Recusal and Disqualification of Judges* (3d ed. 2017) ............................................. 34

William Winthrop, *Military Law and Precedents* (2d ed. 1920) ....................................................................................... 12

## GLOSSARY

| | |
|---|---|
| ACCA | Army Court of Criminal Appeals |
| CAAF | Court of Appeals for the Armed Forces |
| R.C.M. | Rule for Courts-Martial |
| UCI | Unlawful Command Influence |
| UCMJ | Uniform Code of Military Justice |

## INTRODUCTION AND SUMMARY OF ARGUMENT

The district court took the extraordinary step of vacating the judgments of a separate and entirely independent court system—not only Bergdahl's court-martial convictions and sentence, but also the judgments of two military appellate courts established by Congress, including the highest court in the military justice system. Our opening brief explained in detail two fundamental errors in that approach. First, district courts have no jurisdiction to vacate or alter the judgments of military courts, just as they have no jurisdiction to vacate or alter state-court judgments. Second, a district court may disregard a court-martial judgment to award collateral relief only if that judgment is infected by certain types of fundamental error, none of which the district court purported to identify here.

Bergdahl barely responds to these points. He relies on *Schlesinger v. Councilman*, 420 U.S. 738 (1975), as establishing jurisdiction, even though *Councilman* demonstrates that district courts exercise no jurisdiction to vacate or alter court-martial judgments but are limited to determining whether the court-martial "judgment must be deemed

without res judicata effect" in a suit seeking "relief otherwise within the court's power to grant."  *Id.* at 746-47.

Bergdahl does not appear to dispute that a court-martial judgment may be held void based on—at most—jurisdictional and fundamental constitutional errors in the court-martial proceedings. But he does not attempt to show that the purported error identified by the district court here—a supposed appearance of partiality created by Judge Nance's application to be an immigration judge—is constitutional in nature, instead advancing an alternative theory the district court rightly did not embrace.  Moreover, the alleged error undergirding his cross appeal—the unique military-law doctrine of "apparent unlawful command influence"—is a statutory appearance-based doctrine, not a matter of constitutional significance.

These points alone are a sufficient basis for the government to prevail.  But Bergdahl's claims would fail in any event.  Bergdahl's apparent unlawful command influence claim was exhaustively considered by the military courts, and Bergdahl cannot properly ask this Court to reconsider the military courts' rulings on a matter of military law and reweigh the various factors that led the military courts

2

to reject his arguments.  *See Burns v. Wilson*, 346 U.S. 137, 142 (1953) (plurality op.).

Nor was the military courts' rejection of Bergdahl's apparent unlawful command influence claim void because those courts did not consider his allegations about Judge Nance's application on their merits.  Bergdahl does not dispute the basic rule that federal courts do not second-guess the timeliness determinations of another court system. *E.g.*, *Martinez v. Ryan*, 926 F.3d 1215, 1224 (9th Cir. 2019).  Even now, Bergdahl carefully avoids stating when he learned of the potential appearance issue, and thus he cannot articulate any justification for waiting until the day the Court of Appeals for the Armed Forces (CAAF) affirmed his convictions and sentence before seeking Judge Nance's application.  And in any event, Bergdahl's allegations about Judge Nance would not alter the apparent unlawful command influence analysis.  Apparent unlawful command influence under Article 37 of the Uniform Code of Military Justice (UCMJ) and an appearance of partiality under Rule for Courts-Martial (R.C.M.) 902(a) are distinct issues, and Bergdahl cites no military case that merges analysis of the two as he demands.

3

Finally, Bergdahl fails to justify the district court's vacatur. He does not—and cannot—dispute that his actions led to serious injuries to multiple fellow servicemembers and that he voluntarily pleaded guilty to serious offenses under the UCMJ while purporting to "accept[] responsibility for [his] mistake" and requesting a no-confinement sentence. JA292; JA298-99. Under those circumstances, there is no "risk of injustice" to Bergdahl from allowing his convictions and sentence to stand, and Bergdahl does not even address the other factors bearing on vacatur. *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 864 (1988). Moreover, Bergdahl's request that this Court order dismissal of the charges against him with prejudice ignores that military precedent treats that remedy as one of last resort. If Bergdahl is right that Judge Nance's conduct tips the scales, even if further military justice proceedings were to occur, they would necessarily occur before a different military judge, remedying any injury from Judge Nance's participation.

## STATEMENT OF CROSS-APPEAL ISSUE

In addition to the issues raised in our opening brief, Bergdahl's cross-appeal presents the following additional issue:

4

Whether the district court properly denied relief on Bergdahl's claim that the military courts erred in finding no apparent unlawful command influence.

## ARGUMENT

## I.    The District Court Lacked Authority to Entertain Bergdahl's Claims

Bergdahl asked the district court to "declar[e] that his conviction and sentence were obtained in violation of the Fifth Amendment, R.C.M. 104(a)(1) and 902, and Rule 2.11 of the Rules of Judicial Conduct for Army Trial and Appellate Judges," and requested that the court order "his conviction and sentence be expunged." JA486-87. The district court obliged, concluding that Judge Nance was required to recuse under R.C.M. 902(a) and vacating not only Bergdahl's convictions and sentence, but also the judgments of the military appellate courts that reviewed Bergdahl's appeals. JA553.

District courts lack jurisdiction to vacate or alter the judgments of courts-martial, just as they cannot vacate or alter state-court judgments or the judgments of any other separate and independent court system. The power to vacate or alter court-martial judgments is reserved to the military appellate courts Congress has established under the UCMJ

5

and the Supreme Court.  In addition, even when district courts consider the validity of court-martial judgments in appropriate circumstances, their power to grant relief is limited to instances of jurisdictional or fundamental constitutional error, and Bergdahl does not identify any error of this type.  These principles dispose of Bergdahl's suit in its entirety—not only the appearance of partiality claim on which the district court granted him relief, but also the apparent unlawful command influence (UCI) claim that undergirds his cross-appeal.

## A.    District Courts Lack Jurisdiction to Entertain Suits Seeking to Vacate or Alter Court-Martial Judgments

**1.**  As our opening brief explained (at 24-38), the principles governing review of court-martial judgments are no different from those governing review of the judgments of state courts or other coordinate court systems.  A court-martial judgment may be appealed through the military court system, and from there reviewed by writ of certiorari by the Supreme Court.  *See* 10 U.S.C. §§ 866, 867; 28 U.S.C. § 1259.  Those courts exercise appellate jurisdiction over the court-martial judgment, and thus have authority to "revise[] and correct[] the proceedings," *Ortiz v. United States*, 585 U.S. 427, 436 (2018) (quoting *Marbury v. Madison*,

6

5 U.S. (1 Cranch) 137, 175 (1803)), including by vacating, reversing, or otherwise altering the court-martial judgment or the judgments of subordinate courts in the appellate process.

Once a court-martial judgment has become final on direct review, it is binding and has preclusive effect in future litigation. *See* 10 U.S.C. § 876; *Schlesinger v. Councilman*, 420 U.S. 738, 746 (1975). At that point, the judgment is not subject to vacatur or revision by a court outside the military system.[1]

Congress has never included district courts or federal courts of appeals in the military appellate process. They thus lack jurisdiction to vacate or alter court-martial judgments, just as they lack jurisdiction to vacate or alter state-court judgments. *See Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 291-92 (2005). A suit like

---

[1] Like other courts, military courts may revisit their *own* prior judgments through a writ of coram nobis. *See United States v. Denedo*, 556 U.S. 904, 914-15 (2009). Coram nobis is "a belated extension of the original proceeding during which the error allegedly transpired" that must be sought from a court with "statutory subject-matter jurisdiction over [the defendant]'s original judgment of conviction," *id.* at 913, and thus a district court cannot entertain a coram nobis petition seeking to vacate or alter a court-martial judgment.

Bergdahl's—a freestanding action seeking to vacate a court-martial conviction—thus cannot be entertained by a district court.

As we explained, the fact that district courts cannot vacate or alter court-martial judgments does not mean that they cannot ever consider the validity of those judgments.  Instead, when entertaining a suit seeking relief that would otherwise be barred by the preclusive effect of a court-martial judgment—such as a habeas petition seeking release from custody or a back pay suit—a court may determine that a court-martial judgment is not entitled to preclusive effect and thus does not bar the requested relief.  But these collateral proceedings—so called because they occur outside the appellate process—cannot and do not alter the judgment itself.  *See, e.g.*, *Coleman v. Thompson*, 501 U.S. 722, 730 (1991) (explaining that a federal court hearing a habeas petition "does not review a judgment, but the lawfulness of the petitioner's custody *simpliciter*").  Bergdahl's suit here is thus foreclosed because he does not seek—and the district court plainly did not grant—collateral relief in a suit otherwise within the district court's jurisdiction.

**2.**  Bergdahl's brief engages with none of these points.  He contends only that because there was jurisdiction in *Councilman* under

8

28 U.S.C. § 1331, that statute must necessarily confer jurisdiction over his suit as well.  Br. 8.  That misreads *Councilman* and misunderstands basic principles of the law of judgments and collateral review.

To begin, *Councilman* was not an action seeking to vacate or alter a court-martial judgment.  The court-martial at issue was ongoing, and so there was no judgment to vacate or alter.  Councilman instead sought an injunction against the Secretary of Defense to bar the continuation of his court-martial.  *Councilman*, 420 U.S. at 748-49. Section 1331 conferred jurisdiction over that suit because it is the jurisdictional basis for injunctive suits arising under federal law against federal officers alleged to be acting outside their authority.  *See Leopold v. Manger*, 102 F.4th 491, 494 (D.C. Cir. 2024); Act of Mar. 3, 1875, ch. 137, § 1, 18 Stat. 470, 470 (providing jurisdiction over "suits of a civil nature at common law or in equity" arising under the Constitution or federal laws or treaties); *Romero v. International Terminal Operating Co.*, 358 U.S. 354, 359 & n.5 (1959) (explaining that present-day § 1331 did not "change in any way the meaning or content of the Act of 1875"). That an injunctive action against a federal officer may be brought under § 1331 does not mean that § 1331 confers on district courts a power over

9

court-martial judgments they lack over every other judgment of a
coordinate court system. Indeed, § 1331 is also the jurisdictional basis
for injunctive suits against state officials, *see Ex parte Young*, 209 U.S.
123, 144 (1908); *Verizon Md., Inc. v. Public Serv. Comm'n of Md.*, 535
U.S. 635, 648 (2002), yet the Supreme Court has made clear that § 1331
does not allow district courts to vacate or alter state-court judgments,
*see Exxon*, 544 U.S. at 291-92.

Moreover, *Councilman* explains in detail the limited nature of the
collateral review federal courts may undertake. Despite its conclusion
that § 1331 provided jurisdiction over the suit before it, *Councilman*
emphasized that at that time *no* Article III court had "jurisdiction
directly to review court-martial determinations." 420 U.S. at 746.
Collateral review, by contrast, "seeks, as a necessary incident to relief
otherwise within the court's power to grant, a declaration that a
judgment is void," meaning "that for purposes of the matter at hand the
judgment must be deemed without res judicata effect." *Id.* at 746-47;
*accord id.* at 753. These "settled principles of the law of judgments

10

have been held from the start fully applicable to court-martial determinations." *Id.* at 747.[2]

As we explained, the crux of *Councilman*'s jurisdictional holding was the conclusion that the enactment of the finality provision of the UCMJ, 10 U.S.C. § 876, did not strip "subject-matter jurisdiction in suits for collateral relief." 420 U.S. at 749. Instead, the Court held, remedies "historically" available, such as "suits for backpay," remained viable. *Id.* at 751.[3] Suits seeking to vacate or alter court-martial judgments were never "historically" available. For example, the

---

[2] These points also illustrate the error in Bergdahl's assertion that "Article III courts have jurisdiction over cases like this if the error is fundamental." Br. 9. The presence or absence of fundamental error does not go to jurisdiction, but rather to the merits; if a plaintiff seeks truly collateral relief like habeas or back pay, but cannot establish fundamental error, the court denies relief on the merits rather than dismissing for lack of jurisdiction. But absent a request for collateral relief within the district court's jurisdiction, district courts lack jurisdiction to engage in collateral review.

[3] In a footnote, Bergdahl suggests that if the district court lacked jurisdiction, the appropriate course would be to transfer the case "to the Court of Federal Claims for adjudication of Sgt. Bergdahl's entitlement to pay under 37 U.S.C. § 204(a)(1)." Br. 9 n.4. Yet Bergdahl's complaint makes no claim under § 204(a)(1) and does not allege any pay to which he would be entitled, and more generally, § 204(a)(1) receives no mention anywhere in Bergdahl's district court filings. There is thus no claim within the Court of Federal Claims' jurisdiction that could be transferred. *See* 28 U.S.C. § 1491(a).

Supreme Court explained in 1885 that while a district court hearing a habeas petition from a military prisoner may "release the prisoner," it has no "appellate jurisdiction" over a court-martial and no power to "reverse the judgment of the military court," and the "effect the decision of the court may have on the proceedings, orders, or judgments of the military court, is incidental to the order releasing the prisoner." *Wales v. Whitney*, 114 U.S. 564, 570 (1885). Similarly, William Winthrop's seminal treatise on military law noted that a "court of the United States has no more appellate jurisdiction over offences tried by a court-martial—no more authority to entertain a rehearing of a case tried by it, or to affirm or set aside its finding or sentence as such—than has a court of a foreign nation." William Winthrop, *Military Law and Precedents* 50 (2d ed. 1920). Although courts-martial could not be "controlled or directed by the decree or mandate" of any Article III court, in a case asserting "the right to recover pay" that "depends upon the legality of the proceedings of a court-martial, the question whether the court has transcended its authority may be passed upon," though "these *collateral* methods of reviewing the action of military courts have not been frequent in practice." *Id.* at 52-53.

12

This Court recognized the same principle even before the enactment of Article 76 of the UCMJ. In *Goldstein v. Johnson*, this Court explained that a freestanding suit seeking to have a district court "declare null and void a court-martial proceeding" requested "relief of a kind which the District Court is without jurisdiction to grant." 184 F.2d 342, 342-43 (D.C. Cir. 1950) (per curiam); *see Brown v. Royall*, 81 F. Supp. 767, 767-68 (D.D.C. 1949). And the First Circuit—in a case *Councilman* cited with approval—likewise held that district courts could not entertain a suit seeking a declaratory judgment that a court-martial conviction was void. *Davies v. Clifford*, 393 F.2d 496, 496-97 (1st Cir. 1968); *see Councilman*, 420 U.S. at 747 n.13.

Ignoring these longstanding principles undermines Congress's considered judgments in crafting the military justice system, including the provision of a comprehensive scheme of appellate review in the military courts largely independent of the civilian court system. *See Ortiz*, 585 U.S. at 438. District courts do not serve as an additional layer of review at the conclusion of that process. Bergdahl's view would also give district courts greater power over court-martial judgments than Congress has granted to administrative boards empowered to

review and correct military records; those boards lack the power to vacate or alter court-martial judgments, and instead may only alter "the sentence of a court-martial for purposes of clemency." 10 U.S.C. § 1552(f)(2); *accord id.* § 1553(a).

Bergdahl cites without discussion (Br. 7) cases from this Court that he claims hold jurisdiction is proper. Our brief addressed several of those cases in detail, Gov't Br. 38-41, and Bergdahl does not engage with our analysis. The one additional case Bergdahl cites, *Priest v. Secretary of the Navy*, 570 F.2d 1013, 1016 (D.C. Cir. 1977), likewise does not discuss the source of a court's jurisdiction to entertain suits to vacate or alter a court-martial judgment. And in any event, this Court's decisions in *Goldstein* and *McKinney v. White*, 291 F.3d 851, 854, 856 (D.C. Cir. 2002), illustrate that this Court has likewise recognized that district courts lack jurisdiction to vacate or alter court-martial judgments.

Finally, for this suit against the United States, Bergdahl must identify a waiver of sovereign immunity "unequivocally expressed in statutory text." *FAA v. Cooper*, 566 U.S. 284, 290 (2012) (quotation omitted). Bergdahl does not identify any statute that purportedly

14

waives immunity here.  Section 1331 itself does not waive sovereign immunity, *e.g.*, *Swan v. Clinton*, 100 F.3d 973, 981 (D.C. Cir. 1996), and Bergdahl does not contest that the Administrative Procedure Act's waiver of immunity is inapplicable, *see* Gov't Br. 30.  The absence of any applicable waiver further confirms the district court's lack of jurisdiction over this action.

**B.    Bergdahl Identifies No Jurisdictional or Fundamental Constitutional Error That Could Authorize a Grant of Relief**

**1.    Judge Nance's Application Does Not Create Constitutional Error**

Even if Bergdahl's suit were a collateral action within the jurisdiction of the district court, a court may disregard the res judicata effects of a court-martial judgment and grant relief only when the court-martial judgment was infected by a jurisdictional or fundamental constitutional error; errors of military law or procedure are not sufficient.  Gov't Br. 43-46.  Moreover, violations of appearance-based recusal rules do not establish constitutional error, as those prophylactic rules are more protective than due process requires.  Gov't Br. 46-49.  Finally, the district court here expressly disclaimed any holding that Judge Nance harbored any actual conflict or bias, and acknowledged

15

that the appearance rule on which it granted relief was more protective than due process principles require. Gov't Br. 49-50; JA546, 551. These points provide an additional basis on which to reverse the district court's judgment in Bergdahl's favor.

Bergdahl offers little in response. He does not dispute that collateral review is limited to jurisdictional or fundamental constitutional errors, and couches his own argument in due process terms. Br. 1, 21. Though he repeats the claim that Judge Nance's conduct created an appearance of partiality, Br. 47-50, he nowhere explains how a rule-based appearance issue is tantamount to a due process issue. And he now minimizes the claim on which the district court actually granted him relief, arguing chiefly that Judge Nance's purported appearance of partiality makes him "more clearly entitled to prevail" on his claim of apparent unlawful command influence, Br. 44, and that the district court should have "integrate[d] its findings and conclusions" about an appearance of conflict "with the other evidence bearing on" apparent unlawful command influence, Br. 50-51.

The only clear constitutional argument Bergdahl asserts in defense of the district court's judgment is the passing assertion (Br. 46-

16

47) that Judge Nance had a pecuniary interest in employment as an immigration judge that violated Bergdahl's due process rights. The district court did not accept that argument for good reason.

The Supreme Court has held that due process bars a judge from adjudicating a case in which he has a "direct, personal, substantial, pecuniary interest" in the outcome. *Tumey v. Ohio*, 273 U.S. 510, 523 (1927). In the rare circumstances in which this standard has been met, a substantial pecuniary benefit would flow inexorably from the judge's decision in the case to the judge's pocket (or the coffers of an organization considered indistinguishable from the judge). For example, due process bars adjudications by judges who receive a portion of court fees only from a conviction or other judicial act, *e.g.*, *id.* (personal receipt of share of fees by judge); *Ward v. Village of Monroeville*, 409 U.S. 57, 59-60 (1972) (mayor also served as judge and fees went to city coffers, which mayor controlled); *Connally v. Georgia*, 429 U.S. 245, 249-50 (1977) (per curiam) (justice of the peace paid only through a fee for each warrant he issued), rendering them "financially dependent on" the outcome in a particular case, *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 251 (1980). Similarly, due process bars adjudications

17

by a judge who is the plaintiff in other litigation the value of which

would be directly influenced by the judge's decision in a case, *Aetna Life*

*Ins. Co. v. Lavoie*, 475 U.S. 813, 821-25 (1986) (state Supreme Court

justice as plaintiff in pending lawsuit raising same issue under state

law), or where an administrative adjudicator also owns a business and

can eliminate his competitors, *see Gibson v. Berryhill*, 411 U.S. 564,

578-79 (1973) (optometrists on state licensing board could not

adjudicate proceedings designed to revoke the licenses of "nearly half of

all the [other] optometrists" in the state).

More attenuated relationships have never been held to meet that

standard.  For example, in *Lavoie*, the Supreme Court held that there

was "no basis" to hold that state Supreme Court justices who were

putative members of a class action and thus might profit from their

decision in a case "were disqualified under the Due Process Clause," as

their interest was "highly speculative and contingent."  475 U.S. at 827.

Similarly, due process does not preclude judges whose tenure in office is

dependent on reelection or reappointment from presiding over cases—

even high-profile matters that may affect their prospects for continuing

to hold their positions.  *See Van Harken v. City of Chicago*, 103 F.3d

18

1346, 1353 (7th Cir. 1997); *Olson v. Olson*, 671 N.W.2d 64, 77 (Mich. Ct. App. 2003) (holding recusal unnecessary under state rule where plaintiff's counsel sat on "Judicial Tenure Commission" and thus judge's ruling could "implicat[e] his future judicial salary").

Here, Judge Nance's salary as a military judge was in no way dependent on or altered by a conviction or sentence in Bergdahl's case. Bergdahl's theory thus depends on the claim that the strength of Judge Nance's candidacy for the immigration judge position might have been dependent on the judgment in Bergdahl's case. But that supposition— aside from being questionable on its own terms—is far more attenuated than any theory the Supreme Court or any court of appeals has accepted as creating a due process problem. Immigration judges are not appointed by the President, but are instead "appointed directly by the Attorney General" and are subject to her supervision. *In re Al-Nashiri*, 921 F.3d 224, 235 (D.C. Cir. 2019). The application process called for Judge Nance (and all other candidates) to submit specific information about their skills and qualifications. *See* JA371-73. There is no basis to assume that the Attorney General or others involved in the hiring

19

process would ascribe any weight—much less dispositive weight—to Judge Nance's ultimate disposition of Bergdahl's case.

At a minimum, these assumptions demonstrate that any interest in the immigration judge position was too "speculative and contingent," *Lavoie*, 475 U.S. at 826, to constitute a "direct, personal, substantial, pecuniary interest" in the outcome of Bergdahl's court-martial, *Tumey*, 273 U.S. at 523. It is certainly at least as attenuated and contingent as a state judge handling a high-profile case in advance of a reelection campaign—or a federal judge handling high-profile litigation while aspiring to elevation to a higher court.

### 2. Apparent Unlawful Command Influence, Like an Appearance of Partiality, Is Not a Constitutional Issue

The same basic principles also dispose of Bergdahl's cross-appeal, which reiterates his arguments about "unlawful command influence" under military law. Here, too, Bergdahl does not allege a *constitutional* error that could warrant collateral relief. His sole claim is that comments by the President and then-Senator McCain constituted apparent—not actual—UCI. But apparent UCI, like other appearance doctrines, is a prophylactic statutory doctrine focused on concerns about

20

public perception of the military justice process.  Thus, even a successful claim of apparent UCI could not demonstrate a constitutional error that could form the basis for collateral relief.

    **a.**  Article 37 of the UCMJ has long prohibited persons subject to the Code from taking steps to interfere with the court-martial process. The operative provision at the time of Bergdahl's case provided that no convening authority or commanding officer "may censure, reprimand, or admonish the court or any member, military judge, or counsel thereof, with respect to the findings or sentence adjudged by the court, or with respect to any other exercise of its or his functions in the conduct of the proceeding," and further that "[n]o person subject to" the UCMJ could "attempt to coerce or, by any unauthorized means, influence the action of a court-martial or any other military tribunal or any member thereof, in reaching the findings or sentence in any case, or the action of any convening, approving, or reviewing authority with respect to his judicial acts."  10 U.S.C. § 837(a) (2012).

    Although the text of Article 37 makes no mention of "apparent" UCI, the military courts over time came to understand that provision as prohibiting both actual and apparent UCI.  *See United States v. Boyce*,

21

76 M.J. 242, 247-48 (C.A.A.F. 2017) (tracing development of apparent UCI doctrine).  As the names imply, the fundamental difference between the two types of UCI was whether the proceeding was actually affected by UCI.  Actual UCI occurs where there is "improper manipulation of the criminal justice process which negatively affects the fair handling and/or disposition of a case."  *Id.* at 247.  A defendant asserting an actual UCI claim thus must demonstrate both that "the court-martial proceedings were unfair to the accused (i.e., the accused was prejudiced)" and that "the unlawful command influence was the cause of that unfairness."  *Id.* at 248.

Apparent UCI, by contrast, does not require any showing that UCI actually affected the accused's case in any prejudicial way.  *Boyce*, 76 M.J. at 248.  Instead, "the prejudice involved . . . is the damage to the public's perception of the fairness of the military justice system as a whole."  *Id.* at 248-49.  Apparent UCI is thus judged through a test "similar" to that applied "in reviewing challenges to military judges for an appearance of conflict of interest," focusing on "the perception of fairness in the military justice system as viewed through the eyes of a reasonable member of the public" and asking whether "an objective,

22

disinterested observer, fully informed of all the facts and circumstances, would harbor a significant doubt about the fairness of the proceeding." *Id.* at 248 (quoting *United States v. Lewis*, 63 M.J. 405, 413 (C.A.A.F. 2006)); *see United States v. Bergdahl*, 80 M.J. 230, 234 (C.A.A.F. 2020) (articulating the same test).

As this outline illustrates, apparent UCI, like other appearance-based claims, is a statute-based doctrine designed to protect public confidence in the court-martial process even in the absence of any actual bias or unfairness to a litigant.  Such claims are not constitutional in nature: "The Supreme Court has never rested the vaunted principle of due process on something as subjective and transitory as appearance." *Del Vecchio v. Illinois Dep't of Corr.*, 31 F.3d 1363, 1371-72 (7th Cir. 1994) (en banc).

**b.**  The statutory foundation of apparent UCI is especially clear given Congress's actions in the years after Bergdahl's case.  Congress in 2019 amended Article 37 by adding (*inter alia*) a new subsection (c), which provides that "[n]o finding or sentence of a court-martial may be held incorrect on the ground of a violation of this section unless the violation materially prejudices the substantial rights of the accused."

23

10 U.S.C. § 837(c); *see Boyce*, 76 M.J. at 254-56 (Ryan, J., dissenting) (urging this approach). Although the CAAF has not addressed the effect of this amendment, *see United States v. Gilmet*, 83 M.J. 398, 401 n.2 (C.A.A.F. 2023), several military appellate courts have held that Congress has abrogated some or all of the CAAF's prior apparent UCI cases, *see In re Vargas*, 84 M.J. 734, 740-42 (A.F. Ct. Crim. App. 2024); *United States v. Davis*, 2024 WL 3179658, at *9 (A. Ct. Crim. App. June 24, 2024) (unpublished op.); *United States v. Gattis*, 81 M.J. 748, 754-55, 757 (N-M. Ct. Crim. App. 2021); *see also United States v. Eubanks*, 2024 WL 5058698, at *3 (C.G. Ct. Crim. App. Dec. 11, 2024) (noting but not resolving the issue).

Regardless of whether the apparent UCI doctrine survives today, the fact that Congress could abolish it underscores that the doctrine is statutory, not constitutional. Thus, even if Bergdahl were to succeed on an apparent UCI claim, it could not provide a basis to award him relief.

## II. Bergdahl's Claims Fail on The Merits Even if Entertained

The foregoing points establish that the district court lacked jurisdiction over both of Bergdahl's appearance claims, and moreover that those appearance claims, even if both cognizable and legally

correct, could not be a basis for collateral relief.  Either ground is sufficient to decide Bergdahl's case in its entirety in the government's favor without reaching the merits.

Even if this Court considers the merits, Bergdahl would not be entitled to relief—not the vacatur the district court granted, and certainly not the dismissal with prejudice Bergdahl now seeks. Bergdahl still does not dispute that he is guilty of the offenses to which he pleaded guilty or attempt to retract his statements accepting responsibility for his conduct and its consequences—including the injuries suffered by his fellow soldiers while searching for him.  He instead seeks to avoid consequences for his admitted misconduct by asking this Court to second-guess the considered judgments of the military courts about matters of military law.  Those arguments ignore elementary principles of collateral review and should be rejected.

### A.    The Military Courts Exhaustively Considered Bergdahl's Apparent Unlawful Command Influence Claim

While those in custody may be able to obtain relief from a military-court judgment by showing their claims did not receive full and fair consideration, because Bergdahl is not in custody, he must meet a

25

more demanding standard and show that his convictions are "void." *See, e.g.*, *Sanford v. United States*, 586 F.3d 28, 31 (D.C. Cir. 2009); Gov't Br. 50-51. The voidness inquiry turns on "the nature of the alleged defect, and the gravity of the harm from which relief is sought," with those factors "assessed in light of the deference that should be accorded the judgments of the carefully designed military justice system established by Congress." *Councilman*, 420 U.S. at 753. This Court has not had occasion to expand on what renders a judgment "void" under this standard, instead consistently affirming judgments in the government's favor even under the less deferential full-and-fair-consideration test applicable to habeas petitions. *See United States ex rel. New v. Rumsfeld*, 448 F.3d 403, 408 (D.C. Cir. 2006); *Sanford*, 586 F.3d at 33; *see also* JA514. Under that standard, "when a military decision has dealt fully and fairly with an allegation raised in that application, it is not open to a federal civil court to grant the writ simply to re-evaluate the evidence." *Burns v. Wilson*, 346 U.S. 137, 142 (1953) (plurality op.). The relevant question under that standard is thus "whether the military [courts] have given fair consideration to" Bergdahl's claims. *Id.* at 144.

26

**1.** This Court need not parse the differences between the *Councilman* and *Burns* standards because the military judgments here easily satisfy even the greater scrutiny of the full-and-fair consideration standard. As the district court correctly recognized, the military courts gave exhaustive consideration to Bergdahl's apparent UCI claim. Judge Nance "thoughtfully considered the application of the law to the facts alleged" by Bergdahl in three "well-reasoned" opinions addressing each of Bergdahl's three UCI motions. JA515; *see* JA19-27; JA36-43; JA144-48. The Army Court of Criminal Appeals (ACCA) similarly "conducted a thorough review of the military judge's unlawful command influence assessment," JA517, and ultimately rejected Bergdahl's claims in a "well-reasoned opinion," JA518, after reviewing Bergdahl's arguments de novo, *United States v. Bergdahl*, 79 M.J. 512, 520 (A. Ct. Crim. App. 2019). Finally, the CAAF granted discretionary review. Likewise applying a de novo standard, *Bergdahl*, 80 M.J. at 234, that court "conducted an exhaustive review of the court-martial proceedings" and "appl[ied] the relevant law to the facts," JA519, before rejecting Bergdahl's claim.

27

The district court also considered Bergdahl's apparent UCI claim on the merits and endorsed each of the CAAF's holdings. The court agreed that both Senator McCain and President Trump were capable of committing UCI and that their statements constituted "some evidence" of UCI. JA522-24. Examining each stage of the court-martial process, the court also agreed that "an objective, disinterested observer, fully informed of all the facts and circumstances, would not harbor a significant doubt about the fairness of the proceeding." JA524 (alteration and quotation omitted). As to the pre-trial phases, the district court noted that "the government's evidence of [Bergdahl]'s desertion and misbehavior before the enemy" and "the significant, compelling evidence regarding casualties incurred as a result of [Bergdahl]'s alleged desertion" supported the CAAF's decision, as "a member of the public informed of the serious facts which the government alleged in its charges would likely expect [Bergdahl] to be charged and that the case would be referred for court-martial proceedings," particularly given "the numerous casualties incurred as a result of [Bergdahl's] alleged desertion." JA525-27.

28

The district court further concluded that "an objective observer would not harbor a significant doubt about the fairness of [Bergdahl's] guilty plea," given that Bergdahl "concedes that there was a factual basis for his guilty plea." JA529. Similarly, the district court shared the CAAF's conclusion that an objective observer "would not harbor a significant doubt about the fairness of the sentencing" in Bergdahl's case. JA531 (alteration and quotation omitted). The court, like the CAAF, emphasized that "the discrepancy between the sentence [Bergdahl] received, and the potential penalties, as well as the sentences called for by Senator McCain and former President Trump, was significant," and that Bergdahl faced no "prejudice" in receiving the dishonorable discharge he requested. JA530. Finally, the court agreed that "given the aggravating factors in this case," an objective observer would recognize that "the convening authority's decision not to exercise his discretionary clemency authority . . . was a foregone conclusion." JA533 (quoting *Bergdahl*, 80 M.J. at 244).

**2.** The exhaustive consideration of Bergdahl's apparent UCI claims by three levels of the military courts more than suffices to demonstrate that Bergdahl's arguments were "fully and fairly"

considered by those courts. *Burns*, 346 U.S. at 142. It is therefore "not open to a federal civil court" to grant relief from a court-martial judgment based on its own "re-evaluat[ion] of the evidence." *Id.* And that rule would have special force here, where Bergdahl asks this Court to second-guess the CAAF's application of military law in the unique context of military proceedings. *See id.* at 140 ("Military law, like state law, is a jurisprudence which exists separate and apart from the law which governs in our federal judicial establishment."); *New*, 448 F.3d at 409 (noting that the CAAF "is free to refine and develop its prior decisions without our interference" (quotation omitted))

Bergdahl's objections to the CAAF's decision disregard these principles, and are ultimately grounded in his disagreement with the factors the CAAF considered in its analysis and how it weighed those factors. Bergdahl complains that the CAAF "was less than impressed" with one of his arguments and urges this Court to reweigh it in relation "to the other facts and circumstances," Br. 19, and similarly contends that the CAAF should not have relied so heavily on his voluntary decision to plead guilty, Br. 39-40, or his receipt of a sentence that included no confinement and a dishonorable discharge, as he requested,

Br. 41-42.  It is up to the CAAF—not a civilian federal court on

collateral review—to decide what weight to ascribe these various factors

under military law.

Similarly, Bergdahl devotes much of his brief (at 31-37) to

arguing that the CAAF improperly applied the "objective observer"

standard under the apparent UCI doctrine.  These arguments, too, ask

this Court to disregard the CAAF's own treatment of military law.  The

CAAF has long explained that apparent UCI considers whether "an

objective, disinterested observer, fully informed of all the facts and

circumstances, would harbor a significant doubt about the fairness of

the proceeding."  *Boyce*, 76 M.J. at 248 (quoting *Lewis*, 63 M.J. at 415).

Moreover, the CAAF "has not required the parties actually to produce

. . . credible evidence that any substantial segment of the general

population suffered any loss of confidence in the military justice

system," but instead "simply has assessed the aggravating and

mitigating facts and circumstances and then decided, in its own

estimation, whether . . . an intolerable strain upon the public's

perception of the military justice system" exists.  *United States v.

Horne*, 82 M.J. 283, 287 (C.A.A.F. 2022) (quotation omitted).

31

Bergdahl's apparent view is that the "notional observer" should be aware of only some of the relevant facts—those in "general knowledge." Br. 33 (quotation omitted).  Exactly what qualifies is unclear; Bergdahl's observer has "examined the law" and has "rough familiarity with the unique structure of the military justice system" or its "broad architecture," but is not familiar with "changes Congress made" to provisions of the UCMJ or what Bergdahl deems "military justice arcana," Br. 35-36 (quotation omitted), with common military practice in referring cases to courts-martial, Br. 34, or with how action on Bergdahl's case would be perceived by others in the military, Br. 17. Bergdahl's hypothetical observer is also aware of a Department of Defense report from 2000 supposedly documenting a policy of not prosecuting "repatriated [prisoners of war] unless they were guilty of misconduct during captivity," Br. 19-20, but would not be aware of "a congressional report" that describes the duties of the Commanding General of the United States Army Forces Command (the convening authority in Bergdahl's case), Br. 33; *see Bergdahl*, 80 M.J. at 241-42. The observer also would not know "information related to sensitive military operations," Br. 33—by which Bergdahl presumably means the

32

operational stresses the search for him created and the injuries suffered by fellow servicemembers while searching for him, *see* Br. 32—even though that information was part of the record of Bergdahl's sentencing.

The CAAF has never adopted that incoherent approach. Even before Bergdahl's case, the CAAF looked to an objective observer "*fully informed of all* the facts and circumstances." *Boyce*, 76 M.J. at 248 (emphasis added) (quoting *Lewis*, 63 M.J. at 415). For example, in *Boyce*, the CAAF considered comments made during a telephone call from the Chief of Staff of the Air Force to the convening authority in that case, as well as the content of that convening authority's retirement request, *id.* at 251-53, neither of which are matters of "general knowledge," Br. 33 (quotation omitted). As the district court explained, the CAAF's test "is not governed by the perceptions of just any hypothetical member of the public, but rather one who is fully informed of every factual aspect of the case." JA524 n.10.[4]

---

[4] While the CAAF is free to adopt its own standard as a matter of military law, the CAAF's approach is not meaningfully different from federal or state courts assessing appearance of partiality claims, which likewise consider an observer "apprised of all the relevant facts and

*Continued on next page.*

**3.** Bergdahl's specific objections in any event evaporate under scrutiny.  The CAAF afforded "little weight" to Bergdahl's argument about a supposed "practice" of not court-martialing prisoners of war because (*inter alia*) even assuming such a policy existed, Bergdahl "cites no specific instance of this 'practice' having been invoked when a soldier's intentional and criminal act of desertion resulted in" injuries to "fellow servicemembers." *Bergdahl*, 80 M.J. at 239 n.10; *see* JA527 n.11 (noting that Bergdahl's cited source says that desertion was "'aggressive[ly] prosecut[ed]' by the United States Military").

Bergdahl's arguments about clemency are likewise mistaken.  The CAAF concluded that a combination of five factors—including Bergdahl's guilty plea, the injuries suffered by his fellow soldiers while

---

circumstances" who "fully understand[s] those facts and circumstances," which commonly includes "underst[anding] the significance of those facts in light of the applicable legal standards and judicial practice" and "in their proper context."  Richard E. Flamm, *Judicial Disqualification: Recusal and Disqualification of Judges* § 16.5, at 292 (3d ed. 2017) (footnote omitted); *see, e.g.*, *United States v. Pearson*, 203 F.3d 1243, 1277 (10th Cir. 2000) ("knowing all the relevant facts"); *Clemens v. U.S. Dist. Ct. for the Cent. Dist. of Calif.*, 428 F.3d 1175, 1178 (9th Cir. 2005) (per curiam) ("knowledge of all the facts" (quotation omitted)); *Sensley v. Albritton*, 385 F.3d 591, 599 (5th Cir. 2004) ("knowing all of the facts"); *Parker v. Connors Steel Co.*, 855 F.2d 1510, 1524 (11th Cir. 1988) ("fully informed of the facts").

34

searching for him, and receipt of a non-custodial sentence—would lead a "disinterested observer" to conclude that the choice not to grant clemency was "a foregone conclusion unaffected by any public comments." *Bergdahl*, 80 M.J. at 244. Only after reaching that conclusion did the CAAF "observe"—correctly—that Bergdahl had not formally requested clemency. *Id.*; *see* JA302 (post-trial request for "disqualification of the convening authority" and "Staff Judge Advocate," and alternative request for "expeditious action and transmission of the record to the Army Court of Criminal Appeals"); JA307 (similar); R.C.M. 1106, 1110(c).

Bergdahl's objection to the CAAF's recognition that the convening authority in his case "had ready access to . . . casualty information" in deciding to refer Bergdahl's case to a general court-martial, *Bergdahl*, 80 M.J. at 241; *see* Br. 32, 33-34, fails for similar reasons. The CAAF explained that the convening authority was aware that he should "conclusively address[]" the question of casualties before making a referral, a task he could perform with "ready access to . . . casualty information" given that he commanded an infantry division in Afghanistan during Bergdahl's captivity, advised the Secretary of

35

Defense during negotiations over Bergdahl's return, and served as head of U.S. Army Forces Command. *Bergdahl*, 80 M.J. at 240-41 (quotation omitted). Bergdahl does not dispute the accuracy of the CAAF's statements. But in any event, the CAAF further explained that "[e]ven if" the convening authority "had no specific knowledge of any casualties," it would not change the result, based on five factors Bergdahl does not address. *Id.* at 241 n.15.

Bergdahl's arguments about his guilty pleas and sentence are even further afield. Bergdahl still does not dispute that he is in fact guilty of the offenses at issue, has not attempted to retract his concession that his "plea" and his "request for a punitive discharge" were voluntary, Dkt. No. 18-2 at 32, and has not suggested that his statements at the plea hearing taking responsibility for his crimes were false, JA291-92. Given those facts, Bergdahl's speculation about "various reasons why an individual might choose to plead guilty," Br. 39 (quotation omitted), is hardly relevant, particularly as Bergdahl repeats without correction the district court's factual error—noted in our opening brief, Gov't Br. 57 n.6—in asserting that all of his unlawful command influence motions had been denied before he decided to plead

36

guilty.  And Bergdahl's statements that he did not "ask to be demoted to the lowest pay grade" or request a forfeiture, Br. 42, ignore that the demotion was an automatic consequence of the dishonorable discharge he requested and that he never paid a penny of the forfeiture.  Gov't Br. 13 n.4.

## B.    Bergdahl's Late-Raised Allegations of an Appearance of Partiality Do Not Justify Relief

Unable to show that the military courts did not fully and fairly consider his apparent UCI claims on the merits, Bergdahl resorts to the argument that the CAAF's consideration of his apparent UCI claim could not be full and fair because it did not consider his accusations about Judge Nance's application to be an immigration judge.  Br. 44-52. That argument fails for two independent reasons.

**1.**  First, the military courts, applying their own procedural rules, concluded that Bergdahl failed to timely raise issues related to Judge Nance in the military courts.  Bergdahl does not address, much less dispute, the general rule that federal courts on collateral review cannot second-guess another court system's determination that a claim is untimely under its procedural rules.  *See Kendall v. Army Bd. for Corr. of Mil. Recs.*, 996 F.2d 362, 366 (D.C. Cir. 1993); *Martinez v. Ryan*, 926

37

F.3d 1215, 1224 (9th Cir. 2019). That alone disposes of Bergdahl's contentions: the district court was not free to override the ACCA's decision that Bergdahl's claim was not timely raised in the absence of a showing of cause for the default and actual prejudice, and Bergdahl does not attempt to meet that standard. *Martinez v. Ryan*, 566 U.S. 1, 9-10 (2012).

Even if the district court were free to gainsay the military courts' view of timeliness, nothing Bergdahl offers shows that those determinations are themselves void or are not the product of full and fair consideration. Bergdahl's brief still does not explain when he learned of Judge Nance's application—or why he waited until the day the CAAF issued its decision to seek that application. Bergdahl was plainly aware of the potential salience of Judge Nance's application on the day of the CAAF's decision. That salience would have been just as apparent the day before the CAAF's decision—and the day before that, and so on.

Bergdahl suggests that he was entitled to assume that Judge Nance "was going to retire" from all employment based on his statements at Bergdahl's hearing. Br. 13 (quotation omitted). Even if

that were true, it only underscores the need to know when Bergdahl learned that Judge Nance had not, in fact, fully retired from all employment. On Bergdahl's own theory, that awareness should have given him cause to inquire into Judge Nance's application.

Bergdahl's continued failure to address this fundamental question confirms that the ACCA was entirely within its rights to conclude that Bergdahl had failed to provide "valid reasons" for his delay in raising the issue. *Bergdahl v. United States*, 2020 WL 7316058, at *2-5 (A. Ct. Crim. App. Dec. 11, 2020) (unpublished op.); *see, e.g.*, *Ragbir v. United States*, 950 F.3d 54, 65 (3d Cir. 2020) ("What matters is whether a claim can be reasonably raised."); *cf. Murray v. Carrier*, 477 U.S. 478, 488 (1986) (explaining that excuse of procedural default in habeas requires that "the factual or legal basis for a claim was not reasonably available to counsel").

Nor does Bergdahl advance his argument by contending (Br. 20) that the CAAF should have considered his belatedly offered evidence in the first instance. Appellate courts—including this one—commonly decline to address issues raised for the first time in a post-judgment petition for rehearing or similar filing. *See, e.g.*, *United States v.*

39

*Whitmore*, 384 F.3d 836 (D.C. Cir. 2004) (per curiam); *Goland v. CIA*, 607 F.2d 339, 370-71 (D.C. Cir. 1978) (per curiam) (declining to grant rehearing to address "newly discovered evidence" and directing party to file motion for relief from judgment in district court).  The CAAF is no different: that court "will normally not consider any facts outside of the record established at the trial and the Court of Criminal Appeals," C.A.A.F. R. 30A(a) (2016), and "is generally unreceptive to motions … to supplement the record."  Eugene R. Fidell et al., *Guide to the Rules of Practice and Procedure for the U.S. Court of Appeals for the Armed Forces* § 30A.03[1] (23rd ed. 2024); *see* C.A.A.F. R. 30A(a) (2016) (requiring "good cause shown" and an explanation of "why the matter was not raised previously").

**2.**  Second, even if those hurdles could be overcome, the information about Judge Nance's conduct would not materially alter the relevant analysis.  Though Bergdahl criticizes the district court for not "integrat[ing] its findings and conclusions" about Judge Nance's purported appearance of partiality with "other evidence bearing on the UCI issue," Br. 50-51, he cites no military case blending the apparent UCI analysis and the appearance of partiality analysis as he suggests.

40

Those two doctrines address different ills. As discussed above, UCI is a unique military doctrine focused on actions by a person subject to the UCMJ to improperly influence a court-martial proceeding. 10 U.S.C. § 837 (2012). Here, neither Senator McCain nor President Trump—the only individuals alleged to have so influenced a proceeding—are alleged to have had any knowledge of Judge Nance's application, so it is difficult to see how that application could have any relevance to their actions. This Court should not break new ground in military law by merging these inquiries. *See United States v. Turner*, 75 M.J. 954, 958-63 (A.F. Ct. Crim. App. 2016) (analyzing allegations of ex parte communications between military judge and Special Victim's Counsel separately under R.C.M. 902(a) and UCI doctrine).

More generally, even considering any marginal effects stemming from an application unknown to the persons allegedly committing UCI would not render the CAAF's decision void. The CAAF—and the district court—relied on a host of factors to conclude that "'rather than being swayed by outside forces, the military judge [appeared] notably impervious to them.'" JA531 (quoting *Bergdahl*, 80 M.J. at 244). As discussed, those factors included (*inter alia*) the severity of Bergdahl's

41

offenses, the severe injuries suffered by multiple fellow soldiers while searching for him, his voluntary guilty pleas, and the imposition of a non-custodial sentence, as Bergdahl requested. *Bergdahl*, 80 M.J. at 238-44; JA524-34.

Finally, Bergdahl suggests that a judge of the ACCA panel that denied his coram nobis petition was required to recuse because of her husband's work as head of the Army's Criminal Law Division. Br. 11-12. But as the district court explained, the relevant court-martial rules (which Bergdahl does not cite) require that a judge recuse only when their spouse is "a party to the proceeding," is known "to have an interest, financial or otherwise, that could be substantially affected" by the outcome of the proceeding, or is "likely to be a material witness in the proceeding." JA535 n.13 (quoting R.C.M. 902(b)(5)). Bergdahl does not allege that the judge's spouse had any involvement in Bergdahl's proceeding, much less that any of these conditions were met.[5] And more generally, as the district court observed, federal judges likewise

---

[5] Indeed, Bergdahl's apparent theory is that the judge would have to recuse from all cases, insofar as he alleges that "[m]any of the Criminal Law Division's functions align it with the prosecution." Br. 12.

would have no obligation to recuse under similar circumstances. *Id.*

Bergdahl's arguments thus demonstrate no error, much less an error

that could render the ACCA's conclusions void.

### C. Bergdahl Fails to Defend the District Court's Vacatur Remedy, Much Less Justify Broader Relief

Finally, Bergdahl fails to defend the district court's remedial

analysis, much less make the case for a broader remedy than the one

the district court imposed.

**1.** Our brief explained that Bergdahl's allegations about Judge

Nance's purported appearance of conflict failed to justify the district

court's vacatur of his convictions, sentence, and subsequent appellate

judgments of the military courts under the factors articulated in

*Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847, 862 (1988).

Br. 52-59, 64-67. Bergdahl nowhere directly addresses the *Liljeberg*

factors or offers a defense of the district court's approach to those

factors. He suggests (Br. 50) that he was "prejudiced" by Judge Nance's

"failure to disclose" the application because he could not decide whether

to seek recusal or seek a new trial. But that is true of many undisclosed

potential appearance issues, which is why the first factor of the

43

*Liljeberg* analysis instead focuses more broadly on "the risk of injustice to the parties in the particular case." 486 U.S. at 864. Here, as discussed, Bergdahl cannot identify any injustice in being convicted of charges to which he voluntarily pleaded guilty and in receiving a noncustodial sentence, as he requested. And there is substantial prejudice to the government from vacatur—not only from the disruption of otherwise-final proceedings and the need to retry Bergdahl, but also from the risk that Bergdahl cannot be retried by the military courts, as he continues to argue. *See* Br. 55 & n.27.

Bergdahl likewise largely ignores the distinctions between Judge Nance's conduct and the conduct of the judge in *Al-Nashiri*, 921 F.3d 224. In concluding that the judge there had an appearance of conflict that warranted vacatur of his rulings, this Court emphasized that the Attorney General—who hires immigration judges—was so intimately involved with the military commission process as to be a "party to Al-Nashiri's case." *Id.* at 235. In a footnote, Bergdahl characterizes party status in *Al-Nashiri* as turning on "the detail of a single attorney to the prosecution team," Br. 49 n.24, but this Court identified multiple other factors highlighting the Attorney General's involvement, including his

44

"institutional role" in the military commissions and his control over the government's representation in subsequent appeals, *Al-Nashiri*, 921 F.3d at 236.  And Bergdahl compounds these errors in asserting that the party-status distinction is irrelevant because Department of Justice attorneys "played active supporting roles in the prosecution" here.  Br. 49 n.24.  Those "supporting roles" are not specified, and Bergdahl alleges nothing that would make the Attorney General a "party" to Bergdahl's court-martial.

These distinctions from *Al-Nashiri* are relevant both to whether an appearance of conflict existed at all and "the risk of undermining the public's confidence in the judicial process" in denying Bergdahl vacatur. *Liljeberg*, 486 U.S. at 864.  Moreover, Bergdahl offers no reason to believe that vacatur is necessary to avoid producing "injustice in other cases," given the idiosyncratic facts here.  *Id.*  And Bergdahl does not address how the *Liljeberg* factors apply in the context of collateral review, where the doctrine has not previously been applied and where special caution would be appropriate before upending the proceedings of an independent parallel court system.  *See, e.g.*, *Councilman*, 420 U.S. at 753; *United States v. Timmreck*, 441 U.S. 780, 784 (1979) (explaining

45

that "the concern with finality served by the limitation on collateral attack has special force with respect to convictions based on guilty pleas" (footnote omitted)); *cf. Al-Nashiri*, 921 F.3d at 233 (stating that mandamus was available to vacate rulings of military commission judge because of this Court's appellate jurisdiction over a final military-commission judgment).

Finally, Bergdahl's request for an even more sweeping remedy on his apparent UCI claim—not only vacatur, but dismissal of the charges against him with prejudice—is wholly meritless. Br. 52-60. Not only does that request for relief—which asks this Court to determine in the first instance the appropriate sanction under the CAAF's precedents for a novel violation of military law identified for the first time in federal court—underscore how far this suit strays from ordinary principles of collateral review, but it fails to grapple with the very military law it asks this Court to apply. The military courts have "long held that dismissal is a drastic remedy and courts must look to see whether alternative remedies are available," and that dismissal with prejudice "is an appropriate remedy where the error cannot be rendered harmless." *Lewis*, 63 M.J. at 416.

46

Here, the CAAF already held—and the district court agreed—that all the relevant factors other than Judge Nance's application did not give rise to apparent UCI that could warrant relief.  Even if Bergdahl is correct that his allegations about Judge Nance change that result, reassignment of his case to another military judge for further proceedings would fully address those concerns.  And far from there being "no practical purpose" to further proceedings, Br. 55, the district court correctly recognized that there is every reason to allow further proceedings given "the government's strong evidence in support" of the charges, "the seriousness of the charges," and "the extensive casualties that resulted from" Bergdahl's actions.  JA575 (quotation omitted).

At a minimum, even if this Court acts as a further appellate tribunal for the military courts, it still should not pretermit the military courts' consideration of an appropriate remedy.  The military courts did not address such questions given their disposition of Bergdahl's apparent UCI claim, and those courts would be better positioned to consider those issues in the first instance.

47

# CONCLUSION

For the foregoing reasons, the judgment of the district court should be vacated and the case remanded with instructions to dismiss. In the alternative, the judgment should be affirmed as to Bergdahl's apparent UCI claim and reversed as to Bergdahl's appearance of partiality claim.

Respectfully submitted,

BRETT A. SHUMATE
  *Assistant Attorney General*

MELISSA N. PATTERSON

 */s/ Brad Hinshelwood*
BRAD HINSHELWOOD
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7256*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-7823*
  *bradley.a.hinshelwood@usdoj.gov*

August 2025

48

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 28.1(e)(2)(A)(i) because it contains 9,399 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Century Schoolbook 14-point font, a proportionally spaced typeface.

*/s/ Brad Hinshelwood*
Brad Hinshelwood

**ADDENDUM**

# TABLE OF CONTENTS

10 U.S.C. § 837 (2012) .................................................................. A1

10 U.S.C. § 837 .......................................................................... A2

**10 U.S.C. § 837 (2012)**

**Art. 37. Unlawfully influencing action of court**

(a)  No authority convening a general, special, or summary court-martial, nor any other commanding officer, may censure, reprimand, or admonish the court or any member, military judge, or counsel thereof, with respect to the findings or sentence adjudged by the court, or with respect to any other exercise of its or his functions in the conduct of the proceeding.  No person subject to this chapter may attempt to coerce or, by any unauthorized means, influence the action of a court-martial or any other military tribunal or any member thereof, in reaching the findings and sentence in any case, or the action of any convening, approving, or reviewing authority with respect to his judicial acts.  The foregoing provisions of this subsection shall not apply with respect to (1) general instructional or informational courses in military justice if such courses are designed solely for the purpose of instructing members of a command in the substantive and procedural aspects of courts-martial, or (2) to statements and instructions given in open court by the military judge, president of a special court-martial, or counsel.

(b) In the preparation of an effectiveness, fitness, or efficiency report, or any other report or document used in whole or in part for the purpose of determining whether a member of the armed forces is qualified to be advanced, in grade, or in determining the assignment or transfer of a member of the armed forces or in determining whether a member of the armed forces should be retained on active duty, no person subject to this chapter may, in preparing any such report (1) consider or evaluate the performance of duty of any such member as a member of a court-martial, or (2) given a less favorable rating or evaluation of any member of the armed forces because of the zeal with which such member, as counsel, represented any accused before a court-martial.

A1

**10 U.S.C. § 837**

**§ 837. Command influence**

(a)

(1) No court-martial convening authority, nor any other commanding officer, may censure, reprimand, or admonish the court or any member, military judge, or counsel thereof, with respect to the findings or sentence adjudged by the court, or with respect to any other exercise of its or his functions in the conduct of the proceeding.

(2) No court-martial convening authority, nor any other commanding officer, may deter or attempt to deter a potential witness from participating in the investigatory process or testifying at a court-martial. The denial of a request to travel at government expense or refusal to make a witness available shall not by itself constitute unlawful command influence.

(3) No person subject to this chapter may attempt to coerce or, by any unauthorized means, attempt to influence the action of a court-martial or any other military tribunal or any member thereof, in reaching the findings or sentence in any case, or the action of any convening, approving, or reviewing authority or preliminary hearing officer with respect to such acts taken pursuant to this chapter as prescribed by the President.

(4) Conduct that does not constitute a violation of paragraphs (1) through (3) may include, for example—

(A) general instructional or informational courses in military justice if such courses are designed solely for the purpose of instructing persons on the substantive and procedural aspects of courts-martial;

(B) statements regarding criminal activity or a particular criminal offense that do not advocate a particular disposition, or a particular court-martial finding or sentence, or do not relate to a particular accused; or

(C) statements and instructions given in open court by the military judge or counsel.

A2

(5)

(A) Notwithstanding paragraphs (1) through (3), but subject to subparagraph (B)—

(i) a superior convening authority or officer may generally discuss matters to consider regarding the disposition of alleged violations of this chapter with a subordinate convening authority or officer; and

(ii) a subordinate convening authority or officer may seek advice from a superior convening authority or officer regarding the disposition of an alleged offense under this chapter.

(B) No superior convening authority or officer may direct a subordinate convening authority or officer to make a particular disposition in a specific case or otherwise substitute the discretion of such authority or such officer for that of the subordinate convening authority or officer.

(b) In the preparation of an effectiveness, fitness, or efficiency report, or any other report or document used in whole or in part for the purpose of determining whether a member of the armed forces is qualified to be advanced in grade, or in determining the assignment or transfer of a member of the armed forces or in determining whether a member of the armed forces should be retained on active duty, no person subject to this chapter may, in preparing any such report (1) consider or evaluate the performance of duty of any such member as a member of a court-martial, or (2) give a less favorable rating or evaluation of any member of the armed forces because of the zeal with which such member, as counsel, represented any person in a court-martial proceeding.

(c) No finding or sentence of a court-martial may be held incorrect on the ground of a violation of this section unless the violation materially prejudices the substantial rights of the accused.

(d)

(1) A superior convening authority or commanding officer may withhold the authority of a subordinate convening authority or

A3

officer to dispose of offenses in individual cases, types of cases, or generally.

(2) Except as provided in paragraph (1) or as otherwise authorized by this chapter, a superior convening authority or commanding officer may not limit the discretion of a subordinate convening authority or officer to act with respect to a case for which the subordinate convening authority or officer has authority to dispose of the offenses.